UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    Respondent-Appellee-Plaintiff, | | No. 02 CV 6998 |
| v. | | The Honorable Suzanne B. Conlon |
| DARRYL JOHNSON,<br>    Petitioner-Appellant-Defendant. | | Death Sentence Imposed |

**PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO RECONSIDER THE COURT'S MARCH 11, 2003 OPINION
AND ORDER IN LIGHT OF THE SUPREME COURT'S RULINGS
IN _MASSARO v. UNITED STATES_, _WIGGINS v. SMITH_, AND _ROMPILLA v. BEARD_**

Petitioner Darryl Johnson, by his counsel, Terence H. Campbell and Lorinda Meier Youngcourt, respectfully submit this response to the Government's Motion to Reconsider the Court's March 11, 2003 ruling in light of the Supreme Court's subsequent decision in _Massaro v. United States_, 538 U.S. 500 (2003).

Petitioner Johnson also hereby moves the Court pursuant to the United States Supreme Court's decisions in _Wiggins v. Smith_, 539 U.S. 510 (2003) and _Rompilla v. Beard_, 545 U.S. 374 (2005), to reconsider and set aside its March 11, 2003 judgment in favor of the United States on Johnson's ineffective assistance of counsel claims.

## I.     BACKGROUND

After exhausting his direct appeal, Johnson filed a Motion to Vacate Conviction and Sentence and for New Trial Pursuant to 28 U.S.C. §2255 and Rule 33 of the Federal Rule of Criminal Procedure (hereinafter referred to as "§ 2255 petition"). Johnson's first claim of error was a claim that his trial counsel provided ineffective assistance based on a number of demonstrated failures at

1

Johnson's penalty-phase hearing.  (*See* §2255 Petition, Claim I; Init. § 2255 Memo in Support at pp. 3-48; Reply Mem. at pp. 6-24).

On March 11, 2003, this Court entered a judgment denying most of the claims raised in Johnson's § 2255 petition, including his claim of ineffective assistance of counsel with respect to his penalty-phase hearing.  The Court held that Johnson had procedurally defaulted that claim by failing to raise it on his direct appeal based on certain Seventh Circuit caselaw which indicated that "[a]n ineffective assistance of counsel claim 'apparent from the trial record or from evidence that is a matter of public record' must be raised on direct review."  (March 11, 2003 Order at 6, citing *Bond v. United States*, 1 F.3d 631, 636 (7th Cir. 1993); *United States v. Taglia*, 922 F.2d 413, 418 (7th Cir. 1991); *see also*, March 11, 2003 Order at 5, citing *Guinan v. United States*, 6 F.3d 468, 471-72 (7th Cir. 1993)).  Based on this caselaw, the Court held that "Johnson's claim regarding the ineffectiveness of his trial counsel in failing to present this evidence [discrediting Warden Vanyur's testimony regarding the potential conditions of confinement] during sentencing should have been raised on direct appeal."  (March 11, 2003 Order at 7).[1]  The Court concluded, therefore, that Johnson had procedurally defaulted his ineffective assistance of counsel claims arising out of his counsel's failure to investigate and present certain evidence at his sentencing.  The Court further held that because of Johnson's failure to raise those issues on direct appeal, those issues could only be addressed in Johnson's § 2255 petition if Johnson could overcome the strenuous "cause and prejudice" standard announced in *United States v. Frady*, 456 U.S. 152, 170 (1982) applicable to issues which have been procedurally defaulted.  (March 11, 2003 Order at 7, 10) (noting that the

---

[1] Johnson had argued that there was no procedural default of his ineffective assistance claim.  *See*, Johnson's Initial Reply in Support of his § 2255 Petition at pp. 1-6.

2

"cause and prejudice standard is more rigorous than the plain error standard used on direct review," citing *Frady*, 456 U.S. at 170). Based on its finding of procedural default, the Court further concluded that Johnson had not pled a "colorable claim," and, therefore, also rejected Johnson's request for discovery under Habeas Rule 6. (*See*, March 11, 2003 Order at 10).

## II. ARGUMENT

### A. The Supreme Court's Decision in *Massaro* Requires The Court to Reconsider Its Ruling Denying Johnson's Ineffective Assistance of Counsel Claims

On April 23, 2003 – after the issuance of this Court's March 11, 2003 Order discussed above – the United States Supreme Court decided *Massaro v. United States*, 538 U.S. 500 (April 23, 2003), which expressly overruled the Seventh Circuit precedent on which this Court relied in finding that Johnson had procedurally defaulted his ineffective assistance of counsel claim: "We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, *whether or not the petitioner could have raised the claim on direct appeal*." *Massaro*, 538 U.S. at 504 (emphasis added). The Supreme Court explained that subjecting ineffective assistance claims to the *Frady* "cause and prejudice" rule "creates inefficiencies for courts and counsel, both on direct appeal and in the collateral proceeding." *Id.* at 505-07.

Accordingly, based on the Supreme Court's *Massaro* decision, it is necessary that the Court reconsider its March 11, 2003 ruling and address the merits of Johnson's ineffective assistance claims under the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984), *United States v. Cronic*, 466 U.S. 648 (1984), *Strickler v. Greene*, 527 U.S. 263 (1999), *Williams v. Taylor*, 529 U.S. 362 (2000), and their progeny, and not under the considerably heightened "cause and prejudice"

test of the procedural default doctrine.[2] As was discussed in Johnson's prior submissions, *Strickland*, *Cronic*, *Strickler*, *Williams*, and their progeny – as well as the more recent Supreme Court discussions in *Wiggins v. Smith* and *Rompilla v. Beard* (discussed below) – require only that Petitioner establish a "***reasonable probability***" that the outcome of the sentencing hearing may have been different. (*See, e.g.,* Init. § 2255 Memo in Support at 6, 33-35, 45). And, notably, the Supreme Court has made clear that a "reasonable probability" is a *lesser* burden than a preponderance standard. *Strickland* at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the trial."); *see also Williams,* 529 U.S. at 405-06 (2000) (O'Connor, J., concurring) (state court rejection of ineffectiveness claim on grounds that prisoner failed to establish by "a preponderance of the evidence" that the outcome would have differed would be contrary to clearly established precedent). Moreover, the Supreme Court's decision in *Cronic*, 466 U.S. 648 holds that where defense counsel "fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable" – and therefore, *no additional showing of prejudice is required*. Cronic, 466 U.S. at 659. Clearly, the lack of meaningful adversarial testing has been established as to the evidence offered by Vanyur which was, even according to the government,

---

[2] Although the Court briefly addressed the "merits" of Johnson's ineffective assistance of counsel claim on pages 8-10 of its March 11, 2003 Order, it did so solely in the context of its procedural default "cause and prejudice" analysis, which is an extremely strict standard. *E.g.*, *United States v. Frady*, 456 U.S. 152. Moreover, the Seventh Circuit has noted, "there remains some debate as to whether 'prejudice' under *Strickland* and 'prejudice' under the cause and prejudice standard are identical." *Belford v. United States*, 975 F.2d 310, 314 (7th Cir. 1992); *Freeman v. Lane*, 962 F.2d 1252, 1259 n.5 (7th Cir. 1992) (noting the debate). We submit that the caselaw, including the recent Supreme Court decisions in *Wiggins* and *Rompilla* (discussed herein), make clear that standards under *Cronic*, *Strickland* and their progeny are and markedly different from the cause and prejudice standard of *Frady*.

incomplete and quite possibly misled the jury on the critical issue of "future dangerousness."  (*See*, *e.g.*, Init. § 2255 Memo in Support at 4, 21-22, 31-32 (discussing *Cronic* in argument on ineffective assistance claim at pp. 3-48)).

We respectfully submit that a "reasonable probability" of a different result is certainly established by the factual assertions and legal authority already of record in this § 2255 proceeding – and could be further established through the requested discovery – based on trial counsel's ineffective assistance.  This is particularly so in light of the fact that ***the death penalty would have been avoided had the defense been able to "convince only one of twelve jurors to refuse to go along with ta death sentence.***"[3]  *Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996) (emphasis added).  *See also*, 18 U.S.C. § 3593(e) (requiring unanimous vote of jury to impose death sentence); *Strickland*, 466 U.S. at 706 ("counsel's general duty to investigate * * * takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death; claims of ineffective assistance in the performance of that duty should therefore be considered with commensurate care.") (Brennan, J., concurring in part and dissenting in part); *California v. Ramos*, 463 U.S. 992, 1009 (1983) (stressing need that capital juries receive only "accurate information for its deliberation in selecting an appropriate sentence").[4] .

---

[3] The bases for Petitioner's ineffective assistance of counsel claims are set forth in some detail in his Habeas Petition and supporting memoranda.  *See* Initial Mem. in Support at 3-48; Reply Mem. at 6-24.

[4] As Justice Stewart wrote for a plurality of the Court:

> [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long.  Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.  Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

B.      The Court Should Consider Recent Supreme Court Decisions In *Wiggins v. Smith* and *Rompilla v. Beard* Which Further Illuminate the Standards To Be Applied To Johnson's Ineffective Assistance Of Counsel Claim

In addressing the merits of Johnson's ineffective assistance claims as required by *Massaro*, we respectfully suggest that the Court should by guided by two Supreme Court decisions which were issued after this Court's initial ruling in March 2003: *Wiggins v. Smith*, 539 U.S. 510 (June 26, 2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005). Both *Wiggins* and *Rompilla* further support the relief requested by Johnson in this Court.

As the Court is aware, the central issue at the penalty phase of Johnson's trial was the issue of "future dangerousness" and, more particularly, the facilities, authority, and practices of the BOP that could eliminate the possibility of Johnson posing a future danger to anyone. This issue was the subject of significant testimony, and was the centerpiece of the arguments to the jury, both for the prosecution and the defense.

A significant aspect of Petitioner's ineffective assistance claim is that trial counsel did not adequately research the law or relevant facts in mitigation on this issue, and as a result, defense counsel utterly failed to confront the government's evidence during the penalty phase of his trial, nor did they put on evidence showing the falsity of the government witness's testimony in mitigation. For example, Johnson's trial counsel did not research, put on no evidence, offered no jury instructions, and failed to inform either the trial court or the jury about (a) the BOP regulations contained in 28 C.F.R. § 501.3, regarding the BOP's authority to impose strict conditions of confinement; (b) the conditions of confinement specifically allowed to be imposed under 18 U.S.C. § 3582(d); or (c) the actual BOP practices where inmates had been – *and were being* – incarcerated

---

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

under precisely the conditions of confinement that Warden Vanyur claimed were impossible. (Init. § 2255 Mem. in Support, Ex. B, ¶3). Both the BOP regulations contained in § 501.3 and § 541.41(b)(2), and the statutory authority conferred by§ 3582(d) make clear that the sentencing court and the BOP each have the independent authority to order and impose, for as long as necessary, precisely the strict conditions of confinement that Warden Vanyur testified could not possibly occur.

Moreover, there was evidence available to defense counsel that not only did the BOP and the courts have this authority, but such strict conditions of confinement were, in fact, being imposed and carried out on other inmates by Warden Vanyur's BOP at the very same time he testified unequivocally to Darryl Johnson's jury that those conditions were impossible to impose or carry out. And earlier in 1997, prior to Johnson's trial, the government had forcefully argued to the Second Circuit that both the court and BOP had the express authority, under those same BOP regulations and statutory provisions cited above, to impose precisely the strict conditions of confinement that were disavowed by Vanyur. (Ex. A hereto at 36-45, Govt. Br. in *United States v. Felipe*, Case No. 97-1155). None of this, however was brought to the attention of the Court or the jury. Indeed, Johnson's trial counsel did virtually nothing to confront Warden Vanyur's inaccurate and misleading testimony on this central issue of future dangerousness. Trial counsel's failure to investigate was then compounded by the fact that they allowed the government's BOP "expert," Warden Vanyur, offer, without objection, improper (and inaccurate) legal opinion testimony regarding the BOP's power and authority to impose and maintain these strict conditions of confinement for as long as necessary – an error that was specifically noted by the Seventh Circuit in Johnson's direct appeal. *United States v. Johnson*, 223 F.3d 665, 671 (7th Cir. 2000) ("To the extent that these policies are prescribed or codified in statutes or regulations, as distinct from being informal policies, this

testimony was improper ... Witnesses testify about fact, not law. When a legal proposition is relevant to the jury's consideration, the proper procedure is for the judge to instruct the jury on the proposition.").

Quite notably, the government shares the opinion that Johnson's counsel failed to subject the prosecution's future dangerousness case to meaningful adversarial testing. Thus, the government, in opposing Johnson's Petition for *Certiorari* on direct appeal, essentially conceded that defense counsel's failure to properly investigate and cross-examine Warden Vanyur as to the possible conditions of confinement was both ineffective and prejudicial. As the government stated,

> *[T]he existence of Section 501.3 and Section 3582(d) was relevant information for the jury*. Without that information, the jury may have held the *mistaken impression* that no legal authority existed to limit [Johnson's] communications and contacts while in prison in order to curtail his future dangerousness.

(Init. §2255 Mem. in Support, Ex. A, Govt. Opp. to *cert*. at 21) (emphasis added).[5] *See also*, *id.* at 14 (similar). The government claimed, however, that no relief was warranted on direct appeal because "*petitioner could have discovered it and presented it to the jury*." *Id.* (emphasis added); *see also*, *id*., Ex. A, Govt. Opp. to *cert*. at 26 ("Petitioner cannot make that necessary showing because *his counsel could readily have discovered Section 501.3 in the Code of Federal Regulations and Section 3582(d) in the United States Code.*") (emphasis added).

In that same brief, the government continued along this line stating:

> Johnson's counsel "injected the BOP's capacity to confine inmates into the proceedings by presenting the testimony of [Dr. Cunningham]. *Due diligence [i.e. effective assistance of counsel] required petitioner to inform himself of legal*

---

[5] In fact, it is well beyond a mere possibility; it is a near metaphysical certainty that the jury held this "mistaken impression" which utterly destroyed the heart of the defense's case at the penalty phase where the one and only issue was a decision between life in prison without any chance of release, or death.

> *authority relevant to that testimony, and nothing precluded him from raising Section 501.3 or Section 3582(d) in cross-examination of Warden Vanyur, surrebuttal testimony, or by requesting an instruction from the jury.*

(*Id.*, Ex. A, Govt. Opp. to *cert.* at 26) (emphasis added). These admissions by the government concede that the first prong of *Strickland* is satisfied.

Likewise, in that same brief before the Supreme Court, the government also set out the case that defense counsel's errors were prejudicial to Johnson. Significantly, the government acknowledged to the Supreme Court the impact and import that Warden Vanyur's faulty and now discredited testimony played during the government's closing argument to the jury at the penalty phase:

> The government did briefly contend in its rebuttal argument that, pursuant to BOP regulations, [Johnson] would not be sent directly to the control unit at ADX Florence but rather to an open population maximum-security penitentiary. Tr. 2645-2466, 2648. ***Those remarks (to which petitioner did not object) could have left the impression that, absent the death penalty, there was no legal authority to limit the defendant's communications. As we have acknowledged, there is in fact such authority*** * * *

(Init. § 2255 Memo in Support, Ex. A, Govt. Opp. to *cert.* at 28-29) (emphasis added). All of this shows that even the government recognizes that Johnson's trial counsel failed in their duty to provide effective assistance of counsel at the penalty phase of Johnson's trial.

The importance of adequate research and investigation of mitigation evidence by defense counsel in preparation for capital sentencing hearings – indeed the constitutional requirement for such research and investigation – has now been further emphasized and explained by the Supreme Court's decisions in *Wiggins v. Smith*, 539 U.S. 510 (June 26, 2003) and *Rompilla v. Beard*, 545

9

U.S. 374 (2005), both of which granted habeas relief based on trial counsel's inadequate research and investigation into mitigation.[6]

In *Wiggins*, the Supreme Court held that defense counsel rendered constitutionally ineffective assistance under *Strickland* by failing to properly research and present evidence in mitigation in that capital case. On the issue of "prejudice," the Court found that, ***"[h]ad the jury been able to place [the evidence omitted by defense counsel] on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."*** *Wiggins*, 539 U.S. at 537 (emphasis added, citation omitted). In finding counsel's performance constitutionally deficient, the Court relied, in part, on the facts that "[t]he ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor,'" and that counsel had failed to live up to those standards. *Id*. at 524 (emphasis in original), citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989). And importantly, the Court noted that in making this determination of potential prejudice, the Court must "evaluate the totality of the evidence – 'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s]*.'" *Wiggins*, 539 U.S. at 536, citing *Williams v. Taylor*, 529 U.S. at 397-98 (emphasis added by *Wiggins* Court). In Johnson's case, precisely the same analysis demands relief.

---

[6] Indeed, in both *Wiggins* and *Rompilla*, the Supreme Court found prejudicial ineffective assistance even under the stricter standard of review applicable to §2254 actions.

Notably, the issue of whether trial counsel's decision not to present and argue the omitted evidence was a "tactical decision" was hotly debated in *Wiggins*. *In Johnson's case, there is no such debate*. As Johnson's trial counsel has stated under oath:

> "There was no tactical or strategic decision by me not to elicit testimony ... about the BOP regulation contained in 28 C.F.R. 501.3, or about the conditions of confinement which could be and had in fact been imposed by federal courts under 18 U.S.C. Sec. 3582(d), or about the Luis Felipe case. Quite the opposite, had I known about the conditions of confinement and terms thereof which are permitted and/or had been imposed under 28 C.F.R. 501.3 and/or 18 U.S.C. Sec. 3582(d), or about the conditions of confinement imposed and implemented on Luis Felipe, for an indefinite period of time, I would have elicited that information ... because that information was crucially important to support our argument that the BOP had both the power, ability and practices in place to house Darryl Johnson for an indefinite period of time in a manner that would virtually eliminate any future dangerousness of Darryl Johnson."

(Init. § 2255 Memo in Support, Ex. B, Urdangen Affidavit, para. 6). In light of the facts now of record, Mr. Urdangen's affidavit, and the standards set forth in *Wiggins* – including under the various ABA standards referenced in the *Wiggins* decision – there can be no doubt now that the performance of Johnson's counsel on this aspect of the case fell below *Strickland*'s "objective standard of reasonableness," *Strickland*, 466 U.S. at 688.

In *Rompilla v. Beard*, the Supreme Court similarly held that trial counsel's failure to examine readily available public records that contained either mitigating evidence and/or evidence that would rebut aggravating evidence offered by the prosecution constituted ineffective assistance requiring relief on habeas (*i.e.* § 2254). Specifically, in *Rompilla*, trial counsel failed to review a readily and publicly available file on the defendant's prior conviction, portions of which the prosecution presented in aggravation in seeking the death penalty. *Rompilla*, 545 U.S. 374. In the instant case, Johnson's trial counsel failed to review and research readily and publicly available BOP regulations,

11

caselaw, statutory authority, and publicly available information on actual BOP practices relating to the primary contested issue at the penalty phase. Had they done that simple research, it would have shown plainly and unequivocally that the BOP had – and had exercised on multiple occasions – the authority to do exactly what government witness Warden John Vanyur declared to the jury it could not, would not, and did not do.

One need only substitute the phrase "BOP regulations, statutes, caselaw, and publicly-available information about BOP practices" for the word "transcript" or "file on the prior conviction" in the relevant portion of the *Rompilla* decision to see the striking similarity in counsel's failure here.

> With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices] they were seriously compromising their opportunity to respond to a case for aggravation. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense. Reasonable efforts certainly included obtaining the Commonwealth's own readily available [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices] to learn what the Commonwealth knew about the [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices], to discovery any mitigating evidence the Commonwealth would downplay and to anticipate the details of the aggravating evidence the Commonwealth would emphasize. Without making reasonable efforts to review the [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices], defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices] ... Without making efforts to learn the details and rebut the relevance of the [Commonwealth's evidence in aggravation], a convincing argument [by the defense] was certainly beyond any hope.

*Rompilla*, 545 U.S. at 385-86 (with bracketed phrase substituted for emphasis). *See also*, *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984) ("Effective representation hinges on adequate

investigation and pretrial preparation."); *United States v. Williamson,* 183 F.3d 458, 462-63 (5th Cir. 1999) ("[A] reasonable attorney has an obligation to research relevant facts and law.").

Later in its *Rompilla* opinion, the Court continued: "It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking." *Id.* at 389. Precisely the same analysis applies here where Johnson's counsel admittedly failed to conduct any research regarding the applicable BOP regulations, statutes, caselaw, and publicly-available information about BOP practices which were absolutely critical to a fair and effective presentation of the defense's mitigation case, as well as to directly rebut the government's case in aggravation.

In discussing its holding, the *Rompilla* Court stated:

> The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense. As the District Court points out, the American Bar Association Standards for Criminal Justice in circulation at the time of Rompilla's trial describes the obligation in terms no one could misunderstand in the circumstances of a case like this one:
>
> > "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty."

*Rompilla*, 545 U.S. at 387, citing 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.). The Court noted that "we long have referred to these ABA Standards as 'guides to determining what is reasonable," in finding counsel's performance constitutionally ineffective. *Id.* at 387, quoting *Wiggins*, 539 U.S. at 524.

Albeit without any intent, Johnson's trial counsel failed to live up to the standards required to render effective assistance at Johnson's penalty phase. Just as relief was given to Rompilla based on his counsel's failures, it is required here.

C.      If The Petition for Relief Is Not Granted On The Current Record, Discovery Should be Granted So That A Full Factual Record Can Be Developed

We respectfully submit that Johnson's ineffective assistance claim is manifest in the current evidence of record. If the Court deems that claim not proven by the current record, his claim is certainly colorable and, at a minimum, deserving of the opportunity for further factual development through discovery and a hearing. Indeed, the *Massaro* decision is also relevant to Johnson's request for discovery under Habeas Rule 6. Thus, the Supreme Court noted that "*[w]ithout additional factual development,* moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial." *Massaro*, 538 U.S. at 505. The Court specifically noted the importance of allowing discovery on such claims, stating, "[The district court is] the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial. The court may take testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance. *Massaro*, 538 U.S. at 505-06, citing *United States v. Griffin*, 699 F.2d 1102, 1109 (In a § 2255 proceeding, the defendant "has a full opportunity to prove facts establishing ineffectiveness of counsel, the government has a full opportunity to present evidence to the contrary, the district court hears spoken words we can see only in print and see expressions we will never see, and a factual record bearing precisely on the issue is created"); other citations omitted. (Petitioner is filing a Renewed Motion for Discovery along with this Response brief, and the discovery issue is more fully discussed in that filing.)

Accordingly, based on the Supreme Court's recent decision in *Massaro*, if Johnson's § 2255 Petition is not granted on the current evidence, Petitioner also respectfully requests that his motion for discovery relating to his claim of ineffective assistance of counsel be reconsidered and granted, in whole or in part.  *See Massaro*, 538 U.S. at 505-06.

## CONCLUSION

For all the reasons set forth above, Petitioner Darryl Lamont Johnson respectfully requests that the Court (1) set aside its judgment in favor of the government denying Johnson's § 2255 petition; and (2) grant Johnson's § 2255 petition based on a finding of ineffective assistance of counsel.  Alternatively, Johnson respectfully requests that the Court (1) set aside the judgment in favor of the government denying Johnson's petition; (2) grant Johnson's motion for discovery on his ineffective assistance of counsel claims; (3) hold an evidentiary hearing on Johnson's ineffective assistance of counsel claims; and (4) grant Johnson's § 2255 petition.

Respectfully submitted,

/s/ Terence H. Campbell
An attorney for Defendant Darryl Johnson

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, IN 47437-0206
(812)849-9852

### <u>CERTIFICATE OF SERVICE</u>

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies

that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing

(ECF), the following document:

1.      Petitioner's Response to Government's Motion to Reconsider The Court's March 11, 2003 Opinion and Order in Light of The Supreme Court's Rulings in *Massaro v. United States*, *Wiggins v. Smith*, and *Rompilla v. Beard*

was served pursuant to the District Court's ECF system as to ECF filers, including the United States

Attorney's Office.

/s/  Terence H. Campbell
Terence H. Campbell

# EXHIBIT A

97-1186

97-1155(L),
To be Argued by:
ALEXANDRA A.E. SHAPIRO

==============================================================

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket Nos. 97-1155(L) & 97-1186

--------

UNITED STATES OF AMERICA,

Appellee,

-v.-

LUIS FELIPE, also known as King Blood, also known as
Inka, and ZULMA ANDINO, also known as Queen Zulma,

Defendants-Appellants,

JOSE MELENDEZ, also known as King Epic; JOSE GABRIEL,
also known as King Teardrop; JOSE CRUZ, also known as
King Blaze; FRANSISCO SOTO, also known as King
Assassin; SAMUEL SANTIAGO, also known as King Sammy;
MICHAEL ANTONIO SANCHEZ, also known as King Bishop;
MILTON SOTO, also known as King Tee; LUIS TOLEDO, also
known as King Zer; MARIO QUINONES, also known as King
Bosco; NELSON TORRES, also known as King Nell; MICHAEL
IRIZARRY, also known as King Riot; RAYMOND MALDONADO,
also known as King Chino; CARMELO GARCIA, also known as
King Mello; REYNALDO PEREZ, also known as King Lil Rey;
JOSE TORRES, also known as King Chino; ALI FARES, also
known as King Tattoo; ELQUIADES MORALES, also known as
King Apollo; FIDEL AYALA-MERCADO, also known as King
Ito; ULYSSES CAMPOS, also known as King Puti; FELIX
CORDERO, also known as King Bear; DANIEL NAVARRO, also
known as King Scarface; GILBERTO RIVERA, also known as
King Cano; RICHARD RIVERA, also known as King Oreo;
WILSON CORTEZ, also known as King Chino; CARLOS DONIS,
also known as King Mousey; ANGEL FELICIANO, also known
as King Angel, also known as King A; ALBERTO FIGUEROA,
also known as King Drac; FRANSISCO TORRES, also known
as King Bollo; ROBERTO PUENTE, also known as King
Manole; MICHAEL GONZALEZ, also known as King Wolfie;
ANTONIO DELESTRE, also known as King Tone; SAMMY
FONSECA, also known as King Green Eyes and RICHARD
ACEVEDO, also known as King Richie,

Defendants.

--------

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

BRIEF FOR THE UNITED STATES OF AMERICA

---

MARY JO WHITE,
United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.

ALEXANDRA A.E. SHAPIRO,
ROBERT E. RICE,
     Assistant United States Attorneys,
          Of Counsel.

==================================================================

TABLE OF CONTENTS

PAGE

Preliminary Statement ..................................... 2

Statement Of Facts .......................................

 A. The Government's Case ............................

  1. An Overview Of ALKQN And
   Felipe's Role In That Organization ........

  2. The Murder Of William Cartegena And
   The Attempted Murder Of Margie Carderon ...

  3. The Attempted Murder Of Rafael Gonzalez
   And The Murder Of Victor Hirschman ........

  4. The Murder Of Ismael Rios And The
   Attempted Murder Of Ronnie Gonzalez .......

  5. The Conspiracy To Murder Pedro Rosario ....

 B. The Defense Case ................................

 C. Andino's Conviction ............................

  1. Andino's Offense Conduct ..................

   a. The Murder Of Islander Navaez ........

   b. The Assault Upon Annette Martinez ....

  2. Andino's Guilty Plea ......................

ARGUMENT:

POINT I--The District Court Properly Denied Felipe's
 Motion To Suppress His Prison Correspondence ........

 A. Relevant Facts ................................

  1. The Interception Of Felipe's Attica
   Correspondence .............................

  2. The District Court's Denial Of Felipe's
   Motion To Suppress His Attica

ıı

Correspondence ............................

B.   Discussion ......................................

    1.   Felipe's First Amendment Claim
         Is Meritless ..............................

    2.   The United States Postal Service
         Regulations Governing "Mail Covers"
         Do Not Provide Any Basis To Suppress
         Felipe's Attica Correspondence ............

POINT II--The District Court Properly Sentenced Felipe  ...

A.   Relevant Facts ..................................

    1.   The Sentencing Proceeding .................

    2.   The District Court's Order Denying
         Felipe's Rule 35 Motion ...................

B.   Discussion ......................................

    1.   The Court Was Authorized Under 18 U.S.C. §
         3582(d) To Impose The Special Conditions
         Of Confinement ............................

    2.   The Special Conditions Are Sufficiently
         Specific To Satisfy The "Specified
         Person" Language Of 18 U.S.C. § 3582(d)  ...

    3.   The Special Conditions Of Confinement
         Are Constitutional ........................

    4.   Felipe Was Not Improperly Denied
         Notice Or A Hearing .......................

POINT III--The District Court Properly Sentenced Andino  ..

A.   Relevant Facts ..................................

B.   Discussion ......................................

    1.   Andino Has Waived Her Right To Appeal
         Her Sentence ..............................

    2.   The District Court Was Authorized To Impose
         Consecutive Sentences For Each Count ......

iii

3.    The District Court's Refusal To Downwardly
      Depart Is Not Reviewable On Appeal   ........

CONCLUSION   .............................................

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket Nos. 97-1155(L) & 97-1186

- - - - - - - -

UNITED STATES OF AMERICA,

Appellee,

-v.-

LUIS FELIPE, also known
as King Blood, also known
as Inka, and ZULMA
ANDINO, also known as
Queen Zulma,

Defendants-Appellants,

JOSE MELENDEZ, also known as King Epic; JOSE GABRIEL,
also known as King Teardrop; JOSE CRUZ, also known as
King Blaze; FRANSISCO SOTO, also known as King
Assassin; SAMUEL SANTIAGO, also known as King Sammy;
MICHAEL ANTONIO SANCHEZ, also known as King Bishop;
MILTON SOTO, also known as King Tee; LUIS TOLEDO, also
known as King Zer; MARIO QUINONES, also known as King
Bosco; NELSON TORRES, also known as King Nell; MICHAEL
IRIZARRY, also known as King Riot; RAYMOND MALDONADO,
also known as King Chino; CARMELO GARCIA, also known as
King Mello; REYNALDO PEREZ, also known as King Lil Rey;
JOSE TORRES, also known as King Chino; ALI FARES, also
known as King Tattoo; ELQUIADES MORALES, also known as
King Apollo; FIDEL AYALA-MERCADO, also known as King
Ito; ULYSSES CAMPOS, also known as King Puti; FELIX
CORDERO, also known as King Bear; DANIEL NAVARRO, also
known as King Scarface; GILBERTO RIVERA, also known as
King Cano; RICHARD RIVERA, also known as King Oreo;
WILSON CORTEZ, also known as King Chino; CARLOS DONIS,
also known as King Mousey; ANGEL FELICIANO, also known
as King Angel, also known as King A; ALBERTO FIGUEROA,
also known as King Drac; FRANSISCO TORRES, also known
as King Bollo; ROBERTO PUENTE, also known as King
Manole; MICHAEL GONZALEZ, also known as King Wolfie;
ANTONIO DELESTRE, also known as King Tone; SAMMY
FONSECA, also known as King Green Eyes and RICHARD
ACEVEDO, also known as King Richie,

Defendants.

- - - - - - - -

2

## BRIEF FOR THE UNITED STATES OF AMERICA

- - - - - - - -

### Preliminary Statement

Luis Felipe, a/k/a "King Blood," a/k/a "Inka," appeals from a judgment of conviction entered on February 14, 1997, in the United States District Court for the Southern District of New York, following a five-week trial before the Honorable John S. Martin, United States District Judge, and a jury, and from an order entered by Judge Martin on April 29, 1997, denying his motion to modify his sentence. Zulma Andino, a/k/a "Queen Zulma," appeals from a judgment of conviction entered on March 12, 1997, in the United States District Court for the Southern District of New York, following her guilty plea before Judge Martin.

Indictment S16 94 Cr. 395 (JSM) (the "Indictment") was filed on March 13, 1996, in 68 counts. The Indictment charged Felipe, Andino and 16 co-defendants -- Jose Gabriel, a/k/a "King Teardrop," Samuel Santiago, a/k/a "King Sammy," Ulysses Campos, a/k/a "King Puti," Felix Cordero, a/k/a "King Bear," Daniel Navarro, a/k/a "King Scarface," Gilberto Rivera, a/k/a "King Cano," Richard Rivera, a/k/a "King Oreo," Wilson Cortez, a/k/a "King Chino," Carlos Donis, a/k/a "King Mousey," Alberto Figueroa, a/k/a "King Drac," Fransisco Torres, a/k/a "King Bollo," Roberto Puente, a/k/a "King Manole," Michael Gonzalez, a/k/a "King Wolfie," Antonio Delestre, a/k/a "King Tone," Sammy Fonseca, a/k/a "King Green Eyes," and Richard Acevedo, a/k/a

3

"King Richie" -- with various racketeering crimes in connection
with their membership in and association with the Almighty Latin
King Queen Nation ("the Latin Kings" or "ALKQN").[*]

Count One charged Felipe with participating in the
conduct of the affairs of a racketeering enterprise -- the Latin
Kings -- in violation of the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. § 1962(c). Count One
detailed seven racketeering acts committed by Felipe, involving
murder, attempted murder and conspiracy to commit murder. Count
Two charged Felipe with conspiring to conduct and participate in
the affairs of the racketeering enterprise described in Count
One, in violation of 18 U.S.C. § 1962(d). Counts Three and Four
charged Felipe with conspiracy to murder and murder,

---

[*] Indictment S16 94 Cr. 395 superseded S7 94 Cr. 395, which
was filed on June 28, 1995, and unsealed on July 6, 1995, and
charged Felipe, Andino, and 28 co-defendants in 80 counts, as
well as the original indictment, 94 Cr. 395, which was unsealed
on June 21, 1994, and charged Felipe, Andino, and 18 co-
defendants in 33 counts. Prior to trial, all of Felipe's co-
defendants pleaded guilty except for Sammy Fonseca, who was
severed from Felipe and pleaded guilty after Felipe was
convicted. Indictment S16 94 Cr. 395 named Felipe in 23 counts
and 10 racketeering acts; however, the Government elected to try
Felipe on only 18 counts and 7 racketeering acts. At trial, a
redacted version of Indictment S16 94 Cr. 395 was submitted to
the jury. The redacted indictment included only the crimes and
predicate acts on which Felipe was to be tried, excluded the
charges against his co-defendants, and renumbered the 18 counts
and 7 racketeering acts consecutively. Unless otherwise
specified, references in this brief to the Indictment relate to
the redacted superseding Indictment S16 94 Cr. 395, with respect
to Felipe, and to the unredacted superseding Indictment S16 94
Cr. 395, with respect to Andino. Both the redacted Indictment
and the unredacted Indictment are included in the appellants'
appendix.

4

respectively, in connection with the murder of William Cartegena, a/k/a "King Lil Man," in violation of 18 U.S.C. §§ 1959(a)(5), 1959(a)(1) and 2. Counts Five and Six charged Felipe with conspiracy to murder and attempted murder, respectively, in connection with the attempted murder of Margie Carderon, a/k/a "Queen Margie," in violation of 18 U.S.C. §§ 1959(a)(5) and 2. Counts Seven and Eight charged Felipe with conspiracy to murder and attempted murder, respectively, in connection with the attempted murder of Rafael Gonzalez, a/k/a "King Mousey," in violation of 18 U.S.C. §§ 1959(a)(5) and 2. Count Nine charged Felipe with participating in the murder of Victor Hirschman, in violation of 18 U.S.C. §§ 1959(a)(1) and 2. Counts 10, 11 and 12 charged Felipe with conspiracy to murder, murder, and attempted murder, respectively, in connection with the murder of Ismael Rios, a/k/a "King J.R." and the attempted murder of Ronnie Gonzalez, a/k/a "King Ronnie," in violation of 18 U.S.C. §§ 1959(a)(5), 1959(a)(1), and 2. Count 13 charged Felipe with conspiracy to murder Pedro Rosario, a/k/a "Pete Rock," in violation of 18 U.S.C. §§ 1959(a)(5) and 2. Counts 14 through 18 charged Felipe with using and carrying firearms during and in relation to the murders of William Cartegena, Victor Hirschman, and Ismael Rios, and the attempted murders of Rafael Gonzalez and Ronnie Gonzalez, in violation of 18 U.S.C. §§ 924(c) and 2.

Count 23 charged Andino with conspiracy to murder Islander Navaez, a/k/a "King Lex," in violation of 18 U.S.C. §§ 1959(a)(5) and 2. Count 34 charged Andino with conspiring to

5

commit assault, resulting in serious injury, upon Annette Martinez, in violation of 18 U.S.C. §§ 1959(a)(6) and 2. Count 57 charged Andino with using and carrying a firearm during and in relation to the conspiracy to murder Islander Navaez, in violation of 18 U.S.C. §§ 924(c) and 2.

On October 10, 1996, pursuant to a written plea agreement, Andino pleaded guilty to Counts 23, 34, and 57 of Indictment S16 94 Cr. 395. On October 22, 1996, trial commenced against Felipe. The trial concluded on November 19, 1996, when Felipe was convicted on the 18 counts in which he was named and all seven racketeering acts charged in Count One.

On February 14, 1997, Judge Martin sentenced Felipe to life imprisonment and a consecutive term of 45 years' imprisonment, to be followed by a five-year term of supervised release. Judge Martin also imposed mandatory special assessments totalling $900.*

On March 7, 1997, Judge Martin sentenced Andino to a term of 18 years' imprisonment, to be followed by a three-year term of supervised release. Judge Martin also imposed mandatory special assessments totalling $150.

Felipe and Andino are serving their sentences.

**Statement Of Facts**

A. The Government's Case

---

\* On April 29, 1997, Judge Martin denied Felipe's motion to modify his sentence with respect to certain special conditions of confinement imposed in connection with the sentence.

6

The evidence at trial amply demonstrated that from May 1993 until his federal arrest on June 21, 1994, Felipe was the leader of the New York State Chapter of the Latin Kings, a racketeering enterprise whose members and associates engaged in acts of violence, including murder, as well as armed robbery and narcotics trafficking. In that time period, Felipe conducted and participated in the Latin Kings' racketeering activity from a prison cell at the Attica Correctional Facility in Attica, New York ("Attica"), where he was imprisoned on state charges. Felipe's racketeering activity included three murders, three attempted murders and an additional conspiracy to murder. Felipe committed these crimes by directing his fellow Latin Kings to carry out the murders. Felipe communicated his murder orders to other Latin Kings during prison visits and through written correspondence.

The proof establishing the existence of the racketeering enterprise, Felipe's role in that enterprise, and his participation in the murders and other violent crimes included the testimony of two former Latin Kings: Alex Figueroa, a/k/a "King Sombra," who worked closely with Felipe, visited him at Attica numerous times, corresponded with him, and held a statewide leadership position in the ALKQN; and Nelson Torres, a/k/a "King Nell," a leader in the Brooklyn chapter of the Latin Kings, who carried out and attempted to carry out several of Felipe's murder orders and was a close associate of Jose Gabriel. Figueroa and Torres explained Felipe's role in the enterprise,

7

and testified, pursuant to cooperation agreements with the Government, about the various crimes that they had committed with other Latin Kings on orders from Felipe.

The accomplice testimony of Figueroa and Torres was corroborated in substantial detail by numerous other witnesses. These witnesses included a former Latin Queen (a female member of the organization), Margie Carderon, a/k/a "Queen Margie," whom Felipe had targeted for execution, as well as law enforcement officers who responded to crime scenes and executed search warrants at locations controlled by Latin King members, and forensic experts. In addition, the Government introduced physical evidence, including, inter alia, more than 60 letters written by or to Felipe while he was incarcerated at Attica, records from Attica documenting the visits by various ALKQN members to Felipe, the guns used to kill Victor Hirschman and Ismael Rios, the guns used during the attempted murders of Rafael Gonzalez and Ronnie Gonzalez, Latin King literature seized from various locations, and photographs of armed Latin Kings seized from various locations, including Felipe's cell.

## 1. An Overview Of ALKQN And Felipe's Role In That Organization

According to its own printed history, the national organization of the Latin Kings was founded in approximately 1945, in Chicago, Illinois. Felipe founded the New York State Chapter of the Latin Kings in 1986, while he was incarcerated at the Collins Correctional Facility in Helmuth, New York

8

("Collins"). Felipe wrote a manifesto, a constitution and a set of lessons -- or rules -- that Latin King members were to follow. (GX131, GX133-34). Felipe later created a set of lessons for Latin Queens to follow as well. (GX291). Over time, membership in the New York State Chapter grew, both within the prison system and on the streets of New York City, eventually numbering in the thousands. (Felipe PSR ¶ 21).

Under Felipe's leadership, a Latin King member's failure to adhere to the provisions of the constitution, manifesto, or lessons, or to obey any other Latin King rules, frequently led to disciplinary proceedings against him or her. Members who violated the enterprise's commandments were frequently given physical punishments, including a "B.O.S." -- a "Beating on Sight" -- or a "T.O.S." -- a "Termination on Sight" or assassination. (Tr. 208, 528-29).

Felipe designated a five-pointed crown as the ALKQN symbol and structured the ALKQN around that symbol. Felipe declared himself the leader of the Latin Kings, and gave himself various titles, including Godfather, or "Inka," and First Supreme Crown. Felipe created a statewide leadership structure with positions for four leaders working directly under Felipe: the Second Supreme Crown (the Prince or Vice President), the Third

---

"GX" refers to the Government's exhibits at trial; "Tr." refers to the trial transcript; "[Name] Br." refers to the named appellant's brief on appeal; "[Name] PSR" refers to the Presentence Report for the named appellant; "A." refers to the appendix to appellants' briefs on appeal; and "SA" refers to the Government's Supplemental Appendix.

9

Supreme Crown (the Warlord), the Fourth Supreme Crown (the Treasurer) and the Fifth Supreme Crown (the Adviser). In the time period relevant to the Indictment, Jose Gabriel, a/k/a "King Teardrop," was Felipe's Second Supreme Crown, Jose Melendez, a/k/a "King Epic" was Felipe's Third Supreme Crown, and Alex Figueroa was Felipe's Fourth Supreme Crown. (Tr. 525-31, 575-76; GX120, GX328R).

The Latin Kings in New York State were divided into different divisions, whose members and leaders were supervised by Felipe and the statewide leaders working under him. Each division or chapter held its own weekly meetings, and the Latin Kings in New York City held periodic "universal" meetings of all Latin Kings and Queens from the different parts of the state. At various times, each borough of New York City had its own chapter, which was controlled by five leaders with positions analogous to the statewide positions -- First Crown, Second Crown, Third Crown, Fourth Crown, and Fifth Crown. Similarly, within the prison system, the Latin Kings were divided into divisions and presided over by five leaders with titles identical to those of the New York City divisions. In the time period relevant to the Indictment, Jose Cruz, a/k/a "King Blaze," was Felipe's hand-picked "Supreme Crown Representative" of all the prisons within Riker's. (Tr. 172, 532, 534; GX120).

**2. The Murder Of William Cartegena And
The Attempted Murder Of Margie Carderon**

In the spring of 1993, William Cartegena, a/k/a "King

10

Lil Man," a Latin King, became a close associate of Felipe and they wrote several letters to each other. (GX301R-04R, GX306R). In or about June 1993, Felipe named Cartegena his Fourth Supreme Crown (Treasurer). (Tr. 201; GX 220A). In the spring of 1993, Felipe also ordered Cartegena to murder Rafael Gonzalez, a/k/a "King Mousey," whom Felipe viewed as a threat to his power over the Latin Kings.* (Tr. 208-09, 550-52, 1143; SA 7-11).

In that same time period, Jose Gabriel also corresponded with Felipe. By July 1993, Felipe had appointed Gabriel as his Second Supreme Crown. Over time, a dispute for power arose between Cartegena and Gabriel. (Tr. 220, 548; GX301R; SA 1-2). On July 17, 1993, Gabriel went to visit Felipe at Attica to discuss, among other things, his problems with Cartegena. During their visit, Felipe stated that he was unhappy with Cartegena because Cartegena had failed to murder King Mousey and because Cartegena had allegedly stolen money from the ALKQN treasury. Felipe ordered Gabriel to strip Cartegena of his leadership position and have him murdered. Felipe also ordered Gabriel to murder Margie Carderon, Cartegena's girlfriend, because she knew too much about Latin King criminal activities. (Tr. 555-57, 1094-96; GX124).

Gabriel notified Melendez and Figueroa about Felipe's orders to murder Cartegena and Carderon. (Tr. 556). Melendez and Figueroa decided, however, that they did not want to kill

---

* Felipe's motive for killing King Mousey is discussed more fully infra at p..

11

Cartegena until they had an opportunity to speak with Felipe directly and confirm his orders. In the mean time, they held Cartegena and Carderon under armed guard in an apartment in the Bronx for approximately one week. (Tr. 276-78, 557-58).

On July 25, 1993, Melendez and Figueroa brought Cartegena with them to visit Felipe at Attica. Felipe met first with Melendez and Figueroa, and confirmed his orders to strip Cartegena of his position and then kill him. Felipe also instructed Melendez and Figueroa to kill Carderon. (Tr. 275, 559-62; GX124). Felipe further advised Melendez that Cartegena would be given an opportunity to re-pay the money he had stolen, and that they should wait until he had repaid that money before killing him. Felipe subsequently met separately with Cartegena, relieved him of his position and instructed him to re-pay the stolen money. (Tr. 279, 561-63, 1096-97).

After Melendez, Figueroa and Cartegena returned to New York City, Cartegena stopped attending Latin King meetings, cut off contact with other Latin Kings and checked himself into the psychiatric ward of Woodhull Hospital. Carderon, who had by then separated from Cartegena, also stopped going to ALKQN meetings. (Tr. 281, 584-85). In August 1993, during visits by Melendez, Figueroa and Gabriel, and in letters to Figueroa and Gabriel, Felipe reaffirmed his orders to kill Cartegena and Carderon. (Tr. 572-73; SA 3-4). He also promoted Figueroa to Fourth Supreme Crown and Melendez to Third Supreme Crown. (Tr. 575-76, 1097-98; GX328R).

12

On September 5, 1993, Cartegena agreed to meet with Melendez, Figueroa and other Latin Kings at Melendez's former apartment at 1392 Boston Road, Bronx, New York, ostensibly to resolve their differences. In accordance with a pre-arranged plan, however, when Cartegena arrived at 1392 Boston Road, in the Bronx, he was taken at gunpoint by two Latin Kings to Melendez's old apartment. Once there, Cartegena was stripped of his clothing and tied up. Several other Latin Kings, including Melendez and Figueroa, subsequently arrived at the apartment. Fransisco Soto, a/k/a "King Assassin," assisted by Melendez and Figueroa, then choked Cartegena to death. Cartegena's body was placed in a bathtub, where Melendez and several other Latin Kings attempted to dismember it, severing Cartegena's head, his hands, and his Latin King tattoo from his body. The police discovered the body two days later, after another group of Latin Kings attempted to set it on fire to destroy the evidence. (Tr. 587-605, 358-66, 1104-05; GX105-06).

Within days of Cartegena's death, and pursuant to Felipe's instructions, Gabriel dispatched a group of Latin Kings from the Brooklyn chapter to kill Carderon. On four consecutive nights in early September 1993, Nelson Torres, Daniel Delgado, a/k/a "King Dusty," and two or three other Latin Kings went to Carderon's residence at 209 Harrison Avenue, Brooklyn, New York, to kill her. On each night, they brought two firearms to shoot Carderon but were unable to gain entrance to her apartment. Finally, on the fourth night -- September 11, 1993 -- Delgado

13

suggested that they burn the building.  While the other Latin Kings waited outside as lookouts, Delgado entered Carderon's apartment building, poured gasoline under her apartment door and in the hallways, and lit a match.  Carderon, who was home at the time, escaped the fire without injury.  Two of her neighbors in the building, however, suffered severe burns.  (Tr. 85-88, 116-20, 289-90, 1105-17).

> 3.   **The Attempted Murder Of Rafael Gonzalez And The Murder Of Victor Hirschman**

As set forth _supra_, Felipe ordered Cartegena's assassination because of, among other things, Cartegena's failure to carry out Felipe's order to kill Rafael Gonzalez, a/k/a "King Mousey."  Felipe viewed Mousey as a threat to his power over the ALKQN because Mousey had written and circulated his own set of Latin King lessons and had been holding himself out as the Godfather of the Latin Kings, thereby establishing a substantial following.  (Tr. 552, 1143).  Beginning as early as May 1993, Felipe wrote numerous letters to Cartegena and other Latin Kings insisting that Mousey must be killed.  (SA 7-11).  After Felipe stripped Cartegena and ordered the other Latin Kings to kill him, he instructed Gabriel to take care of Mousey's murder.  (Tr. 1098).

On October 10, 1993, Gabriel, Melendez and Figueroa visited Felipe at Attica, and Felipe insisted that Mousey must be killed.  (Tr. 617, GX124).  A few days later, as a follow-up to that discussion, Felipe sent Mousey's real name and address to

14

Gabriel and Melendez. (GX336R, 337R). Felipe also sent Figueroa several addresses where Mousey was believed to be living. (Tr. 643). On an evening in late October 1993, Melendez, Figueroa and approximately 6 other Latin Kings from the Bronx went to Brooklyn, where they met up with Gabriel, Torres and several other Latin Kings from Brooklyn. Approximately 10 of the Latin Kings then left in three separate cars, and drove around for several hours looking for Mousey in order to kill him. They could not locate Mousey and thus were unable to carry out Felipe's order. (Tr. 642-44, 1151, 1154-55).

On October 30, 1993, Figueroa attended a Latin King meeting in Brooklyn, and brought several guns with him. (Tr. 650). In the course of that meeting, Gabriel stated that he had information that later that night, King Mousey would be at one of the addresses that he had obtained from Felipe. Gabriel and Torres subsequently selected five Latin Kings from Brooklyn to kill King Mousey that evening, and Figueroa and others provided them with various weapons for the "mission." The weapons including a sawed-off Mossberg shotgun, and .32, .38, .45 and .9 millimeter calibre guns. (Tr. 1159-60, 650-53).

Osvaldo LaTorre, a/k/a "King Ozzie," one of the five Latin Kings chosen to kill King Mousey, drove four other Latin Kings -- Gilberto Rivera, a/k/a Richard Rivera, Carmello Garcia, a/k/a "King Mello," and Mario Quinones, a/k/a "King Bosco" -- to 120 Humboldt Street in Brooklyn, New York, where all but LaTorre entered the building to look for King Mousey. A Halloween party

15

was in progress, and King Mousey and Victor Hirschman, King Mousey's brother-in-law, were in attendance. After the four Latin Kings entered the party, Rivera shot and killed Hirschman, and Garcia fired shots at King Mousey, who sustained serious injuries and was hospitalized, but ultimately survived. (Tr. 655-58, 1161-64; GX166, GX177-80).

### 4. The Murder Of Ismael Rios And The Attempted Murder Of Ronnie Gonzalez

Ismael Rios, a/k/a "King J.R.," and Ronnie Gonzalez, a/k/a "King Ronnie," Latin Kings from Brooklyn, were closely allied. In the summer of 1993, Rios and Gonzalez got into a dispute with Gabriel, and refused to follow his orders. They also attempted to recruit other Latin Kings, including Torres, away from Gabriel, and told people that Gabriel could not have a leadership position because he had been kicked out of the Latin Kings while incarcerated at the Franklin Correctional Facility. (Tr. 1170-75, 617-18). Rios and Gonzalez also began to associate with King Mousey's group of Latin Kings in the Bushwick area of Brooklyn. (Tr. 617-19; SA 12).

Gabriel wrote Felipe about his problems with Rios, and in September 1993, during visits with Figueroa and Gabriel, Felipe issued T.O.S. orders against Rios and Gonzalez. (Tr. 617-19, 1175; SA 12-13). The T.O.S. orders were not carried out right away because of Felipe's continued focus on killing King Mousey. Over time, tension arose between Gabriel's faction of Brooklyn Latin Kings and Figueroa's and Melendez's faction of

16

Bronx Latin Kings. Felipe had also become frustrated with Gabriel, principally because of his inability to kill King Mousey. (Tr. 663-65). Thus, in mid-November 1993, Felipe issued an order stripping Gabriel of his position, and that order was carried out at a Latin King universal meeting on December 12, 1993. Felipe still intended to have Rios and Gonzalez killed. In order to deceive them into thinking that their dispute with Felipe's Supreme Crowns had ended, however, Felipe gave Rios and Gonzalez crown positions after Gabriel was stripped of his. (Tr. 665-70, 1176-81).

Felipe, Melendez and Figueroa only permitted Rios and Gonzalez to retain leadership positions in the Brooklyn chapter for a short time. On January 20, 1994, Melendez and Figueroa lured Rios and Gonzalez to a Latin King's apartment at 2324 Morris Avenue, in the Bronx, purportedly for a meeting of all the Crowns and Supreme Crowns. In accordance with a pre-arranged plan, a Latin King and two Latin Queens left the apartment and pretended to get into a dispute with members of a rival gang known as Unity. Melendez then sent Rios, Gonzalez and several other Latin Kings, including Ali Fares, a/k/a "King Tattoo," and Sammy Santiago, a/k/a "King Sammy" out of the apartment, allegedly to retaliate against the Unity members. When they went outside, however, Fares immediately gunned Rios down with a Tec-9 semi-automatic gun. Santiago, armed with a .25 calibre semi-automatic, attempted to kill Gonzalez, who ran away and escaped unharmed. (Tr. 680-86, 1182-86; GX196, GX198).

17

### 5. The Conspiracy To Murder Pedro Rosario

After he assumed the statewide Fourth Supreme Crown position, Figueroa maintained regular contact with Jose Cruz, Felipe's Supreme Crown Representative at Riker's. Cruz informed Figueroa that Pedro Rosario, a/k/a "Pete Rock," an inmate at Riker's, was considered an enemy of the ALKQN because he had slashed several Latin Kings at that jail. During one of his visits to Attica, Figueroa discussed Pete Rock with Felipe. According to Felipe, several Latin Kings from Riker's had written to him about this problem, and Felipe directed Figueroa to "put the green light on him," i.e., inform Latin Kings at Riker's that Rosario should be terminated on sight. (Tr. 675-76).

In January 1994, Cruz wrote to Felipe, reporting that Pete Rock had cut a Latin King and that the Latin Kings had put a "green light" on Pete Rock. (SA 14). In a letter dated February 1, 1994, Felipe wrote to Cruz that he was "real proud" of the way Cruz handled the situation with Pete Rock. On that same day, several Latin Kings attacked Pete Rock and slashed his face with a razor while they were in the cell block at the Bronx County courthouse. (Tr. 720-22, 729-30, 1342-46; GX380-81). In a subsequent letter to Felipe, Cruz reported the slashing of Pete Rock and assured Felipe that although Pete Rock had gone "into hiding," he would ultimately be "decapitated." (SA 14). On February 16, 1994, Felipe wrote a letter to Cruz expressing his pleasure about the slashing, stating "I'm glad about Pete Rock what I plesent [sic] and lovely surprise." (SA 15). In a letter

18

to Felipe dated February 22, 1994, Cruz wrote that he had decided that since Pete Rock had already been slashed in the face, and had begged for mercy, he issued an order taking the green light off of Pete Rock. (SA 16). Felipe marked that order "VOID," wrote "Overruled By King Blood" on the bottom of the letter and returned it to Cruz. (GX362R). In a letter dated February 27, 1994, Felipe explained that Pete Rock "must be T.O.S." because he had attacked Latin Kings and it was important that "[w]ho ever try to challenge our Nation in any kind of way or fashion must feel the Almighty Wrath." (SA 16).

**B. The Defense Case**

Felipe did not present any evidence.

**C. Andino's Conviction**

**1. Andino's Offense Conduct**

**a. The Murder Of Islander Navaez**

In or about late 1993, Andino became the First Supreme Crown, or Godmother, or "Luna," i.e., the leader, of the Latin Queens, and as such, had authority to order Latin Kings to carry out Felipe's orders to murder people. In the fall of 1993, Felipe ordered his underlings to murder Islander Navaez, a/k/a "King Lex," a Latin King who allegedly had violated ALKQN rules by cooperating with prison authorities and by warning another Latin King that he had been targeted for assassination. (Tr. 633-35). In December 1993, upon his release from prison, Navaez visited Andino and informed her that he was going to a pool hall in Brooklyn, New York. As soon as Navaez left her house, Andino

19

contacted Figueroa and verified that a T.O.S. order had been issued against Navaez. Andino then contacted another Latin King, known as "King Jose Green Eyes," directed him to murder Navaez, and informed him that Navaez was on his way to the pool hall. King Jose Green Eyes carried out Andino's order by shooting Navaez to death with a .9 millimeter semi-automatic pistol. (Tr. 672-75; Andino PSR ¶¶ 44-47).

### b. The Assault Upon Annette Martinez

In 1994, Andino learned that a woman named Annette Martinez was falsely claiming to be a high-ranking leader of the Latin Queens. Based upon that information, Andino ordered that Martinez be B.O.S.'d, i.e., beaten on sight. On or about May 7, 1994, at Andino's direction, a large group of Latin Queens, accompanied by several armed Latin Kings, travelled to the lower East Side of Manhattan to carry out Andino's order to assault Martinez. Andino and several other Latin Queens kicked and punched Martinez, causing serious injuries. During the assault, one of the Latin Kings fired shots at a male friend of Martinez who was present. (Andino PSR ¶¶ 48-51).

### 2. Andino's Guilty Plea

On October 10, 1996, following a careful and thorough proceeding pursuant to Rule 11 of the Federal Rules Of Criminal Procedure ("Fed. R. Crim. P."), the sufficiency of which is not challenged on appeal, Andino pleaded guilty pursuant to a written agreement. (A. 265-92). In her plea agreement, which she and her attorney executed on the day of her guilty plea, Andino

20

agreed to plead guilty to Counts 23, 34 and 57 of the Indictment. (A. 256-61). Those charges carried a combined statutory maximum sentence of 18 years' imprisonment, substantially less than the term of life imprisonment Andino would have faced had she proceeded to trial and been convicted on all count.

## A R G U M E N T

### POINT I

**The District Court Properly Denied Felipe's
Motion To Suppress His Prison Correspondence**

Felipe contends that the District Court erred in denying his motion to suppress his Attica correspondence. He argues that the Attica officials lacked reasonable cause to intercept that correspondence, and that they intercepted it without complying with New York State and federal Postal Service regulations. (Felipe Br. 15-34). These claims are meritless.

**A. Relevant Facts**

**1. The Interception Of Felipe's
Attica Correspondence**

From May 1993 through June 1994, Steven Kruppner, an Attica official, conducted a "mail watch" on Felipe, pursuant to which Felipe's incoming and outgoing correspondence was intercepted and copied. Sixty-five such letters were introduced at trial. (GX301R-GX365R).

The mail watch was initiated and renewed periodically in accordance with procedures set forth in regulations promulgated by the New York State Department of Correctional

21

Services ("DOC").* (Tr. 370; A. 154-66). Felipe's claim on appeal that the mail watch was initiated and renewed without sufficient cause, (Felipe Br. 15, et seq.), is baseless.

The officials at Attica initiated the mail watch in May 1993 because DOC officials had learned, as a result of Felipe's violation of several prison rules, that he was the leader of the Latin Kings. DOC had previously learned of the Latin Kings in 1988 and had deemed that organization an unauthorized prison gang because its members engaged in acts of violence and other illegal behavior within the prison system. (A. 103 & n.2).

In or about 1991, DOC officials learned that an unidentified inmate known as "King Blood" was the founder and leader of the New York State chapter of the Latin Kings, and that King Blood had written manifestos to recruit inmates at various prison facilities to join the Latin Kings. The manifestos were frequently distributed by means of unauthorized inmate-to-inmate correspondence or third-party correspondence.** In this same period, the members of Latin Kings in the prison system had increased, in part due to King Blood's recruiting efforts. (A. 104).

---

* The DOC regulations, entitled DOC Directive 4422, are reproduced in the Appendix. (A. 108-15).

** "Third party" correspondence, sometimes referred to as "kiting letters," occurs when an inmate corresponds with someone with whom the inmate is not permitted to correspond under DOC rules, such as an inmate at another correctional facility, by sending the correspondence via a third party. (A. 102 & n.1).

22

In April 1993, while incarcerated at Collins, Felipe was disciplined for violations of three different prison regulations. (A. 106). Officials at Collins determined that Felipe had attempted to send "kited" letters to an inmate at another facility with whom he was not authorized to correspond. In one letter, Felipe said that he would send a Latin Kings manifesto to the inmate via the inmate's mother. Felipe also said that an unidentified individual whom he believed had "betray[ed] the Latin Kings 'deserve[d] to die.'" (A. 105). Felipe included with another letter a Latin Kings recruiting manifesto, which referred to a "war" with Muslims at Collins in 1987, "war meetings" and the creation of an illegal inmate organization. Felipe's letters also indicated that he was King Blood. (A. 104-05, 116-52).

In May 1993, following an administrative hearing, dents, Felipe was transferred to Attica, a maximum security facility. (A. 106). On May 19, 1993, as a result of Felipe's prior violations of prisons rules and DOC's knowledge that he was the leader of the Latin Kings, DOC concluded that Felipe posed a security threat within the prison system. (A. 106). DOC officials therefore requested a "mail watch" on Felipe, pursuant to New York State's regulations governing correspondence by inmates incarcerated in the State's correctional facilities. (A. 106, 167). On May 20, 1993, the Acting Superintendent of Attica authorized a mail watch on Felipe, which was renewed every 60

23

days while Felipe was incarcerated at Attica. (A. 154-66).

### 2. The District Court's Denial Of Felipe's Motion To Suppress His Attica Correspondence

Before trial Felipe moved to suppress his Attica correspondence, arguing that surveillance and interception of that correspondence was unconstitutional, and violated New York State and federal postal regulations." The District Court denied the motion, concluding that surveillance and interception of Felipe's mail did not violate the Constitution because DOC had "'reasonable cause for suspicion,'" and that Felipe's claim that "prison officials did not comply fully with their own regulations" did not entitle him to suppression of the mail. (A.

---

* For examples of letters DOC officials relied upon to renew the mail watch, see, e.g., GX309R ("if I was in New York "Mousey" will be terminated by now . . . I want him terminated my style"); GX323R ("make that bitch little man feel it for you and me 'slow burn'"); GX350R ("do you remember J.R. 'R.I.P.' well he flip on teardrop and teardrop was running scare until I take care of business for him. . . also little man R.I.P. he stole some money from the treasure box claiming that it was for my lawyer I never see a penny but as you see he is no problem paid with his life").


** The Government submitted affidavits establishing that DOC officials in Albany reviewed Felipe's Attica mail on a regular basis; that they requested each renewal of the mail watch based on information gathered from Felipe's mail as well as other sources; and that this information indicated that Felipe appeared to be involved, through the Latin Kings, in illegal activities that threatened the security of the prison and included violent crimes outside the prison system. (A. 106-7; SA 18).
Felipe's claims that DOC officials did not recognize "during the year of surveillance in question [that his letters] depict[ed] incipient criminal activity, or unlawful activity" and that his mail "merely went into storage," (Felipe Br. 15-16, 26), is baseless. Felipe presented no evidence to support these claims or to refute the Government's evidence to the contrary.

24

254) (quoting United States v. Workman, 80 F.3d 688, 699 (2d Cir.), cert. denied, 117 S. Ct. 373 (1996)).  The District Court also rejected Felipe's claim that the mail watch violated United States Post Office regulations governing "mail covers," see 39 C.F.R. § 233.3, reasoning that "nothing in this regulation . . . suggests that it would apply to the actions of prison officials undertaken to address matters of prison security," or requires "the extreme remedy of suppression, even if there was a technical violation of the Post Office regulations."  (A. 254).

**B.    Discussion**

**1.    Felipe's First Amendment Claim Is Meritless**

Relying principally on DOC's alleged reliance on written orders that "set forth no factual basis" for the mail watch, and the duration of the mail watch, Felipe argues that his correspondence should have been suppressed because DOC violated his First Amendment rights.  (Felipe Br. 18-20, 23-29) (emphasis original).  These arguments are of no avail.

It is well-settled that "[l]awful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a 'retraction justified by the considerations underlying our penal system.'"  Wolff v. McDonnell, 418 U.S. 539, 555 (1974) (quoting Price v. Johnston, 334 U.S. 266, 285 (1948)); see also Sandin v. Conner, 115 S. Ct. 2293, 2301 (1995); Hudson v. Palmer, 468 U.S. 517, 524 (1984) ("[i]mprisonment carries with it a circumscription or loss of many significant rights").  Further, although "a prisoner is not wholly stripped of

25

constitutional protections when he is imprisoned for crime,"
Wolff v. McDonnell, 418 U.S. at 555, "[t]he fact of confinement
as well as the legitimate goals and policies of the penal
institution limits these retained constitutional rights." Bell
v. Wolfish, 441 U.S. 520, 546 (1979).

The standard for determining whether prison officials
have violated an inmate's constitutional rights is whether their
actions are "reasonably related to legitimate penological
interests." Turner v. Safley, 482 U.S. 78, 89 (1987); Thornburgh
v. Abbott, 490 U.S. 401, 409 (1989); Purnell v. Lord, 952 F.2d
679, 682 (2d Cir. 1992); Fromer v. Scully, 874 F.2d 69, 72 (2d
Cir. 1989). Applying Turner v. Safley, this Court has made clear
that interception of a defendant's prison correspondence does not
violate the First Amendment if prison officials had "good cause"
to inspect the defendant's mail. United States v. Workman, 80
F.3d at 699.

The defendant in Workman, like Felipe, argued that
letters he had written to co-conspirators while in prison should
have been suppressed because the monitoring of his prison mail
violated the First and Fourth Amendments. This Court rejected
that claim, holding that prison officials may monitor an inmate's
mail if they have reasonable cause to suspect that the inmate is
engaging in illegal activities. Workman, 80 F.3d at 699 (no
First Amendment violation because prison officials had "good
cause" to inspect defendant's mail, based upon monitored
telephone conversations in which he discussed on-going drug deals

26

and contract murders).*

The District Court correctly denied Felipe's motion to suppress his Attica correspondence because the Attica officials had reasonable cause to inspect his mail. As set forth supra, the mail watch was initially authorized only after DOC officials had learned that Felipe was the leader of the Latin Kings, a disruptive and violent prison gang, that he was actively engaged in encouraging attacks on other inmates and recruiting inmates to join the Latin Kings, and that he was violating prison regulations. The renewals of the mail watch were authorized because DOC learned from Felipe's correspondence and other sources that he was involved, through the Latin Kings, in illegal activities that threatened the security of the prison system, and that he was ordering Latin Kings outside the prison system to commit acts of violence, including murder.

Felipe does not seriously dispute that the facts discussed above constitute reasonable cause to search his mail. Instead, he contends that suppression is warranted because DOC failed to comply with its regulations governing inmate mail, which require that authorization for inspection of an inmate's outgoing mail "set forth specific facts forming the basis for the

---

* To the extent Felipe relies on Procunier v. Martinez, 416 U.S. 396 (1974), (see Felipe Br. 18, 28), his reliance is misplaced. As this Court observed in Workman, the touchstone for assessing prisoners' constitutional claims is Turner v. Safley, a Supreme Court case that "is considerably more deferential to restraints imposed by prison officials on inmate rights than the standard of Procunier v. Martinez." Workman, 80 F.3d at 698.

27

action." (Felipe Br. 19-20). This claim is baseless.

Even assuming that the written authorizations for Attica's mail watch on Felipe were not in technical compliance with DOC's regulation, the Government would not be precluded from introducing Felipe's letters at trial because his constitutional rights were not violated. In Workman, this Court rejected the claim of a defendant who, like Felipe, argued that he was entitled to suppression because "the Superintendent of the prison failed in his written authorization of the mail surveillance to 'set forth specific facts forming the basis for the action.'" Workman, 80 F.3d at 699 n.7. In so doing, this Court held that such a "technical violation of the prison's regulations" does not constitute grounds for suppression:

> Where, as here, there is sufficient basis for the decision to institute a mail watch, the Constitution does not in our view require suppression of the evidence gathered during the surveillance merely because the relevant supervising official, when approving the mail watch, failed to restate in writing the facts underlying the decision.

Id.; cf. Purnell v. Lord, 952 F.2d at 683-84 (DOC correspondence regulations, i.e., Directive 4422, do not create due process liberty interest in inmate correspondence).

Felipe contends that "the position taken by [this

_____

   * In any event, it is well settled that "where evidence seized by state officers is subsequently offered in a federal criminal proceeding, the seizure need not satisfy state law requirements." Workman, 80 F.3d at 694; see, e.g., United States v. Smith, 9 F.3d 1007, 1014 (2d Cir. 1993); United States v. Rowell, 903 F.2d 899, 901-02 (2d Cir. 1990).

28

Court] in the Workman case . . . is indefensible and is not supportable in legal theory or by any convincing body of authority." (Felipe Br. 24). Felipe's apparent suggestion that this Court discard Workman fails, however, because "'prior opinions of a panel of this [C]ourt are binding . . . in the absence of a change in the law by higher authority or [an] . . . in banc proceeding (or its equivalent).'" United States v. Jackson, 59 F.3d 1421, 1423-24 (2d Cir. 1995) (quoting United States v. Moore, 949 F.2d 68, 71 (2d Cir. 1991), cert. denied, 503 U.S. 988 (1992)), cert. denied, 116 S. Ct. 1428 (1996).

Felipe's claims that the duration of the mail watch was unduly lengthy and was extended despite DOC officials' failure to read Felipe's letters, (Felipe Br. 26-28), are specious. Felipe did not dispute below the facts established by the Government regarding the basis for continued inspection of his mail. He now claims for the first time on appeal, however, that there was an insufficient basis for DOC to renew the mail watch; that his letters "were routinely copied; but . . . not read for content"; and that "[t]he copied letters wound up in an Albany office of [DOC] and were apparently not reviewed until it was discovered much later on by federal authorities that a cache of possibly vital, but unculled, information was in State storage." (Felipe Br. 26). As demonstrated supra, Felipe's belated claim finds no support in the record and is belied by the evidence presented

29

below.  (See supra [  ]).    2.    **The United States Postal**
**Service Regulations**
**Governing "Mail Covers" Do Not Provide Any**
**Basis To Suppress Felipe's Attica Correspondence**

Felipe also argues that his letters should have been

suppressed based on the DOC's putative failure to comply with

United States Postal Service regulations governing "mail covers."

See 39 C.F.R. § 233.3.  Felipe claims that the DOC was required

to obtain written authorization from the Postal Service to

inspect Felipe's mail, and that DOC's failure to do so entitled

him to suppression of the letters.  (Felipe Br. 29-34).  This

claim is meritless.

At the outset, the factual contention on which Felipe's

claim rests is simply wrong.  The United States Postal Service

regulation requiring law enforcement agencies to request

authorization in writing from the Postal Service for a "mail

---

Furthermore, Felipe's suggestion that a hearing was needed
"to determine the factual basis for the 60-day renewals," (Felipe
Br. 27), is completely specious.  The Government submitted an
affidavit and other supporting documents establishing the basis
for Attica's initial decision to inspect Felipe's mail, as well
as each of the subsequent renewals of that decision.  (E.g., A.
106-07).  By contrast, Felipe did not submit an affidavit based
on personal knowledge demonstrating that there was an issue of
material fact in dispute as to the basis for the 60-day renewals.
Accordingly, his moving papers in the District Court were
deficient as a matter of law.  See, e.g., United States v.
Gillette, 383 F.2d 843, 848-49 (2d Cir. 1967) (to raise a factual
issue warranting a suppression hearing, a defendant must, at a
minimum, present that issue through an affidavit of an individual
who has personal knowledge of the relevant facts).  Similarly,
Felipe's argument that a hearing was necessary to establish
whether he was aware of the DOC regulations authorizing
inspection of inmate mail, (Felipe Br. 28-29), is equally
specious.  He failed to file an affidavit on that issue as well,
and in any event, he cites no authority entitling him to relief
on that basis.

30

cover" does not apply to the DOC's inspection of inmates' mail. Indeed, the United States Postal Service Manual makes it abundantly clear that DOC is entitled to deliver mail to inmates in accordance with DOC's internal rules and regulations:

> Mail addressed to patients or inmates at institutions is delivered to the institution's authorities who, in turn, deliver the mail to the addressee under the institution's rules and regulations.

United States Postal Service, Postal Operations Manual § 615.1 (Aug. 1, 1996).*

In any event, even assuming that the United States Postal Service regulations governing mail covers applies to correctional facilities' handling of inmate mail, and that DOC failed to comply with those regulations, Felipe would not be entitled to suppression of his Attica letters. Suppression is not a remedy for violations of agency regulations that do not raise constitutional questions. See United States v. Caceres, 440 U.S. 741, 743-44 (1979); United States v. Choate, 619 F.2d 21, 23 (9th Cir.) (rejecting defendant's claim for suppression based upon evidence gathered pursuant to mail cover; "where violation of an agency regulation does not raise a constitutional question and defendant 'cannot reasonably contend that he relied on the regulation, or that its breach had any effect on his conduct,' he may not in a criminal prosecution 'seek judicial enforcement of the agency regulation by means of the exclusionary

---

*  The Postal Operations Manual is incorporated into the Code of Federal Regulations. See 38 C.F.R. § 211.2(a)(3).

31

rule.'"), cert. denied, 449 U.S. 951 (1980).

In United States v. Caceres, the Government introduced into evidence tape recordings of the defendant's conversations with an Internal Revenue Service ("IRS") agent, two of which had been made without prior approval of the Department of Justice, as required by IRS regulations. The Supreme Court rejected the defendant's claim that the tape recordings should be suppressed on that basis, holding that the Government's violation of the IRS regulations did not entitle the defendant to such relief because "the violations of agency regulations [in the case] do not raise any constitutional questions." Caceres, 440 U.S. at 752. The Court reasoned that

> we are dealing with a criminal prosecution in which respondent seeks judicial enforcement of the agency regulations by means of the exclusionary rule. That rule has primarily rested on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals throughout the community outweighs the importance of securing the conviction of the specific defendant on trial. In view of our conclusion that none of respondent's constitutional rights has been violated here, either by the actual recording or by the agency violation of its own regulations, our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case.

---

Cf. United States v. Piervinanzi, 23 F.3d 670, 682 (2d Cir. 1994) (United States Attorney's Manual guidelines "provide no substantive rights to criminal defendants"), cert. denied, 513 U.S. 904 (1994); United States v. Valencia, 609 F.2d 603, 636 n.28 (2d Cir. 1979) (the Government's failure to comply with regulations that are "not required by either the Constitution or statute" does not violate due process), cert. denied, 446 U.S. 940 (1980).

32

Id. at 754. Similarly, Felipe's constitutional rights were not violated in any way. See supra pp. 23-28. Under Caceres, therefore, any violation by DOC of the United States Postal Service regulations do not entitle him to suppression of the letters.

## POINT II

### The District Court Properly Sentenced Felipe.

Felipe also challenges the District Court's decision at sentencing to impose special conditions of confinement limiting his ability to communicate with other inmates, ALKQN members and non-family members. Felipe's argues that the District Court lacked authority to impose these special conditions and that they were unconstitutional. (Felipe Br. 35-50).

As demonstrated below, this claim is without merit. In light of the extensive trial evidence of Felipe's ability to order murders while he in solitary confinement at Attica, the District Court's imposition of special conditions of confinement on Felipe was a proper exercise of its statutory authority. In addition, the special conditions imposed by the District Court are fully consistent with well-settled constitutional standards.

## A. Relevant Facts

### 1. The Sentencing Proceeding

On February 14, 1997, after sentencing Felipe to a term of life imprisonment, the District Court imposed "special conditions of confinement," requiring that Felipe: (1) be confined without contact with other prisoners; (2) not be

33

permitted "to communicate in any fashion with any other defendant in this case or any member of the Latin King/Queen Nation"; (3) correspond with and receive visits from no one except his attorney and close family members approved by the District Court with notice to the United States Attorney's Office, and that correspondence and visits with everyone except his attorney be monitored; and (4) not be permitted telephone contact with anyone. (A. 459).*

The District Court imposed the special conditions after finding that Felipe had

> orchestrated a number of murders and attempted murders from jail. He did it by using his correspondence, his visiting privileges and his contact with other prisoners to facilitate his communications of his orders to murder. He also used codes to attempt to frustrate the attempts of prisons [sic] officials to monitor his conversation. It appears to me that unless Mr. Felipe's ability to communicate with the outside world is severely restricted, other people will be murdered on his orders.

(A. 426-27). The District Court also found that

> this case presents unusual circumstances and raises unique concerns.
>
> While in prison, this defendant used the privileges he had to correspond with those outside the prison and to receive visits from friends and family, to maintain his control over the criminal activities of the Latin Kings and to cause the murder of a number of people. Unless those privileges are severely restricted in the future, there is every reason to believe that the defendant will again abuse these privileges for illegal purposes.

---

* The District Court subsequently modified its order to permit Felipe to make telephone calls to his attorney. (A. 558).

34

. . .

> The record in this case clearly establishes that there is a great danger that this defendant will attempt to by human contact that he is permitted in prison, will attempt to orchestrate additional murders. Thus, the conditions of confinement must be such that he has limited contact with other individuals and that he has no unmonitored contact with anyone but his attorney.

(A. 447-48).

### 2. The District Court's Order Denying Felipe's Rule 35 Motion

On March 6, 1997, Felipe moved for an order "pursuant to Rule 35 of the Federal Rules of Criminal Procedure" to vacate and set aside the sentence, and to be resentenced without imposition of any special conditions of confinement. On April 29, 1997, the District Court issued a written opinion denying Felipe's Rule 35 motion. (A. 542-55).

In its opinion, the District Court noted that the special conditions were not imposed "for the purpose of punishing the defendant," but rather "because the record of the defendant's trial before this Court established that this defendant, while in state prison, used his contacts with other prisoners and visitors

---

* The District Court did not conduct a hearing before imposing the special conditions of confinement, finding that it was unnecessary because the "record of the proceedings in this case" provided the basis for imposing the special conditions. (A. 449). The District Court did, however, afford Felipe and his counsel an opportunity to comment on the proposed special conditions before ordering that they be imposed. (A. 430, 442). The District Court also granted Felipe additional time to file a written submission addressing the special conditions of confinement. (A. 449, 542).

35

and his correspondence to orchestrate at least three murders. This record persuaded the Court that, unless serious restrictions were placed on the defendant in prison, he would again order murders from prison." (A. 543).

The District Court held that the special conditions satisfy the constitutional requirement, set forth in Turner v. Safley, 482 U.S. at 89, that "a 'valid, rational connection' [exist] between the prison regulation and the legitimate governmental interest put forward to justify it." Noting that the Felipe was convicted of ordering three murders from jail and that PSR indicated that he had ordered five additional murders from jail, Judge Martin found that "[t]he record of the trial in this case . . . demonstrates that this defendant is a cold blooded murderer who orders the murder of anyone who somehow incurs his wrath," and that "the risk is that the defendant will order additional murders from jail and, in the Court's view, that real and substantial risk fully justifies the restrictions imposed." (A. 544-45). The District Court also held that it was imposing the special conditions pursuant to its statutory authority under 18 U.S.C. § 3582(d), and its inherent authority to enter an order designed "to prevent a defendant from carrying out additional crimes while serving a prison sentence it has imposed." (A. 547).

B.   Discussion

     1.   The Court Was Authorized Under 18 U.S.C.
          § 3582(d) To Impose The Special Conditions
          Of Confinement

36

Felipe argues that District Court lacked authority to impose the special conditions of confinement because the "control and management of federal penal institutions is vested solely in the Attorney General and the Bureau of Prisons." (Felipe Br. 38 (emphasis original)). Because the record established that Felipe repeatedly used his communications privileges while incarcerated at Attica to commit murder and other violent crimes, the District Court's imposition of the special conditions of confinement was a proper exercise of its statutory authority to limit the right of a defendant convicted of racketeering to associate with certain people.

The place and conditions of a prisoner's confinement are ordinarily determined by the Attorney General through the Bureau of Prisons ("BOP"). See, e.g., 18 U.S.C. § 3621; United States v. Williams, 65 F.3d 301, 307 (2d Cir. 1995); United States v. Huss, 520 F.2d 598, 602 (2d Cir. 1975). "[W]here specific statutory authority exists," however, the sentencing court may impose special conditions of confinement. United States v. Huss, 520 F.2d at 602.[*]

In this case, "specific statutory authority" exists for the District Court's imposition of the special conditions of confinement. Indeed, Congress expressly authorized federal district courts to limit the associational rights of a defendant

---

[*] Notably, the BOP has not asserted any objection to the District Court's order regarding Felipe's special conditions of confinement. (A. 545).

37

-- like Felipe -- who has been convicted of racketeering offenses.  See United States v. Sotelo, 94 F.3d 1037, 1040 (7th Cir. 1996) (district courts may restrict communications of inmates convicted of racketeering or narcotics crimes pursuant to 18 U.S.C. § 3582(d)).  18 U.S.C. § 3582(d) provides, in pertinent part, that

> [t]he court, in imposing a sentence to a term of imprisonment upon a defendant convicted of a [RICO offense], or at any time thereafter upon motion by the Director of the Bureau of Prisons or a United States attorney, may include as a part of the sentence an order that requires that the defendant not associate or communicate with a specified person, other than his attorney, upon a showing of probable cause to believe that association or communication with such person is for the purpose of enabling the defendant to control, manage, direct, finance, or otherwise participate in an illegal enterprise.

Id.  "The purpose of [18 U.S.C. § 3582(d)] is to prevent the defendant from continuing his illegal activities from his place of confinement."  S. Rep. No. 225, 98th Cong., 2d Sess. 121, reprinted in 1984 U.S.C.C.A.N. 3304.

The record amply supports the District Court's imposition of the restrictions on Felipe's ability to communicate and associate with other inmates and other members of the Latin Kings.  Indeed, as the District Court found, these restrictions constitute "the only foolproof means of preventing [Felipe] from ordering murders in the future."  (A. 446).

The evidence at trial demonstrated that Felipe used his correspondence and visiting privileges to order other Latin Kings to commit numerous murders and other acts of violence while he

38

was incarcerated at Attica. The evidence also established that Felipe was able to control the illegal affairs of the Latin Kings, in part, by circumventing the prison's rules and by using secret codes to prevent prison officials from deciphering his orders to murder people. In fact, Felipe's success in evading prison rules that were designed to frustrate inmate violence and gang activity led the officials at Attica to screen his correspondence. (A. 104-06). In short, the record easily establishes "probable cause to believe that [Felipe's] association or communication with [Latin Kings and other inmates was] . . for the purpose of enabling [Felipe] to control, manage, direct, finance, or otherwise participate in an illegal enterprise," i.e., the Latin Kings, thus justifying the District Court's imposition of the special conditions of confinement. See 18 U.S.C. § 3582(d).[*]

---

[*] Felipe contends that the trial evidence relates to events that occurred in 1993 and 1994, and therefore is too "stale" to establish probable cause. (Felipe Br. 43). He cites no authority, however, nor is the Government aware of any, for the proposition that probable cause, under 18 U.S.C. § 3582(d), is subject to the timing restrictions applicable in other circumstances where probable cause is required, i.e., the Fourth Amendment. Indeed, because 18 U.S.C. § 3582(d) authorizes the district court to make the probable cause finding at the time of sentencing, it obviously contemplates that such a determination will be made based upon evidence relating to the defendant's past criminal activities.

Furthermore, Felipe's claim that he "has been transformed into a model prisoner" and has not directed the illegal, violent activities of the ALKQN since his June 1994 arrest, (Felipe Br. 36), is a conclusory assertion, unsupported by anything in the record. In its argument below, the Government offered to present evidence establishing that Felipe continued to

(χοντινυεδ...)

39

### 2. The Special Conditions Are Sufficiently Specific To Satisfy The "Specified Person" Language Of 18 U.S.C. § 3582(d)

Apparently conceding that 18 U.S.C. § 3582(d) confers authority upon the District Court to limit his communications from prison, Felipe argues that the District Court's order exceeded the scope of any such authority under that provision. According to Felipe, the statute's reference to communications with a "specified person" requires "identification of the particular person with whom" he may not communicate. (Felipe Br. 40 (emphasis original)). Felipe's narrow construction of the statute, which is unsupported by any legal authority, ignores the plain meaning and purpose of 18 U.S.C. § 3582(d), and is inconsistent with case law interpreting an analogous statute.

_____

(...χοντινυεδ)
order his followers to commit murders while he was a pre-trial detainee at the Metropolitan Correctional Center. The District Court concluded, however, that there was no need for a hearing regarding Felipe's post-arrest conduct. Rejecting Felipe's suggestion that the special conditions were unwarranted because he does not "pose[ ] a current threat to anyone" as based on "a far too narrow view of the evidence," the District Court explained:

> [A] defendant awaiting trial and possible conviction and sentence is unlikely to engage in criminal conduct during that period. The relevant record to be considered is the record of the trial in this case which demonstrates that this defendant is a cold blooded murdered who orders the murder of anyone who somehow incurs his wrath. There is no reason to believe that the defendant has undergone a spiritual transformation and poses no danger to anyone in the future.

(A. 544).

40

First, the District Court's order <u>does</u> specify the persons with whom Felipe is barred from communicating: other prisoners, his co-defendants, and members of ALKQN. (A. 459). Further, contrary to Felipe's interpretation, the statute nowhere states that the District Court must identify by name all of the "specified person[s]." Indeed, such a cramped reading would defeat the purpose of the statute, <u>i.e.</u>, to prevent prisoners convicted of racketeering from having contact with other members of organized crime groups and gangs. Because such groups are often large with constantly changing membership, it would be difficult -- if not impossible -- to identify by name all persons who are members of the group and are involved in criminal activities. As the District Court explained:

> It makes no sense in a case such as this, where the proof established that the defendant controlled a large organization and used his prison contact to facilitate his crimes, to require the Court to list by name all those who this defendant might attempt to use to order additional murders. . . . The purpose of § 3582(d) 'is to prevent the defendant from continuing his illegal activities from his place of confinement. In this defendant's case the type of order entered by the Court is the only way 'to prevent [him] from continuing his illegal activities from his place of confinement.'"

(A. 546-47 (quoting S. Rep. No. 225, 98th Cong. 2d Sess. at 121, <u>reprinted</u> <u>in</u> 1984 U.S.C.C.A.N. at 3304)).

Second, although 18 U.S.C. § 3582(d) has not been interpreted in any reported case, courts interpreting a similar statute containing the "specified person" language have rejected a narrow interpretation of that language. 18 U.S.C. § 3582(d) is

41

similar to 18 U.S.C. § 3563(b)(6), which authorizes courts to impose a special condition of probation prohibiting a defendant from "associating unnecessarily with specified persons." Id. (emphasis added); see also 18 U.S.C. § 3583(d) (incorporating § 3563(b)(6) with respect to conditions of supervised release). Indeed, the drafters of 18 U.S.C. § 3582(d) noted its similarity to the statutes authorizing non-association with specified persons as conditions of probation or supervised release. See S. Rep. No. 225 at 121-22, reprinted in 1984 U.S.C.C.A.N. at 3304-05.

Courts commonly prohibit defendants, while on probation or supervised release, from associating with other convicted felons, and with members of particular organized crime or other groups. In the few reported cases involving challenges to such restrictions, the Courts of Appeals have upheld sentencing courts' imposition of such conditions, even though no particular prohibited person was specifically named. In United States v. Showalter, 933 F.2d 573, 574 (7th Cir. 1991), for example, the defendant, who had been convicted of a weapons offense, challenged the District Court's imposition of a term of supervised release prohibiting him from associating with "those who . . . participate in[] the organization known as `skinheads' or any neo-Nazi organization." The Seventh Circuit held that this condition was not too vague to satisfy the statute's "specified person" language, and rejected the defendant's argument that the prohibited persons must be "specified to some

42

greater . . . degree." Id. at 575.* See also Malone v. United States, 502 F.2d 554 (9th Cir. 1974) (upholding condition of probation prohibiting defendant from "participating in any American Irish Republican movement," belonging to any "Irish organizations, cultural or otherwise," belonging to or participating in "any Irish Catholic organizations or groups," and visiting Irish pubs, where crime stemmed from defendant's involvement in Irish Republican cause), cert. denied, 419 U.S. 1124 (1975); United States v. Romero, 676 F.2d 406, 407 (9th Cir. 1982) (upholding probation condition prohibiting defendant from associating with persons involved in narcotics trafficking); United States v. Albanese, 554 F.2d 543 (2d Cir. 1977) (probation condition requiring defendant to associate "only with law-abiding persons" neither unconstitutionally void for vagueness nor overbroad); Birzon v. King, 469 F.2d 1241, (2d Cir. 1972) (parole condition prohibiting defendant from associating with persons engaged in criminal activity not unconstitutionally void for vagueness).

### 3. The Special Conditions Of Confinement Are Constitutional

Felipe also attacks the constitutionality of the

---

* Felipe attempts to distinguish Showalter as "hinged expressly upon what was seen to be the inherent or historic power of the trial court to fashion conditions of 'probation.'" (Felipe Br. 41). This argument represents a misreading of Showalter, in which the Court of Appeals' holding was expressly based upon its interpretation of the federal statute authorizing limitations on defendant's communication with "specified persons" while on probation or supervised release. Showalter, 933 F.2d at 575 (citing 18 U.S.C. § 3563(b)(6)).

43

special conditions of confinement, arguing principally that these conditions violate the First Amendment. (Felipe Br. 41-43, 48-50). These arguments are meritless. The communications restrictions the Court has imposed on Felipe are consistent with well-settled principles of constitutional law.

The test for assessing a prisoner's First Amendment claim is considerably more deferential to state authority than are standards applied to an ordinary citizen's First Amendment claims. The test is whether the restrictions imposed on prisoners are "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. at 89.

The District Court's order restricting Felipe's correspondence and visits easily satisfies the Turner v. Safley standard. The order was based upon Felipe's past criminal activity and was designed to prevent him from ordering others to commit murders in the future. As the District Court found, Felipe's past conduct

> clearly establishes that there is a great danger
> that this defendant will attempt by human contact
> that he is permitted in prison, . . . to
> orchestrate additional murders.

(A. 448). Accordingly, the basis for and purpose of the Court's order were "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. at 89; see also Workman, 80 F.3d at 699 ("the investigation and prevention of ongoing illegal inmate activity constitute legitimate penological objectives") (citing Thornburgh v. Abbott, 490 U.S. at 411-12).

44

Indeed, BOP's own regulations recognize that the need to protect the public from dangerous inmates is a valid penological objective. Those regulations authorize the director of the BOP, pursuant to the direction of the Attorney General, to "implement special administrative procedures that are reasonably necessary to protect persons against the risk of death or serious bodily injury," upon a finding that "there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons." 28 C.F.R. § 501.3(a). Furthermore, BOP regulations specifically authorize precisely the types of restrictions that the Court imposed in this case:

> These special administrative measures ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risks of acts of violence or terrorism.

Id.*

Felipe further asserts that the Court's order

---

* Felipe's argument that the Turner standard applies only to administrators with expertise on penology and not to judges, (Felipe Br. 36-37), is unpersuasive. In this case, "the need for the special conditions arises from the nature of the defendant's criminal activity which was proved at trial," and therefore "the Court is clearly in the best position to determine what conditions are necessary to protect the public from the defendant." (A. 548). Indeed, 18 U.S.C. § 3582(d) clearly reflects Congress's judgment that in RICO cases the Court may often be in a better position than BOP to recognize the need for special conditions of confinement.

45

prohibiting him from corresponding with anyone except "close family members" on a judicially-approved list is too sweeping because he has been barred from corresponding with "the press, broadcasting media and to governmental officials and the Courts." (Felipe Br. 48). As the District Court noted at sentencing, however, "this case presents unusual circumstances and raises unique concerns" justifying severe restrictions on Felipe's ability to communicate with the outside world. (A. 446-47). If Felipe were granted unrestricted rights to correspond with the media or with people other than close family members, he could easily abuse these rights and use these people, with or without their knowledge, to communicate with prohibited third party correspondents such as other Latin Kings.[*]

---

[*] Felipe also contends that the restrictions on his ability to communicate with others constitute an ex post facto increase in punishment, and that solitary confinement amounts to cruel and unusual punishment in violation of the Eighth Amendment. (Felipe Br. 42-43, 45-46). Both arguments are meritless. The Court's imposition of the special conditions of confinement cannot possibly be treated as ex post facto, because § 3582(d) was enacted in 1984, nearly 10 years before Felipe began committing the violent crimes of which he was convicted.

    Furthermore, the Court's order restricting Felipe from contact with other prisoners does not violate the Eighth Amendment. Contrary to Felipe's claim, the Court did not sentence him to solitary confinement for life. Rather, the Court specifically retained jurisdiction to consider any application by Felipe or BOP to modify any of the conditions. (A. 459; see A. 451 (Court will modify conditions "on any showing of the change of circumstances or that the passage of time indicates that Mr. Felipe does not pose a substantial threat to others")). See generally Sandin v. Connor, 115 S. Ct. 2293, 2301 (1995) (holding that inmate's discipline in segregated confinement does not create Due Process liberty interest because "disciplinary segregation, with insignificant exceptions, mirrored those

(χοντινυεδ...)

46

### 4.     Felipe Was Not Improperly Denied Notice Or A Hearing

Felipe argues that he was denied proper notice and an opportunity for a "plenary" hearing on the applicability of 18 U.S.C. § 3582(d) and the imposition of special conditions of confinement.  (Felipe Br. 43-45).  This claim is specious.

First, at sentencing the District Court informed the parties of its intention to order special conditions of confinement and provided both Felipe and his attorney with an opportunity to be heard on the issue.  (A. 430, 442).  In fact, due to defense counsel's strenuous objections to the proposed conditions, the District Court decided not to limit Felipe's contacts with his attorney.  (A. 432, 435).  The District Court also provided defense counsel with additional time to make a further submission, and the defense took advantage of this opportunity by filing the Rule 35 motion, upon which the Court ruled after full briefing and oral argument.  (A. 542).

Second, there was no need for an evidentiary hearing because the District Court's order was based upon evidence proven

---

(...χοντινυεδ)
conditions imposed upon inmates in administrative segregation and protective custody"); Hutto v. Finney, 437 U.S. 678, 686-87 (1978) (length of solitary confinement may be relevant to determining whether conditions are cruel and unusual; however, "[i]t is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual; "[i]f new conditions of confinement are not materially different from those affecting other prisoners, a transfer for the duration of a prisoner's sentence might be completely unobjectionable").

47

at the trial in this case.  Indeed, the Court declined to order a hearing for this very reason:

> [T]he basis for the actions that I am taking is found in the record of the proceedings in this case.  It is the basis of the murders and attempted murders that were ordered in this case from jail that gives rise to the concern that suggests that this defendant must be severely limited in his contacts, so that other persons are not murdered.

(A. 449).*

Third, the procedures followed by the District Court are not defective under **Burns** v. **United States**, 501 U.S. 129 (1991).  (Felipe Br. 45).  **Burns** did not address the discretion of the sentencing judge to impose sentence and related conditions within the applicable guidelines range.  Rather, **Burns** involved an upward departure from the sentencing guidelines.  In **Burns**, the Supreme Court held that district courts may not **sua sponte** depart upward from the guidelines range without giving the parties reasonable notice that it is contemplating such a ruling. **Id**. at 138-39.  The District Court's order in this case was not an upward departure; the District Court sentenced the defendant

---

* "The district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes." United States v. Slevin, 106 F.3d 1086, 1091 (2d Cir. 1996) (citing United States v. Olvera, 954 F.2d 788, 792 (2d Cir.), cert. denied, 505 U.S. 1211 (1992); United States v. Prescott, 920 F.2d 139, 143-44 (2d Cir. 1990)).  As the Slevin court explained, "[a]ll that is required is that the court 'afford the defendant some opportunity to rebut the Government's allegations.'"  106 F.3d at 1091 (quoting United States v. Eisen, 974 F.2d 246, 269 (2d Cir. 1992), cert. denied, 507 U.S. 1029 (1993)).

48

to terms of imprisonment within the Guidelines range.

Moreover, even if restrictive conditions of confinement were treated as an upward departure, sufficient notice was provided here. Burns does not require that the parties be notified of the Court's contemplation of a departure prior to the date of sentencing. See id. at 139 n.6 (declining to address the timing of what constitutes "reasonable notice" under Rule 32 of the Federal Rules of Criminal Procedure). Burns merely requires that the Court notify the parties of the specific ground on which it is contemplating a departure, in order to afford them with a meaningful opportunity "'to comment upon . . . matters relating to the appropriate sentence.'" Id. at 136 (quoting Rule 32(a)(1)). As noted above, the District Court informed the parties that it intended to impose certain special conditions of confinement; allowed both Felipe and his attorney to comment on this issue; modified its original proposal before imposing the final conditions; and afforded defense counsel an opportunity to submit written objections to the special conditions after the sentencing proceeding. Thus, Felipe was provided with sufficient notice and opportunity to be heard before the District Court imposed the special conditions of confinement.

## POINT III

### The District Court Properly Sentenced Andino

Andino attacks her sentence, claiming that the District Court lacked authority to impose a cumulative sentence of 18 years' imprisonment and that the District Court abused its

49

discretion by refusing to depart downwardly from the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."). (Andino Br. 13-19). Andino's claims are frivolous. Indeed, Andino waived her right to appeal a sentence of 18 years' imprisonment in her plea agreement, and the District Court's refusal to depart downwardly is unreviewable on appeal.

## A.    Relevant Facts

Andino stipulated in her plea agreement that the her sentencing range under the Guidelines was "360 months' to life imprisonment, plus a consecutive sentence of 5 years' imprisonment." Andino also stipulated in her plea agreement that because "the statutory maximum term of incarceration for the offenses" to which she pleaded guilty was 18 years, her "stipulated Guidelines sentence is 18 years' imprisonment." (A. 258). While Andino reserved the right in her plea agreement to argue for a downward departure based on her epilepsy and related illnesses, pursuant to U.S.S.G. § 5H1.4, and the Government reserved the right to oppose such a motion, she explicitly waived her right to appeal "a sentence of 18 years' imprisonment." (A. 259).

At the sentencing proceeding on March 7, 1996, Andino moved for a downward departure, claiming that she had health problems related to epilepsy, asthma and liver ailments, as well as psychiatric problems and a difficult background. The Government opposed that motion. The District Court refused to exercise its discretion to depart from the Guidelines sentence of

50

18 years' imprisonment, reasoning that:

> I am not unsympathetic to the circumstances of Miss Andino's background and her current family circumstances. But even were there to be a departure, the departure has to be in relation to the sentence that is available. And we already indicate where there is a substantial departure from the guidelines.
>
> Also, if this were a case where we were talking about something other than murder, for example, if it were a case where the amount of time was set by the guidelines, it might be in my view appropriate to depart.
>
> But the fact is that this is conspiracy that resulted in murder. And I think as to sentence that it would not be appropriate to impose any sentence less than that called for by the statutory provisions at issue here, which is a substantial departure from the guidelines.

(A. 476-77).

## B.   Discussion

### 1.   Andino Has Waived Her Right To Appeal Her Sentence

As set forth supra, Andino stipulated in her plea agreement that she would not appeal "a sentence of 18 years' imprisonment." (A. 259). Because Andino was sentenced to 18 years' imprisonment, her sentencing claims are foreclosed by her plea agreement. See, e.g., United States v. Maher, 108 F.2d 1513, 1531 (2d Cir. 1997) (where defendants sentenced within Guidelines range stipulated to in plea agreements and waived right to appeal sentences within such ranges, sentencing claims "not properly before [this Court] because they have been waived"); United States v. Salcido-Contreras, 990 F.2d 51, 53 (2d Cir.) ("[i]n no circumstance . . . may a defendant, who has

51

secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement"), cert. denied, 509 U.S. 931 (1993); accord United States v. Rivera, 971 F.2d 876, 896 (2d Cir. 1992).

    2.    **The District Court Was Authorized To Impose Consecutive Sentences For Each Count**

Even assuming that Andino has not waived her right to appeal a sentence of 18 years, her claim that the District Court was not authorized to impose consecutive sentences for the three offenses to which she pleaded guilty is without merit. (Andino Br. 13-16).

As noted supra, the Guidelines range for Andino's offenses was 360 months' to life imprisonment, plus a five-year mandatory consecutive term for violation of 18 U.S.C. § 924(c). This sentencing range was computed based upon a combined offense level of 42 and a Criminal History category of VI. (A. 258; Andino PSR ¶ 156). Because the Guidelines range far exceeded the statutory maximum sentences for each of the three counts, the District Court was legally required to impose a sentence of 18 years, i.e., by imposing consecutive sentences for each count.

---

    *    Andino knew full well that the Guidelines range exceeded the total statutory maximum sentence, as evidenced by her plea agreement and her statements during her plea allocution. At the plea, the District Court specifically advised her that under the plea agreement "[t]here is a maximum sentence of 18 years that is available and the guidelines exceeds that range," and asked her whether she understood that. Andino responded, "Yes, your Honor." (A. 285).

52

U.S.S.G. § 5G1.2(d) provides in pertinent part that "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, . . . to the extent necessary to produce a combined sentence equal to the total punishment." The Commentary to U.S.S.G. § 5G1.2, in turn, defines "total punishment" as the "combined length of the sentences . . . determined by the adjusted combined offense level," i.e., the sentence arrived at by the District Court within the Guidelines range computed from the combined offense level and the defendant's criminal history. See, e.g., United States v. Loeb, 45 F.3d 719, 723 (2d Cir.), cert. denied, 115 S. Ct. 2017 (1995). The Commentary also makes clear that consecutive sentences on all counts must be imposed if no count carries a statutory maximum as high as the applicable guidelines range:

> Usually, at least one of the counts will have a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count. The sentence on each of the other counts will then be set at the lesser of the total punishment and the applicable statutory maximum, and be made to run concurrently with all or part of the longest sentence. If no count carries an adequate statutory maximum, consecutive sentences are to be imposed to the extent necessary to achieve the total punishment.

U.S.S.G. § 5G1.2 (Commentary) (emphasis added). Accordingly, contrary to Andino's argument, the District Court was authorized to impose consecutive sentences on each of the three counts to which she pleaded guilty, because the total of the combined

53

statutory maximums -- 18 years -- was less than the minimum of her Guidelines range -- 360 months.  See United States v. Loeb, 45 F.3d at 723 ("§ 5G1.2(d) allows the imposition of consecutive sentences as long as the total sentence remains within the total punishment range").

### 3. The District Court's Refusal To Downwardly Depart Is Not Reviewable On Appeal

Again assuming that Andino has not waived her right to appeal her sentence of 18 years, the District Court's failure to grant her downward departure motion is not cognizable on appeal. As this Court has repeatedly held, a sentencing court's decision not to grant a downward departure is an exercise of discretion that is ordinarily unreviewable on appeal.  See, e.g., United States v. Brown, 98 F.3d 690, 692 (2d Cir. 1996); United v. Chabot, 70 F.3d 259, 260 (2nd Cir. 1995); United States v. Harris, 38 F.3d 95, 97 (2d Cir. 1994), cert. denied, 513 U.S. 1198 (1995).  Such decisions are appealable only if "the guidelines were misapplied, the court misapprehended its authority or imposed an illegal sentence."  United States v. Haynes, 985 F.2d 65, 68 (2d Cir. 1993); see also United States v. Obgondah, 16 F.3d 498, 499 (2d Cir. 1994) ("'if the refusal to depart downward is based on a district court's mistaken view that it lacks authority to depart, a defendant retains his right to appeal this denial'") (quoting United States v. Sharpsteen, 913 F.2d 59, 63 (2d Cir. 1990)); United States v. McGregor, 11 F.3d 1133, 1138 (2d Cir. 1993) (same).

54

Andino's sole argument with respect to the downward departure is that the District Court "abused its discretion in not downward departing from the term imposed." (Andino Br. 19). Andino does not suggest, much less establish, that the District Court misunderstood his authority to depart. In any event, the record makes clear that the District Court understood its authority to depart, but simply declined to exercise that authority in light of the facts and circumstances of the case. (A. 476-77). Accordingly, none of the exceptions apply and Andino's downward departure claim is unappealable.

## CONCLUSION

**The judgments of conviction should be affirmed.**

Dated:     New York, New York
           August 4, 1997

                          Respectfully submitted,

                          MARY JO WHITE,
                          United States Attorney for the
                          Southern District of New York,
                          Attorney for the United States
                                  of America.

ALEXANDRA A.E. SHAPIRO,
ROBERT E. RICE,
    Assistant United States Attorneys,
        Of Counsel.