# EXHIBIT A

## AFFIDAVIT OF JILL MILLER

STATE OF WISCONSIN

COUNTY OF DATE

I, Jill Miller, after being duly sworn according to law, state as follows:

1.  I am a forensic social worker in private practice in Madison, Wisconsin. I have been in private practice since January, 1984. I received my Bachelor's of Science degree, with a major in Social Work, from the University 0f Wisconsin- Madison in 1967, and my Masters of Science Social Work degree from the University of Wisconsin-Madison in 1971. I am a Licensed Clinical Social Worker in the State of Wisconsin, License No. 1662. I have practiced as a social worker in legal settings for over thirty-five years. I was on the faculty of the University of Wisconsin-Madison School of Social Work from 1973 to 1985. Since 1986, my work has primarily involved preparation for the penalty phase of capital trials, review of the penalty phase of capital trials, and preparation for post-conviction proceedings in capital cases.

2.  Since 1986, I have worked on over one hundred twenty-five capital cases in which I have conducted extensive social history investigations, prepared social history reports, conducted psycho-social assessments, and assisted the attorneys in preparing for the penalty phase of trials or for post-conviction proceedings, including federal habeas corpus proceedings. These cases have been at the trial and post-conviction levels, and in state, federal and military jurisdictions. I have testified in capital proceedings thirty-six times. I have worked on capital cases in thirty states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and Korea (military).

3.  I have done extensive training of attorneys, mitigation specialists, investigators and mental health professionals regarding the investigation, development and presentation of mitigation, and preparation for the penalty phase in capital cases at national, state and local programs. A complete list of my training presentations is contained in my Resume.

4.  As a member of the Board of Directors and Defender Council of the National Legal Aid & Defender Association (NLADA), I participated in the

development and approval of "Standards for the Appointment and Performance of Counsel in Death Penalty Cases", adopted by NLADA in 1987, and adopted as guidelines by the American Bar Association in 1989. I consulted on the updating and revision of the ABA's "Guidelines for the Appointment and Performance of Counsel in Capital Cases", adopted by the ABA in February, 2003. I am the author of a law review article titled "The Defense Team in Capital Cases", published in the Hofstra Law Review, issue devoted to the 2003 ABA Guidelines; summer, 2003; Volume 31, No.4, page 1117.

5.    The role of the mitigation specialist at trial in a capital murder case is to assist counsel by: conducting an extensive and thorough social history investigation and psycho-social assessment; oversee the collection of all relevant records, including, but not limited to, vital records, medical and school records, employment records, criminal history records, jail/prison records, probation/parole records; identifying factors in the client's background or circumstances that require expert evaluations; assisting in locating appropriate experts; providing background materials and social history information to experts, in order to enable them to perform competent and reliable evaluations; consulting with the attorney(s) regarding the development of the theory of the case and case strategy, thereby ensuring coordination of the strategy for the guilt-innocence phase with the strategy for the penalty phase; identifying potential penalty phase witnesses; assisting in preparing witnesses and exhibits; and working with the client and his or her family while the case is pending. The mitigation specialist should investigate all noticed or potential aggravators in order to rebut, challenge, explain and/or mitigate aggravating evidence. Development and presentation of mitigating evidence must take into account the nature and extent of aggravating evidence, and the weight that might be accorded it by the jury. The mitigation specialist can also assist the defense team in understanding the client's functioning, and in communicating effectively with the client. The mitigation specialist may be a witness in the penalty phase hearing, and may offer testimony regarding the results of the social history investigation.

6.    I was initially contacted by Chicago attorneys Jeffrey Urdangen and Cynthia Giacchetti, and asked to act as the mitigation specialist in the capital case of United States v. Darryl Lamont Johnson, 96-CR 379, in September, 1996. The indictment in this case had been filed on June 19, 1996. The government filed notice of intent to seek the death penalty on October 1, 1996. I did not begin work in earnest until December, 1996.

The trial commenced on October 23, 1997.  Mr. Johnson was convicted of the capital murders, and the penalty phase commenced on November 6, 1997.  On November 17, 1997, the jury returned its verdicts, agreeing unanimously that Darryl Johnson be sentenced to death in both murders. Darryl Johnson was sentenced to death on July 27, 1998.

7.    At the inception of my involvement in this case, I reviewed materials, including charging and investigation documents and met with the team to formulate plans for the investigation.  At that time, the team consisted of the attorneys, investigator Mort Smith, and myself.  In the spring of 1997, Juliet Yackel, a young attorney working out of the offices of Urdangen and Giachetti, was retained to assist me in obtaining records, locating sources for interviews, doing research, and doing some interviews.  She was brought in due to the volume of work that needed to be done, time pressures and the difficulty in getting work completed by the investigator.

8.    Following initial meetings with the client and collateral sources in December, 1996, I developed a list of potential sources of information for the social history investigation, including persons to be interviewed, records and documents to be obtained, and research to be conducted. I communicated that information to counsel in a memo dated January 2, 1997 (see Attachment 1).  The understanding with counsel was that the investigator in the case would obtain records under my direction and would locate persons for me to interview for whom I didn't have contact information.  In spite of this, I had difficulty in reaching Mr. Smith, and had very little direct contact with him.  Requests in my memos were communicated to him by the attorneys.  There was no clear definition of roles, and delineation of responsibility for making sure that tasks were completed.  The attorneys failed to monitor and direct the social history investigation, and did not follow-up when assigned tasks were not completed.    I  further  recommended,  in  that  memo,  that  a neuropsychological evaluation be done, and suggested a specific expert. That expert was retained.  I also discussed other potential types of experts, and outlined preliminary mitigation themes.  I specifically mentioned the importance of information on gangs in Chicago and Vitiligo, a skin disorder that Darryl Johnson has, as well as research on Chicago schools. I also recommended investigation of the background of the victims in this case.

9.    In April, 1997, I conducted interviews, primarily with the client and family members, and also with a gang expert, in Chicago; and drafted

another memo to counsel listing additional sources of information, as well as recommendations for future work.  I discussed sources, including publications and experts, for information on gangs in Chicago.  I specifically mentioned the name of Luis Rodriguez, a gang expert.  I made very limited attempts to reach him, and did not adequately pursue this.  I received no direction from the attorneys regarding this effort.  I again noted the need for information on the victims, including the need to anticipate victim impact evidence.  I referred counsel to the January, 1997 memo to note records that were still needed, and had not yet been obtained.  The memo also provided names of several persons known to Darryl Johnson who had died by violent means, and whose deaths were traumatic for him.  The issue of traumatic loss, and its effects on Darryl Johnson, particularly the way in which exposure to violence and traumatic loss leads to a sense of futurelessness and fatalism was not adequately developed in this case.

10.  I continued to conduct interviews and review records through the summer.  Many records listed in my source memos of January and April had not been obtained, e.g. medical records of Dr. Morgan (who diagnosed Darryl with Vitiligo in August, 1991), other childhood medical records, pre-sentence investigation report from 1983 manslaughter case, probation/parole file, police reports on domestic violence incidents involving John, Sr. and Brenda Johnson, MCC records.  There appeared to be difficulty with the investigator in terms of his follow-through with requested tasks.  He was not responsive to my efforts to reach him.  I asked counsel to ascertain his progress on requested tasks, assuming that they had made requests to him pursuant to lists in my memos.  When I inquired of counsel as to the status of records requests, they appeared to be largely unaware of Mr. Smith's activities or progress.  At some point, Juliet Yackel began obtaining records that Mort Smith had not obtained, e.g. DOC records, school records, divorce records for Darryl Johnson's parents.  During the summer, I began verbalizing to counsel my concerns about the scheduled trial date and the ability to be ready by October, given the complicated nature of the case, the extent of investigation that needed to be done and the volume of discovery to be reviewed, particularly the tapes of the wiretaps.  I spoke to them several times regarding my belief that they should seek a continuance.  To my knowledge, this was not done.

11.  On July 29, 1997, I forwarded to counsel a detailed memo outlining the proposed penalty phase strategy.  It addressed the categories of mitigating evidence, and the information to present in each, and included

a detailed discussion of aggravating evidence that was likely to come in during the first phase of the trial (see Attachment 2). The memo noted that the Government appeared to intend to focus its case in aggravation on Darryl Johnson's purported future dangerousness, and much of the Government's penalty phase evidence was going to be used to establish that aggravator. It outlined, based on review of discovery, some of the facts likely to come in at trial/penalty through Government witnesses. There was specific discussion of available evidence in Department of Corrections records regarding Johnson's adjustment in prison and participation in programs, including work and educational programs, and the earning of meritorious good time, that should have been presented to counter some of the negative information that would be presented by the Government regarding some of his activities while incarcerated, particularly pre-trial.

12. From the beginning of my involvement in this case, I felt it would be important to explain Darryl Johnson's involvement in the Gangster Disciples and the drug economy. This involvement was a function of a number of vulnerabilities, including evidence of personal vulnerabilities (low cognitive functioning, developmental delays, ADHD, low self-esteem), family dynamics (father's alcoholism, witnessing violence towards his mother, poverty), and social/cultural vulnerabilities (poor quality of education, racism, social and economic marginalizing of African-American males, and exposure to community violence). Evidence in support of these themes was outlined in the July, 1997 memo. During the spring and summer, I researched the history of gangs in Chicago, and consulted Dwight Conquergood, an expert from Northwestern University. I met with Conquergood in April, and I arranged for a meeting with the attorneys and Mr. Conquergood in July. At these meetings, he provided additional information on reasons that adolescents and young adults become involved in gangs. He also provided us with names of other community experts on this topic. It was understood on the defense team that Conquergood would be a resource to the team, and would not be a testifying witness. I failed to fully pursue the names of other potential experts on gangs in Chicago, as I should have done. I received no direction from counsel following the July, 1997 meeting with Conquergood regarding this matter. Review of the penalty phase transcript reveals that this issue was not fully or adequately developed such that the jury might understand the reasons young African American men are drawn into gangs.

13. Information about gangs in Chicago revealed that frequently recruitment of young men into gangs occurred in the Cook County Jail and in facilities of the Illinois Department of Corrections. Darryl Johnson was not an active gang member, despite living in neighborhoods with intense pressures to join, until he went to prison at age twenty-one. Interviews with family members and others indicated that Johnson may have been assaulted or had other negative experiences early on in his confinement, and that he joined the gang primarily for protection. Andre Johnson and Letra Watson, both of whom testified, had information indicating that Darryl had been assaulted and/or needed protection at Menard (see Attachment 3 - testimony outlines). They were not asked about this during their testimony. Brenda Johnson, Darryl's mother, knew that he was frightened in the jail, and said that he cried when she visited, begging her to get him out of the jail. She was not asked about this during her testimony. Legislative hearings had been held that documented the influence of gangs in the Cook County jail and Illinois prisons, including the fact that many young men joined the gangs for protection during the early period of their confinement. The Department of Corrections was taking steps to reduce gang influence in the prisons. Transcripts of the hearings should have been obtained. Persons, particularly professionals, who testified at the hearings regarding this problem could have been called to testify. While the defense presented one former inmate at Menard who testified about this matter, this former inmate, a prior client of one of the attorneys, had not joined a gang while in prison. This fact diminished the effect of his testimony. Counsel gave no direction to myself or Ms. Yackel regarding pursuing other persons who could have testified. This issue was not adequately developed such that the jury could give it weight.

14. On September 8, 1997, approximately six weeks prior to the start of trial, I wrote a letter to counsel expressing my growing concern regarding our ability to be prepared to go to trial on October 23rd. (See Attachment 4) After several conversations regarding this, I felt the need to put my concerns in writing. In the letter, I listed the many tasks that needed to be completed prior to any penalty phase proceeding. Among them were the need to: prepare the video of Darryl Johnson's daughters; obtain all records; research Vitiligo; research Robert Taylor Homes; conduct additional research on gang structure, operation and recruitment in Illinois jails and prisons; complete expert assessments and testing (PET scan had been recommended by neuropsychologist); completing all interviews (letter noted there were still many to do, and difficulty locating sources), and prepare to challenge and mitigate the aggravating

evidence, in particular the allegations of future dangerousness. Following the receipt of this letter by the attorneys, there was a distinct change in our working relationship. The attorneys appeared to be upset that I had put these concerns in writing, and communication between the attorneys and I deteriorated following my writing of the letter. The bulk of my time during September and October was spent on preparation of the video, conducting additional interviews, and drafting testimony outlines for witnesses. The attorneys did not respond to, or communicate with me regarding, the other tasks outlined in my letter, many of which were re-statements of things discussed in earlier communications. They provided little, if any, direction to me regarding my work, other than to ask me to do the video of Mr. Johnson's daughters, and to prepare outlines of testimony for potential penalty phase witnesses. I continued, with the assistance of Ms. Yackel, to locate persons to interview, and to conduct those interviews.

15. I wrote another memo to counsel on October 3, 1997, outlining work that still needed to be done, and requesting assistance from the investigator in locating sources. (See Attachment 5) Several of the persons listed, including family members of government witnesses in this case, had information about positive acts by Darryl Johnson. I was able to locate both Angie Gaines and Cheryl Fletcher on my own, with Ms. Yackel's assistance. I contacted Morgan Park High School and ascertained that none of Darryl's teachers were still at the school at the time. Several were retired, and may have still been in Chicago. No efforts were made to locate them. I did speak to an administrator who was able to interpret the high school transcript (see below). I provided that information to counsel in a memo, dated October 24, 1997 (after jury selection had commenced) to be provided to the neuropsychologist, Ms. Burford (elementary special education teacher) and Kathleen Kostelny. I received no response from the attorneys or the investigator regarding other requests to locate persons, as requested in the October 3rd memo, and no direction from counsel to attempt to reach retired teachers. The October 3rd memo emphasized the need for records, including: the sentencing transcript, with actual imposition of sentence and reasons the Judge gave for imposing the minimum, from the manslaughter conviction; all DOC records; all MCC records; and the need for someone with expertise on the operation of gangs in Illinois jails and prisons. It also noted that there was information suggesting that Darryl Johnson had paid funeral expenses for Charles Banks. There is information on the wiretaps to support this, but that information was not provided to the jury. I received no response to the October 3rd memo.

16.    It was clear, based on review of discovery provided by the government, that it was critical to challenge and rebut the allegation of future dangerousness to the extent possible. The prior conviction for voluntary manslaughter would be used to support this aggravator. Review of court documents and prison records indicated that Darryl Johnson received the minimum sentence for this offense. Based on that, I urged counsel on a number of occasions, to obtain the trial transcript, including the sentencing transcript, and to consider interviewing the sentencing judge regarding the reasons for giving the minimum sentence. Apparently, at some point, they did obtain the transcript. The transcript does not include the Judge's actual sentencing decision with comments supporting it. The judge was not interviewed, and did not testify.

17.    I did locate and interview a key witness to this offense, Cheryl Fletcher. It was Fletcher's boyfriend, Jesse Simpson, who was killed. According to Fletcher, Johnson acted in defense of her and her brother in this incident. Simpson had been drinking and Fletcher suspected that he had shot heroin earlier in the evening. On the night of the shooting, Simpson and two of his friends were visiting Fletcher at her home, where she resided with her two children. Simpson and Fletcher began to argue, and he struck her. She called the police, who came to the home and spoke with her and Simpson, but did not ask Simpson to leave. Following this, Cheryl Fletcher, fearing Simpson would subject her to more abuse, phoned her mother and asked that she send her brother, Reginald (Reggie) Fletcher, over to her home. On his way to his sister's home, Fletcher encountered Darryl Johnson and told him about the situation. Johnson offered to accompany him. Jesse Simpson was in the home at the time that Reginald Fletcher and Darryl Johnson arrived. When the doorbell rang, Simpson told Cheryl Fletcher to get rid of whoever was there. She heard the squeak of a kitchen drawer and suspected that Simpson had a knife, which he did. She told her brother this. Reggie Fletcher went in and confronted Simpson. The two struggled and Simpson stabbed Fletcher in the face with the knife. They continued to struggle, and Simpson continued to try to stab Reggie in the back. At that point, after asking Simpson to stop several times, Darryl shot Simpson. The trial record indicates that Simpson still had the knife in his possession when he was shot. Cheryl Fletcher said that they then all panicked. Reggie Fletcher took Simpson's body outside. Darryl Johnson and Cheryl Fletcher grabbed Cheryl's children and drove to her mother's. One of Simpson's friends who was present called the police. Cheryl added that all three - she, Reggie and Darryl - were very upset and

remorseful about this incident.  Reggie Fletcher had to undergo cosmetic surgery to repair the cut to his face by Simpson.  Cheryl Fletcher's statements in this interview were consistent with her testimony at trial. At the sentencing hearing, Judge Robert Collins stated that he found the testimony of Archie Rudd not credible.  Rudd was a witness for the government in it's aggravation case against Darryl Johnson.  The Judge further found that: there was no question that the victim had been abusive to Cheryl Fletcher; there was no question that the victim had "a very lengthy knife"; and Darryl Johnson shot Jesse Simpson because he believed Simpson would kill Reggie Fletcher.  He further found that this belief was not reasonable, thereby making Darryl Johnson guilty of the lesser included offense of voluntary manslaughter.  He sentenced Johnson to four years in prison, the minimum sentence for this offense.

18.  Cheryl Fletcher was present outside the courtroom, and prepared to testify to these facts, during the penalty phase of the trial.  This testimony would have been very important, in light of testimony by Archie Rudd, a friend of Simpson's who was present at the time of the offense, during the government's case at penalty, and in light of the government's closing argument that Johnson shot Simpson in the back. The transcript, as cited above, indicated that the Judge did not believe Rudd's testimony to be credible.  Yet, the government called him to testify in this penalty phase.  Knowing that Johnson shot while Simpson and Reggie Fletcher were struggling, and Simpson was trying to stab Fletcher, would have cast a different light on this offense.  A detailed outline of potential testimony by Cheryl Fletcher was prepared for the attorneys.  The attorneys did not call Cheryl Fletcher to testify.  They never spoke with her prior to the day she arrived at court.  Rather, they merely introduced a copy of the transcript of the manslaughter trial without any real explanation of its relevance.  It did not contain the transcript of the actual imposition of sentence, with the Judge's reasons for giving the minimum.  Live testimony of a witness who was present, whose testimony was supported by the transcript and trial judge's comments, would have been much more compelling and persuasive to the jury.

19.  The mitigation case at penalty must be developed and presented in a manner that takes into consideration the extent of aggravating evidence, and the mitigation that might be necessary for a jury to determine that the aggravation does not outweigh the mitigation.  Mitigating evidence must be presented in a manner, and in sufficient detail, so that the jury understands the mitigating value and can give it appropriate weight.  It

was clear in this case that there would be a great deal of aggravating evidence put on by the government, particularly in support of the future dangerousness aggravator.   In that regard, it was important to understand the effects on Darryl Johnson of witnessing the abuse of his mother, witnessing violence in the community, suffering traumatic losses, being a special education student, and needing protection in jail and prison, and the contributions these experiences made to his involvement in the gang and the drug economy.  The Vitiligo that Darryl suffered from (an acquired skin disease characterized by unpigmented skin, for which there is no treatment) was mentioned, but not explained, including the effects it may have had on Darryl.  It was also important that more be done to humanize Darryl Johnson, to show that he had positive qualities, and that he had performed many acts of kindness and generosity to others.

20.  It not sufficient for a couple witnesses to briefly talk about the abuse that Brenda Johnson suffered at the hands of her husband, which was witnessed by her youngest child, Darryl Johnson.  Several witnesses who could have provided detailed descriptions of specific incidents were not questioned about them (see testimony outlines).  This is significant in that only two jurors found that Darryl had witnessed the abuse of his mother.  More detailed stories of specific incidents, described by several different persons with direct knowledge, might have led to a different finding on this mitigator.  Further, very little evidence was put on regarding the fact that Darryl's father was an alcoholic, and became more abusive when he had been drinking.  No jurors found the mitigator related to John Johnson, Sr.'s alcoholism.  The effects on Darryl of witnessing this were not adequately addressed.  The links between what he witnessed as a child, and the feelings of helplessness and powerlessness it produces in a young boy who cannot protect his mother, were never linked to his motives for assisting his friend, whose sister was being abused by her boyfriend, and which led to his involvement in the manslaughter case.  This shooting, and Darryl's subsequent incarceration, was a critical turning point in his life, and led to his involvement in the Gangster Disciples while in prison.  The effects on Brenda Johnson's mental state (depression), and the extent to which it affected her parenting, were also not adequately presented.  She actually sought mental health counseling for depression, and was prescribed medication for it, in the late 1960's;  this information was not presented.  Nor was sufficient evidence presented about Darryl's speech delay, learning problems, Attention Deficit Hyperactivity Disorder, low self-esteem and frustrations with his inability to learn.  I interviewed an official from

Morgan Park High School who interpreted Darryl's high school transcript. He explained that the academic courses in which Darryl was enrolled were for students who had been in special education in elementary school. They were for low-functioning students, and constituted the extent of special education offered at the high school at that time. This testimony should have been presented, and would have supported the findings of Dr. Gelbort. A memo detailing this information was provided to counsel. They did not ask this official to testify. These experiences may have contributed to Darryl Johnson's involvement with the Gangster Disciples. A gang expert could have talked about how gangs provide protection, a sense of belonging and acceptance to young men like Darryl Johnson.

21. There were a great many specific stories of things that Darryl had done to help family members and others, including families of the victims and the informants/government witnesses, that might have given the jury a more complete view of him, might have humanized him, and that were not presented (see Attachment 3 - testimony outlines). A particular example is the care that Darryl Johnson gave to Richard Lofton, a friend who was paralyzed in the same shooting incident in which Darryl was shot. Richard Lofton was interviewed and substantiated this claim. Angie Gaines, Lofton's girlfriend at the time, and the sister of Darryl Johnson's girlfriend, Michelle Gaines, could also have provided this information, as could Michael Johnson, a friend of Darryl's (not related). I did not make adequate efforts to locate and interview Angie Gaines. Richard Lofton and Michael Johnson were reluctant to testify. This is not unusual in these cases. It is counsel's duty to meet with potential witnesses, establish a relationship of trust with them, and strive to overcome their reluctance. This was not done. Only two jurors found that Darryl would help family and friends in need. Had additional testimony been presented in support of this mitigator, the findings might have been different. A couple persons did testify about Darryl's efforts to encourage relatives and friends to stay in school, complete their education, and stay out of the street. He also actually financed the educations of relatives. Additional and detailed testimony regarding this might have led to jurors finding mitigator #15, that Darryl Johnson encouraged and assisted his family members and friends to pursue an education, which no jurors found in one case and only one juror found in the other.

22. No information about Darryl Johnson's participation in programs and work in prison was presented, nor was the fact that he was transferred to minimum security facilities and that he earned meritorious good time.

This would have countered, to some extent, the government's assertion that he would be dangerous in prison. It is noteworthy that no jurors found that Darryl would not be a continuing danger to society while he was in prison. Had the jury been presented with this type of information about how he actually functioned in prison, some jurors might have reached a different conclusion with regard to this aggravator.

23. Very little was presented about Darryl Johnson's depression and hypervigilance in the period leading up to his arrest, or of his expressions to various family members and friends about his desire to get out of the gang and drug economy, his belief that he would be killed if he tried, and his feelings of fatalism (see Attachment 3 - testimony outlines).

24. Not enough evidence was put before the jury about Darryl Johnson's relationship with his daughters, his care for them, and his desire to make sure that they had a better life than he did. Michelle Gaines, Linda Quinn and Angie Gaines could have testified about this, but were not called. They, like Lofton and Michael Johnson, were reluctant, and counsel did not make adequate efforts to overcome this reluctance, and persuade them to testify. No jurors found that Darryl Johnson actively participated in the care of his daughters in one case, and only one juror found it in the other. Had more evidence been put on regarding this, through witnesses that did testify and weren't asked (Darryl's family members) or through Linda Quinn, Michelle Gaines and Angie Gaines, jurors might have reached a different conclusion about this mitigator.

25. Kathleen Kostelny, who was retained as a teaching witness, presented compelling testimony about the effects on children of witnessing family and community violence, and the protective factors and risk factors that lead to children in the same family being affected differently. Sufficient lay testimony to support her testimony, particularly the risk factors and lack of protective factors present in Darryl Johnson's life, was not presented, nor were the connections between her testimony and Darryl Johnson's early life clearly made in closing argument.

26. Early on in my involvement in the case, counsel informed me that it was their plan to have me be present at counsel table during the penalty phase, rather than have me testify as to the results of my social history investigation. Prior to the start of the penalty phase, I was informed that I would not be allowed to be at counsel table. There was no discussion at the time of my being a witness, this despite the fact that there were several persons with important information that were reluctant to testify

(e.g. Michelle Gaines, Angie Gaines, Linda Quinn, Richard Lofton, Michael Johnson)and records that needed to be admitted and explained, e.g. high school transcript, correctional records, parents' divorce, etc.  At no time did counsel ask for my notes, or discuss in detail those persons whom I had interviewed who were not called to testify.  No efforts were made to persuade reluctant witnesses to testify.  Without knowing the substance of the information that could have been provided, and without actually meeting the potential witnesses, to assess what kind of witnesses they might be, what they could offer in testimony, and to address the concerns they had regarding testifying, counsel could not make a strategic decision not to call them.  I would have been willing to testify had I been asked. (see Wiggins v. Smith, in which the US Supreme Court noted that the social worker who conducted the mitigation investigation for the defense could have testified as to the results of the social history investigation).

27.   As a result of all of the problems cited in this affidavit, I felt that I was not able to fulfill the standard of practice for a mitigation specialist in this case.  Counsel did not adequately monitor and direct the social history investigation.  They did not request all results of my work including notes of all interviews.  They did not discuss potential witnesses, and any problems that might be resolved such that reluctant witnesses might be persuaded to testify. Communication among team members was strained during the two month preceding trial, and during trial.  There was not sufficient time, prior to trial, to complete all work, particularly obtaining all records, locating possible experts, and working with witnesses in advance of trial, such that reasonable strategy decisions could be made. Due to time constraints and the direction of counsel, following the writing of my letter to counsel in September, 1997, my time was focused on preparing the video, developing testimony outlines for witnesses, and conducting additional interviews, to the exclusion of other things listed in the letter and previous memos that had not been done.  The social history investigation and penalty phase strategy development should be completed sufficiently in advance of trial to enable counsel to coordinate guilt phase and penalty phase strategy.  This was not done.  It was clear that, given the nature and extent of aggravating evidence in this case, a very compelling and persuasive mitigation presentation, with detailed information provided by witnesses, and corroborated and documented through records, in support of the mitigators was necessary.  Had such a presentation been made, it is believed that at least one juror would have reached a different decision as to sentence.

_____

JILL MILLER, MSSW, LCSW

STATE OF WISCONSIN }
                   } ss.
COUNTY OF DANE     }

Signed and sworn to before me
this 27 day of February , 2008

_____
Notary Public, State of Wisconsin
My Commission Expires OCT 10, 2010