# EXHIBIT B

**JILL MILLER, MSSW**
_____

Forensic Social Work Services P.O. Box 44343
E-mail: jillemiller@sbcglobal.net Madison, Wisconsin 53744-4343
(608) 271-0227
FAX (608) 271-0491

## RESUME

### CURRENT POSITION

1984-present    Forensic Social Work Services.  Private practice in forensic social work, providing consultation and expert witness services to attorneys and courts in criminal, juvenile, family and other civil proceedings.  Specializing in social history investigations and psycho-social assessments;  the development of treatment and rehabilitation plans for sentencing and dispositional hearings;  preparation for the penalty phase of capital murder cases; and analysis of penalty phase preparation and presentation in post-conviction capital cases.  Primary focus in recent years has involved work on capital cases, at the trial and post-conviction levels; and in state, federal and military cases.  Sole proprietorship; opened in January, 1984.  Previously engaged in limited private practice from 1973 to 1976, and 1978 to 1983.

### LICENSE

Licensed as a Clinical Social Worker, State of Wisconsin, License Number 1662.

### EDUCATION

1983    Completed 20 hour training program on Mediation in Divorce and Family Disputes.

1973-74    Doctoral student, University of Wisconsin-Madison, School of Social Work.  Emphasis on legal aspects of social work practice and welfare economics.

1971    Masters of Science Social Work, University of Wisconsin-Madison.  Field placements at Legal Services Center and Dane County Mental Health Center.  Thesis research on

Page 2

attitudes of welfare recipients toward welfare rights organizations. Recipient of HEW Social and Rehabilitation Services Training Grant.

1967 Bachelor of Arts Degree, major in Social Work, University of Wisconsin-Madison. Recipient of UW-Madison tuition scholarship during all semesters

1963-64 Attended Carroll College, Waukesha, Wisconsin. Recipient of tuition scholarship as National Merit finalist

## EMPLOYMENT HISTORY

1973-85 Clinical Assistant Professor, School of Social Work, University of Wisconsin-Madison. Taught courses in Social Work Advocacy and the Law, Social Work Methods, and Field Experience. Supervised field course units at the Wisconsin State Public Defender Office, Youth Policy and Law Center, Legal Services Center of Dane County, Dane County Juvenile Court, Wisconsin Indian Legal Services and Wisconsin Council on Criminal Justice. Areas of expertise included law and legal skills for social workers, advocacy, criminal and juvenile justice, and policy development.

1979-84 Client Services Director, Office of the State Public Defender, Wisconsin. Position entailed responsibility for the social work services of the statewide public defender system and other administrative responsibilities. Duties included development of positions, hiring, training, supervising, legislative monitoring, development of resource materials, consultation with trial offices throughout the state, development of student placements, and other duties as determined by the State Public Defender. Special assignments included: coordinating the representation of unaccompanied Cuban minors placed in Wisconsin after the Mariel boat-lift; conducting a study of the issue of recoupment from parents for the costs of legal representation of their minor children; and developing and directing a joint training program with the Division of Corrections on probation and parole

Page 3

revocation procedures.  In addition, provided services to attorneys on selected cases.

1976-78      Associate Director, Youth Policy and Law Center, statewide public interest agency in Wisconsin.  Agency involved child advocacy and policy reform in the state's juvenile justice system. Responsibilities included administrative duties, fund-raising, supervising intern program, personnel and affirmative action, and involvement in substantive issues. Special projects included state budget issues, detention practices, dispositional alternatives, correctional practices, mental health issues and legislative monitoring.  Involved in the drafting and passage of a new state juvenile code.  Co-founder of agency.

1975      Instructor, University of Wisconsin Extension course on Law and Social Work.

1974-75      Program Co-director of U.S. HEW-funded project on "Legal Training for Child Welfare Workers", sponsored by the University of Wisconsin Center for Social Services.  Program involved workshops on legal aspects of substantive areas in child welfare field, production of eight videotape programs to be used as training tools in agencies, and production of training manual.  Co-authored grant proposal.

1974      Instructor, University of Wisconsin Extension course on Law and Social Work

1973      Instructor, University of Wisconsin Extension course on Juvenile Justice

1971-73      Staff Social Worker, Legal Services Center of Dane County, Madison, Wisconsin.  Supervisor of social services in juvenile, criminal and civil programs of agency; caseload in Juvenile Defender Program; liaison field instructor for graduate students of the University of Wisconsin-Madison School of Social Work.

1971-72      Staff, Emergency Mental Health Services; twenty-four hour suicide and crisis intervention service operated by the Dane

Page 4

County Mental Health Center, Madison, Wisconsin. Part-time position.

1970-71 Teaching Assistant, School of Social Work, University of Wisconsin-Madison. Assisted in teaching of undergraduate field experience and social work methods course at the Dane County Department of Social Services.

1967-70 Undergraduate Counselor, School of Social Work, University of Wisconsin-Madison. Provided academic counseling to undergraduate students; prepared timetable of courses; assisted during registration; contributed to preparation of school bulletin; and performed other duties as required by the Director of the School of Social Work.

## PROFESSIONAL MEMBERSHIPS

1998 - 2005 The American Academy of Experts in Traumatic Stress; Board certified in Forensic Traumatology  (January, 1999)

1995 - present National Alliance of Sentencing Advocates and Mitigation Specialists (formerly the National Association of Sentencing Advocates); member of Conference Committee for 2004 annual conference; past member of Policy Committee  and Mitigation committee; past co-ordinator of mentor project; organization recently became a section of the National Legal Aid & Defender Association

1992 - 2000 National Organization of Forensic Social Work; also a member from 1986 to 1989; Elected member of Board of Directors (1993 - 1996); Secretary of Board of Directors (1995 - 1996)

1980 - present National Legal Aid & Defender Association.  Elected member of Defender Council (1993 - 1998, and 1983 - 1990); elected member of Board of Directors (1986 - 1990);  chairperson of Social Services Section and co-chairperson of Death Penalty Litigation Section; founder of Social Services Section; Chairperson of Defender Council (1996 - 1998);  past member of Executive Committee, Conference and Awards

Page 5

Committee, Membership Committee, and Nominating and Resolutions Committee at various times.

## AWARDS

2000 — Recipient of "Life in the Balance" Achievement Award, presented annually to a lawyer or mitigation specialist by the National Legal Aid & Defender Association in recognition of contributions to capital defense representation

1999 — Recipient of award for "Outstanding Contributions to the Profession", annual award by the National Association of Sentencing Advocates, for dedication in the advancement of sentencing advocacy

## PROFESSIONAL SERVICES

2002 — Consulted on the updating and revision of "Guidelines for the Appointment and Performance of Counsel in Capital Cases", American Bar Association; adopted by ABA in February, 2003

1997 — Appointed member of Working Group for the U.S. Department of Justice, Bureau of Justice Assistance and Bureau of Justice Statistics co-sponsored national study of indigent defense systems.

1995-96 — Member of Blue Ribbon Advisory Committee appointed by the National Legal Aid & Defender Association under a grant from the U.S. Department of Justice, Bureau of Justice Assistance. Committee composed of experienced academics and practitioners who were knowledgeable about the criminal justice system, particularly the defense function. Purposes of the committee were to identify successful models of indigent defense programs, alternative initiatives crucial to the improvement of the criminal justice system, and areas of indigent defense representation that required further research and development.

Page 6

| | |
|---|---|
| 1993-96 | Board Member, Consortium for the National Equal Justice Library. |
| 1990-92 | Consultant, National Legal Aid & Defender Association, for Mitigation Specialists Training Project and Mitigation Affidavit Project. |
| 1991 | Consultant to the Missouri State Public Defender System; provided training for mitigation investigation staff. |
| 1990-91 | Consultant to the Illinois Capital Resource Center, provided two sixteen-hour training programs for mitigation staff. |
| 1986-89 | Consultant, Project FIT (Families in Transition), an intensive in-home treatment program for adolescents and their families, operated by Family Services, Madison, Wisconsin |
| 1988 | Consultant to State of Florida, Department of Health and Rehabilitation Services.  Prepared training monograph for state juvenile court workers titled "The Social Worker in Court: Case Preparation and Testifying." |
| 1983-89 | Task Force on Women in the Criminal Justice System, Wisconsin Women's Network.  Member and legislative coordinator. |
| 1979-86 | Mental Health Association in Wisconsin.  Member, Board of Directors; chairperson of the Public Policy Committee and the Child Advocacy Committee; treasurer. |
| 1983-84 | Judicial Council, State of Wisconsin, General Projects Committee.  Represented the Office of the State Public Defender at meetings to study the issue of recoupment from parents for the costs of legal representation of their children and appellate procedures in state courts. |
| 1978-84 | Project TRY Advisory Committee.  TRY (Treatment and Rehabilitation for Youth) was an intense treatment program for delinquent children in need of mental health treatment in a secure setting. |

Page 7

| | |
|---|---|
| 1981-82 | Committee on Revision of Administrative Rules Governing Child Welfare Institutions. Appointed by Secretary of the Wisconsin Department of Health and Social Services. |
| 1980-82 | Consultant, ABT Associates, private consulting firm in Cambridge, Massachusetts. Consulted on federally-funded project to develop program model materials on social services in public defender offices. |
| 1980 | Consultant, to Briarpatch (runaway center in Madison, Wisconsin) on the development of a group home for Cuban juveniles. |
| | Consultant to University of Kentucky School of Social Work on the development of social work field placements in legal settings. |
| 1978-79 | Consultant and Research Associate, Youth Policy and Law Center. |
| 1979 | Foster Care Monitoring Project, Advisory Committee, joint project of the Wisconsin Department of Health and Social Services and the University of Wisconsin-Milwaukee. |
| | Consultant to research project on issues in mental health, conducted by Dr. Dave Gustafson, Center for Health Sciences, University of Wisconsin |
| 1977-79 | Juvenile Grievance Procedure Implementation Committee, state committee appointed by Wisconsin Division of Corrections to implement a grievance mechanism in juvenile correctional programs. |
| 1976-79 | Law-Related Education Advisory Committee, committee established to oversee project co-sponsored by Wisconsin Department of Public Instruction and State Bar of Wisconsin, to establish law-related education in the state's secondary and middle schools. |
| 1975-79 | Wisconsin Civil Liberties Union, Children's Rights Committee. |

Page 8

1977-78        Juvenile Detention Implementation Committee, co-chairperson.  State committee established by the Wisconsin Department of Health and Social Services to implement the recommendations of the Juvenile Detention Study.

Juvenile Grievance Procedure Committee.  State committee appointed by the Wisconsin Division of Corrections to study the need for a grievance procedure in juvenile correctional programs and to establish guidelines for the development of a procedure.

Prison Health Care Advisory Committee.  State committee appointed by the Wisconsin Department of Health and Social Services to study and make recommendations on health care programs in adult and juvenile correctional facilities.

Title XX Advisory Committee.  Committee appointed by the Wisconsin Department of Health and Social Services to develop Title XX plan for the state.

1975-76        Joint Legislative Committee on Institutional Closings. Committee mandated and appointed by the Wisconsin Legislature to study the closing of the Wisconsin School for Girls and the Wisconsin Child Center, and to develop plans for alternate placements of the juveniles.

1972-75        Board of Directors, Briarpatch; Madison, Wisconsin agency serving runaway youths and their families.

1972-73        Consultant to Jonah House, a group home for emotionally disturbed adolescents in Madison, Wisconsin.

**TRAINING, WORKSHOPS AND SPEECHES**

2008           Speaker, Capital Habeas Unit, Office of the Federal Public Defender, Salt Lake City, Utah; "Mitigation: Investigation, Development and Presentation of Mitigation at Trial and in Habeas"

Page 9

| | |
|---|---|
| 2007 | Faculty, Life in the Balance; annual penalty conference sponsored by the National Legal Aid & Defender Association; Dallas, Texas |

Faculty, National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases; sponsored by the Office of Defender Services, Administrative Office of the Courts, Department of Justice; Washington, D.C.

Faculty, Death Penalty Mitigation Institute, sponsored by the National Alliance of Sentencing Advocates and Mitigation Specialists, a section of the National Legal Aid & Defender Association; Chicago, Illinois

Faculty, "Managing the Capital Case In Arizona", sponsored by the National Judicial College; Phoenix, Arizona

Faculty, Death Penalty Seminar, sponsored by the Oregon Criminal Defense Lawyers Association; Hood River, Oregon

2006   Faculty, Capital Defense Training; sponsored by the National Consortium for Capital Defense Training; Plano, Texas

Faculty, Life in the Balance 2006, annual death penalty conference sponsored by the National Legal Aid & Defender Association; Philadelphia, Pennsylvania

Faculty, National Seminar on the Development and Integration of Mitigation Evidence, sponsored by the Habeas Assistance and Training project; Washington, D.C.

Faculty, Death Penalty Mitigation Institute and Annual Conference, sponsored by the National Alliance of Sentencing Advocates and Mitigation Specialists, a section of the National Legal Aid & Defender Association; Baltimore, Maryland

Faculty, "Making the Case for Life", sponsored by the National Association of Criminal Defense Attorneys; Las Vegas, Nevada

Guest speaker, University of Wisconsin-School of Social Work

Page 10

2005         Faculty, "Making the Case for Life", sponsored by the National Association of Criminal Defense Attorneys; Oklahoma City, Oklahoma

Trainer, NAACP Legal Defense Fund: Capital Punishment Seminar; Warrenton, Virginia

Faculty, Life in the Balance 2005, annual death penalty conference sponsored by the National Legal Aid and Defender Association; New Orleans, Louisiana

Faculty, Mitigation Training Program, sponsored by the ABA Death Penalty Representation Project and DePaul University College of Law, Center for Justice in Capital Cases; Chicago, Illinois

Guest speaker, Lacrosse (Wisconsin) County Bar Association

Guest speaker, University of Wisconsin School of Social Work

2004         Faculty, Building the Case for Life, program sponsored by the Washburn University School of Law; Topeka, Kansas

Guest speaker, School of Social Work, University of Wisconsin, seminar on criminal justice

Faculty, Making the Case for Life VII: Mitigation Investigation In Capital Case; sponsored by the National Association of Criminal Defense Lawyers; Arlington, Virginia

Faculty, Annual Conference of the National Association of Sentencing Advocates; Milwaukee, Wisconsin

Coordinator and faculty, Death Penalty Mitigation Institute; sponsored by the National Association of Sentencing Advocates; Milwaukee, Wisconsin

Faculty, Life in the Balance XVI, annual death penalty conference sponsored by the National Legal Aide and Defender Association; Memphis, Tennessee

Page 11

2003          Faculty, Annual Conference of the National Association of Sentencing Advocates, presentation on 'Mitigation A to Z: A Primer"; Albuquerque, New Mexico

Faculty, Making the Case for Life VI: Mitigation Investigation in Capital Cases", death penalty training sponsored by the National Association of Criminal Defense Lawyers; Memphis, Tennessee

Presenter, "Strengthening the Guiding Hand of Counsel: Reforming Capital Defense Systems", conference on the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, sponsored by the ABA Death Penalty Representation Project and Hofstra University School of Law

2002          Faculty, "Making the Case for Life V: Mitigation Investigation in Capital Cases", death penalty training sponsored by the National Association of Criminal Defense Lawyers; Raleigh, North Carolina

Faculty, "Defending Complex Cases", Naval Justice School; Newport, Rhode Island

Faculty, "Life in the Balance XIV", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Kansas City, Mo.

2001          Faculty, "Life in the Balance XIII", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Albuquerque, New Mexico

Faculty, "Capital Litigation Defense Course", sponsored by the Naval Justice School; Newport, Rhode Island

2000          Faculty, "Making the Case for Life IV: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Houston, Texas

Page 12

Trainer, "Death Penalty Defense Workshop", sponsored by the Office of the State Appellate Defender - Death Penalty Trial Assistance Division; Chicago, Illinois

Faculty, "Life in the Balance XII", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Washington, D.C.

Faculty, Annual Conference of the National Association of Sentencing Advocates; San Diego, California; also, co-coordinator and faculty, Death Penalty Institute, held in conjunction with annual conference

1999    Faculty, "Making the Case for Life: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Boise, Idaho

Faculty, Death Penalty Training Seminar, sponsored by the Florida Association of Criminal Defense Lawyers; Haines City, Florida

Faculty, Annual Conference of the National Association of Sentencing Advocates; Miami, Florida

Faculty, "Life in the Balance XI", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Atlanta, Georgia

1998    Faculty, "The Fight for Life: Mitigation That Wins", sponsored by the Tennessee Association of Criminal Defense Lawyers and The Tennessee District Public Defenders Conference; Nashville.

Trainer, Annual Conference of the National Association of Sentencing Advocates; Washington, D.C..

Faculty, "Life in the Balance X", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Philadelphia, Pennsylvania.

Page 13

Faculty, "Making the Case for Life: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Scottsdale, Arizona.

Trainer, Death Penalty Seminar sponsored by the Federal Defender Office of Washington & Idaho; Boise, Idaho

1997    Trainer, Annual Conference of the National Legal Aid & Defender Association; St. Louis, Missouri.

Trainer, Annual Conference of the New Mexico Public Defender; Glorietta, New Mexico.

Trainer, Nebraska Commission on Public Advocacy; presented day-long training program on mitigation in capital cases for staff of the Major Case Resource Center; Lincoln, Nebraska.

Faculty, "Life in the Balance IX", annual death penalty conference sponsored by the National Legal Aid & Defender Association.

1996    Trainer, Annual Conference of the National Legal Aid & Defender Association; Las Vegas, Nevada.

Faculty, "Understanding Violence: Prevention Strategies and Mitigation Training", seminar sponsored by the Center for Death Penalty Litigation, the Carolina Justice Policy Center, and the UNC-Chapel Hill School of Social Work; Chapel Hill, North Carolina.

Faculty, "Life in the Balance VIII", annual death penalty conference sponsored by the National Legal Aid & Defender Association; St. Louis, Missouri.

Trainer, Client Services Workshop, Office of the State Public Defender; Madison, Wisconsin.

1995    Trainer, Annual Conference of the National Legal Aid & Defender Association; New Orleans, Louisiana.

Page 14

|  | Trainer, Indiana Public Defender Council, Sentencing Training; Indianapolis, Indiana. |
|---|---|
|  | Trainer, "The Defense of Drug Cases", National Legal Aid & Defender Association regional conference; Baltimore, Maryland. |
|  | Trainer, Annual Conference of the National Association of Sentencing Advocates; Chicago, Illinois. |
|  | Trainer, Annual Conference of the National Organization of Forensic Social Work; Reno, Nevada. |
|  | Faculty, "Life in the Balance VII", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Kansas City, Missouri. |
| 1994 | Trainer, Annual Conference of the National Legal Aid & Defender Association; Washington, D.C.. |
|  | Speaker, University of Wisconsin-Madison Law School, course on Capital Punishment. |
|  | Trainer, NAACP Legal Defense and Education Fund; annual Capital Punishment Conference; Warrenton, Virginia. |
|  | Trainer, Annual Conference of the National Organization of Forensic Social Work; Atlanta, Georgia. |
|  | Faculty, "Life in the Balance VI", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Austin, Texas. |
| 1993 | Trainer, Annual Conference of the National Legal Aid & Defender Association; Albuquerque, New Mexico. |
|  | Trainer, Defender Association of Philadelphia; day-long training for homicide unit; Philadelphia, Pennsylvania; April, 1993. |

Page 15

|      | Faculty, "Life in the Balance V", annual death penalty conference sponsored by the National Legal Aid & Defender Association; New Orleans, Louisiana; March, 1993. |
|------|---|
| 1992 | Trainer, Annual Conference of the National Legal Aid & Defender Association; Toronto, Ontario, Canada; October, 1993. |
|      | Trainer, Criminal Defense Conference, the Wisconsin State Public Defender; Oconomowoc, Wisconsin; October, 1992. |
|      | Faculty, Death Penalty Seminar, sponsored by the Indiana Public Defender Council; Indianapolis, Indiana. |
| 1991 | Trainer, Annual Conference of the National Legal Aid & Defender Association; Portland, Oregon. |
|      | Faculty, "Mitigation Specialists Training", sponsored by the National Legal Aid & Defender Association, the Missouri Capital Punishment Resource Center, and the National Association of Social Workers - Missouri Chapter; St. Louis, Missouri. |
|      | Faculty, "Life in the Balance III", annual death penalty conference sponsored by the National Legal Aid & Defender Association; New Orleans, Louisiana. |
|      | Trainer, Annual Conference of the National Organization of Forensic Social Work; Washington, D.C. |
| 1990 | Trainer, Annual Conference of the National Legal Aid & Defender Association; Pittsburg, Pennsylvania. |
| 1989 | Trainer, Annual Death Penalty Seminar, sponsored by the Office of the State Appellate Defender; Collinsville, Illinois. |
| 1988 | Trainer, Annual Conference of the National Legal Aid & Defender Association; San Diego, California. |

Page 16

1987          Trainer, "Critical Issues in Juvenile Justice: A Working Conference", sponsored by the Wisconsin Department of Health and Social Services; Madison, Wisconsin.

              Trainer, Annual Death Penalty Seminar, sponsored by the Office of the State Appellate Defender; Chicago, Illinois.

              Trainer, "All About Families Conference", sponsored by the Wisconsin Child Advocacy Project; Madison, Wisconsin.

1986          Trainer, Annual Conference of the National Legal Aid & Defender Association; Atlanta, Georgia.

              Speaker, Milwaukee Young Lawyers Association.

              Trainer, Regional Conference of the National Defender Investigator Association; Madison, Wisconsin.

              Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

              Speaker, Criminal Law Section of the Dane County Bar Association; Madison, Wisconsin.

1985          Trainer, Annual Conference of the National Legal Aid & Defender Association; also, coordinator of day-long training program for social services personnel in defender offices and private practitioners providing sentencing services to attorneys; Washington, D.C.

              Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

              Speaker, University of Wisconsin-Madison School of Social Work, Spring Symposium; Madison, Wisconsin.

1984          Trainer, American Bar Association, Annual Program Meeting; Chicago, Illinois.

              Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

Page 17

Trainer, Jefferson County Human Services Department and county law enforcement personnel.

Trainer, Eau Claire, Wisconsin region of Social Services Departments; Eau Claire, Wisconsin.

Speaker, Criminal Law Section of the Dane County Bar Association; Madison, Wisconsin.

1982      Trainer, Annual Conference of the National Legal Aid & Defender Association; Boston, Massachusetts.

1981      Trainer, Annual Conference of the National Legal Aid & Defender Association; San Francisco, California.

Faculty, Annual Conference of the Office of the State Public Defender; Madison, Wisconsin.

Trainer, First Annual Juvenile Court Intake Training Seminar, sponsored by the Wisconsin Juvenile Court Intake Association; Madison, Wisconsin.

Trainer and coordinator; Client Services Spring Workshop, Office of the State Public Defender; Madison, Wisconsin.

1973-80      Trainer and speaker at numerous programs in Wisconsin on Legal Skills for Social Work, Sentencing, Child Advocacy, Mental Health, Juvenile Justice, and Child Abuse and Neglect.

## PUBLICATIONS, PROFESSIONAL PAPERS & MEDIA PRODUCTIONS

2003      Author of article, "The Defense Team in Capital Cases", Hofstra Law Review; summer, 2003; Volume 31, No. 4, page 1117

1991-96      Contributed several newsletter articles to "Capital Report", newsletter of the Death Penalty Litigation Section of the National Legal Aid & Defender Association; articles covered topics relating to the death penalty and mitigation, including mentally retarded capital defendants, Fetal Alcohol Syndrome

Page 18

|  | and Effects, and cultural and environmental mitigation; several articles have been reprinted in newsletters published by state defender programs, resource centers, and criminal defense attorney associations. |
|---|---|
| 1981-82 | Developed a series of videotape programs on "Probation and Parole Revocation Procedures in Wisconsin", as part of the Joint Training Program on Probation and Parole Revocation Procedures, funded by the National Institute on Corrections. Directed the development of the training manual to be used in conjunction with the tapes; authored the grant proposal. |
| 1980 | Paper presented before the 1980 Program Meeting of the Council on Social Work Education, on "The Social Worker as Client Advocate: Teaching Advocacy in a Legal Setting"; Los Angeles, California. |
| 1979 | Article published in the <u>Journal of Education for Social Work</u> (Fall, 1980), titled "Teaching Law and Legal Skills to Social Workers"; also presented as a paper before the 1979 Annual Program Meeting of the Council on Social Work Education; Boston, Massachusetts. |
| 1978 | Paper presented to the Prison Health Care Advisory Committee, state of Wisconsin, title "Health Care Needs in Juvenile Correctional Facilities." |
| 1977 | "Children in Jail and Detention", report to Acting Governor Martin Schreiber, state of Wisconsin, on the need for non-secure temporary care alternatives for juveniles. |
| 1974 | Developed and produced a series of eight videotape programs titled "Legal Training for Child Welfare Workers", used as training aids in social service agencies and social work classes; wrote grant proposal for development of training program, videotapes, and training manual; co-directors of program. |

Page 19

## RESEARCH

1980-81       "Study of Recoupment From Parents for Costs of Legal Representation for Their Children", study mandated by the Wisconsin Legislature in Chapter 356, Laws of 1979. Study included analyzing statutes from other states on recoupment and parental responsibility for costs of legal representation of their children; surveying policies and practices in a number of public defender systems in the country; researching case law on the issue; and conducting a survey of parents of juvenile clients regarding their ability to pay and attitudes towards recoupment. Resulted in leglslative provision for recoupment in Chapter 20, laws of 1981.

1977-78       Conducted study of all juveniles present in Wisconsin juvenile correctional institutions on June 30, 1977. Variables included age, sex, race, county of residence, committing offense(s), prior offense history, prior services and placements, history of running away from placement, and recommendations of Juvenile Offender Review Board. Data was used by state officials for future planning of juvenile correctional programs.

## GRANTS

1973-1982       Authored or co-authored grant proposals resulting in over $550,000 in grant awards for various projects, including for: the establishment of the Youth Policy and Law Center, a statewide public interest agency involved in juvenile justice policy issues in Wisconsin; a staff social worker position at the Legal Services Center of Dane County, in Madison, Wisconsin; a joint training program on probation and parole revocation procedures for the Department of Corrections and the Office of the State Public Defender; a project to train child welfare workers in the state of Wisconsin on law and legal skills; projects for the representation and resettlement of unaccompanied Cuban minors in Wisconsin; and a project to provide special services to indigent minority and veteran defendants through the Office of the State Public Defender.

Page 20

## OTHER ACTIVITIES

Testified before committees of the Wisconsin legislature on numerous occasions since 1976 on issues related to juvenile justice, mental health, and state funding for human services.

Served on oral examining boards for state and county positions in Wisconsin approximately twelve times since 1975.

Participated in the drafting and passage of several pieces of legislation in Wisconsin, including the Children's Code revision (1978), the Mental Health Act, bills related to the criminal justice and human services systems, and state budget proposals.

Guest speaker on numerous occasions in classes at the University of Wisconsin-Madison.

Along with husband, own and operate a Christmas tree farm in western Wisconsin.

[February, 2008]

# EXHIBIT C



CONFIDENTIAL

DARRYL LAMONT JOHNSON
CHRONOLOGY

DRAFT

1890's      DOB, William Johnson; Tupelo, Miss., paternal grandfather

2-26-1897   DOB, Minnie Lou Johnson; Atlanta, Ga., paternal grandmother

02-28-11    DOB, John Taylor; Chicago, maternal grandfather

03-05-18    DOB, Josie Gilbert Taylor, Chicago, maternal grandmother

08-18-38    DOB, John Johnson, Sr., in Chicago

1940        Death of William Johnson, of heart attack

03-09-41    DOB, Brenda Taylor, Chicago

05-10-55    DOB, Andre Johnson, to Brenda Taylor, age fourteen, and John Johnson; Brenda was living with Johnson's family at 3150 S. Prairie at the time

05-12-55    Death of Josie Taylor, two days after Andre's birth

06-13-55    Marriage of John Johnson and Brenda Taylor, in Clinton, Iowa; continued to live with Johnson family on S. Prairie

1956        John Johnson joined the Air Force; stationed at Andrews Air Force Base outside Washington, D.C.

11-09-56    Brenda, along with Andre, joined John in Washington; two days later her grandmother, who had helped raise her, died

09-17-58    DOB, Sharon Johnson, at Walter Reed Army Hospital

1959        (early) Brenda miscarried twins (had two other miscarriages at other times)

1959        (spring) Brenda left John, Sr. for the first time; she went to Chicago with her children, where John's family urged her to divorce John; she eventually returned to him in Washington

02-27-61    DOB, John Johnson, Jr., at Andrews Air Force Base; premature birth - eight months

DARRYL LAMONT JOHNSON
CHRONOLOGY
Page 2

1961        (summer) John, Brenda and children moved back to Chicago;
            John was discharged from Air Force; they lived with John,
            Sr.'s family at 3150 S. Prairie

12-07-61    DOB, Kim Johnson, at Michael Reese Hospital, Chicago
            (premature birth - seven or eight months)

06-13-63    Family moved to 5266 S. State Street, in the newly built
            Robert Taylor Homes

10-14-63    Brenda was admitted to the hospital with false labor;
            discharged the following day

11-11-63    **DOB, Darryl Lamont Johnson, at Presbyterian St. Luke's
            Hospital; father worked as a platformer for Railway
            Express at the time**

1960's      (mid) John Johnson also worked first shift at Railway
            Express

07-25-66    Brenda called police after John, Sr. beat her

11-12-66    Brenda started working at the Post Office, second shift

02-1967     John, Sr. lost his job at Railway Express; was fired for
            drinking and stealing; did not hold steady job after this
            time

            *1967 Brenda had a hysterectomy (hx of cancer in her family)*

04-1968     Brenda left her job at the Post Office; went on AFDC

04-28-68    Brenda called police after John, Sr. choked and beat her

07-01-68    Brenda Johnson filed for divorce, citing her husband's
            uncontrollable temper, excessive alcohol use and failure
            to support his family (alleged he had been in a constant
            state of drunkeness for more than two years); John, Sr.
            was ordered to vacate the marital premises, and did so on
            7-3-68

08-06-68    John, Sr. returned to the home and the couple attempted
            to reconcile; records indicate that psychological
            guidance was sought

DARRYL LAMONT JOHNSON
CHRONOLOGY
Page 3

1968 (approx.) Darryl enrolled in a pre-kindergarten readiness program at Mary Terrell School, adjacent to Robert Taylor Homes; attended Terrell until 1-30-70

10-05-68 John, Sr. became drunk and held a gun to a neighbor's head, then beat Brenda and tore her clothes; the police were called; Brenda and the children had to flee the premises; John, Sr. was ordered to vacate the premises on 10-15-68 and a restraining order was issued; John, Sr. continued to constantly harrass Brenda and interfere with her freedom, calling her at all hours of the day and night at her home and her place of employment; he burned all of her clothes; he paid no support; Brenda called the police on 10-16-68; court order entered on 10-25-68 ordering support, affirming the order to vacate the premises, and ordering John, Sr. to be brought before the court; John, Sr. was arrested on 10-26-68

01-21-69 An order was issured dismissing the divorce petition for want of prosecution

07-1969 Brenda began outpatient psychiatric treatment at Michael Reese Hospital; depressed over abusive relationship with husband; had left him many times (taking children with her to home of Minnie Livingston, her sister-in-law); separated from John for several months in 1968-69, then reconciled

10-1969 Brenda ~~left job at post office~~ and started a training program at the YMCA

11-17-69 Death of Minnie Johnson, paternal grandmother

01-31-70 The family moved out of Taylor Homes and into the home of John Johnson's mother, at 3150 S. Prairie; Darryl was enrolled at Douglas Elementary School on 2-3-70

02-1970 Brenda was hired full-time at YMCA by Benjamin Smith, as a clerk typist

05-04-70 Brenda's divorce from John was finalized

07-21-70 Brenda took the children and moved to an apartment at 6509 S. Ellis (she lived briefly at 3126 S. Giles)

**DARRYL LAMONT JOHNSON**
**CHRONOLOGY**
Page 4

09-08-70    Darryl transferred to Dumas Elementary School; Brenda soon became involved with Benjamin Smith, for whom she worked at the YMCA; John continued to harass her over the phone and by showing up at her apartment

06-19-71    Brenda purchased a home at 11449 S. Hermosa, in Morgan Park neighborhood; Darryl enrolled at Esmond School

1971    (Fall) A few weeks into the school year Darryl was tested and placed in special education; he was classified EMH (educable mentally handicapped); his teacher from 1971 to 1975 was Edith Burford

1973    Andre Johnson left the home to attend college in Wisconsin; attended from 1973 to 1977

02-1977    Death of Darryl's maternal Aunt Mabel Coleman

06-16-78    Darryl graduated from the eighth grade at Esmond School

09-1978    Darryl enrolled at Morgan Park High School; attended through most of the 1979-80 academic year

06-12-79    Darryl was seen at Beverly Morgan Park Mental Health Center; taken there by his mother

06-30-80    Darryl enrolled at Central YMCA High School

04-1981    Brenda Smith earned her GED

09-12-81    Brenda Johnson married Benjamin Smith; moved to 7714 S. Prairie; Darryl and sisters remained in home on Hermosa

1982    Brenda Johnson Smith was laid off from her job at the YMCA due to funding cutbacks

1983    (approx.) Darryl was the victim of head trauma; four stitches to head

03-1983    John, Jr. entered the military and left Chicago; to 5-1986

05-06-83    Arrest for Criminal Damage to Property; no disposition

DARRYL LAMONT JOHNSON
CHRONOLOGY
Page 5

09-17-83   Arrest for Disorderly Conduct; convicted on 10-18-83; no disposition noted

11-01-83   Arrested and charged with murder and armed violence in the shooting death of Jesse Simpson; released at some point on $1000 bond; at first the case was SOL'd and dismissed; then presented to a Grand Jury and indictment obtained *(This is when Brenda moved her daughters & Darryl out of the home on Hermosa)*

12-12-83   Brenda Smith began work at the University of Illinois Dental School; remained there for six years

03-27-84   Darryl was arrested and charged with possession of marijuana; pled on 3-28-84; three months supervision; living at 11449 S. Hermosa

10-16-84   Darryl was charged with Possession of Cannabis; Unlawful Use of Weapon and Falsification of ID; pled to Delivery of Cannabis more than 500 GM on 12-27-84; sentenced to 2 years DOC, concurrent with four years on Vol. Mansl.

10-17-84   Start of bench trial on murder case; convicted of lesser included Voluntary Manslaughter on 10-18-84; bond revoked; held at Cook Co. Jail

11-19-84   Sentenced on Voluntary Manslaughter conviction to four years DOC

11-30-84   Received at Joliet

12-18-84   Darryl was sent to Diagnostic Unit at Logan

01-09-85   Darryl was transferred to Menard Corr. Inst.

1985       Death of Darryl's friend from neighborhood, Richard (Ricky) Johnson

11-14-85   Darryl was trasnferred to Shawnee Corr. Center, Vienna

04-16-86   Darryl was transferred to Lincoln Corr. Center

08-15-86   Mandatory release from Lincoln Corr. Ctr. to parole; shortly after release he became involved with Stacy Curtis

**DARRYL LAMONT JOHNSON**
**CHRONOLOGY**
Page 6


1987        Death of John Taylor, paternal grandfather

07-03-87    Death of Ruth Johnson, paternal aunt

03-18-88    Charged with Possession of Controlled Substance (cocaine); nolle prossed on 11-2-88

04-01-88    Seen in Emergency Room at St. Francis Hospital with complaints of pain in head, blurred vision, dizziness and nausea

05-1988     Met Michelle Gaines (pregnant at the time with Bianca); became involved with her in 6-88

08-29-88    Death of John Taylor, maternal grandfather

10-24-88    Birth of Bianca Gaines to Michelle Gaines

12-15-88    Arrested and charged with Possession of Stolen Vehicle, UUW - Felon, and Armed Violence (traffic stop - gun in glovebox); out on bond; found guilty on 1-30-90; sentenced to two years and three years, concurrent, on first two counts; subsequently released on appeal bond until 1992

07-30-89    Charged with Battery; no disposition; address 7714 S. Prairie (his mother's home)

02-1990     Brenda Smith went to work at Marshall Fields

06-1990     Shot in head by Mike Edwards; 33 stitches; treated in ER at Little Company of Mary Hospital; in same incident his friend Richard Lofton was shot and paralyzed

02-18-91    Brenda Smith went back to work at YMCA

04-19-91    Birth of daughter Daryl "Lucki" to Michelle Gaines; birth was by caesarean section; Michelle and Lucki remained hospitalized for twelve days; during this time Darryl took a bed at the hospital and helped care for Lucki and Michelle

## DARRYL LAMONT JOHNSON
### CHRONOLOGY
Page 7

04-29-91    Arrest of UUW - Felon and FOID (chasing Mike Edwards, who had shot him); pled on 9-30-91 to misdemeanor; eighteen months probation with 45 days work program; $500 fine

06-05-91    Arrested on Possession of Stolen Motor Vehicle; released on bond

08-1991     Darryl was diagnosed with Vitiligo by Dr. Nathanial Morgan

01-29-92    Arrested for Possession of Controlled Substance; nolle prossed on 3-3-92

05-15-92    Received at Joliet; lost appeal on 1988/89 case; three years on Theft of Motor Vehicle

05-28-92    Transferred to Taylorville Corr. Fac.

07-10-92    Transferred to Vienna Corr. Center

12-22-92    Transferred to Centralia Corr. Center

05-11-93    Paroled from Centralia Correctional Center

*Death of Shower*

12-17-9?    Death of cousin Salima Dantzler in traffic accident

1994        Father was in a nursing home; saw him at Thanksgiving at Kim's house for first time in ten to fifteen years

05-07-95    Death of Darryl "Blunt" Johnson

05-11-95    Discharged from parole

06-09-95    Death of Charles "Jello" Banks

07-03-95    Arrest in this case; held at MCC, Chicago

01-17-97    Transferred to federal medical facility at Springfield, for six weeks, fro treatment of eye condition; returned to MCC in early March

[10-15-97]

# EXHIBIT D

**JILL MILLER, MSSW**
_____
Forensic Social Work Services                    330 East Wilson Street, Suite 100
                                                          Madison, Wisconsin  53703
                                                                    (608) 257-7990
                                                              FAX (608) 256-7909

**CONFIDENTIAL MEMORANDUM TO ATTORNEYS**

**TO:**        Attorneys Jeff Urdangen, Cindy Giacchetti, Juliet Yackel
**RE:**        Darryl Lamont Johnson - Social History Investigation
**DATE:**      April 22, 1997


        Pursuant to our meeting last week and as a result of the interviews I conducted during that trip, I am updating my memo of 1-2-97 with information on phone numbers I have obtained, and additional records and locates that are needed.  I will begin with providing phone information I have obtained for names on the previous memo.

## Previous Sources

Brenda Smith, mother - 773-873-4442 (H), 773-947-0700 (W)
        Address: 7714 S. Prairie
John Johnson, father - 312-808-9644 (H);3245 S. Prairie, # 901
Andre Johnson, brother -708-339-4222 (H);17124 Vollbrecht, S. Holland
John Johnson, brother - through father's number or Andre
Kimberly Williams, sister - 773-846-2947 (H);7828 S. Wabash
Sharon Cresswell, sister - 773-783-5136 (H);7909 S. Eberhart
Benjamin Smith, step-father - through Brenda
Minnie Livingston, paternal aunt - 773-445-4350; 9015 S. Elizabeth
Michelle Gaines, girlfriend - 312-846-0983 (lives with Hoover's wife;
        currently in trial - need to go through her attorney)
Lucky Johnson, daughter by Michelle - lives with Brenda
Bianca Gaines, Michelle's daughter - through Michelle's mother
Kenya Morgan Pettigrew, former girlfriend - 708-798-6354
Lakiesha Hayes, friend - 630-829-1140
Letra Watson, former girlfriend - number needed
Carolyn Demeray, friend - 708-891-3397
Donald Taylor, maternal uncle - may be in Miami
Shirley Dantzler, paternal cousin - 708-489-0153
Mrs. Burford, former special ed teacher at Esmond - need locate
Mr. Weltz or Welch, former basketball coach at Esmond - need locate
Tommy Adams, engineer at YMCA (Darryl worked for him ) - Brenda
Richard Lofton, friend who was shot and paralyzed (shot by Mike Edwards,
        the same man who shot Darryl)
Reginald Fletcher and his sister Sheryl (re:manslaughter charge) -
        can be located through Stacy Curtis, friend
Dwight Conquergood, gang expert, Northwestern U - 847-491-3171 or 3259(W)
        or 773-275-5853 (H)

## New Sources

Stacy Curtis, friend - 708-331-4750
Eugene Austin, friend of father's - 773-779-8404; 1146 W. 104th
Clarence "Billy" Johnson, paternal uncle - 312-225-8241; 2851 King Dr.

Page 2


Michael Johnson, friend who is getting out of jail soon - through his
        mother - 773-779-8953; 1753 Steuben
Junior Prue, childhood friend, Morgan Park area - need locate
Dorothy Rivers, Darryl did some work for her at a warehouse (1983)
Willoughbys, neighbors and friends of family - ask Brenda or Andre
Louise Martin, neighbor in Morgan Park - ask Brenda or Kim
Kevin Matthews, friend of Andre's - 773-224-7757
Eileen Dean, an older woman with whom Darryl spent time as a teen,
        lived around 109th and Esmond (also her mother Helen Richardson) -
        through Stacy Curtis
Tony Livingston, paternal cousin - through Minnie
Ron Livingston, paternal cousin - through Minnie
Ron Showers, Jr., son of friend of Darryl's who was killed - through
        Michelle
Theresa Fletcher, Sherry's sister - through Stacy Curtis
Jane McBane, Ricky Johnson's widow - through Kim
Helen Sanders, friend - through Kim

        Please refer to the memo of 1-2-97 re: records that are needed, and continue to try to obtain these. In addition, we need information on the Morgan Park neighborhood (Darryl lived there from 1971 on), including changes over time. Darryl spoke of a pool hall at 111th and Vincennes, where he said "it all started." Any information on this location, and police contacts with it would be useful. There may be records of police calls re: domestic abuse when John, Sr. was in the home. The family said that the precinct that was called was at 48th and Wabash. Darryl saw a Dr. Morgan in about 1992 re: his skin condition. He thought the office was in the area of 112th and Halstead. Try to locate this doctor and get his records. Obtain the divorce records for Brenda and John Johnson; they were divorced in about 1970. Darryl was seen by a social worker at the Chicago Board of Health on Monterey, between Hale and Longwood (in the area of 111th) in about 1970. Try to track down the records and the social worker.

        Darryl was drawn into the business by Richard "Ricky" Johnson, out in the Morgan Park neighborhood. Johnson was later shot and killed. It would be helpful to get information about his death, and about his background, e.g. criminal history, role in the Disciples, family, etc. He died while Darryl was in prison at Menard, and this was described as a traumatic event for Darryl. Verify the deaths of Reginald Tolbert, in Morgan Park in about 1977 or 1978, and the death of Wilbert Showers, who was shot in the early 1990's. We need all the MCC records, including discipline and medical, and all the records from Darryl's stay in Springfield. Locate a book on gangs by George Knox of Chicago State University (Conquergood may have a cite). He is likely to be relied on by the government, and we will want to anticipate their approach to the gang issue. Another gang expert that the government may call on is Yablonski, whose work is similar to Knox. His book was published by University of Chicago Press. Irving Spergel, University of Chicago, is another recognized expert on gangs. I spoke to him at the time of the Davis case. Conquergood reports that he uses police department data in doing his work, which is faulty.

Page 3


I am awaiting the materials related to the case that you said you would furnish. Any news accounts of the Hoover trial that mention Darryl should be obtained and provided, as well. We also need to do some research on the victims. Begin with their criminal histories and obituaries. We need to anticipate victim impact evidence, and need to diminish the effect of it in the guilt phase. Please furnish records as they are obtained. I would like to return to Chicago in a few weeks, and hope to spend three days. I need a long session with Darryl. If teachers can be located before school is out for the summer, I will try to come before then, so I can interview them. Andre will keep me apprised of his father's condition. I said that I could come down on short notice to interview John, Sr. if he is having a good, i.e. lucid, day.

As you can see, there is much to do. I am anxious to hear how Mike Gelbort's session went. Let me know as soon as you know something. I'm sure we'll be talking soon.

# EXHIBIT E

**JILL MILLER, MSSW**

Forensic Social Work Services

330 East Wilson Street, Suite 100
Madison, Wisconsin 53703
(608) 257-7990
FAX (608) 256-7909

## CONFIDENTIAL MEMORANDUM TO ATTORNEYS

**TO:**       Attorneys Jeffrey Urdangen & Cynthia Giachetti
**RE:**       Darryl Johnson - Preliminary Social History Findings
**DATE:**     August 8, 1997

Preliminary results of social history investigation are summarized below to aid other experts in conducting their assessments. The social history investigation in ongoing, and further results will be reported at a later time. Major findings to date include:

1.     Early (pre-birth) family history - Hereditary/Genetic factors and factors affecting his parents (their functioning, including parenting): There is a family history of alcohol and drug abuse on both sides of the family. Brenda's parents were both drug addicts; her mother abused alcohol. Her father was a major drug dealer. Both parents were incarcerated. Her brother abused drugs. Though Brenda has not abused alcohol or drugs, she is a classic child of an alcoholic, and fits the role of super-responsible child. Marrying an alcoholic (and marrying young, while pregnant) are also child of alcoholic behaviors. John, Sr.'s mother abused alcohol, as did his maternal grandmother. John, Sr. and his sister Ruth (deceased) are/were alcoholic. John, Sr. was also a compulsive gambler. John, Jr. appears to be the only child of Brenda and John, Sr. to abuse alcohol. Others report a low tolerance for alcohol - Darryl, Kim and Andre. Each child in this family fits a role of child of alcoholic: Andre is super-responsible; Kim is a placater; Sharon was a caretaker early, then became immature and self-centered - she married a man who abused substances and was abusive towards her; John, Jr. is alcoholic; Darryl was emotionally dependent and immature for some time, with some acting out (also had problems with relationships of trust and intimacy), then became a caretaker.

John, Sr., the youngest of five children, was only two years old when his father died. He was reportedly spoiled, as the baby of the family. The family received welfare. He reportedly attended school only through the ninth grade (he earned his GED in the Air Force). He did not abuse alcohol prior to being in the Air Force. Brenda has one brother, who lives in Miami, and with whom she has had little contact. Brenda's father physically abused her mother. He then left her mother and lived openly with another woman. Brenda's mother reportedly had a number of men in the home. Minnie Livingston believes that Brenda was accosted by men who stayed with her mother at various times. Brenda had little supervision or guidance. Brenda was out riding motorcycles with John, Sr., when she was twelve years

Page 2

old and he was fourteen or fifteen. She became pregnant at age thirteen. She gave birth to her first child at age fourteen, two days before her mother's death, from ovarian cancer. There is a history of cancer on Brenda's side of the family. Brenda then went to live with John, Sr.'s family. She and John married shortly after Andre's birth. She had five children in eight years (by age twenty-two), plus three miscarriages, including a set of twins. It appears that John. Sr.'s abuse of alcohol and physical abuse of Brenda began while he was in the Air Force, and they were living on or near Andrews Air Force Base, Washington, D.C. (1956-61).

There is a family history of mental illness on Brenda's side of the family, and a family history of Attention Deficit Hyperactivity Disorder (not clear yet where this comes from). Brenda's Aunt Mabel, with whom she was very close, was an alcoholic and was in and out of mental hospitals a number of times. She reportedly suffered from "nervous breakdowns" (diagnosis of paranoid schizophrenia). Brenda's nephew (her brother's child) has schizophrenia, and is currently in a halfway house. Other relatives on Brenda's side of the family have had mental health problems ("nervous breakdowns"). Brenda has been treated for depression. John, Sr. may have suffered from depression. There are multiple members of the family that appear to have ADHD (which is often hereditary), including Darryl, Lucki, Andre's son, Kim's son, Sharon, Sharon's daughter, Sharon's grandson, John, Jr., John's son (probably more, if we really look). This can have an hereditary basis. No one else seems to suffer from low cognitive functioning similar to Darryl so, review of prenatal and birth records is important for any clues.

2.    Birth: Darryl's birth appears to have been normal, with no anomalies apparent; birth weight of 7'6". Brenda was hospitalized, however, one month before his birth for false labor. The family moved to the newly opened Robert Taylor Homes in June, 1963, five months before Darryl's birth. By the time of his birth, Darryl's father had become an alcoholic and had been physically and verbally abusive towards Brenda for some time (appears to have begun while they lived in Washington, D.C.).

3.    Cognitive deficits/impairments: Darryl was diagnosed as a slow learner early, and placed in EMH (educable mentally handicapped) classes. Recent testing reveals a full scale IQ of 76 (mentally retarded is 70-75, with adaptive skills deficits). Developmental delay occurred in the area of speech; he did not talk until he was two years old. He was taken to Cook County Hospital for evaluation at that time (search for records is ongoing). Behavioral observations of family members and testing are indicative of probable Attention Deficit Hyperactivity Disorder (linked to impulsivity, poor judgement and risk-taking behaviors). This disorder appears to run in the family.

4.    Early family life - chaotic and violent: Darryl spent the first six years and three months of his life in the Robert Taylor Homes. The condition of the homes rapidly deteriorated. Large numbers of persons were confined to a small space. Physical condition and safety of

Page 3

buildings deteriorated. There were large numbers of children, including adolescents, with nothing to do. Poverty rate was high. Residents were almost totally African-American. Gang activity (Blackstone Rangers) was present, with pressure on young people to get involved. Uncle Clarence "Bill" Johnson opined that Taylor Homes were built for political and economic reasons, to keep minorities together in a small space. When Darryl was still a pre-schooler both parents were working second shift - Brenda at the Post Office and John, Sr. at Railway Express. Finances were still a problem for the large family. Darryl was looked after by his older siblings (Andre and Sharon), who were quite young themselves.

Ben Smith noted that during her pregnancy with Darryl, Brenda was in an abusive relationship with an alcoholic husband; she was under a great deal of stress and had four young children to care for during the pregnancy. Over the years, especially after she started working, John, Sr. became increasingly jealous, possessive and abusive. The older children enjoyed some pleasant times with their father, and were able to develop a relationship with him. Darryl's only memories of his father are of his mistreatment of his mother and his failure to support his family. He never had a positive relationship with his father. He witnessed a great deal of physical and verbal abuse of his mother by his father. The police were called to the home numerous times. There were a number of times that Brenda gathered the children and fled to a relative's home, usually Minnie Livingston's (John, Sr.'s sister).

In 1968, John, Sr. was laid off from his job at Railway Express. He never held a steady job after that time. He did not support his family. Brenda filed for divorce in 1968, but then reconciled with John. Brenda was robbed at gunpoint in Taylor Homes (there may have been two robberies). Shortly after that she and the family left Taylor Homes and moved back into John, Sr.'s mother's home on S. Prairie. Mrs. Johnson had died by this time, but family remained in the home. The death of Minnie Johnson was a loss for Darryl, who had been close to his grandmother. John, Sr. continued to be abusive towards Brenda. Family members, including Minnie and her daughter Shirley personally witnessed incidents.

Brenda left John and the home on S. Prairie in 1970. John, Sr. continued to harass her for years afterward. He would frequently phone her or would stand outside her home yelling at her and verbally demeaning her. Darryl would witness these incidents. Brenda had to work two jobs to try to support the family. They struggled financially. There were times there was nothing to eat in the house. Brenda would go to the grocer's and beg for food until payday (this continued even while they lived in Morgan Park). At times they ate ketchup or syrup sandwiches, or pancakes for dinner. Sometimes they would go to relative's or neighbor's for something to eat. Christmases and birthdays were difficult; they had very little. They had few clothes, which were often hand-me-downs, though Brenda kept the children neat and clean. Darryl was aware of the family's difficult circumstances and his father's failure to help the family. He was devoted to his mother - extremely attached to her -

Page 4

and did not like to see her struggle. His memories of her struggles were indelibly etched in his mind.

Darryl is described by all as an active and energetic youngster, but also a quiet child, who was a bit of a loner and extremely attached to his mother. Brenda reported that after she and John, Sr. divorced, Darryl stopped talking for a time. He wanted to be with his mother all the time, and was extremely demanding of her attention. Family described Darryl, as a child, as withdrawn and a loner.

5. School - Special Education and Self-Esteem: Darryl started school at Mary Terrell at age four, in a pre-school class (1968). This was a time of great turmoil in his home (see divorce records). He was one of the slowest children in the class, and did not seem to communicate much. He did not mix well with other children. He attended Terrell for a year and a half; then transferred to Douglas School in 2-70. In the fall of 1970, he enrolled in the first grade at Dumas School (three schools in three years). In 1971, Brenda moved the family to Morgan Park. Darryl was enrolled in the second grade at Esmond School (fourth school). This number of school changes is problematic for any child, but particularly for a low-functioning child with special needs, who is somewhat withdrawn, immature and dependent (and who had experienced a high level of emotional turbulence in his home). We know that by this time he had been determined to be in need of EMH services (special education for educable mentally handicapped, e.g. mildly or borderline retarded). His second grade teacher, Edith Burford, took a special interest in him and gave him extra attention.

Darryl referred to himself as "slow", as did family members. It clearly bothered him to have this label attached to him. He was made fun of by other children at school because of this. Brenda recalled that Darryl would often cry about being teased and because he had such a hard time with schoolwork. She had to work long hours, and was attending school, so she was able to give him little help. Kim worked with Darryl to help him learn to read. At age twelve he was identified as a virtual non-reader. Brenda recalled that when he was little his father would "threaten and hound him" to be more like his siblings, who were good students. All of Darryl's siblings are cognitively competent. He felt he could never compete with them or be as good as they were at anything. Darryl did not like to go to school because of his low functioning and the teasing he received. He was easily frustrated in school and was distractible. He just gave up. Except for Ms. Burford, he could remember none of his teacher's names. He did not participate in organized activities at school. The neighborhoods in which the family lived, and, therefore, the schools, were segregated - primarily black. The quality of education in Chicago's inner city schools, especially for children with special needs, was poor at the time. All family members report that Darryl's self-esteem was severely affected by his low functioning and by being identified as "slow"/EMH. Ben Smith noted that Darryl always questioned his worthiness and ability; he was always looking for approval.

Page 5

Darryl's elementary school years, from second through eighth grades, were spent in the Morgan Park neighborhood. During that period the neighborhood changed rapidly from one that was integrated to one that was primarily black, due to white flight. Brenda worked, went to school, and was involved with Ben Smith. Though she was always a loving mother, she did not spend much time with Darryl. He was often in the care of older siblings or left to fend for himself. Sharon, who had looked after him much of the time, became pregnant at a young age (16 or 17, in 1975-or 1976). His father was non-existent in his life; Darryl wanted nothing to do with him anyway. As he approached his teens, he was out in the streets and neighborhood more, and subject to the influence of the neighborhood gang, the Gangster Disciples. It appears he had few, if any, close friends. Darryl began truanting during high school. His performance was poor. He withdrew from Morgan Park High School (or just stopped attending) in the spring of 1980. He started spending time at Eileen Dean's house, on Esmond. He was using marijuana, and probably selling a little marijuana. At the time, marijuana was the thing in the neighborhood; cocaine did not come into the neighborhood until he returned from his first stint in prison.

In June, 1980, Darryl entered the alternative school at Central YMCA (which it appears he only attended until early 1981). By that time, he had hooked up with Ricky Johnson, the neighborhood drug dealer (marijuana). Darryl said that he idolized Johnson. The pressure to get into the gang (Gangster Disciples) in the neighborhood was "relentless." It was not highly structured or organized at that time. Andre was able to avoid it because he was an honor student and bookworm, college bound. John, Jr. flirted with the gang - was on the fringes - but was a talented athlete in school and an average student who went on to join the military.

6. Darryl's need for acceptance and belonging, and to feel good about himself made him vulnerable to gang recruiters. He was also a passive and easily led adolescent. The center of the marijuana selling trade was at 111th Street and Vincennes. As a teen, Darryl had little supervision, guidance or limits. He drifted into the gang and the selling of marijuana. His mother married in 1981, moving out of the house on Hermosa, and leaving Darryl, Sharon and Kim there. Andre was in college and John, Jr. in the service. Darryl was pretty much on his own. Darryl's marijuana use was regular (daily) through the early 1980's, until his incarceration. He had some occasional employment prior to his first incarceration, but his lack of education and skills, and his low functioning, combined with the fact of being African-American meant that only menial, low paying jobs were available to him. Ben Smith noted that teens got drawn in by being offered a way to make quick money..."go to the corner and take this package to this man for $10...or stand on the corner and tell us if the police are coming...get $50 a day...take that home to Momma, who is living on food stamps...so he has sanction at home (and in the community)... making money to help out...gets hooked."

Page 6

Darryl's involvement in the offense which led to his voluntary manslaughter conviction was a turning point. At the time, he was a regular marijuana user and occasional drinker, and a low-level seller of marijuana. His low cognitive functioning and ADHD contributed to impulsivity and poor social judgement. In the situation, he felt he was helping a friend and protecting the friend's sister. He is described as extremely distraught upon learning that Jesse Simpson had died, and extremely concerned about Simpson's family. He was also terrified of being incarcerated. He was actually twenty-one years old (not nineteen, as previously thought) when he was incarcerated at Menard, though he functioned socially and emotionally at a lower level. He was not well-prepared for the prison experience.

Two things did happen while Darryl was in prison that had an impact on him. The first was the death of Ricky Johnson (I believe he was shot and killed). Darryl said that Johnson had been trying to turn his life around at the time. He was going to college and trying to find a way out of the drug economy. He had a family and was "stepping away from the life." He was turning away from violence. He had been Darryl's mentor. Darryl was extremely upset about his death. He stopped using marijuana at that time, and did not abuse substances again. The second thing appears to be his recruitment into the serious and more organized drug dealing of the Gangster Disciples. They were extremely organized in the jails and prison system. There was a formal screening process when someone entered the prisons, and distribution of literature. Darryl made the decision to become more involved in selling drugs when he left prison; it is while in Menard that he made this life choice.

Darryl's reasons for this career choice were his desire to gain respect (especially self-respect/self-esteem) and to earn money to take care of his family. Money would enable him to help his mother, whose financial struggles he had witnessed throughout his life, as well as others in his family (see below), and to feel successful (enhance his self-esteem). Stating, "I always had dreams...just because I'm slow doesn't mean I don't have dreams," Darryl said he knew of no other way to compete with his siblings or to make the kind of money, and have the material things, that symbolized success in America. Like most young people, he wanted the outward symbols of success in our society, e.g. car, clothes, jewelry. He said that in his community, and his circumstances, selling drugs was how a lot of people "got things...it was on every corner." Others noted that in Morgan Park many people in the neighborhood were connected to the drug economy. David (nephew) said it was a way of life for kids in the neighborhood, accepted as part of the culture of the neighborhood.

By this time he had several obstacles to legitimate opportunities: low cognitive functioning; being black (especially young, black male) in a racist society; no education, and no training or job skills; and being a convicted felon. In the world of the underground economy the fact of having spent time in prison, especially for having shot someone to protect a friend's sister, earned him automatic respect in the streets and neighborhood. John, Jr. noted that in this world he could be "be a big shot...the fact he couldn't read didn't matter." Ben Smith said that Darryl got "caught up trying to be somebody...brothers and sisters were accomplishing

Page 7

things...he wanted to compete...be as good...saw having money as a sign of making it ...drug dealing as the easiest, quickest way to have money." Stacy Curtis, who met him shortly after he got out of prison in 1986, said that Darryl started selling cocaine as a low-level street dealer. He said he was just going to do it for a little while; he wanted to get some money together and start a business.

Darryl progressed in the drug economy over the years. When he came back into the neighborhood in 1986, cocaine/crack had become the main drug that was sold (previously it had been marijuana). It became known that he was selling, and making money. He earned respect in the neighborhood. Then others he knew would ask him to get some for them. Suppliers became willing to front him because he was known to pay his bills. He was then able to obtain larger amounts. He gradually became a coordinator; he had people selling under him. Curtis said these were generally people he knew, and were generally his same age. He was making more money, and spending more money. At first, he seemed to need to have the outward symbols of success. He dressed in flashy clothes, wore jewelry and drove a Mercedes. As he gained in confidence, he did not need these things as much. He did help his family financially. He also helped others (see below). By 1989, Darryl was reportedly a governor in Morgan Park. He remained in that position until he went to prison in 1992. When he came out, he was reportedly on the Board of Directors, where he remained until his arrest.

Over the years of his involvement in the drug economy, Darryl was exposed to violence. He was shot. A friend was shot and paralyzed in the same incident. He lost other friends to violent deaths (particularly the Showers). His early life had been violent, as well. Witnessing violence and suffering traumatic losses caused him to develop self-protective behaviors, including numbing of feelings. He said that, growing up, "violence (was) all around you...you have to turn off your emotions to survive." In his world, violence was dramatized, romantized and justified. Compounding the problem is the sense of futurelessness and fatalism that young black men develop. Homicide rates and incarceration rates of young black males leads to a belief that they will be dead or in prison at a very young age. This facilitates rationalization of involvement in the drug economy where quick money can be made. I believe Darryl did not feel he would last long in the business - he knew he would be dead or in prison. Towards the end he evidenced increasing signs of stress and anxiety. The Vitiligo is an immune system disorder exacerbated by stress. His hair was falling out. He had a nervous stomach, and a rash. He had symptoms of depression and anxiety, including hypervigilance. The death of his cousin Salima in December, 1994 was a devastating loss for him. He talked about wanting to get out. While he may, at times, have not believed he could get out, he did make some plans. He even sent Michelle to Atlanta in early 1995 to look for a place for them to live. He worried about having enough money to start a legitimate business. Michelle said he did not have that much money; they were often behind in the rent and other bills. He told Kim that he wanted to get out of the business, but that he feared for the safety of his family if he tried.

Page 8

## Positive Qualities and Acts/Good Deeds

Collateral sources reported that Darryl has exhibited positive qualities and has performed acts of kindness towards others. There are many examples of this. This demonstrates, in many ways, his true concern for his family and others, and an understanding of his own mistakes, including an awareness of the wrongfulness of what he was doing. Family and friends know describe Darryl as warm and caring, generous and loyal, friendly and affectionate. Some examples:

He was determined that his children not be exposed to what he was exposed to growing up (domestic violence). He was careful with Bianca and Lucki, making sure they were not exposed to this.

When Lucki was born, the delivery was by caesarean. Darryl was present for her birth. Michelle remained hospitalized for twelve days. Darryl took a bed at the hospital and remained with her. He did nighttime feedings, changed and bathed Lucki in the hospital.

He participated in all aspects of care for both daughters, feeding, changing, bathing, reading to them, taking them to the park, etc. He made sure they had good health care, as well as good educations.

He made sure that Bianca and Lucki went to good schools (private schools), and that they are receiving a good education.

He always treated Bianca as though she were his biological daughter, and treated her the same as Lucki. He is the only father Bianca has known. She calls him Daddy. Her biological father died in 1991.

He met Michelle when she was pregnant with Bianca. He was with Stacy Curtis at the time. Michelle's good friend had just died. She had no money. He bought her clothes to go to the funeral. Then he got her an apartment and furnished it with furniture and equipment for the baby, and food. He bought her maternity clothes. At this time, they were only friends, though they soon became involved.

As a teen, when he worked at the YMCA, other odd jobs, or even selling small amounts of marijuana, he would do things for his cousins and other children in the neighborhood, like buying everyone ice cream or soda.

Page 9

He often brought children from the neighborhood home to eat, if they had nothing to eat. He helped an elderly lady (deceased) in the neighborhood, when they lived on Ellis, by doing errands and chores for her.

He has helped family and relatives out financially, including giving them food, or money for clothes, furniture, or to send children to school.

When Richard Lofton was shot and paralyzed (while with Darryl, in Darryl's car - drive-by shooting), he brought Lofton home from the hospital to the apartment that he and Michelle shared, and personally cared for Lofton for months, including bathing, feeding, and carrying him.

He encouraged his nieces and nephew in school, constantly reminding them to stay in school and finish their education. He helped some of them with college expenses. He constantly stressed the importance of a good education.

He has always remained absolutely devoted to his mother, and respectful towards her. He has done things to help her over the years.

He wanted Lucki to have a safe, stable and normal upbringing, so he placed her in the care of his mother, though he spent a great deal of time with her. His greatest gift to his daughter has been the stable and loving home in which he chose to have her raised. He continues to encourage Lucki and Bianca in school and in their activities, including rewarding them for good report cards.

He encouraged his nephew David, an honor student, in his education. He kept him out of the gang. He helped him with college expenses. He bought him a car for getting back and forth from college. He told David that he regretted not finishing school and told him that being in the streets is no way to live. He has motivated David to do well and to achieve (he is a recent college graduate and a devout Muslim). He encouraged David in his faith. He has been a good listener, and someone David could talk to about problems. David said that Darryl even pushed other kids in the neighborhood to go to school, and rewarded them if they did.

He has been like a father to his niece Nicole. He has helped her financially. She is eighteen and has two young children. He encouraged her to stay in school, even when she had the babies. She did finish high school. He took care of Nicole one summer when her mother was working.

He was a good friend to Carolyn Demeray, and encouraged her to stay in school. She, too, is a single parent. He has read books and articles on child development and child rearing, and shared these materials with her.

Page 11


## AGGRAVATING FACTORS/ADDITIONAL AGGRAVATION


**Noticed Aggravating Factors**

I. Count Five and Count Six - Murder/Intentional Killing of Darryl "Blunt" Johnson
  **A.** Threshold Culpability Factors

  1. Intentional Acts to Take Life or Use Lethal Force (death of Darryl "Blunt" Johnson)

  2. Intentional Acts in Reckless Disregard for Life (death of Darryl "Blunt" Johnson

  **B.** Statutory Aggravating Factors

  1. Procurement of Offense by Payment - alleges that he paid money to Anthony Copeland to shoot "Blunt" Johnson

  2. Substantial Planning and Premeditation (conversations with Roger Stewart, et. al. re problems caused by "Blunt" cooperating)

  3. Continuing Criminal Enterprise Involving Drug Sales to Minors - alleges that the CCE involved the distribution of drugs to persons under the age of 21 (information as to Darryl's participation in, or knowledge of, sales to minors?)

  **C.** Non-Statutory Aggravating Factors

  1. Vileness of the Crime - Johnson ordered the murder in order to obstruct justice.

  2. Future Dangerousness - probability that Johnson would commit serious acts of violence in the future which would be a continuing and serious threat to society. Alleges numerous instances of violent criminal conduct including: (1) ordering the murder of Gregory Sharp; (2) threatening and ordering the beatings, shootings and /or murders of gang members for violating rules (some specific acts detailed below); (3) urging and ordering GD members to commit acts of violence against rival gang members, including drive-by shootings (see below); (4) planning to kill a witness against him while he was incarcerated at the MCC (presumably the "threat" against Quan); and (5) conviction for the voluntary manslaughter of Jesse Simpson in 1983.

  3. Victim Impact - impact upon the victim's family ("devastating!") [Obviously, we need all information possible on Darryl "Blunt" Johnson, including his criminal history, role in the gang, acts of violence, and his family]

Page 12

II.    Counts Seven and Eight - Murder/Intentional Killing of Charles "Jello" Banks

    A. Same as above

    B. Statutory Aggravating Factors

    1. Previous conviction of violent felony involving a firearm (the voluntary manslaughter conviction for the shooting of Jesse Simpson)

    2. Procurement of Offense By Payment - paying Quan Ray with an automobile

    3. Substantial Planning and Premeditation

    4. Continuing Criminal Enterprise Involving Drug Sales to Minors

    C. Non-Statutory Aggravating Factors

    1. Future Dangerousness - same as above

    2. As to Count Eight only - Vileness of the Crime - Johnson ordered this murder because he believed Banks was cooperating with federal authorities and to obstruct the effective enforcement of the law

    [Notice: they do not allege victim impact on Bankcs]


**Other Aggravating Evidence/Information** : that will be used to support Future Dangerousness or that will be presented in the guilt phase (from statements and Grand Jury testimony)

-    Larry Hoover is the only person above Darryl "Pops" Johnson in the Gangster Disciples; Pops generally relayed his orders through Roger Stewart

-    The offense of involving minors in the distribution of drugs is aggravating (will be viewed as such by the jury)

Pugh Affidavit/testimony:

-    Pugh joined the Gangster Disciples at age 12 or 13; sold marijuana as a teen in Morgan Park; sold for Ronnie Showers (as did Richie Wash and Roger Stewart); Showers got his marijuana from Darryl

Page 13

- At age sixteen he worked security for Darryl; the first time he did this he was paid $50; was seventeen when he sold (distributed/delivered) for Darryl

- Darryl directed the drug business from prison during 1992-93; he used Michelle Gaines (the mother of his children - thereby placing her at risk) and others to direct the business

- Pugh witnessed the violation of Delano "Trouble" Finch the day that Darryl got out of prison (5-11-93); Finch was given a "pumpkin head" for messing up the peace treaty with the Vice Lords - he lied to Shorty G; Mike J (Johnson) told Finch that Darryl said he was in violation; Finch accepted the violation; he ended up at the hospital

- Pugh was made to take a violation for not taking a gun charge (not taking the weight) for Big Rog (Roger Stewart), who had already been in jail/prison; the violation was a punch in the eye from Stewart after Darryl asked Pugh why he didn't take the weight

Finch Testimony/Affidavit:

- When Finch was a governor he violated members on orders from Darryl, e.g. Dre - Darryl ordered him violated for being responsible for getting a member murdered

- Finch was violated by Darryl when Darryl got out of prison because he had argued with Darryl while he was in prison; had to go to the hospital (medical records from St. Francis Hospital confirm that he was treated in the ER for head injuries from being assaulted on 5-11-93, the same day Darryl was paroled from Centralia

- As a director Darryl had the power to name governors, assistant governors and regents, e.g. he made Finch governor of the south suburbs the night that Ronnie Showers was murdered; he took this job away from Finch when he got out of prison

- Darryl gave Nation Work to governors, etc.; the quality of the nation dope was poor and the price was high - $1200 (the cocaine had been "stepped on" several times - good cocaine was $800/oz.); he required members to sell a certain amount of Nation Dope

- BJ reported that Parks told his partner to kill BJ because Darryl thought BJ was cooperating (BJ was governor in Minnesota after Noonie Ward)

- Finch heard a conversation between Darryl and Parks in which Darryl told Parks to get together with Herron (Harold Jackson) to eliminate a situation; Finch believed that Darryl wanted Herron killed; Herron was removed as regent

Page 14

- Darryl had Finch's name on a list of people he thought were cooperating; Darryl saw Finch in the bullpen the day of Finch's proffer; Darryl told Finch he saw Finch's family in court (which can be interpreted as a threat to harm Finch's family)

- Richie Wash told Finch that Darryl wanted Lance and someone in Roger Stewart's family killed because they could testify as to who killed Jello and Blunt

- Richie Wash told Finch that Quan Ray murdered Angel (nothing about an order from Darryl, though Quan was known as enforcer for Darryl)

- Finch heard Darryl say that he wanted Capone and Victor Thompson murdered; Darryl personally went looking for Capone

- Darryl sent Roger Stewart, Kevin Williams and Blue to shoot up Victor Thompson's mother's house; Darryl told Finch to send a couple guys with them; Darryl talked about shooting up and burning Thompson's mother's house

- Finch was present when Meechie and two of his guys told Darryl they had murdered Capone's brother, E-Man (presumably for Darryl)

- Eight Ball was murdered by Quan Ray and Mendell; Eight Ball worked as security under Victor Thompson; Darryl had Eight Ball killed so it would be easier to kill Thompson

- Richie Wash told Finch that Darryl had Stan murdered; Stan was one of Darryl's guys

- Finch heard Darryl tell Thael ( or Thel - Jathael Garrett) to kill E-Man, Victor Thompson's brother; he also heard Darryl tell Meechie to kill Kenny, Thompson's nephew; Darryl said if they didn't do it, Trouble (Finch) and Fool (Parks) would kill them (Thael and Meechie); Darryl gave them a week to do the murders; within a week E-Man was dead (Ricky G was, however, locked up for the murder; there was also a rumor that the opposition killed E-Man)

- In March, 1995, Finch's house was shop up; Darryl blamed it on Victor Thompson and Thompson blamed Darryl

- Murder of Gregory Sharp (G Sharp): Sharp was a governor; Finch said that Darryl told him that the other governors were complaining about Sharp, alleging that he was mistreating members; Darryl said he was going to "holler at" G. Sharp; there was a meeting in the gym at the Boys Club during which Darryl and G Sharp had a heated discussion; a week before Sharp's murder Darryl said he was going to hit Sharp (though Finch could not recall the exact words); logistics were discussed; on the day of Sharps murder, several GDs met at a gas station; Darryl told K-Dog, Parks and Finch to kill G

Page 15

Sharp whenever they got the chance; later Sharp was in a car going down the Dan Ryan; Parks said "it's a go"; K-Dog and Heavy (not Roger Stewart, but a different Heavy) shot Sharp and Otis; Parks called Darryl and told him that they took care of it

Roger Stewart testimony/statement:

- Darryl had Michelle Gaines (the mother of his children) get guns and ammunition for the GDs; she picked up and delivered drugs and money, and picked up burn-out cellphones for Darryl

- Stewart implied that Darryl had Finch violated by Mendell and Mike J after Darryl got out of prison because he didn't like the way Finch handled the business in Morgan Park while he was away

- Darryl had Stewart violated for failing to go to the funeral of a GD drug dealer; Darryl had two other GDs violated for the same reason

- The GDs who worked security were usually fourteen or fifteen (though as old as twenty-five); security made sure the streets had lookouts; they had guns

- Darryl told Parks to have some GDs drive by and shoot up Victor Thompson's mother's house and burn the garage down; Parks had K-Dog and his crew do the drive-by shooting

- Darryl told Richie Wash to "stand strong, stand on his function...don't let anyone play you." Richie took the advice too seriously and shot someone (Stewart said Richie was talking crazy)

- Quan Ray would do violations and executions for Darryl; he was Darryl's enforcer

- Jamie Pugh did whatever Darryl ordered him to do

- Darryl ordered the murders of several people, including "Blunt"

- Murder of Angel: Darryl thought Angel had something to do with the murder of Ronnie Showers; Angel was a rival coke dealer; the day Angel was murdered Q asked Stewart for a gun; later Q said he had murdered Angel; Q did this murder to get back in Darryl's good graces; Darryl bought Q a car

- Darryl would buy cars for GDs for their silence

Will Showers statement/testimony:

Page 16

- The death of Ron Showers: that night Darryl was going, with Will Showers, to talk to Capone (a member of another gang); Darryl and Capone's nephew had words, and Darryl hit him; the nephew got a gun and fired it, but it didn't go off; Will Showers was given a gun and shots were exchanged - no one was hit; later Darryl wanted Will to go back and get Darryl's rental car; Ron Showers said he would go for the car; Showers left with Speedio and Bugaloo, and Will followed; Will heard gunshots; when he pulled up he saw a body lying in the street - it was Ron Showers, who had been shot by a rival gang (Darryl felt responsible for the death of Showers, who was a close friend)

- A few days after Showers death, Michael Harris, Capone's brother, was killed; Will Showers was present at Finch's, with Darryl, Finch and Parks when Parks said to Will that he "got them" for his brother; while there is no statement that Darryl ordered this, Darryl did give Will some work after this, including picking money up from Darryl's workers and delivering drugs

Debriefing of Delano Finch:

- Darryl was having problems with Victor Thompson, a GD governor; he wanted Thompson killed but was unable to do so; Darryl told Jathel Garrett (Thel/Thael) to kill E-Man, Thompson's brother - E-Man was killed; Darryl told Meechie to kill Kenny, Thompson's nephew - Kenny was not killed

- Darryl told Dollar Bill (may be Lamar Rozier) to kill Mike Edwards, who had previously shot Darryl (need to get the circumstances of shooting, which Finch may have wrong); later Darryl said that Dollar Bill "took care of that"

- Patrick White, a supplier of cocaine to the GD's and close associate of Darryl's, said that he had kilos of cocaine and money stolen from him by two GDs; Darryl wanted to find out who was responsible; two possible GDS who located and were taken to a residence to be interrogated by Darryl; the subjects were told they would be beaten if they didn't reveal the whereabouts of the cocaine and money; the subjects were stripped and beaten, including with a metal pipe; salt was poured on their wounds; hot curling irons were used to burn their chests; at some point Darryl left, then returned, stating that the two didn't know anything; they were released

- Finch was present at times when Darryl ordered violations on numerous GDs; he heard about other violations ordered by Darryl; some beatings required hospitalizations. Victims of violations/beatings included: Finch, Roger Stewart, James Yates, Dre, Blue, Sherman Moore, Andrew Howard, Torrence, William Edwards, Jathel Garrett, Patrick White, Victor Thompson, Mendel, Quan Ray, Jamie Pugh, Mickey Red, Charles Dorsey, Raynard McDowell, Lil Rob, Germaine Haslett, Meechie, and Dollar Bill

Page 17

- Quan Ray, who was enforcer for Darryl, was involved in the murders of Gregory Sharp, Charles Banks, Angel and Eight-Ball

Other:

- There are transcripts of Grand Jury testimony by Roshawn Smith, age 16, Alonzo Butler, age 16, and Demetrius Banks, age 13, all regarding the murder of Charles "Jello" Banks. All say the were members of the GDs, but do not describe roles in the drug economy. They may be used, however, as evidence of use of minors

Page 10

## **Prison Adjustment**

Darryl's conduct records in prison, both state and federal, are not really bad. There is the write-up for allegedly threatening Quan, though Quan denies he was threatened. He did participate in programs, including educational programming, and had work assignments. He moved quickly to low-security facilities and received extra good time credits.

# EXHIBIT F

**JILL MILLER, MSSW**
Forensic Social Work Services

330 East Wilson Street, Suite 100
Madison, Wisconsin 53703
(608) 257-7990
FAX (608) 256-7909

## CONFIDENTIAL MEMORANDUM TO ATTORNEYS

**TO:** Jeffrey Urdangen & Cynthia Giachetti

**RE:** Darryl Johnson - Social History
Supportive information for Neuropsychologist

**DATE:** October 24, 1997

This memo provide a summary of my interview with Edith Burford, Darryl's special education teacher at Esmond Elementary School as well as information I obtained from the administrative assistant at Morgan Park High School regarding interpretation of the high school transcript. This information should be helpful to Dr. Gelbort, and should be provided to him. I am assuming that he has the few school records we have been able to obtain. As you know, despite extensive efforts, it has not been possible, thus far, to locate Darryl's special education records from Esmond. Should they be found, they should be furnished to Dr. Gelbort.

### Edith Burford, former special education teacher, Esmond School

Ms. Burford is now retired. She was Darryl's special education teacher at Esmond Elementary School from the fall of 1971 until the fall of 1975. She had the classroom for EMH (educable mentally handicapped) students who were working below the third grade level, and were under the age of twelve. At that time, the school had two special classrooms. One for children up to age twelve (they stayed in the same classroom until they reached the third grade level or turned twelve), and one for children twelve to fifteen, or working at the third grade level or above. The school graduated children in special education at age fifteen, regardless of the level at which they were working.

Ms. Burford said that in order to be placed in her classroom children were tested. An IQ test and achievement testing were done, and additional psychological assessment was performed. A social history was done, as well. To be in her room, they usually had an IQ in the range of 68 - 75. Later, the schools stopped using IQ tests. Her room usually had twelve to fifteen children in it. They each worked at their own level. Her coursework included primary level work, kindergarten through third grade levels. They were promoted within the classroom if they were able to do the work at the next level.

Darryl was in Ms. Burford's room for almost four years. She became close to Darryl and was clearly fond of him. She said he would talk to her about problems he was having. He was a sweet and gentle boy, who always worked very hard and really tried to understand his schoolwork. He had a difficult time with the work, and struggled. He was responsive to her direction. He was polite and respectful.

The special education classroom was in the basement of the building when Darryl entered the program. Later it was in a trailer next to the building. The children were physically isolated from the other children. Special ed children were teased and made fun of by the other students.

Page 2

Burford's room was called "the dummy room." The children felt isolated and different. Darryl, like the other children in the room, wanted to feel good about himself. She tried to encourage him. He had self-esteem problems. She thought that Darryl did learn to read at the third grade level, though he never read well when he was in her room. She left the school the following year, transferring to a different school, and did not know how he did after he left her classroom. Her recollection was that the high school did not have the same kind of special education program. Children were not given the kind of individual attention they received in grade school.

### Mr. Herry Administrative Assistant, Morgan Park High School

Mr. Herry provided some interpretation of the high school transcript. There is a column in the transcript, after each subject, labeled LEV (level). It describes the course level. R stands for regular course level, i.e. the general level at which most students worked. Darryl had only performance classes at the R level, including Music, Art and Physical Education. E or ESS stands for essential, which is below the regular level of achievement. These courses were for children/students who had been in special education at the grade school level. B stood for basic, which was below the level of essential, for pretty low-functioning students. Darryl was at the B level in Math, and in Reading Lab. The Reading Lab was a special resource for low-achieving/low-functioning students. These special levels of coursework constituted the special education services available at the time. None of the teachers listed on Darryl's high school transcript are currently at the school.

# EXHIBIT G

## AFFIDAVIT OF JULIET YACKEL

I, Juliet Yackel, state that the following is true and correct to the best of my knowledge under penalty of perjury under 28 U.S.C. §1746.

1.      I am an attorney and capital mitigation expert specializing in federal capital cases. I have worked on over 40 capital cases nationwide since 1992 in the capacity as lead counsel, co-counsel, and mitigation expert.

2.      The Darryl Johnson case was only the second case in which I served as a mitigation expert - -and it was the first capital case in which I was involved that went to trial and in which there was a capital sentencing hearing.

3.       I am now a nationally recognized expert in the area of capital mitigation, and I train both attorneys and mitigation experts alike in the defense of capital cases.

### Education & Experience

4.      I graduated from Tulane Law School in 1992 and am licensed to practice law in the states of Illinois and Indiana.  I am also admitted to practice before the Seventh Circuit Court of Appeals and the United States Supreme Court.

5.      I started my practice as a staff attorney in the Capital Case Unit of the Office of the Indiana Public Defender.   In this capacity, I handled capital cases in post-conviction proceedings.

6.      I left the Indiana Public Defender's Office in the fall of 1996 to start my own criminal defense practice in Chicago, Illinois. I became associated, through shared office space, with attorneys Jeffrey Urdangen and Cynthia Giachetti.

7.      At the time I moved into their office space, Jeffrey Urdangen and Cynthia Giachetti were representing Darryl Johnson in his capital case pending in the federal district court with The Honorable Suzanne Conlon presiding.

8.      In the fall of 1996, Jeffrey Urdangen asked me to assist him as a capital mitigation expert in *USA v. Tyrone Tidwell*, a federal capital case that was as the pre-authorization phase.  I was appointed by the court to assist another, more experience, mitigation expert in this case.  After a several months, the Department of Justice opted not to seek the death penalty against Mr. Tidwell and my involvement in that case ended.

### Involvement in Johnson's Defense

9.      Around the time my involvement in the Tidwell case came to a close, in about March of 1997, Jeffrey Urdangen and Cynthia Giachetti asked me to assist their mitigation specialist, Jill Miller, in the Darryl Johnson case.  I agreed, since I had previously developed a positive working relationship with Ms. Miller when we worked together on a capital case I handled as counsel in Indiana.

10. At the time, I lived and worked in Chicago, IL while Jill Miller lived in Wisconsin. I was able to assist Jill Miller by meeting with Darryl Johnson, collecting certain records, locating and interviewing certain witnesses in the Chicago area.

**Johnson Defense Team**

11. Since my involvement in Johnson's case, I have accumulated ten yeas of experience in working with lawyers, mitigation specialist, and investigators and other professionals who make up capital defense teams.

12. It is clear to me that sometime in the months before Johnson's trail there was a total breakdown in communication between counsel and mitigation specialist Jill Miller. This break-down it the defense team was never repaired and, in my view, it intensified as the case moved into the capital sentencing hearing.

13. At some point, I served as the de facto liaison between counsel and the defense team. This was not an adequate substitute for direct communication between the parties, particularly since I had absolutely no experience serving as the mitigation specialist at the trial phase of a capital sentencing hearing. Jill Miller, on the other hand, had significant experience in this area – but Mr. Johnson did not receive the full benefit of her experience due to the breakdown in the defense team.

14. One of my assigned tasks was to work closely with Mr. Johnson and I spent a substantial amount of time meeting with him at the Metropolitan Correctional Center. As the penalty phase approached, Mr. Johnson expressed to me his growing distrust of counsel. This distrust manifested in Johnson not wanting to attend the penalty phase proceedings. It was my job each morning of the penalty phase trial to convince Johnson to enter the courtroom.

**Robert Taylor Homes**

15. One of my tasks was to gather information about the Robert Taylor Homes where Johnson and his family lived when he was young. Miller suggested that I look for any documentation of the violent crime rates in the neighborhood. Johnson had not only witnessed his mother physically abused by his father, but had also spent his early years in a neighborhood were violent crime was an everyday occurrence. I started this area of research, but did not complete it. Based on my current training and experience, I believe that documentation of the crime rates and other problems at the Robert Taylor Homes during the time period that Johnson lived there would have helped to convince the jury that Johnson was in fact subjected to violence as a child such that he did not develop the sense of security and safety that Dr. Kostelney testified is so imperative to normal childhood development. The lack of a sense of safety according to Kostelney's and other's research is what drives young men raised around such violence to feel the need to be armed with guns and other weapons. The documentation of the crime rates in Johnson's neighborhood would have also demonstrated that Johnson was chronically surrounded by violence and not just on the occasions that his father beat his mother.

**Turning Point in Johnson's Life**

16. My interviews, review of records, and investigation revealed that the turning point in Darryl Johnson's life was the shooting of Jesse Simpson. Prior to Simpson's death, Darryl had been a quiet and somewhat withdrawn young man who had no involvement with the Gangster Disciples or any other street gang.

17. The time I spent with Johnson led me to the conclusion that Johnson was exceptionally sensitive to violence against women based in large part upon what he had witnessed his mother suffer as a child. It was Johnson's abhorrence of the violence his mother suffered that led him to accompany his friend Reginald Fletcher to Cheryl Fletcher's home in October of 1983. And, it was his undeveloped sense of security that mandated he be armed with a weapon. The violent struggle Johnson witnessed in the Fletcher home triggered Johnson's shooting of Jesse Simpson.

18. I assisted Miller in locating Cheryl Fletcher. Fletcher was outside the courtroom during the penalty phase of Johnson's trial prepared and willing to testify. Counsel were aware that she was there but she was not called to testify. Had Fletcher testified, she would have explained that Johnson shot Simpson after Simpson had stabbed her brother in the face and was attempting to stab him again, in the back. This testimony would have been consistent with her prior testimony before the grand jury and at Johnson's and Fletcher's trial. She would have testified that Johnson was horribly upset over Simpson's death and that he exhibited remorse. This evidence would have contradicted the government's assertions that Johnson had cold bloodedly shot Simpson in the back.

19. One of my tasks was to research the problem of gangs and gang recruitment in the Cook County Jail and Illinois prisons. I had learned that between Johnson's incarceration for voluntary manslaughter and his being indicted in the instant case, the Illinois legislature held hearings on the prevalence of gangs such as the Gangster Disciples in both the Cook County Jail and the Illinois Department of Corrections. Miller suggested that I obtain transcripts of those hearings to learn who had testified for the purpose of identifying possible witnesses who could substantiate that young men incarcerated in the Cook County Jail and the Illinois Department of Corrections were recruited into gangs in order to obtain protection from other inmates. I started researching this area, but ultimately did not obtain the available materials regarding this matter.

20. Johnson's detention and incarceration for Jesse Simpson's manslaughter was the first time he had spent any significant time in jail or prison. I learned through my interviews that Johnson had been the victim of some type of violence while he was detained. In an interview with Brenda Smith, she told me how when she went to visit him at the jail, he was "climbing the walls," crying, and begging her to get him out of the jail. Smith described her son as clearly scared to death. Other witnesses described Johnson as changed when he came out of prison. He was built up and muscular and a member of the Gangster Disciples. Had I obtained information about the legislative hearings on gang recruitment in Illinois jails and prisons, the jury would have been presented evidence which showed that like others, Johnson joined the gang out of a need for protection.

FURTHER AFFIANT SAYETH NAUGHT.

/s/  Juliet Yackel
Juliet Yackel