IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,          )   Docket No. 02 C 6998
                                   )
                    Plaintiff,     )
                                   )
          v.                       )   Chicago, Illinois
                                   )   June 3, 2008
DARRYL LAMONT JOHNSON,             )   10:30 o'clock a.m.
                                   )
                    Defendant.     )

TRANSCRIPT OF PROCEEDINGS - STATUS
BEFORE THE HONORABLE WILLIAM J. HIBBLER

APPEARANCES:

For the Government:          HON. PATRICK J. FITZGERALD
                             United States Attorney, by
                             MR. DAVID E. BINDI
                             Assistant United States Attorney
                             219 South Dearborn Street
                             Chicago, Illinois 60604

For the Defendant:           COTSIRILOS, TIGHE & STREICKER, by
                             MR. TERENCE H. CAMPBELL
                             33 North Dearborn Street
                             Suite 600
                             Chicago, Illinois 60602

ALEXANDRA ROTH, CSR, RPR
Official Court Reporter
219 South Dearborn Street
Room 1224
Chicago, Illinois 60604
(312) 294-0134

(Proceedings had in open court:)

THE CLERK:  02 C 6998, USA versus Johnson for status.

MR. BINDI:  Good morning, your Honor.  David Bindi for the United States.

THE COURT:  Good morning.

MR. CAMPBELL:  Good morning, your Honor.  Terry Campbell on behalf of Mr. Johnson.

THE COURT:  Good morning.

As you gentlemen know, this Court has inherited Mr. Johnson.  And I am trying to get up to speed on the case.  I have very limited documentation of prior proceedings.  Counsel was kind enough to give to my courtroom deputy a disk of portions of the proceedings a few days ago.  And I am trying to orderly collect the entirety of the proceedings so that I can review it and try and decide where we go from here.

Does the government have a complete set of all materials?

MR. BINDI:  Not on disk, your Honor.  We have in various places a complete set of all the materials.  If the Court wants, I can try and put that together.  You know, I don't know what -- what it is that Mr. Campbell has given you, but --

MR. CAMPBELL:  What I provided to him was all of the transcripts from both the trial phase and the penalty phase with the exception of probably about 60 or so pages, I think,

that even Blanca Lara, who was the court reporter doesn't have or isn't able to access at this point.

And right now, to -- at least as far as I know, your Honor, the place to get the remaining transcripts, I think which I assume are in there, would be in that -- the records that are shipped down to South Pulaski. That's where I had gone to get some other things. And I know -- or at least I think that Judge Conlon had called those boxes back. And I don't know if they're in transit or if they're back at that facility.

But as far as the transcript goes, I can identify to Mr. Bindi the pages that were missing. And if he can locate those, that will complete, I think, the transcript portion.

As far as other records, what I don't have access to and I don't know if the Court wants it or needs it, I don't have access to all of the exhibits that were offered into evidence. We have -- I think, at least in large part the issues that are before the Court don't necessarily require all the exhibits. They certainly require some of them, more focused on the penalty phase than on the guilt phase. But I'm not sure if your Honor wants us to try to get those. I don't have access obviously to those.

As far as the briefing that has been done, in particular on the habeas, I can certainly collect all of those and send them over in one package so you have all of that at

once.

THE COURT:  Would that also include Mr. Urdangen's affidavit?

MR. CAMPBELL:  Yes, his affidavit is an exhibit to the initial memorandum in support of our 2255.

THE COURT:  Now, it's probably sort of putting the cart ahead of the horse.  But depending upon the Court's ruling on this habeas, at some point we are going to have to deal with the issue of the entirety of the original trial because it would either entail retrying the entirety of the case, not retrying the guilt phase but having some way to recollect to whatever jury hears the death penalty phase what happened in the guilt phase.

So, you know, thinking ahead, we do need an entirety of the entire proceedings.  Does either side have, for instance, an updated review of Mr. Johnson's adjustment while within custody?

MR. BINDI:  No, I do -- I don't have that, your Honor.

MR. CAMPBELL:  I don't either, your Honor.

THE COURT:  Then either the Court on its own will secure that information.  Or if either of you gentlemen wish to undertake that task, the Court would also need that information at some point prior to resolution of the pending habeas.

Has there been any discussion between the parties about the resolution of this issue?

MR. CAMPBELL: The resolution of the 2255 issue?

THE COURT: Yes.

MR. CAMPBELL: Well, there certainly have been discussions, Judge, you know, going back to 2003, where we had a meeting with Pat Fitzgerald about these issues and asked him to recommend to the Department of Justice in Washington that the government should confess error. There was -- as I informed Judge Conlon, there was sentiment on direct appeal at the solicitor general's office that there was error here that required a new sentencing hearing. That obviously didn't prevail in the bureaucracy there.

We spent some time with Mr. Fitzgerald. A recommendation was made to the Department of Justice. I don't know what that was. But the Department of Justice held this under consideration for more than four years after that recommendation was made. It was only last summer where they came back and said, we are not going to confess error on this.

However, at the last hearing before Judge Conlon, the government did make a significant concession in that they had now conceded -- and I think they did it in front of the Supreme Court on the cert petition, but they now conceded in the District Court through this local U.S. Attorney's Office, that counsel's performance was deficient. And so the only issue, according to the government, is the prejudice prong of Strickland. Now, we're talking solely about the ineffective

assistance claim, of course.

So we are, you know, in my view, you know, down to the goal line here. And I think if you -- once your Honor has read the record and has read the briefs on this, you will see that the government has conceded in their response to our cert petition on direct appeal -- they made an explicit admission in two or three places that the jury may well have had a mistaken impression about the law, the BOP regulations, and the BOP practices that were available and in place at the time of the sentencing hearing. To me, particularly in light of the fact that in a death penalty case it requires only one juror to say no, that is an admission of prejudice.

So my view, your Honor, is that you can find, based on the papers that are before the Court at this point, that we prevail on that ineffective assistance claim, which has been the most heavily litigated of the issues that we have here. Okay? And that would obviously eliminate the need for the discovery request that we've made on the various other issues that we've raised in this petition.

So long way of answering your question is, yes, we have had discussions. My belief is that the U.S. Attorney's Office here recommended to the Department of Justice that we should be given relief in the form of a new sentencing hearing. But the Department of Justice said no last summer. And so that's where we are.

MR. BINDI: I'm not going to comment on what the recommendation was to the Department of Justice because obviously that's privileged material.

THE COURT: Sure.

MR. BINDI: The only claim that's left in this case is the ineffective assistance claim that was originally raised in the original 2255. And the only thing left to determine based on that claim is whether or not Darryl Johnson suffered prejudice as a result of his attorney's failure to discover that there were statutes and regulations regarding special administrative measures for potentially dangerous inmates within the BOP, and one particular case in which those measures were invoked.

That was an issue that was raised in the post-trial phase of the litigation, before the direct appeal. And Judge Conlon rejected the claim there, rejected the argument that Darryl Johnson was prejudiced. It was also raised as a sort of a failure to disclose type of issues on direct appeal. And the Seventh Circuit rejected it there.

The Supreme Court denied certiorari on direct appeal, and Judge Conlon initially rejected the claim again on both performance and prejudice prongs when she ruled on the 2255 in March of 2003. She was asked to reconsider the issue because it appeared from her opinion that she may have used the prejudice standard that's applicable to a procedurally

defaulted claim, rather than the prejudice standard set forth by the Strickland decision. And there is -- there was a subsequent decision by the Supreme Court in Massaro versus United States, which held that ineffective assistance claims are never procedurally defaulted. They can always be raised either on direct review if the record is ripe or in a 2255. And, therefore, there is no procedural default.

Judge Conlon was asked to reconsider that one ruling in light of Massaro. And we submit that that is the only issue left before this Court, the only issue properly before this Court.

There is a claim that Judge Conlon did not rule on. And it was a claim that Darryl Johnson was not eligible for the death penalty because he's mentally retarded. This is based on the Supreme Court's decision in Atkins versus Virginia. In March of 2003, when -- yeah, I think it's 2003 -- when Judge Conlon denied all the rest of the claims raised in 2255, she held that one out there. And basically she said that there is not enough support in the record as it stands for me to grant relief on this claim. But if the defendant thinks that he can find some further support for it, then I'll take a second look at it. And five years later there has been nothing added to the claim. We submit that that claim has been abandoned.

Earlier this year, when the government moved to reconsider the ineffective assistance ruling in light of

Massaro, the defendant filed a renewed motion for discovery on a supplemental submission. The renewed notion for discovery calls for all kinds of things, discovery of all kinds of things, that might have been available to counsel back at the time of the original sentencing hearing. And it specifically related to this issue regarding special administrative measures and cases in which they've been applied.

Judge Conlon -- the same discovery motion was made in connection with the original 2255 motion. And Judge Conlon denied it. And we submit that the renewed motion for discovery should be denied for the same reasons that Judge Conlon invoked back in 2003.

The issue here is whether, had defense counsel known about the existence of special administrative measures and the one or two cases in which they had been invoked at the time of the original sentencing hearing, that information could have been used to impeach Warden John Vanyur, and an outcome -- different outcome would have resulted.

The defendant is now asking for all kinds of discovery that has very little to do with any of that. In fact, they're asking for discovery that would have made an entire trial out of this whole issue of special administrative measures.

Our concession of deficient performance covers no more than the failure of counsel to have discovered the existence of special administrative measures and the Felipe case out of New

York in the Second Circuit. They were not deficient, we submit, in failing to seek all of the discovery that counsel now wants in connection with the testimony of a rebuttal witness at the sentencing hearing.

That leaves the supplemental submission, which makes a more global ineffective assistance claim regarding defense counsel's performance at the sentencing hearing and argues that there are all kinds of avenues for presenting mitigating evidence that went unexplored or underexplored.

We submitted a response to the supplemental submission, in which we've argued that it comes too late. You can't file a 2255 motion and use it as a place holder and then filter in additional claims as judgment day draws near which are unrelated to the original motion.

The claims now being made regarding the failure to discover all kinds of mitigating evidence that might have been presented at the original sentencing hearing has nothing to do with the ineffective assistance claim as it pertains to special administrative measures and the Felipe case out of New York and the potential cross-examination of John Vanyur. This is not newly discovered information. It's based on reports submitted by a mitigation specialist retained by trial defense counsel. This has been in their files for years. And only just now have they decided to bring it out.

The Supreme Court has said in Felix versus Mayle,

which case is cited in our response to the supplemental submission, that this is no way to go about litigating 2255 cases. You can't save up grounds and then just bleed them out to prolong the whole situation. You must submit all of your claims in your original filing. And supplementing your filings later with unrelated claims runs afoul of the one-year statute of limitations.

So in sum, it's our position that the only claim left that's properly before this Court is the ineffective assistance claim regarding special administrative measures, the Felipe case, and the potential cross-examination of Warden John Vanyur. And the only issue left to be decided in connection with that one remaining claim is whether Darryl Johnson was prejudiced in the Strickland sense of that word by his lawyer's failure to discover special administrative measures and the Felipe case.

MR. CAMPBELL: Let me take a few of the issues one at a time and maybe in no particular order. No. 1 is, with respect to what counsel didn't do at trial and what evidence they didn't get or what research they didn't do that was material to this, just so your Honor has some background on this, the central issue -- and there is a lot of literature on this. The central issue at most every death penalty hearing is future dangerousness. It was the central issue at the penalty phase here. The question basically being, if we don't kill

this person, are they going to hurt somebody else?

That was the focus here. And the government said, well, Mr. Johnson had used the telephone to direct somebody to murder two gang members. And in the defenses case, at the penalty phase hearing the defense said -- and they put on an expert, a gentleman named Mark Cunningham, to testify that, hey, the Bureau of Prisons and the United States government has the ability and the facilities to house this person in a way that he will not be a future danger to anyone. They have the ability to put him under strict conditions of confinement. In fact, they built a facility specifically designed for that. He reviewed the facilities at Florence. He talked about those, talked about the fact that they can put restrictions on the communications, the telephones, the letters that people receive, and the visitors.

In rebuttal, without -- and, you know, these things happen at trial. But in rebuttal without any advance notice to the defense other than the night before getting a phone call, we're putting on Warden John Vanyur in rebuttal. John Vanyur gets on the stand. He's a BOP official. And he says, it is absolutely impossible for the BOP to house him under the strict conditions of confinement that Cunningham had suggested. It's not allowed under BOP regulations. We do not do it. It likely would run afoul of the law, and it does not happen.

He further said, that means that inevitably Mr.

Johnson will be placed in a general population prison. He will have, according to Warden Vanyur, inevitably unlimited access to phone, unlimited access to mail, unlimited access to visitors, as many phone calls and letters as he can afford or someone will agree to take.

At the exact same time that that testimony was being presented in the court here, the United States government was arguing in the Second Circuit in the Felipe case. They argued in the district court, you, Judge, can put him under strict conditions of confinement. You can limit his phone calls. You can limit his visitors. You can require that there be approval and notice to the U.S. Attorney's Office about who's going to visit him and the like.

The Judge imposed those conditions in Felipe. And the government was arguing -- at the same time that they were telling this jury in Darryl Johnson's case it cannot happen, it's against BOP regulations, they do not do it, it's a violation of their practices and it would be against the law, they are telling the Second Circuit, it is absolutely okay, and you should uphold this. And in fact, the Second Circuit did uphold it. And as Mr. Bindi said, the Felipe case is one of the cases. It certainly is one of the cases, and it's an important case because of the identity of issues and in particular the timing of this. Felipe happened, you know, shortly before Darryl Johnson's trial.

But there were several other cases. This wasn't as though Warden Vanyur made a mistake, and there was one isolated case where this had happened, however high profile Felipe was. And it was reported in the news and all that.

There are other cases. There are cases of Ramsey Yousef, who was held under those types of conditions of confinement. There is a case -- two cases that we also cite in our papers on habeas. Clayton Fountain, or -- yeah Clayton Fountain and another gentleman who were held under these types of strict conditions of confinement and had been for 12 or 15 years prior to Darryl Johnson.

We have now in addition a case that happened shortly after Mr. Johnson's case, Anthony Ayeni Jones. It was a case in Maryland. Very similar factually in many respects. He was a gang leader, had ordered murders of people, had used the phone, in fact had used the phone at a federal penitentiary, in order to order violence. And that jury, unlike Darryl Johnson's jury, heard accurate information. That jury was presented with the penalty phase after all of the litigation in this case.

That jury heard that the BOP can impose these types of strict conditions of confinement to the extent it's necessary. And that's all we've ever said, to the extent it's necessary. That jury heard accurate information. And seven jurors found that the BOP had the ability and the facilities to eliminate

essentially his future danger. And he was -- his life was spared.

In our case, where they heard inaccurate information -- and by all accounts, even the government admits, the information the jury got was inaccurate -- zero jurors found that the BOP had the ability to house him in a way that would eliminate his future dangerousness. That is the essence of prejudice.

Now, it is also not simply that there are a case or five cases prior to Mr. Johnson where these conditions were imposed. But what John Vanyur said, what Warden Vanyur said, under the auspices of I am a BOP official, and I am much more reliable than Mark Cunningham, an outside expert, he said the BOP policies don't allow it. Well, in fact, there is a CFR that says exactly what the BOP policies are. And it says, this is allowable. 501.3 -- 28 CFR 501.3. It's cited in our papers. It was discussed in the cert petition on direct appeal. And so you got a BOP policy in specific that says, these are the things that are allowed.

You also have a statute. I think it's 3582(d), where it says that the Court can impose these kinds of conditions if it's warranted, you know, for a length of time or forever or indefinitely. The court can impose those types of conditions.

So there are multiple sources of authority, laws, CFRs, practice and case law that say this is allowable. You

can house this person in a way that will eliminate his future danger.

What Warden Vanyur did was he absolutely took away that issue. And not only did he take it away in his testimony -- and again, this is a BOP official who comes in and says, this cannot happen. This person cannot be housed under those conditions, cannot be there indefinitely, will inevitably get to a general population place. And then the argument that's made to the jury in closing -- and you'll see we quote this. The argument that was made to the jury in closing is, you heard what Warden Vanyur said. He is not going to a place where he is going to be under these special conditions of confinement. He is going to a general population place.

And they say to the jury, no one, no witness, no witness' family, no one is safe unless you kill this man.

Now, put aside the flaws in that argument, which are evident from what I've just laid out. We know now from ten years of experience that Mr. Johnson is not a danger to anyone, hasn't done anything to cause any danger to anyone while he's been incarcerated down in Terre Haute.

So to say that there is just one case or one instance that counsel failed to research, find, cross-examine Warden Vanyur on, ask for jury instruction on, oppose the jury instructions that were given, object to the arguments and evidence that were made -- it's not just the Felipe case.

There is a whole series of cases.

And when you get to the discovery request, one of the things that we've asked for, which -- you know, in my view again I think you can find on the record before you right now that there was prejudice caused based on the admission of the government and based on all of the cases that show what Warden Vanyur said was wrong, and based on the fact that it only takes one juror to change their mind, based on the fact that in the Anthony Ayeni Jones case that's exactly what happened. They found that he was a future danger in Anthony Ayeni Jones. And then they said, but seven of us find that the BOP has the ability to house him in a way that eliminates that. And his life was spared.

We've asked for discovery about other times prior to Mr. Johnson's hearing where the BOP either sought or achieved housing someone under these conditions. I think that's something that we're entitled to here. Rule 6 of the habeas rule says, you are allowed to get and the Judge has the discretion to get -- to give discovery to any party so that they can illuminate their claims, unless basically the claim is frivolous. This clearly is not a frivolous claim. We are 90 percent of the way there. They admitted deficient performance.

We are only talking about the prejudice prong. And as I said, to the extent that the Court thinks, you know, we need more information in order to prove that, I don't think we

necessarily do, but we certainly are entitled to get discovery about prior cases, where the government sought or obtained these kinds of conditions on various prisoners. When did the BOP put people into housing conditions that impose limitations on their phone calls or impose limitations on their letter writing or on their visitors? Those are things that all go to whether Mr. Johnson was denied a fair trial in this case.

As far as the next issue that Mr. Bindi raised was the mental retardation claim. We certainly have raised that in the initial petition. The -- just so you understand the timeline here. We filed the initial petition in the fall of 2002 with an initial memorandum. In I think January of '03 we filed a motion for discovery asking for discovery on a number of issues including the ineffective assistance claim, the mental retardation claim, the racial bias claim in administration of the death penalty, and other of our claims.

The Court in March of 2003 issued a ruling denying our petition with the exception of the mental retardation claim, which she says we could further pursue. It was basically within a week or so after that ruling came down in 2003 that we had a meeting with Mr. Fitzgerald in the U.S. Attorney's Office here. The case was essentially on hold for those four-plus years while the Department of Justice considered whether or not they were going to confess error.

And so, you know, for any number of reasons, your

Honor, we did not -- we have not spent -- we've not spent those four years investigating and put -- filing papers on the mental retardation claim because, quite frankly, I was very hopeful that the decision from the Department of Justice would be favorable.

We now have -- as your Honor may know, the Atkins decision at that time was very new. There is a developing body of both academic and case law on the issues of mental retardation. We told Judge Conlon at the hearing two months ago that we intended to pursue that to the extent it was -- it was necessary; that is, to the extent the Court wasn't going to rule on the ineffective assistance claim in short order that we deserved a new sentencing hearing.

The issue on the mental retardation claim -- again this is a developing body -- but really is an adaptive functioning investigation. We have taken steps since our last hearing in front of Judge Conlon to retain people to do that work. And that work is underway. We have not waived that claim in any way. And we are intending to pursue it, again to the extent that it is necessary.

The last thing that Mr. Bindi talked about was the supplemental submission that we made before Judge Conlon I think in February of this year. And that talked about a number of things that in my view all relate to issues that were raised in our initial petition, in particular the future danger issue.

These were issues that all support the idea that Mr. Johnson is not a future danger. And that, as I said at the outset, was the central issue at the sentencing hearing. We submitted a lengthy affidavit from Jill Miller, who was the social worker, the mitigation specialist, who worked with the trial team at Mr. Johnson's trial. The government has filed an opposition to that. We are happy to brief the issue.

The issue on that is, are these issues related to the issues that were raised in the initial petition? Do they relate back? So if your Honor has any doubt about that, I'm happy to submit a brief on that issue showing that the issues we've put before the Court, the supplemental materials that we've put before the Court, all relate back to the issues that were raised in the initial petition.

We're certainly entitled to do that. The Rule 6 and the habeas rules talk about discovery. We've had none at this point. They talk about an evidentiary hearing. We obviously haven't had that at this point. And so us putting forward additional evidentiary materials at this point, there is nothing unusual about that or untoward about that at all. It's in fact how the process should go. And we perhaps have submitted them earlier than we needed to because we haven't had a chance for discovery. We haven't had a chance to have an evidentiary hearing. So those are I think the three central issues there.

I would also point the Court to two cases that are very recent from the Supreme Court having to do with failures of the trial counsel at sentencing hearings of this sort, Wiggins and Rompilla, both of which are cited and discussed in one of our recent filings.

But in essence what they say is, the failure of counsel to discover either mitigating or impeaching evidence is sufficient to satisfy the standard that is required in order to get a new sentencing hearing. And that standard, of course, is very different from the standard that Judge Conlon applied when she denied the petition back in March of 2003.

The reason that Judge Conlon denied discovery back in 2003 was because that she found that we had procedurally defaulted our claim of ineffective assistance because we didn't raise it on direct appeal. Therefore, she said, you have to satisfy the cause and prejudice standard in order to even make a colorable claim and said, you procedurally defaulted it; therefore, you cannot surmount that hurdle.

Now we are in a very different position. The Supreme Court said in Massaro, you never procedurally default an ineffective assistance claim. And the standard now is not a showing of cause and prejudice. But the showing that is required is merely a reasonable probability that had the correct evidence or had the additional evidence or had the additional work been done, a reasonable probability in the

death penalty scenario that one juror might have taken a different view of this. It's a very low standard. Strickland makes clear and cases after Strickland from the Supreme Court make clear that a reasonable probability is a lower standard, a lower standard, than preponderance. So we are in a very different place now in terms of what the legal standards are and what hurdles we need to surmount in order to get discovery.

Now, I come back to where I was at the beginning, which is, I think, your Honor, that based on the information that is before you now you can make a decision without hearing anything else that we have satisfied the prejudice standard of Strickland. The government has conceded deficient performance. The government in the cert response conceded prejudice by saying, the jury may well have held the mistaken impression about the law, about BOP policy, about BOP practices.

That is the essence of prejudice in this context. So I think you can make the decision without anything more.

But to the extent that your Honor thinks we should or wants more evidence, we are entitled to get the discovery that we have requested. That's what the rules call for. They call for a full exploration of any claims that are colorable.

So to say that Judge Conlon's denial of our motion for discovery, when she was doing it under the cause and prejudice standard and said, because you can't surmount that, because you procedurally defaulted your ineffective assistance claim, I'm

not going to give you discovery -- to say that that should hold now under vastly different circumstances I don't think has any merit.

So that's where we are on those main issues.

MR. BINDI: I don't know how much of the merits or discussing or arguing the merits of the -- of the one remaining issue is going to make sense to you, your Honor, today at this point because I'm not sure where you are in terms of your review of the enormous record that you got to deal with.

THE COURT: Right. I haven't obviously had an opportunity to do that because I haven't had the entire record. I have had certain excerpts. I have read the motions that have been filed.

You know, I understand and appreciate the argument of both counsel. Let me just say that the Court finds it difficult under these circumstances, not having seen all that material, to reach any firm conclusions. But it seems to me that the government's response, which indicates that there is some problem with the information that the jury received during the death penalty phase, presents a sizeable problem because, you know, if we were talking about whether you are here on the guidelines or there on the guidelines and it's a small difference, that's one thing. When you are talking about life or death, that's a much more impactful decision.

The Court is understanding that with the death penalty

that it is a very difficult issue for many people, even the jurors who sit and listen to the evidence. And I know I have talked to people who have served in my cases. And one of the things that I find in many instances is utmost in the minds of those jurors is this issue of future dangerousness, whether or not this person has any possibility of committing such an act again.

I have talked to people who say, as long as there is life, there is that possibility because we don't know. People can escape, or all kinds of things can happen. Then there are other people who say, life is uncertain. When I walk out that door, I could get hit by a bus. And so for us to ask for some degree of certainty in our decision is an impossibility because nothing is certain in life.

And so I can imagine in a circumstance where critical -- and it is critical evidence when you talk about dangerousness. It's something that the jury is going to consider very seriously. I think the Court needs to see and to consider very seriously -- and not to suggest either of you gentlemen are giving me any erroneous information.

But for me to read the words for myself and see what was said to the jury, in what context and what that conversation was in context to the entirety of the argument, et cetera, is going to be absolutely important. And so I am going to take the time to read the transcript and to know all that I

can about the case.

I don't know that the Court needs any additional information.  Certainly I can understand why the defense in this case would want the opportunity to provide some additional information in terms of discoverable information.

I think one of the things that was said rings quite candidly true to the Court.  For instance, in my own mind, I would want to know whether or not there were any other persons similarly situated before this instance who were provided with some alternative to death which would entail restrictions upon the ordinary freedoms, if we can call it that, that inmates normally have in institutions.  And if that has been done on one occasion, then that might be an anomaly.  If it's been done on five occasions or more occasions or fewer occasions, it might have some impact in terms of the likelihood that the fact that it occurred might have on the jury.

You know, some things happen once in a lifetime.  Other things happen more frequently.  And, therefore, the frequency of that process taking place with the special conditions being imposed, et cetera, might have some impact in the Court's ultimate determination, as it would, I'm sure, on the jury.

So that I would allow even now discovery regarding the special conditions of confinement as to prisoners.  Why don't we -- this sentencing happened in 2002?

MR. CAMPBELL: The sentencing happened in '97, and then there were post-trial proceedings. The direct appeal took a couple or three years. And then the habeas was filed in '02. So the sentencing took place in '97 or '98.

MR. BINDI: Well --

THE COURT: Is the defense posture that there were persons housed under those special conditions in '97, or is it after?

MR. CAMPBELL: We know of at least four, I believe, that were housed in that -- in those conditions prior to. Felipe, Ramsey Yousef, Clayton Fountain, and another gentleman whose name I can't recall at this moment. And then there are a whole bunch afterwards.

THE COURT: What was the earliest year you are aware of?

MR. CAMPBELL: Fountain and Silverstein. Thomas Silverstein is the other gentleman. I think that goes back to the mid-'80s. Those are the two earliest that I know of where these were imposed. Felipe I think was in '96, '97. And Ramsey Yousef was sometime in the mid-'90s.

MR. BINDI: Well, your Honor?

THE COURT: Yes.

MR. BINDI: I would just point out that what we are inquiring here is what it would have been reasonable to expect defense counsel to have discovered after hearing the testimony

of a rebuttal witness. And so I think we have to -- if we are going to engage in discovery, it has to be limited to the invocation of special administrative measures on inmates within the BOP predating the sentencing hearing in this case. Anything beyond that is first of all beyond the government's concession about what counsel should have known about. And second, it's beyond the pail of a reasonable ineffective assistance claim.

THE COURT: Well, let me say this: I am going to allow discovery predating and up to and including any defendant who was pending sentencing as of the date of the sentencing of Mr. Johnson, so that persons who are sentenced at the time of Mr. Johnson or who were pending sentencing at the time Mr. Johnson was sentenced I think is also -- because what happened to them perhaps is more revealing than for the people who prior thereto had that possibility.

MR. CAMPBELL: May I make --

THE COURT: Yes.

MR. CAMPBELL: -- two points with respect to what Mr. Bindi said. He is trying to limit it solely to the SAMS, special administrative measures. There -- as the government admitted in its cert petition, it can be -- under the SAM there is 501.3 CFR, or it could be under the statute. So there are multiple ways that you can get there to impose these kinds of conditions.

And so it's really anyone who was housed under these conditions, not if they were specifically done under the SAM. If they were done under any other provision or no provision at all, we're entitled to know that because that goes to what Warden Vanyur said about the BOP policies and practices.

The second piece of this is, Mr. Bindi says, well, we have to limit it to only one what the -- you know, the defense attorneys could reasonably be expected to have obtained on this rebuttal witness. But another claim that we've made here and that we've asked for discovery on is a Brady claim. It's not just the defense attorney's responsibility to go and seek these things out.

But if the Bureau of Prisons, which is an arm of the Department of Justice, has policies, practices, procedures in place, it's the responsibility of the government to turn that over. That's -- that's what Brady says, anything that goes to the issue of either guilt or punishment. Brady was a capital case.

So there is a Brady component to this issue as well. So I just don't want a hyper technical reading of what we are entitled to get to be made that it only talks about SAMS. It's anybody who was housed under these conditions by the Bureau of Prisons.

MR. BINDI: It's news to me that there is a Brady claim involved in this 2255 motion. And there never has been,

not on direct appeal, not in the post-trial proceedings, not on certiorari. And so, you know, I'm a little bit mystified by that -- by that statement.

I will say this, though, your Honor: Just keeping things in context -- and I want to make sure that I have specifically what the Court is ordering discovery on. The argument that was made at sentencing by Darryl Johnson, based on the testimony of his expert witness, Dr. Cunningham, was that the United States has at its disposal the super-maximum security facility at Florence, Colorado, which includes a control unit that can house inmates in the most restrictive type of setting possible or available in the United States. And that because the government has this facility, it's possible for the government to house Darryl Johnson there for the rest of his life, indefinitely.

The responsive testimony, the rebuttal testimony, of Warden Vanyur, which Mr. Campbell has characterized that as -- that it was impossible for the government to do that, first of all, the impossibility -- no fair reading of Warden Vanyur's testimony would show that he ever said anything was impossible. Judge Conlon rejected that contention. The Seventh Circuit rejected that contention. And it -- I'm surprised that it's still being proposed because it just never happened.

Warden Vanyur talked about what was likely to happen. So now, is the discovery order that the Court is issuing, is

that related to inmates who were ordered housed for the rest of their lives in these kinds of conditions?  Or is it just inmates who were ordered -- in comportment with the defense argument that was made at sentencing, or it is just inmates who were ordered held in special conditions of confinement?

And I'm also trying to make sure that I have a distinction between the highly restrictive sorts of things involved in special conditions of confinement or special administrative measures as opposed to ordinary disciplinary measures that BOP institutions take when they put someone in a solitary confinement unit.

THE COURT:  Okay.  I will answer your questions.  I am not talking about those situations where somebody hits a correctional officer and they are put in segregation or whatever for some 30-day period or whatever.  I am talking about people who are housed under those kinds of restrictions for an extended period of time.

Doesn't have to be forever.  If they are designated to a particular institution which has such restrictions for the foreseeable future, let's assume their behavior changes or there is a long period by which they seem to adjust appropriately within the institution and then they are released, I still want those people to be disclosed to the defense.

MR. BINDI:  Okay.  I understand.

THE COURT: Because they are restricted under those conditions for an indeterminate period of time. But I don't mean short term.

MR. BINDI: Actually under the law you can't restrict anybody for an indeterminate period of time. There has to be a risk assessment done every I think 30 or 60 days. You can't just impose these kinds of restrictions, particularly communications restrictions, you know, or physical environment restrictions indefinitely. The rules never -- that I'm aware of just never provided for that.

But we will look for any other inmates against whom special administrative measures or statutory measures beyond merely disciplinary segregation --

THE COURT: Okay.

MR. BINDI: -- were imposed at the time of the sentencing here.

MR. CAMPBELL: Well, and, Judge, I want to be clear because we have I think now at lease some gray area as to the time period that somebody has to be held under these conditions. I think Mr. Bindi is correct that in general -- I think there have been exceptions, but in general certainly under the SAMS provisions, it has to be revisited.

THE COURT: Right.

MR. CAMPBELL: So to me there are -- there are at least a couple limitations that we -- you know, we may have

disagreements about. One is the length of time that they have to have been held under that. It was never the defense's position in this case that Mr. Johnson had to be held under these conditions for the remainder of his life. The position was for as long as it was deemed necessary by the Bureau of Prisons.

And so if somebody is held under the SAMS restrictions for 60 days, whether it is directly ordered from the sentencing Court, you know, from day one or it happens because of some conduct in prison doesn't matter to the argument here. The argument was, the BOP has the authority and the power to house this person however they deem necessary.

So it should not be limited solely to people who were sent from a sentencing Court into these strict conditions. That's certainly a subcategory, which is, you know, on all fours with this. But it is not the only thing that's relevant to the issue that Warden Vanyur testified about, which is we can't do this. He said the ADX and these strict conditions are solely for people who committed violence in prison, and they are solely for a short period of time, people sent to go to general population.

It should not be limited to -- solely to people who are sent directly from the sentencing Court. And my suggestion would be, anyone who's being held under these conditions for more than 60 days consecutively, after reviews they're still

being held at these strict conditions of confinement, we ought to get. Some of them may be more probative than others. There is no reason for us not to get that information.

Second --

THE COURT: Let me ask, counsel, do you have any objection to that 60-day limit, persons 60 days or more?

MR. BINDI: No, I have no objection to that.

THE COURT: Okay.

MR. CAMPBELL: The second issue, which I referred to earlier was the Brady claim. There should be no surprise. In our September 30, 2002 petition on page 9 we have a section entitled Violation of Brady versus Maryland. In the initial memorandum in support also filed on September 30, 2002, the initial filings on this 2255 has a section that's briefed on the Brady versus Maryland issue because the government had a responsibility to turn over the information that they knew contradicted or impeached or was inconsistent with Warden Vanyur's testimony.

So this is not a new issue, and there is no surprise on that Brady claim. But it certainly ties into what we are talking about here.

MR. BINDI: I apologize for that, your Honor. If it slipped my mind, I guess it's because it was rejected by Judge Conlon five years ago.

THE COURT: Well, let me just say this: That issue, I

think we need not highlight that issue because the information that counsel receive for the defendant, should it suggest that there was knowledge out there within the government's possession, that -- and perhaps, you know, I'm not sure. I am sure as I tried cases that there were things that I should have known that I didn't. But the fact that the knowledge is out there can be impugned to me.

Then, you know, whether or not it's a Brady violation is one thing. But clearly it's information that the defense would have been entitled to and would be considered by the Court in its ultimate determination.

MR. CAMPBELL: Thank you, Judge.

THE COURT: Okay.

MR. BINDI: Just to clarify, your Honor. There is a couple of things that I want to make sure I have in mind here in terms of our marching orders from this point.

THE COURT: Okay.

MR. BINDI: You need to find out what the extent or what is the state of Darryl Johnson's adjustment in the BOP?

THE COURT: Yes.

MR. BINDI: Okay. You want me to turn over as discovery materials any instances of either special administrative measures under the BOP regulations or statutory provisions providing for extraordinary security measures for inmates that were requested or imposed at the time of Darryl

Johnson's sentencing that involved restrictions extending more than 60 days, for 60 days or more.

THE COURT: Continuously.

MR. BINDI: Continuously. Okay.

MR. CAMPBELL: And what we're talking about, I just want to make sure we are all on the same page. What we're talking about when we talk about, you know, you I think described it as extraordinary security measures. Restrictions on telephone, letters, or visitor access.

THE COURT: I think counsel's --

MR. CAMPBELL: Sure.

THE COURT: -- restrictions is to cover all of that.

MR. BINDI: There are a whole array of possible restrictions, and I was going to focus on those things because that's what we are here talking about.

And the third thing that I have down in my notes here is that we are missing some transcript pages that it might be possible to locate somewhere.

MR. CAMPBELL: And as a first step, why don't I go back to my office, figure out what pages are not in the materials that I have provided to chambers, call you up and give you those.

MR. BINDI: See if I can find them. Those -- that's what we're doing at this point. That's where we are going from here.

THE COURT: Correct.

MR. BINDI: Okay.

THE COURT: Now, if you prefer, rather than have this interchange, that the materials that counsel gave to the Court, if you belief you have the missing pieces, I would be more than happy to give you a copy of the disk so that you can then collate it with your material. And then you don't --

MR. BINDI: You know, I can possibly just get a copy of the disk from --

MR. CAMPBELL: I asked him to make a copy. So I will get you a copy. I think it's four CDs. Four or five, something like that.

THE COURT: Now, is there a time frame where you believe you will be able to get that information to counsel and --

MR. BINDI: I don't know, your Honor. Right now I have certainly -- it's certainly in the government's interest to move this litigation along now. And so I'll do this as quickly as I can. But I've never had to make a request like this to the Bureau of Prisons or to the department to find out if there is anything that, you know, was requested by the department that the Bureau of Prisons never found out about.

So I don't know how long it's going to take. I'll certainly do it as quickly as I can.

THE COURT: I --

MR. BINDI: We could set a status -- you know, however long it's going to -- you think it's going to take you to review the material you have, maybe we could set a status for, you know, next week?

(Laughter.)

MR. BINDI: Whenever you want to set the status, your Honor.

MR. CAMPBELL: Judge, do you want me to also collect up all the filings that have been made since the 2255 was filed and send that over to you in one package? Or do you have that?

THE COURT: I think I have that. But, you know, it's better to be safe than sorry. So if I can get everything again and maybe get it in one packet, I can find it easier to go through.

MR. CAMPBELL: Great. I will do that. I would suggest, I guess, Judge, just given all the collection efforts that we're going to need to do and all the reading that you are going to have to do, a status in, you know, 60 to 90 days?

THE COURT: Yes, I was looking at the latter part of August.

THE CLERK: Tuesday, August 26. We are free any time after 10:00.

MR. CAMPBELL: Do you want to do 10:30 again?

THE CLERK: 10:30.

MR. BINDI: August 26 at 10:30?

THE CLERK:  Yes.

THE COURT:  Okay.  Thank you, gentlemen.

MR. CAMPBELL:  Thank you, Judge.

MR. BINDI:  Thank you, Judge.

(Which were all the proceedings had at the hearing of the within cause on the day and date hereof.)

CERTIFICATE

I HEREBY CERTIFY that the foregoing is a true, correct and complete transcript of the proceedings had at the hearing of the aforementioned cause on the day and date hereof.

/s/Alexandra Roth                                    6/9/08
_____        _____
Official Court Reporter                              Date
U.S. District Court
Northern District of Illinois
Eastern Division