1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,               )   Docket No. 02 C 6998
                                        )
                    Plaintiff,          )
                                        )
          v.                            )   Chicago, Illinois
                                        )   August 26, 2008
DARRYL LAMONT JOHNSON,                  )   10:30 o'clock a.m.
                                        )
                    Defendant.          )

              TRANSCRIPT OF PROCEEDINGS - STATUS
           BEFORE THE HONORABLE WILLIAM J. HIBBLER

APPEARANCES:

For the Government:            HON. PATRICK J. FITZGERALD
                               United States Attorney, by
                               MR. DAVID E. BINDI
                               Assistant United States Attorney
                               219 South Dearborn Street
                               Chicago, Illinois 60604

For the Defendant:             COTSIRILOS, TIGHE & STREICKER, by
                               MR. TERENCE H. CAMPBELL
                               33 North Dearborn Street
                               Suite 600
                               Chicago, Illinois 60602

                               MS. LORINDA MEIER YOUNGCOURT
                               P. O. Box 206
                               Huron, Indiana 47437

                      ALEXANDRA ROTH, CSR, RPR
                       Official Court Reporter
                      219 South Dearborn Street
                            Room 1224
                      Chicago, Illinois 60604
                         (312) 294-0134

(Proceedings had in open court:)

THE CLERK: 02 C 6899, USA versus Johnson.

MR. BINDI: Good morning, your Honor. David Bindi for the United States.

THE COURT: Good morning.

MR. CAMPBELL: Good morning, your Honor. Terry Campbell on behalf of Darryl Johnson. I also have with me and want to introduce to the Court, Ms. Lorinda Youngcourt, who is co-counsel in this case.

MS. YOUNGCOURT: Good morning, Judge.

THE COURT: Good morning.

MR. BINDI: Your Honor, the last time we were before the Court, we had a couple of tasks to perform. One was to supply the Court and counsel with transcript pages that were missing from the record that Mr. Campbell had available. And that has been done.

Another thing that we were instructed to do was to provide a statement regarding Darryl Johnson's adjustments within the Bureau of Prisons. I have given a copy of a written document, a declaration of the case manager who has Mr. Johnson down in Terre Haute. I can tender a copy of that to the Court as well.

THE COURT: Sure. Counsel has a copy?

MR. BINDI: Yes.

MR. CAMPBELL: I just got a copy.

MR. BINDI: I turned that over this morning. I just got this myself fairly recently. There are really -- there is really nothing to report regarding his institutional adjustment other than that there doesn't seem to be any problem.

Last we were ordered to provide some discovery regarding the imposition of SAMS restrictions that had occurred at the time of Darryl Johnson's sentencing hearing in November of 1997. And also to provide some information regarding the imposition of communications restrictions pursuant to statute, Section 3582(d) of the Title 18, or any other similar restrictions under statutes or regulations pertaining to the BOP. I made inquiry of the office of legal counsel at BOB, and they have provided me with that information to the best of their ability.

As of November 17, which was the day that the verdict was rendered, 1997, as of that date, there had been a total of six SAMS imposed. Five of them were terrorism SAMS, and one of them was an espionage SAM. They have all been continued and remain in place to this date.

Regarding the restrictions of -- that can be imposed pursuant to the Statute 3582(d), there is a four-page letter here I have from the office of legal counsel detailing their efforts to ascertain that information. And the upshot of it is that the only one that they're aware of is the one that we all know about already, which was with you Luis Felipe out of the

Southern District of New York, which happened shortly before Darryl Johnson's sentencing hearing.

There -- it's really -- it's really not possible to come up with very hard information about this particular subject because at the time at least the BOP did not sort their data according to that criteria. But the institutional memory of people that were contacted -- were contacted during the course of this inquiry is that they don't remember anything other than Luis Felipe but they remember Luis Felipe.

I can tender copies of those documents to the Court as well, if you like, your Honor.

THE COURT: Sure.

MR. BINDI: I have provided copies to Mr. Campbell.

(Document tendered.)

MR. BINDI: And that's where we are, your Honor.

THE COURT: Okay. One of the things that I did not see in all the materials that was supplied to me, and I thank you gentlemen for doing so, and lady --

MS. YOUNGCOURT: Thank you, Judge.

THE COURT: I did not see Mr. Urdangen's memo that was apparently supplied at some point early on.

MR. CAMPBELL: His affidavit?

THE COURT: His affidavit.

MR. CAMPBELL: It is an exhibit to the initial 2255.

THE COURT: Okay.

MR. CAMPBELL:  Let me tell you which exhibit it is.

THE COURT:  Okay.

MR. CAMPBELL:  It's Exhibit B.  This is an extra copy of this, if you want me to hand it up to you right now.

THE COURT:  I have that then, you are telling me?  I have so much to look through.

MR. CAMPBELL:  Right.

THE COURT:  Okay.  It's Exhibit B.  I am not sure I have this.

THE CLERK:  This is an extra copy, Judge.

THE COURT:  I can have this copy?

MR. CAMPBELL:  Absolutely, Judge.  It should have been sent over with -- I think we sent you a box of documents.

THE COURT:  There was a box that came over.  I did not see this in it.

MR. CAMPBELL:  That's an important document.

THE COURT:  I may have overlooked.  It's easy to do.

MR. BINDI:  They are all important, Judge.

THE COURT:  What do you suggest that our next step should be?  Obviously I want to review these materials.  Also I had thought that perhaps at some point I wanted to confer with you gentlemen in chambers to try and determine -- lady and gentlemen -- and try and determine what you ultimately believe is going to be the outcome and how we should proceed to the next step.

Are you prepared to do that today or --

MR. CAMPBELL: I'm prepared to do that today, Judge. I would, if the Court wishes, like to respond just briefly to --

THE COURT: Sure.

MR. CAMPBELL: -- what Mr. Bindi has presented this morning.

There are a couple concerns I have. Obviously I appreciate that it can be a difficult task for the Bureau of Prisons to gather up the documents that were requested. But I want to make sure that the request has been made in a proper way, that the search has been done in a proper way. I'm going to go through this kind of in sequence.

From the beginning it has been our position, and we discussed this at the hearing in front of your Honor when you ordered the discovery, that it is not merely the imposition of these restrictive conditions through SAMS or through 3582(d) but through any BOP regulation or policy or practice. So that is what I understood the Court had ordered, that any time that the BOP has imposed these types of restrictions, limitations on phone calls or monitoring of mail or restrictions on visitation, for 60 days or more, that that was what should be discoverable here.

The second thing, just on the framework that we're working in, is what the Court ordered was that anyone who had

been sentenced or was pending sentencing at the time of Mr. Johnson's sentencing. So the request here was understood by the Bureau of Prisons, the cutoff as of November 17, which is the end date of his initial sentencing hearing. That's not quite right. It actually should extend beyond that to anybody who was pending sentencing at that time.

And so we may actually pull in another year or so, depending on how cases proceeded, of individuals who might have been subject to these. So I think the request needs to be at least clarified in that regard.

Third, with respect to that, I think something for the Court to consider is also that there were post-trial proceedings going on into the middle of 1998. And so it might make sense to make it that date, where people were pending sentencing as of July of '98, which I think is when the final decision was made by the District Court. That's one point.

The second, to follow up on the limitations of whether these conditions were imposed pursuant to SAMS or 3582(d) or otherwise, there are, you know, six people who have been identified by the government as having had SAMS imposed, and they are continuing to be imposed. I think that speaks volumes about our point as to this.

I think that the Court would find that if you look at the data going after 1997, that there are a whole host of others who have had those restrictions placed on them and are

still having those restrictions placed on them for what amounts to indefinitely, not unreviewed but, you know, relatively indefinite time period, certainly significant time periods.

The --

THE COURT: That was one of the questions I was concerned about. There seems to obviously be a number of people who have those conditions imposed. Is there some reason -- and I did not know until I got this document -- it appears as though Mr. Johnson is not one of those individuals.

MR. BINDI: That's true.

THE COURT: Now, is there an evaluation process that the BOP goes through to decide whether or not to impose those conditions on --

MR. BINDI: The BOP does not make any decisions regarding these sorts of restrictions, either under SAMS or 3582(d). 3582(d) authorized a District Court to order restrictions if requested by the government and if the necessary factual background is present.

SAMS are imposed at the direction of the attorney general or the head of a law enforcement agency or the head of a security agency. So the BOP is not a decision-maker there. They are just following orders.

MR. CAMPBELL: Well, I want to make two points on that, Judge. I think it is -- at least as far as my understanding goes, it's not entirely accurate to say that the

Bureau of Prisons doesn't have any involvement in SAMS. They are the ones who initiate the process. I think formally the Attorney General is the person who's in charge of that, of implementing that. But it's clearly -- part of the role of the Bureau of Prisons is to say, this person needs to be held under these conditions. And they get a sign-off from the Attorney General.

But it is initiated by the Bureau of Prisons. They're the people who are managing the inmates. And it is -- it's my understanding that it is the personnel of the Bureau of Prisons who conduct the reassessments as time goes by.

But what Mr. Bindi said highlights one of my significant concerns here, and that is that the government has taken -- and I, you know, thought this was a possibility at the last hearing. But they've taken an extraordinarily narrow view. And one category which is entirely missing from this is inmates on whom these types of conditions have been imposed for greater than 60 days by Bureau of Prisons wardens for instance.

I can tell the Court that you will be receiving shortly an ex parte motion to request funding for an expert that we have recently come in contact with and I've spoken with a couple times, who is a former warden in the Bureau of Prisons, long-time warden at the Bureau of Prisons, who has identified any number of files that would be either maintained by the warden's office or by the Bureau of Prisons facility,

each maximum security facility. And I am informed by him that it was routine for a warden to impose these types of restrictions on an inmate whenever there was a disciplinary problem or if there was a problem with a visitor or there is a problem with someone who had misbehaved over the phone or any of those things.

I'm also informed by him that it was routine, regular, for inmates' mail not only to be monitored as it is often but for copies to be made if there was any thought that the inmate had engaged in inappropriate behavior.

So what we have here is a net that was cast very narrowly as opposed to capturing what has always been our position, which is, the Bureau of Prisons always has had and always has utilized its authority to house people in a manner that is consistent with its -- its observation of what the security needs are.

And so while we have six that have had SAMS, you know, going back prior to November of 1997, which is I think a shorter time period than we are entitled to, we also don't have a whole host of information. And I will be able to submit to the Court within 30 days and maybe help the government locate the types of documents by identifying files, the types of files -- there is a disciplinary hearing officer at each maximum security institution. There are warden memos. There is a special investigation supervisor file that's kept. And so

when these conditions are imposed -- and they are imposed rather regularly on inmates; and that goes back to prior to 1998 -- there are documents that the BOP has.

And, you know, I understand that this is a task that, you know, requires a good deal of effort by the government to reach out to the right people. But as you review the documents -- I haven't had a chance to go through it very carefully. But there -- the letter that Mr. Bindi tendered this morning, where he's gone essentially is to legal counsel. And you see that most if not all of this is focused on the SAMS. And then even greater majority is focused on conditions under 3582(d). And it misses entirely the question of were these conditions of confinement imposed on individuals by the BOP under any other authority that they have.

MR. BINDI: Mr. Campbell fundamentally misunderstands the nature of the issue that's before this Court. The issue that's before this Court is whether counsel performed deficiently and rendered ineffective assistance at the sentencing hearing in failing to discover things like 3582(d) and the SAMS. We're not here to conduct extensive litigation about all these types of issues. We are here to determine what counsel should have known in preparing to cross-examine Warden Vanyur and what was knowable at the time.

As far as what sorts of restrictions were imposed on inmates after this sentencing hearing, that simply is not

relevant to whether counsel performed adequately or deficiently at the sentencing hearing.

As far as other restrictions besides 3582(d) or SAMS, I find it rather ironic that we could be talking about whether or not trial defense counsel performed deficiently and rendered inefficient assistance in failing to discover these other restrictions that counsel for the defendant standing before the Court today don't even know about.

MR. CAMPBELL: Judge --

MR. BINDI: Finally, finally, our concession regarding the performance of counsel was that they should have known about SAMS and they should have known about 3582(d). That was out there. That was knowable. That was easily ascertainable. Or at least it was ascertainable.

How many wardens had imposed 60-day communication restrictions on how many inmates going back to the beginning of time is simply not knowable. It would not have been reasonable to expect counsel to come up with that. Again, we're talking about performance of these lawyers at the sentencing hearing, not beyond that and not beyond what should have been or could have been known at the time.

So I think that we're going off sort of on a tangent here that could take a lot of time and a lot of effort and a lot of energy. And it simply is not relevant, not to the issue that's before this Court.

MR. CAMPBELL: Judge, if I may make a couple brief comments. No. 1, we also have a Brady claim. And so the question of whether these conditions were imposed by the BOP regularly goes directly to the issue of the Brady claim. Should they have turned that over? They put on -- the government put on -- they sponsored Warden Vanyur to say that these conditions could not be imposed and were not imposed and could not be impose in this case. That testimony was false. That testimony was false.

We were entitled to know what the BOP did with its inmates. We were entitled to know what their regular practices were. Mr. Bindi tells you that it's going to take a lot of time and energy to discover this because there were so many inmates presumably who were under these conditions and that's why we should deny this motion?

THE COURT: Well, see --

MR. BINDI: No Court --

MR. CAMPBELL: Judge --

THE COURT: I think the issue is a little different. I think we are framing the issue differently now. I think the real issue with that jury as these witnesses testified was whether or not Mr. Johnson could be incarcerated under these conditions. And although we did talk about 60 days because I think that's a time frame that was brought up by the parties, but whether or not he could be maintained under these

conditions for an extended period.

MR. BINDI: Indefinitely.

MR. CAMPBELL: No.

THE COURT: Indefinitely.

MR. CAMPBELL: For as long as necessary.

THE COURT: Right, as long as necessary.

So I don't know that we need at this point every 30-day sanction period that some warden imposes because the inmate spits on a guard. I don't think we are getting into that kind of detail.

But I do believe that the defense position that the jury was entitled to know that there were inmates being held under these conditions for extended period of time, or for whatever period that the powers that be decided that that person needed to be, and that Mr. Johnson was probably entitled to the same kind of treatment if he were sent to the Bureau of Prisons, and the fact that the government admitted that the information provided by their witness was inaccurate in saying that that was not possible, was something that was problematic. And that's why we are here today rather than this case being somewhat by the boards.

You know, all the things that I reviewed of this trial suggest that it was a very involved proceedings, that people on both sides did the kind of effort that we would expect from well-trained lawyers in a most serious case. But I think

sometimes mistakes happen. And clearly there is some indication that there was a mistake in this case.

The question is, does that mistake rise to the level that it puts us in a position where we can no longer have trust in the verdict of the jury on the death phase. And, you know, I don't know that that's a question that is easily answered. But I think that the handwriting is sort of on the wall that if a jury of 12 people -- and I don't know. Does anybody know? How long were the deliberations on the death phase?

MR. BINDI: Offhand, your Honor, I can't say.

MS. YOUNGCOURT: Give me ten minutes, Judge. Keep talking. I will find out for you.

THE COURT: Okay. I get the impression from everybody that I talked to, and my clerk who is my clerk now, not now but she is away for the day, but she was here during the pendency of this case. She was in Judge Conlon's courtroom during the pendency of this case. It was not immediate. It was some time spent.

And so, you know, I just think it is difficult to assume that if a witness comes on the stand, personnel from the DOC -- from the Bureau of Prisons -- you can tell I'm used to the state -- and says that, look, there is no way we can keep him under these conditions, and the 12 people say, well, under those circumstances, you know, one of the options is sort of foreclosed to us, and comes back with option two. And now to

have there be no dispute that that witness was incorrect or misspoke or whatever happened in terms of that assertion and say that, well, we can do it. We have done it. There is someone else who is being held under those conditions. To say with certainty that that's not going to change one of those 12 jurors' minds, I don't know that that's possible because I don't know in my own mind, if I were given two choices and one of the choices that I was given was foreclosed to me and then later on I was told that it's not quite foreclosed, there are some circumstances in which it can happen, I think that changes the whole nature of the game, folks.

So I think that, you know, my mind is not closed. But this is a question that because the stakes are so high, when you have that kind of inquiry that has been now changed, there seems to be a strong probability, a possibility, that those 12 people would or could change their outcome in terms of death or no death. And that creates a whole issue as to, you know, how would one suggest that one get back to that issue and give a jury a fair opportunity to make that same decision, whether or not witnesses are still here, whether or not we read transcripts, whether or not, you know, someone is going to take it up and if we may be talking about years down the road before we even get to that to determine how we are going to decide.

And that's one of the reasons I wanted the adjustment report because I think that information would be available to

this jury. And that's going to be something that, if a jury hears that the jury, you know, we need to decide whether or not to take some life, and we hear that a person has adjusted in the institution, is doing well, there is no problem, that's another issue.

When you take away that first issue that says that there is no way we can keep him in isolation, and now we have an issue where he hasn't been kept in isolation. He is functioning behind bars as one would expect prisoners to function behind bars. This is a situation that, folks, I think there need to be hard decisions as to whether or not we are fighting whatever, an uphill battle that the win is really not a win for anybody.

MS. YOUNGCOURT: Judge, 13 hours they were out.

THE COURT: Thirteen hours of deliberation. So it wasn't one of those things they went back and said, this is a done deal.

MR. CAMPBELL: I believe it was over two-plus days is my recollection offhand.

MR. BINDI: And the hearing itself was I think five days, five or six. The hearing itself was I think five days.

THE COURT: I thought the trial was longer than that.

MR. BINDI: You --

THE COURT: You mean the death phase.

MR. BINDI: The penalty phase I think was -- hold on a

second.

(Brief pause.)

MR. BINDI:  The penalty phase was November 6 through November 17 was when the verdict came back.  So the evidentiary portion -- part of it took place over ten days.

THE COURT:  Have you folks had any discussion about the entirety of the situation now that we have this most recent information?

MR. CAMPBELL:  Judge, we just got this right as we walked into court.  So as I say, I haven't -- no, we have not had any further discussion with the government.  I would like to take the Court up on its offer to have a discussion in chambers, if the government is willing to do that right now.

MR. BINDI:  Sure.

THE COURT:  Okay.  Let's take a recess and meet in chambers.

(Further proceedings had in chambers off the record.)

CERTIFICATE

I HEREBY CERTIFY that the foregoing is a true, correct and complete transcript of the proceedings had at the hearing of the aforementioned cause on the day and date hereof.

/s/Alexandra Roth                                    9/4/2008
_____          _____
Official Court Reporter                                Date
U.S. District Court
Northern District of Illinois
Eastern Division