IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**DEFENDANT'S RENEWED AND AMENDED
MOTION FOR DISCOVERY ON PETITIONER'S
INEFFECTIVE ASSISTANCE OF COUNSEL AND *BRADY* CLAIMS**

Defendant, Darryl Lamont Johnson, by his counsel, Terence H. Campbell of Cotsirilos,

Tighe & Streicker, and Lorinda Meier Youngcourt, files this Renewed and Amended Motion for

Discovery pursuant to this Court's Order of October 21, 2008. In support of this motion, Mr.

Johnson states as follows:

A.      **Procedural History And Law**

1.      Mr. Johnson filed his Motion to Vacate Conviction and Sentence and for New Trial

Pursuant to 28 U.S.C. §2255 and Rule 33 of the Federal Rules of Criminal Procedure on October

1, 2002. Mr. Johnson filed his first Motion for Leave to Conduct Discovery on February 3, 2003.

2.      Mr. Johnson's §2255 and discovery motions were initially denied on March 11, 2003,

based upon a finding that Mr. Johnson had procedurally defaulted his ineffective assistance of

counsel claim by failing to raise it on direct appeal. (Mem. Opin. and Order at 6-7). Applying the

cause and prejudice standard of *McCleese v. United States*, 75 F.3d 1174, 1177-78 (7th Cir. 1996),

the Court ruled that Johnson had failed to show good cause for the default. (Mem. Opin. and Order,

p 10).

3. On April 23, 2003, the United States Supreme Court held "that an ineffective assistance of counsel claim may be brought in a collateral proceeding under §2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 509, 123 S.Ct. 1690, 1696 (2003). Accordingly, after deliberating about resolving this case, on November 11, 2007, the government moved the Court to reconsider its basis for rejecting Mr. Johnson's ineffective assistance of counsel claim in light of *Massaro*.

4. The government has now conceded before this Court that defense counsel's performance in defending Mr. Johnson at trial was deficient under the first prong of *Strickland v. Washington* (*e.g.*, Transcript of 2/29/08 hearing at 4-5; Transcript of 6/3/2008 hearing at 10), but contests whether Mr. Johnson can show he suffered "prejudice" as a result of that deficient performance (*i.e.* the second prong of *Strickland*). 466 U.S. 668, 692,104 S.Ct. 2052, 2067 (1984).

5. Mr. Johnson asserts that his *Brady-Giglio* claim -- which is based on much the same evidence that supports his ineffective assistance of counsel claim -- must also be reconsidered and requires relief. *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194 (1963); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763 (1972).

6. In conceding the performance prong of *Strickland* the government has also effectively conceded that it suppressed evidence in its possession which would have impeached the testimony of Warden Vanyur and was clearly relevant to the issue of the punishment to be imposed. Thus, Mr. Johnson has satisfied the base requirement of *Brady* and *Giglio* and has only to prove the materiality of the evidence. When a Court assesses the likely impact of suppressed evidence in *Brady* cases, their analysis of the "materiality" issue is equivalent to an assessment of "prejudice" in an ineffective assistance of counsel case, particularly where, as here, counsel failed to present available, exculpatory evidence to the jury. *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of

2

Blackmun, J.) (the standard of materiality applicable to withheld impeachment evidence was adapted from the formulation of "prejudice" in *Strickland*).

7. On August 26, 2008, the government provided a letter written by Ann H. Zgrodnik, Senior Counsel of the Litigation Branch of the Federal Bureau of Prisons ("BOP"), within the U.S. Department of Justice ("DOJ"). Ms. Zgrodnik's letter details her contact with various employees of the Department of Justice and the Bureau of Prisons, and indicates that there were several inmates housed under strict conditions of confinement due to security concerns and/or because of their future dangerousness, including inmates Thomas Silverstein and Clayton Fountain. As for inmates subjected to strict conditions of confinement pursuant to Special Administrative Measures ("SAMS"), the government provided an e-mail from Dominique Raia of the BOP to AUSA Bindi stating,

> As per our conversation this afternoon, I am providing the following information regarding the number os SAMs in BOP prior to 11/17/97:
>
> Five SAMs pursuant to 28 CFR 501.3 (terrorism); one SAM pursuant to 28 CFR 501.2 (espionage). Four of the terrorism SAMs were imposed in 8/96 and one in 3/97; the espionage SAM was impoed in 3/96. All of the aforementioned SAMs have been extended in accordance with the regulations and are currently still in place.

(Ex. C). As for inmates subjected to such strict conditions of confinement specifically by Court order under 18 U.S.C. §3582(d) and prior to November 1997, Ms. Zgodnik reports that other than inmate Luis Felipe, the people she contacted within the BOP do not recall any inmates subjected to formal, court-ordered restrictions on communication and association under 18 U.S.C. §3582(d) prior to November 1997. Notably, Ms. Zgrodnik makes clear that there may well be other inmates who were subjected to such conditions of confinement in the relevant time period. (Ex. Ex. C at ¶6 ("Thus, it is entirely probably that other inmates may be or have been in Bureau of Prisons custody

with court imposed communication restrictions that [BOP staff] are not aware of."); *id*. at ¶10 (similar).

8.    Mr. Johnson has learned from Mark Bezy, retired Warden of the Federal Correctional Complex at Terre Haute, Indiana, and 28 year veteran of the BOP, that despite the representations of the government, records such as those Mr. Johnson requests in this motion exist in various files maintained by the BOP.  (*See* Ex. A attached hereto, Affidavit of Mark A. Bezy).  Mr. Bezy also confirms that a number of additional BOP inmates beyond those thus far identified by the government were housed at various BOP facilities under the very types of strict conditions of confinement that Warden Vanyur testified were not possible "*for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.*"  (Ex. A, Bezy Affidavit at ¶¶7, 9, 11, 12, 13, and 14) (emphasis added).

## B.    Discovery Requested[1]

In order to adduce further evidence establishing the prejudice prong of *Strickland* and the materiality standard of *Brady* and *Giglio,* Mr. Johnson requests the government be ordered to produce the following discovery:

---

[1]Mr. Johnson filed motions for discovery on February 3, 2003 and November 13, 2007.  By this submission, Mr. Johnson is not waiving or withdrawing his earlier requests for discovery, but is merely providing this discrete request at this time which is focused on the particular issues the Court has addressed in recent hearings.

1. for the period of time prior to July 27, 1998[2], the DHO (Disciplinary Hearing Officer) record of all BOP inmates held under strict conditions of confinement (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people outside the prison, whether by phone, mail, and/or visits), for 60 days or more consecutively, based on concerns about the inmate's future dangerousness and/or security concerns (*i.e.* not for mere discipline of an inmate). This request includes, but is not limited to, information about BOP inmates Thomas Silverstein, Clayton Fountain, Rodney Hamrick, Luis Felipe, David Sahakian, John Walker, Ed Wilson, Jonathan Pollard, Christopher Boyce, Peter Rollack, John Gotti, Ramzi Yousef, Anthony Ayeni Jones, Barry Mills, T.D. Bingham, and any other similarly situated inmate. (*See* Ex. A, Bezy Affidavit at ¶¶6-9);

2. for the period of time prior to July 27, 1998, the SIS (Special Investigation Supervisor) Files of all BOP inmates held under strict conditions of confinement (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people outside the prison, whether by phone, mail, and/or visits), for 60 days or more consecutively, based on concerns about the inmate's future dangerousness and/or security concerns (*i.e.* not for mere discipline of an inmate). This request includes, but is not limited to, information about BOP inmates Thomas Silverstein, Clayton Fountain, Rodney Hamrick, Luis Felipe, David Sahakian, John Walker, Ed Wilson,

---

[2] July 27, 1998 is the date Mr. Johnson's post-trial motions were denied and his death penalty formally imposed by the trial court.

Jonathan Pollard, Christopher Boyce, Peter Rollack, John Gotti, Ramzi Yousef, Anthony Ayeni Jones, Barry Mills, T.D. Bingham, and any other similarly situated inmate. (*See* Ex. A, Bezy Affidavit at ¶¶6-9);

3.  for the period 1984 through 1996, the DHO record, SIS files and inmate files for all inmates who were housed in the "K-Unit" at the United States Penitentiary at Marion for 60 days or more consecutively. (*See* Ex. A, Bezy Affidavit at ¶9);

4.  for the period July 27, 1998 and prior, any BOP inmates held at the Florence ADX facility in a "side pocket" or "special cell" for 60 days or more continuously. (*See* Ex. A, Bezy Affidavit at ¶11);

5.  for the period July 27, 1998 and prior, records regarding any BOP inmates held in the Control Unit at USP Marion for 60 days or more continuously based on concerns about the inmate's future dangerousness and/or security concerns (*i.e.* not for mere discipline of an inmate). (*See* Ex. A, Bezy Affidavit at ¶7);

6.  for the period July 27, 1998 and prior, records relating to any BOP inmates held at the Florence ADX facility under strict conditions of confinement (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people outside the prison, whether by phone, mail, and/or visits), for 60 days or more consecutively, because of security concerns or in order to reduce/eliminate the inmate's future dangerousness (*i.e.* not for mere discipline of an inmate). (*See* Ex. A, Bezy Affidavit at ¶¶8, 11);

7.    for the period July 27, 1998 and prior, records relating to any BOP inmates held in a Special Housing Unit ("SHU") within any maximum/high security BOP facility, for 60 days or more consecutively, because of security concerns or in order to reduce/eliminate the inmate's future dangerousness (*i.e.* not for mere discipline of an inmate). (*See* Ex. A, Bezy Affidavit at ¶13);

8.    for the period of time prior to July 27, 1998, any memos written by a Warden or a member of the Department of Justice or Attorney General's Office, which ordered or documented that an inmate be held under strict conditions of confinement (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people outside the prison, whether by phone, mail, and/or visits) based on concerns about the inmate's future dangerousness and/or security concerns (*i.e.* not for mere discipline of an inmate). (See Ex. A, Bezy Affidavit at ¶135);

9.    for the period July 27, 1998 and prior, any inmates who were housed under strict conditions of confinement (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people outside the prison, whether by phone, mail, and/or visits), whether pursuant to 28 C.F.R. §501.3, 18 U.S.C. §3582(d), Court order, a Special Administrative Measure (SAM), or under the inherent power of the BOP, for 60 days or more consecutively, because of security concerns or in order to reduce/eliminate the inmate's future dangerousness (*i.e.* not for mere discipline of an inmate).

C. **Basis for Items Requested**

1. A habeas corpus petitioner is entitled to discovery if he can establish "good cause" for his request. *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997). A petitioner establishes "good cause" whenever "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Id.*, 520 U.S. at 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)). *See also* Rule 6 of the Rules On Motion Attacking Sentence Under Section 2255.

2. On June 3, 2008, the Court ordered the government to produce certain discovery requested by the defense. Specifically, the Court ordered the government to produce documents relating to any BOP inmate who was held under strict conditions of confinement (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people outside the prison, whether by phone, mail, and/or visits), for 60 days continuously or longer, based on security concerns and/or to curtail/eliminate that inmate's future dangerousness. *See* Transcript, June 3, 2008 at 30-34 (attached hereto as Exhibit B).

3. In response to that Order, on August 26, 2008, the government produced some information about a number of inmates held under such strict conditions prior to November 17, 1997. (*See* Group. Ex. C, discovery responses from the government). Based upon the language of the government's disclosures themselves, as well as on the information contained in the Mark Bezy affidavit attached to this motion, we believe that the information provided by the government on August 26, 2008 is incomplete. For example, in the government's written response via letter dated August 25, 2008 from BOP attorney Ann H. Zgrodnik directed to AUSA Bindi (Ex. C), Ms. Zgrodnik indicates that, in responding to the discovery requests, she contacted several people within the BOP, but was told, in essence, that the imposition of these types of "strict conditions of

confinement" are not formally tracked by the BOP and cannot be queried on the BOP database. (Ex. C at ¶¶1-3, 5, 10). As a result, BOP attorney Zgrodnik expressly states that it is "entirely probably" that the list of inmates provided does not capture all the inmates who were housed under the strict conditions of confinement, per the Court's Order. (Ex. C at ¶6 ("Thus, it is entirely probably that other inmates may be or have been in Bureau of Prisons custody with court imposed communication restrictions that [BOP staff] are not aware of."; *id*. at ¶10 ("[BOP Supervisory Attorney] Mr. Synsvoll was doubtful that his list [of inmates held under these strict conditions of confinement prior to November 17, 1997] was exhaustive.").

4.      It also appears that Ms. Zgrodnik requested information solely on inmates who "were housed under ***no-human-contact conditions***, not including normal disciplinary segregation." (Ex. C at ¶2, 9) (emphasis added). This request – *i.e.* asking only for inmates held under "no-human-contact conditions" – is significantly more restrictive than what was ordered by the Court. That overly-restrictive criteria must be rectified in a subsequent response to the discovery already ordered.

5.      Finally, Ms. Zgordnik's letter also makes clear that the request was expressly limited to inmates housed under these strict conditions "prior to November 17, 1997." (Ex. C at ¶¶1, 6, 7). Based on the Court's prior ruling, the government is required to obtain information about any inmates held under such conditions prior to July 27, 1998 (the date that the trial court ruled on Mr. Johnson's post-trial motions and imposed the death sentence). (Docket Entry 6/3/2008).

6.      Notably with respect to his *Brady* claim, Mr. Johnson is not arguing – nor need he prove – that the individual prosecutors who tried Mr. Johnson's case knew of the *Brady* material that was not turned over, or that they acted in bad faith. As the *Brady* decision itself made clear, "the suppression by the prosecution of evidence favorable to an accused upon request violates due

proceeds where the evidence is material either to guilt or to punishment, ***irrespective of the good faith or bad faith of the prosecution***." *Brady*, 373 U.S. at 87 (emphasis added). Rather, the fact that the government, in the form of any of its departments that were involved in Mr. Johnson's prosecution – including, for example, Warden Vanyur's own BOP and the Department of Justice – had in its possession the information is sufficient to support Mr. Johnson's *Brady* claim. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others *acting on the government's behalf in the case*.") (emphasis added) *United States v. Andrews*, 824 F.Supp. 1273, 1289-90 (N.D. Ill. 1993) (J. Conlon) (prosecution team responsible under *Brady* for exculpatory and impeachment information known to the Bureau of Prisons, and the prosecution's failure to disclose the impeaching material "deprived defense counsel of the opportunity to independently investigate and fully develop a defense to these serious charges.") (internal citations omitted). *See also*, *Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977) (holding prosecution responsible for information known to government agent who testifies for prosecution); *United States v. Rosner*, 516 F.2d 269 (2d Cir. 1975) (same); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973).

7.     In addition to the information – statutory authority, BOP regulations, and various inmate-specific information – previously cited in defense briefs in this §2255 proceeding which directly contradicts Warden Vanyur's testimony, Mr. Johnson has now put before the Court the affidavit from Mr. Mark A. Bezy, a former long-serving Warden in the BOP. In his affidavit, Mr. Bezy confirms what Mr. Johnson has long alleged:

> Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and/or imposed both prior to 1998 and after, there is no doubt that the Bureau of Prisons had, at all times, the authority and ability to house inmates in the most restrictive conditions of confinement necessary

10

> to ensure security and/or to reduce or eliminate an inmate's "future dangerousness." This included, but was not limited to, housing inmates in conditions of confinement where they did not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or mail. The BOP could, and did, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deemed it necessary to do so for the security of either prison staff, other inmates, or the public.

(Ex. A, Affidavit of Mark A. Bezy). Mr. Bezy, in fact, identifies a number of BOP inmates who were actually subjected to these types of strict conditions of confinement, due specifically to security and/or future dangerousness concerns, at various BOP facilities prior to July 1998, and further testifies that these strict conditions of confinement could be, and were, imposed on inmates ***"for as long as the BOP deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (i.e. to reduce or eliminate the inmate's future dangerousness)."***[3] (Ex. A at ¶12 (emphasis added); *see also*, *id*. at ¶¶7, 9, 11, 13, and 14 (same)).

8. In light of the information now before the Court, including that contained in the affidavit of former BOP Warden Bezy, regarding the facilities and practices of the BOP, and about specific inmates who were housed under the very type of strict conditions of confinement that Warden Vanyur testified were not available in Darryl Johnson's case, we respectfully submit that the *Brady* violation has been proven. This *Brady* violation provides another, independent basis for the relief sought by Mr. Johnson (*i.e.* a new sentencing hearing).

If, based upon the evidence of record, including Mark Bezy's affidavit, the government is now willing to concede that Mr. Johnson's alleged *Brady* violation claim has been established, more discovery on that topic will not be necessary. However, if, after being confronted with the evidence

---

[3] Former Warden Bezy provides significant additional detail in his affidavit which strongly supports both Johnson's ineffective assistance of counsel claim and his *Brady* claim.

of record thus far, the government remains unwilling to concede that – intentionally or unintentionally (*Brady*, 373 U.S. at 87) – there was a *Brady* violation relating to Warden Vanyur's testimony, then Mr. Johnson is entitled to further discovery and necessary expert assistance on this issue.

WHEREFORE, for the foregoing reasons and those set forth in his prior submissions, Darryl Lamont Johnson respectfully requests that the Court enter an Order authorizing him to conduct discovery related to the claims contained in his §2255 motion, and directing the government to produce the discovery requested herein.


Respectfully submitted,


/s/ Terence H. Campbell                          /s/ Lorinda M. Youngcourt

Terence H. Campbell                              Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.              1773 Huron Williams Road
33 North Dearborn Street, Suite 600              Mitchell, Indiana  47446
Chicago, Illinois  60602                         (812) 849-9852
(312) 263-0345

Counsel for Darryl Lamont Johnson

**CERTIFICATE OF SERVICE**

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1.      Petitioner's Renewed And Amended Motion for Discovery on Petitioner's Ineffective Assistance of Counsel and *Brady* Claims

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.

/s/  Terence H. Campbell
Terence H. Campbell

# EXHIBIT A

STATE OF ARIZONA )
) ss
COUNTY OF PINAL )

### AFFIDAVIT OF MARK A. BEZY

MARK BEZY, after being duly sworn, deposes and states under oath as follows:

1. I am over the age of 18, and I am competent to testify to the matters stated herein. I make the statements in this affidavit based upon my personal knowledge.

2. I worked for the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006, starting my career as a Correctional Officer and working my way up. During that time, I held a number of positions, including: (a) Warden of the Federal Correctional Complex at Terre Haute, Indiana from August, 2004 through October, 2006; (b) Warden of the Federal Correctional Institution in Elkton, Ohio from December, 2002 through August 2004; (c) Associate Warden at the United States Penitentiary in Leavenworth, Kansas, a high security facility, from July, 1999 through November, 2002; (d) Correctional Services Administrator of the North Central Regional Office of the BOP in Kansas City, Kansas from May, 1995 through July, 1999; and (e) Captain at the maximum security U.S. Penitentiary in Marion, Illinois ("USP Marion") from February, 1992 through May, 1995.

3. I received a number of awards during my service with the Bureau of Prisons, including being named a Member of the Senior Executive Services; being named Associate Warden of the Year for the North Central Region; and receiving a Director's Award in 1997.

4. While I was Warden at Terre Haute, I was responsible for the operation of, among others, the high security penitentiary and the Federal Death Row which is located at the FCC in Terre Haute. As Warden at Terre Haute, I oversaw 1,500 adult male high security offenders, as well as 37 inmates who were under death sentences. I managed several emergency situations that

occurred while I was Warden at Terre Haute, including a homicide, and numerous inmate assaults and emergency lockdowns.

5. As Correctional Services Administrator for the North Central Regional Office of the BOP, my duties included providing consultation, advice and on-site assistance to 18 federal correctional institutions within the North Central region of the United States, which included at the time the states of Illinois, Wisconsin, Minnesota, Missouri, South Dakota, Kansas, and Colorado. I also oversaw the regional disciplinary transfer program for the North Central Region, and the Control Unit Hearing Program for the entire BOP.

6. When I worked at USP Marion, that facility was the highest security prison in the United States. USP Marion housed the "worst of the worst" of federal prisoners in its general population, and did so under highly secure and restrictive conditions of confinement, including, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort. While the hope of the BOP was that inmates sent to the general population at USP Marion would modify their behavior and return to a mainstream maximum security facility after two to three years, there were many inmates who were housed at USP Marion for many years, including some who were housed at USP Marion for years and then transferred directly to the Administrative Maximum ("Super-Max" or "ADX") facility in Florence, Colorado when that facility opened. In addition, there were some inmates who were assigned directly to USP Marion from the sentencing court. For example, John Gotti was an inmate sent directly to USP Marion from the sentencing court.

7. While I worked there, USP Marion had units within the facility where the most dangerous and/or high security risk inmates were housed under even more strict conditions of

confinement than those imposed on USP Marion's general population. These even more strict conditions of confinement were imposed for as long as the BOP and/or the Warden deemed necessary to ensure security and to reduce or eliminate the inmate's risk of violence or future dangerousness. For example, USP Marion had a Control Unit within the prison where the most violent offenders, including particularly those who were deemed to pose a future danger of violence and/or criminal activity, were housed prior to the opening of the Super-Max ADX facility in Florence, Colorado. Typically, inmates could be assigned to the Control Unit at USP Marion for a specific amount of time, up to five years, based on their offense. The specific amount of time that an inmate was committed to the Control Unit was determined by the BOP. Moreover, if an inmate engaged in additional criminal or violent activity, they could be re-committed to the Control Unit for additional time beyond the five years. Inmates assigned to the Control Unit were housed in that Unit for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

8. The Super-Max ADX facility in Florence, Colorado opened in approximately 1994. I know that a number of inmates who, due to security and/or "future dangerousness" concerns, had been housed at Marion under very strict conditions of confinement for years prior to the opening of the ADX facility in Colorado, were then transferred to the ADX facility where they continued to be held under very strict conditions of confinement due to the same long-standing security and/or future danger concerns. Inmates who fit this description that I can recall at this time include Barry Mills, and T.D. Bingham, high ranking members of the Aryan Brotherhood gang, as well as leaders of other gangs and disruptive groups. In addition, shortly after ADX was opened, a number of other

violent inmates, including gang members, domestic terrorists, and organized crime figures, were also were transferred directly from USP Marion to the ADX facility. At ADX, both before and after 1998, these types of inmates were housed in conditions that were even more restrictive than the conditions had been at USP Marion in terms of their ability to interact or communicate with staff, other inmates, or persons outside the facility.

9.      USP Marion also had what was called the "K-Unit" from at least the mid-1980's through the mid-1990's in which inmates who were a security risk were housed under extremely strict conditions of confinement. Inmates housed in the K-Unit due to security and/or future dangerousness concerns that I can recall included John Walker, a convicted spy, Ed Wilson, a former CIA operative, Jonathan Pollard, a convicted spy, and Christopher Boyce, a former CIA operative. These inmates were held in K-Unit because of security and/or future danger concerns, and were held there for as long as the BOP deemed it necessary to ensure security and that these individuals did not constitute a future danger. Inmates housed in K-Unit were housed in single cells and had no physical interaction with other inmates. All their mail was screened by BOP officers, all telephone calls had to be arranged through BOP officers who would bring the phone to the inmate in his cell. Those calls could only be made to people who were on an approved phone list, and all such calls were recorded and monitored by the BOP. All visitors to any inmates on K-Unit had to go through a somewhat intensive background screening process, and had to be pre-approved by the BOP before they could visit.

10.      Also at the USP Marion, there is an inmate housing unit above the hospital called the "I-Up Unit". Similar to the K-Unit, in the I-Up Unit, all inmate mail was screened and/or copied, and all telephone calls were recorded and monitored. I know, for example, that gang leader David

-4-

Sahakian, whose crimes included ordering the murders of others, was held in the I-Up Unit during his pre-trial detention in order to protect others and ensure that he did not commit, order or direct any additional criminal activity. I believe this was after 1998, but inmate Sahakian was held under conditions of confinement that were available to the BOP at USP Marion in and prior to 1998.

11.     The Super-Max facility in Florence, Colorado, was designed to hold the most dangerous inmates under extremely strict conditions of confinement, including with strict limitations on any communications with people outside the prison, whether by phone, mail, or visits, whenever deemed necessary by the BOP. It is my understanding that inmates were in 1998 and prior thereto (and have been from 1998 through the present) held at the ADX facility under strict conditions of confinement, including severe restrictions on their communications, whether by mail, phone or visitation, whenever that was deemed necessary by the BOP or the ADX Warden, and for as long as necessary to deal with the security or future danger concern raised by a particular inmate. I also know that some inmates have been assigned to the ADX facility directly from the sentencing court, when the circumstances warranted. The ADX facility also has areas within the prison that are referred to as "side pockets" or "special cells," which are used to hold prisoners who are deemed to be exceptionally dangerous. For example, inmate Luis Felipe was assigned to ADX directly from the sentencing court and inmate Felipe was held in one of these "side pockets" after being sentenced in 1997 due to concerns about security and/or his future dangerousness as set forth by the sentencing court. It is my belief that other inmates, too, were housed in these "side pockets" in order to address concerns about security and/or future dangerousness in and before 1998.

12.     I know of some other examples of inmates who, in 1998 and prior, were housed under strict conditions of confinement specifically in order to reduce or eliminate their potential future

dangerousness. For example, Federal inmate Rodney Hamrick, a convicted bomber, was housed at USP Marion when I worked there. All of Hamrick's mail, including his legal mail, was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Inmate Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the assessed risk that he posed to be a future danger by ordering crimes or violence while incarcerated. Other inmates that I can recall who, in 1998 and prior, were housed under very strict conditions of confinement due to security concerns include Thomas Silverstein and Clayton Fountain. Again, these strict conditions of confinement were (and are, to my knowledge) imposed on high security inmates by the Bureau of Prisons for as long as the BOP deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness). In the years after 1998, there have been a great many more federal inmates housed under such strict conditions of confinement in order to address security and/or future dangerousness concerns.

13. All maximum security BOP facilities also have what is called a Special Housing Unit ("SHU") within the facility. SHU's are, in essence, a prison within a prison where security and conditions of confinement are more strict than those imposed on the general population within the maximum security facility generally. Both before and after 1998, inmates could be and were housed in a SHU for a variety of reasons, including because of concerns about security and/or an inmate's "future dangerousness."

14. Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and/or imposed both prior to 1998 and after, there is no doubt that the Bureau of Prisons had, at all times, the authority and ability to house inmates in the

-6-

most restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's "future dangerousness." This included, but was not limited to, housing inmates in conditions of confinement where they did not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or mail. The BOP could, and did, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deemed it necessary to do so for the security of either prison staff, other inmates, or the public. Under the BOP regulations, these are considered "privileges" and not "rights," so they could be taken away whenever it was deemed necessary. Moreover, these strict conditions of confinement could be, and were, imposed for as long as the BOP deemed it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

15.     When strict conditions of confinement, such as being sent to the Control Unit or a SHU, or having mail, visiting and/or phone privileges taken away, were imposed on federal inmates for security reasons or concerns about violence, documentation of that action would normally be created and maintained in one or more places within the BOP. Information about both the restrictive conditions imposed and the reason(s) for imposing those conditions could be contained in one or more of the following: (a) in the DHO (Disciplinary Hearing Officer) record which is kept at the individual BOP facilities; (b) in the SIS (Special Investigation Supervisor) Files, which are kept at all high and maximum security BOP facilities; and (c) when the Warden imposed such conditions, s/he would write a memo which should be contained both in the inmate's file and the files of the BOP facility where the conditions were imposed. In order to ascertain all the inmates on whom these types of restrictive conditions were imposed based on security and/or "future dangerousness"

concerns, at a minimum, one would need to review the above files at each of the high and maximum security BOP facilities.

16.     While restrictive conditions of confinement, including taking away communication privileges such as mail, phone and correspondence, could be imposed for a variety of reasons, I know that, in 1998 and prior thereto, those conditions were imposed on a number of inmates specifically in order to address security and violence/future danger concerns, and that those strict conditions of confinement were maintained for as long as the BOP deemed necessary to address the security of violence concerns regarding the particular inmate. I do not know the names of all the inmates who had strict conditions of confinement imposed on them in order to address security and/or future dangerousness concerns, but believe that, in 1998 and prior, there were a number more such inmates beyond those that I have recalled and described in this affidavit.


Further, Affiant sayeth not.


_____
Mark A. Bezy


Subscribed and sworn to
before me this 21st day
of November, 2008.

_____
Notary Public

AARON HALLSTROM
Notary Public - Arizona
MARICOPA COUNTY
My Comm. Exp. 04-30-2011

# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,        )   Docket No. 02 C 6998
                                 )
                  Plaintiff,     )
                                 )
            v.                   )   Chicago, Illinois
                                 )   June 3, 2008
DARRYL LAMONT JOHNSON,           )   10:30 o'clock a.m.
                                 )
                  Defendant.     )

TRANSCRIPT OF PROCEEDINGS - STATUS
BEFORE THE HONORABLE WILLIAM J. HIBBLER

APPEARANCES:

For the Government:          HON. PATRICK J. FITZGERALD
                             United States Attorney, by
                             MR. DAVID E. BINDI
                             Assistant United States Attorney
                             219 South Dearborn Street
                             Chicago, Illinois 60604

For the Defendant:           COTSIRILOS, TIGHE & STREICKER, by
                             MR. TERENCE H. CAMPBELL
                             33 North Dearborn Street
                             Suite 600
                             Chicago, Illinois 60602

ALEXANDRA ROTH, CSR, RPR
Official Court Reporter
219 South Dearborn Street
Room 1224
Chicago, Illinois 60604
(312) 294-0134

that related to inmates who were ordered housed for the rest of their lives in these kinds of conditions? Or is it just inmates who were ordered -- in comportment with the defense argument that was made at sentencing, or it is just inmates who were ordered held in special conditions of confinement?

And I'm also trying to make sure that I have a distinction between the highly restrictive sorts of things involved in special conditions of confinement or special administrative measures as opposed to ordinary disciplinary measures that BOP institutions take when they put someone in a solitary confinement unit.

THE COURT: Okay. I will answer your questions. I am not talking about those situations where somebody hits a correctional officer and they are put in segregation or whatever for some 30-day period or whatever. I am talking about people who are housed under those kinds of restrictions for an extended period of time.

Doesn't have to be forever. If they are designated to a particular institution which has such restrictions for the foreseeable future, let's assume their behavior changes or there is a long period by which they seem to adjust appropriately within the institution and then they are released, I still want those people to be disclosed to the defense.

MR. BINDI: Okay. I understand.

31

THE COURT: Because they are restricted under those conditions for an indeterminate period of time. But I don't mean short term.

MR. BINDI: Actually under the law you can't restrict anybody for an indeterminate period of time. There has to be a risk assessment done every I think 30 or 60 days. You can't just impose these kinds of restrictions, particularly communications restrictions, you know, or physical environment restrictions indefinitely. The rules never -- that I'm aware of just never provided for that.

But we will look for any other inmates against whom special administrative measures or statutory measures beyond merely disciplinary segregation --

THE COURT: Okay.

MR. BINDI: -- were imposed at the time of the sentencing here.

MR. CAMPBELL: Well, and, Judge, I want to be clear because we have I think now at lease some gray area as to the time period that somebody has to be held under these conditions. I think Mr. Bindi is correct that in general -- I think there have been exceptions, but in general certainly under the SAMS provisions, it has to be revisited.

THE COURT: Right.

MR. CAMPBELL: So to me there are -- there are at least a couple limitations that we -- you know, we may have

disagreements about. One is the length of time that they have to have been held under that. It was never the defense's position in this case that Mr. Johnson had to be held under these conditions for the remainder of his life. The position was for as long as it was deemed necessary by the Bureau of Prisons.

And so if somebody is held under the SAMS restrictions for 60 days, whether it is directly ordered from the sentencing Court, you know, from day one or it happens because of some conduct in prison doesn't matter to the argument here. The argument was, the BOP has the authority and the power to house this person however they deem necessary.

So it should not be limited solely to people who were sent from a sentencing Court into these strict conditions. That's certainly a subcategory, which is, you know, on all fours with this. But it is not the only thing that's relevant to the issue that Warden Vanyur testified about, which is we can't do this. He said the ADX and these strict conditions are solely for people who committed violence in prison, and they are solely for a short period of time, people sent to go to general population.

It should not be limited to -- solely to people who are sent directly from the sentencing Court. And my suggestion would be, anyone who's being held under these conditions for more than 60 days consecutively, after reviews they're still

33

being held at these strict conditions of confinement, we ought to get. Some of them may be more probative than others. There is no reason for us not to get that information.

Second --

THE COURT: Let me ask, counsel, do you have any objection to that 60-day limit, persons 60 days or more?

MR. BINDI: No, I have no objection to that.

THE COURT: Okay.

MR. CAMPBELL: The second issue, which I referred to earlier was the Brady claim. There should be no surprise. In our September 30, 2002 petition on page 9 we have a section entitled Violation of Brady versus Maryland. In the initial memorandum in support also filed on September 30, 2002, the initial filings on this 2255 has a section that's briefed on the Brady versus Maryland issue because the government had a responsibility to turn over the information that they knew contradicted or impeached or was inconsistent with Warden Vanyur's testimony.

So this is not a new issue, and there is no surprise on that Brady claim. But it certainly ties into what we are talking about here.

MR. BINDI: I apologize for that, your Honor. If it slipped my mind, I guess it's because it was rejected by Judge Conlon five years ago.

THE COURT: Well, let me just say this: That issue, I

think we need not highlight that issue because the information that counsel receive for the defendant, should it suggest that there was knowledge out there within the government's possession, that -- and perhaps, you know, I'm not sure. I am sure as I tried cases that there were things that I should have known that I didn't. But the fact that the knowledge is out there can be impugned to me.

Then, you know, whether or not it's a Brady violation is one thing. But clearly it's information that the defense would have been entitled to and would be considered by the Court in its ultimate determination.

MR. CAMPBELL: Thank you, Judge.

THE COURT: Okay.

MR. BINDI: Just to clarify, your Honor. There is a couple of things that I want to make sure I have in mind here in terms of our marching orders from this point.

THE COURT: Okay.

MR. BINDI: You need to find out what the extent or what is the state of Darryl Johnson's adjustment in the BOP?

THE COURT: Yes.

MR. BINDI: Okay. You want me to turn over as discovery materials any instances of either special administrative measures under the BOP regulations or statutory provisions providing for extraordinary security measures for inmates that were requested or imposed at the time of Darryl

38

THE CLERK: Yes.

THE COURT: Okay. Thank you, gentlemen.

MR. CAMPBELL: Thank you, Judge.

MR. BINDI: Thank you, Judge.

(Which were all the proceedings had at the hearing of the within cause on the day and date hereof.)

CERTIFICATE

I HEREBY CERTIFY that the foregoing is a true, correct and complete transcript of the proceedings had at the hearing of the aforementioned cause on the day and date hereof.

_Alexandre Roth_                    6-9-08

Official Court Reporter                    Date
U.S. District Court
Northern District of Illinois
Eastern Division

# EXHIBIT C

## Bindi, David (USAILN)

**From:** Dominique Raia [DRaia@bop.gov]
**Sent:** Thursday, July 10, 2008 1:52 PM
**To:** Bindi, David (USAILN)
**Cc:** Ann Zgrodnik; Joyce Zoldak
**Subject:** SAM information in Johnson case

As per our conversation this afternoon, I am providing the following information regarding the number of SAMs in the BOP prior to 11/17/97:

Five SAMs pursuant to 28 CFR 501.3 (terrorism); one SAM pursuant to 28 CFR 501.2 (espionage). Four of the terrorism SAMs were imposed in 8/96 and one in 3/97; the espionage SAM was imposed in 3/96.  All of the aforementioned SAMs have been extended in accordance with the regulations and are currently still in place.

Thank you,
Dominique


Dominique Raia
Senior Counsel
Legislative and Correctional Issues Branch Office of General Counsel Federal Bureau of Prisons
phone: (202) 353-8250
fax: (202) 307-2995

1

U.S. Department of Justice

Federal Bureau of Prisons

_Washington, DC 20534_

August 25, 2008

David E. Bindi
Assistant U.S. Attorney
United States Attorney's Office
for the Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604

  Re: <u>United States v. Darryl Johnson</u>, N.D. Ill., No. 02 C 6998

Dear Mr. Bindi:

  This letter is written in response to your request for a response from the BOP to a court order in the above-referenced matter. Specifically, Judge Hibbler has ordered the government to turn over to Mr. Johnson's attorneys information believed to be maintained in the records of the Bureau of Prisons (BOP) regarding instances of <u>formal restrictions</u> being placed on the communications privileges of BOP inmates. As outlined in your letter dated June 18, 2008, the order is limited to instances of formal restrictions on communications imposed prior to Mr. Johnson's sentencing hearing, which began on November 6, 1997, and concluded on November 17, 1997. In responding to the court's order, I have taken the following actions.

  (1) On June 27, 2008, your letter and court order were forwarded to Dominique Raia, Senior Counsel in the Legislative and Correctional Issues (LCI) Branch, to determine whether she had any responsive information. On July 10, 2008, Ms. Raia provided you with an e-mail regarding the number of special administrative matters (SAMs) in the BOP prior to November 17, 1997.

  (2) Soon thereafter, I discussed with Ms. Raia ideas for obtaining information about communication restrictions ordered by the district courts pursuant to 18 U.S.C. §3582, or any other similar statutory or other regulatory measures. She suggested that I speak to a Research Analyst for the BOP and our Correctional Programs Division to see if they have this information. She also recommended that I speak with Chris Synsvoll, Supervisory Attorney at the Consolidated Legal Center, Florence, Colorado, and to Linda Thomas, Administrator of the Correctional Services Branch with regard to the request pertaining to how many BOP inmates were housed under no-human-contact conditions, not including normal

disciplinary segregation.

(3)    I initially spoke with Randy Etcmick, Administrator of the Correctional Programs Branch, with regard to any information he may have concerning the court order. He did not have any responsive information, and referred me to Linda Thomas of the Correctional Services Branch.

(4)    On August 18, 2008, I e-mailed Ms. Linda Thomas, Administrator of the Correctional Services Branch requesting information on whether she was aware of any BOP inmates other than Thomas Silverstein and Clayton Fountain who were subject to similar restrictions. Ms. Thomas stated that the Correctional Services Branch does not have any information that would be responsive to this request. Ms. Thomas had no additional recommendations from what I had already.

(5)    I contacted Jennifer Batchelder, Research Analyst for the BOP in order for her to determine whether these type of restrictions had been tracked by the BOP. She suggested that I speak to Ron Riker at the Designation Sentence Computation Center (DSCC), located in Grand Prarie, Texas, to find out if there are any codes in our BOP database that are used for tracking these restrictions. Mr. Riker identifed several basis of change codes which I provided to Ms. Batchelder. Ms. Batchelder then provided this information to William Saylor, the Director of Research and Evaluation for his opinion. Mr. Saylor agreed that the codes identified by Mr. Riker are not relevant to obtaining information on communication restrictions as they are applied when an inmate's sentence is changed. Based on the input she received from Mr. Saylor, Ms. Batchelder recommended that we speak to Mr. Rowles from the Correctional Services Branch for his input.

(6)    On August 4, 2008, I met with Mr. Rowles the Administrator of the Central Office Intelligence Section with regard to any inmates who were placed on court imposed communication restrictions prior to November 17, 1997. Beginning in January, 2002, the Central Office Intelligence Section began compiling a monthly report identifying, by facility and category of restriction, inmates who have SAMs, court imposed restrictions, or restrictions agreed to during plea negotiations. The first report shows two inmates as having court ordered restrictions. Inmate Luis Felipe, Register Number 14067-074, was the only inmate listed in this report in which the court imposed restrictions prior to November 17, 1997. All of the other reports that were provided to me listed inmates names whose restrictions were imposed by the court after November 17, 1997. In compiling these reports, the intelligence section relies upon the SENTRY assignment loaded by field or other Central Office staff and does not verify the court order, request copies of any court documents, or verify the assignment in SENTRY. Thus, it is entirely probable that other inmates may be or have been in Bureau of Prisons custody with court

2

imposed communication restrictions that they are not aware of. Additionally, Kevin Schwinn, Chief of Intelligence Section at Central Office indicated that his office does not track those individuals with similar restrictions to inmates Silverstein and Fountain. Mr. Schwinn was unaware of anyone having this information.

(7)     Mr. Schwinn also provided me with the SENTRY assignment for inmates with court ordered communication restrictions. He was unaware of when this SENTRY assignment was created. I provided this information to Ms. Batchelder. She ran a search and provided me with a list of inmates who are subject to court ordered communication restrictions. This list included seven inmates names. Inmate Luis Felipe, Register Number 14067-074, was the only inmate listed in this report in which the court imposed restrictions prior to November 17, 1997.

(8)     Based on Ms. Raia's recommendation, I contacted Chris Synsvoll, Supervisory Attorney for the Consolidated Legal Center, located in Florence, Colorado, to determine whether he had any responsive information. He indicated that Luis Felipe is the only inmate who is currently housed at the Administrative Maximum, Florence, Colorado (ADX) whose restrictions were imposed prior to November 17, 2007.

(9)     Mr. Synsvoll also indicated that he is not aware of any inmate being housed under a no-human-contact status. Rather, inmates such as Thomas Silverstein and Clayton Fountain were housed under restrictive conditions of confinement to minimize their impact on security and orderly running of the institution. Even with that assignment, their access to programs and communication (telephone, correspondence, and visitation) was handled in accordance with BOP program statements.

(10)    Since Mr. Synsvoll was doubtful that his list was exhaustive, he suggested that I contact the DSCC to see if they have a mechanism for tracking these type of restrictions. Based on Mr. Synsvoll's recommendation, I contacted Sonya Cole who is the Assistant General Counsel assigned to the DSCC. She indicated that the DSCC has no responsive materials prior to November 6, 1997 because it came into existence in 2005, and records of such communication restrictions are not and have never been maintained at the DSCC. Ms. Cole suggested that I contact each Regional Counsel and Regional Correctional Programs Administrator to see if they may still have any responsive documents.

(11)    On August 5, 2008, I e-mailed all six Regional Counsels requesting responsive documents and provided them with a copy of your letter and the court order. I asked them to check with their Regional Correctional Programs Administrator for responsive documents. All six Regional Counsels did not have any responsive documents. In fact, Hank Sadowski, Regional Counsel for the Northeast Region,

3

recalled involvement in the § 3582 (d) order and the appeal of that order in the case of United States v. Felipe, 148 F.3d 101 (2nd Cir.), cert. denied, 525 U.S. 907 (1998). At that time, he remembers, to the best of his recollection, that this was the first time a court utilized 18 U.S.C. § 3582(d). Mr. Sadowski recommended that I speak to Daryl Kosiak, former Regional Counsel for the North Central Region, regarding his recollection. On August 20, 2008, I spoke with Mr. Kosiak who explained to me that to his knowledge inmate Felipe's case was the first time a court had utilized 18 U.S.C. § 3582 (d).

Based on the above steps that I have taken in response to the court order and your letter, aside from inmate Luis Felipe, no other inmates have been identified prior to November 17, 1997, who are or were subject to formal restrictions in their ability to communicate and associate with others, based on § 3582(d), or any similar statutory or regulatory provision addressing long-term security problems, not including normal disciplinary segregation. As discussed above, inmates Thomas Silverstein and Clayton Fountain did receive visits, and had mail and telephone access.

I trust this has been responsive. If you have any questions, or need additional information, please contact me at (202) 616-7706.

Sincerely,

Ann H. Zgrodnik
Senior Counsel
Litigation Branch

4