IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**PETITIONER'S REPLY IN SUPPORT OF HIS RENEWED
AND AMENDED MOTION FOR DISCOVERY ON PETITIONER'S
INEFFECTIVE ASSISTANCE OF COUNSEL AND *BRADY* CLAIMS;
AND HIS MOTION FOR LEAVE TO SEEK EXPERT FUNDING EX PARTE**

Defendant, Darryl Lamont Johnson, by his counsel, Terence H. Campbell of Cotsirilos, Tighe

& Streicker, and Lorinda Meier Youngcourt, respectfully submits this Reply in Support of His

Renewed and Amended Motion for Discovery on Petitioner's Ineffective Assistance of Counsel and

*Brady* Claims.

**ARGUMENT**

**I.      Motion for Leave to Seek Expert Funding *Ex Parte***

On November 24, 2008, Petitioner filed two motions – one asking leave to seek expert

funding *ex parte*, and the second, a renewed and amended discovery motion pursuant to Habeas Rule

6. The government responded to both motions in its most recent brief. As to the Motion for Leave

to Seek Expert Funding *Ex Parte*, the government states that it "does not oppose [P]etitioner's

motion for leave to file an *ex parte*, under seal, application for funds for expert assistance." Govt.

Resp. at 1, 12.[1] Accordingly, Petitioner's motion for leave to seek expert funding *ex parte* should

---

[1] The government argues only that it does not believe expert assistance on Mr. Johnson's
ineffective assistance of counsel and *Brady* claims is necessary.

be granted as unopposed.

## II. Renewed And Amended Motion For Discovery

Mr. Johnson's second motion was a renewed and amended motion for discovery, specifically focused on necessary discovery relating to the BOP's abilities, policies, and practices regarding the imposition of strict conditions of confinement on inmates (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people, whether by phone, mail, and/or visits), for 60 days continuously or longer, based on security concerns and/or to curtail/eliminate that inmate's future dangerousness. *See* Transcript, June 3, 2008 at 30-34 (Attached as Exhibit B to Petitioner's Motion). The discovery requested by Petitioner in his most recent filing is relevant to two of his claims: (1) his *Brady* claim based on the government's failure to disclose any number of inmates that it had, in fact, held under the very type of strict conditions of confinement that Warden Vanyur testified were not possible; and (2) the prejudice prong of his ineffective assistance claim.[2]

### A. Affidavit of Former BOP Warden Mark Bezy

In addition to making specific discovery requests, Mr. Johnson also submitted an affidavit from Mr. Mark Bezy, a long-time BOP Warden, which, we respectfully submit, establishes the alleged *Brady* violation. At a minimum, Mr. Bezy's affidavit demonstrates that the information requested by Mr. Johnson which would further establish his *Brady* claim does, in fact, exist and is in the exclusive possession, custody and control of the BOP. Because, in its response, the government persists in its contention that *Brady* information was not suppressed – *even if*

---

[2] Because of the government's prior concessions that the performance of Johnson's trial counsel was deficient, and what we believe to be clear evidence "prejudice" under *Strickland* resulting from that performance, much of our argument in the latest discovery motion was directed to the *Brady* claim. However, the discovery requested is also relevant to the prejudice prong of Johnson's ineffective assistance of counsel claim.

*inadvertently* (*Brady v. Maryland,* 373 U.S. 83, 87 (1963) – and claims that there is "not [] one statement by Warden Vanyur that is contradicted by anything [in Bezy's affidavit or otherwise]," we quote below some significant portions of Mr. Bezy's testimony verbatim.

First, a brief review of Warden Vanyur's testimony at Johnson's penalty-phase trial establishes the following[3]:

> (a) Vanyur testified that the BOP cannot hold any prisoner indefinitely in segregation without access to telephone or correspondence privileges. According to Vanyur, strict segregated detention is only available as a *temporary* option. Tr. 2482-83 ("But in either case, administrative detention or administrative segregation, those are both temporary holding patterns, those are not permanent statuses for inmates.").
>
> (b) Warden Vanyur testified, "When you are in this special housing unit, you don't have the same access as the rest of the inmate population to programs, educational opportunities, and so forth. There is definitely a degree of deprivation inside there. *And so it is not permissible, by the Bureau of Prisons policy, to keep an inmate in that status indefinitely.*" Tr. 2483 (emphasis added).
>
> (c) Warden Vanyur testified that even inmates at ADX Florence would ultimately have "a lot of contact with inmates" and "frequent and constant contact with staff unrestrained." Tr. 2489-90.
>
> (d) After declaring that strict conditions of confinement could only be imposed as a temporary measure, Warden Vanyur testified that even the most dangerous inmates would end up in general population maximum security prisons. In describing the freedoms of inmates at those general population prisons, Warden Vanyur testified, "in open population penitentiary, you have constant contact, unrestrained with other staff and inmates. ... you are out and about in large recreation areas; you have movement unrestrained to and from the dining hall; there is virtually unlimited access to telephones and a great deal of open visiting contact." Tr. 2472. Warden Vanyur later stated, "the inmate would have a great deal of open contact visiting with his family, probably in excess of twelve visits a month. He would have as many phone calls as he could

---

[3] Warden Vanyur's testimony is quoted at length in Johnson's Reply in Support of His Sec. 2255 Motion. R.19 in the docket.

pay for or get someone to accept them as collect charges, so he would have virtually unlimited phone access if he had the time to make the phone calls. And he would have unlimited correspondence privileges." Tr. 2477.

(e) Warden Vanyur testified that even in the Control Unit at ADX Florence, "you have one fifteen-minute phone call per month" as well as "five visits per month" and "virtually unlimited correspondence with the outside world." Tr. 2485.

The meaning, import, and substance of Warden Vanyur's testimony was clear to everyone in the courtroom.

Contrary to Warden Vanyur's testimony at Johnson's trial, former Warden Bezy's affidavit plainly establishes that the BOP had the ability, facilities, policies, and actual practices in place – at the time of Darryl Johnson's case – to impose the strict conditions of confinement on inmates whenever the BOP deemed it necessary, and for as long as the BOP deemed it necessary, to ensure the safety and security of the institution, staff, and the public. Thus, former Warden Bezy attests in his affidavit, *inter alia*:

> 6. When I worked at USP Marion, that facility was the highest security prison in the United States. USP Marion housed the "worst of the worst" of federal prisoners in its general population, and did so under highly secure and restrictive conditions of confinement, including, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort. While the hope of the BOP was that inmates sent to the general population at USP Marion would modify their behavior and return to a mainstream maximum security facility after two to three years, there were many inmates who were housed at USP Marion for many years, including some who were housed at USP Marion for years and then transferred directly to the Administrative Maximum ("Super-Max" or "ADX") facility in Florence, Colorado when that facility opened. In addition, there were some inmates who were assigned directly to USP Marion from the sentencing court. For example, John Gotti was an inmate sent directly to USP Marion from the sentencing court.

4

7.      While I worked there, USP Marion had units within the facility where the most dangerous and/or high security risk inmates were housed under even more strict conditions of confinement than those imposed on USP Marion's general population.  These even more strict conditions of confinement were imposed for as long as the BOP and/or the Warden deemed necessary to ensure security and to reduce or eliminate the inmate's risk of violence or future dangerousness.  For example, USP Marion had a Control Unit within the prison where the most violent offenders, including particularly those who were deemed to pose a future danger of violence and/or criminal activity, were housed prior to the opening of the Super-Max ADX facility in Florence, Colorado. * * * Inmates assigned to the Control Unit were housed in that Unit for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

8.      The Super-Max ADX facility in Florence, Colorado opened in approximately 1994.  I know that a number of inmates who, due to security and/or "future dangerousness" concerns, had been housed at Marion under very strict conditions of confinement for years prior to the opening of the ADX facility in Colorado, were then transferred to the ADX facility where they continued to be held under very strict conditions of confinement due to the same long-standing security and/or future danger concerns.  Inmates who fit this description that I can recall at this time include Barry Mills, and T.D. Bingham, high ranking members of the Aryan Brotherhood gang, as well as leaders of other gangs and disruptive groups.  In addition, shortly after ADX was opened, a number of other violent inmates, including gang members, domestic terrorists, and organized crime figures, were also were transferred directly from USP Marion to the ADX facility.  At ADX, both before and after 1998, these types of inmates were housed in conditions that were even more restrictive than the conditions had been at USP Marion in terms of their ability to interact or communicate with staff, other inmates, or persons outside the facility.

9.      USP Marion also had what was called the "K-Unit" from at least the mid-1980's through the mid-1990's in which inmates who were a security risk were housed under extremely strict conditions of confinement.  Inmates housed in the K-Unit due to security and/or future dangerousness concerns that I can recall included John Walker, a convicted spy, Ed Wilson, a former CIA operative, Jonathan Pollard, a convicted spy, and Christopher Boyce, a former CIA operative.  These inmates were held in K-Unit because of security and/or future danger

5

concerns, and were held there for as long as the BOP deemed it necessary to ensure security and that these individuals did not constitute a future danger. Inmates housed in K-Unit were housed in single cells and had no physical interaction with other inmates. All their mail was screened by BOP officers, all telephone calls had to be arranged through BOP officers who would bring the phone to the inmate in his cell. Those calls could only be made to people who were on an approved phone list, and all such calls were recorded and monitored by the BOP. All visitors to any inmates on K-Unit had to go through a somewhat intensive background screening process, and had to be pre-approved by the BOP before they could visit.

* * *

11. The Super-Max facility in Florence, Colorado, was designed to hold the most dangerous inmates under extremely strict conditions of confinement, including with strict limitations on any communications with people outside the prison, whether by phone, mail, or visits, whenever deemed necessary by the BOP. It is my understanding that inmates were in 1998 and prior thereto (and have been from 1998 through the present) held at the ADX facility under strict conditions of confinement, including severe restrictions on their communications, whether by mail, phone or visitation, whenever that was deemed necessary by the BOP or the ADX Warden, and for as long as necessary to deal with the security or future danger concern raised by a particular inmate. I also know that some inmates have been assigned to the ADX facility directly from the sentencing court, when the circumstances warranted. The ADX facility also has areas within the prison that are referred to as "side pockets" or "special cells," which are used to hold prisoners who are deemed to be exceptionally dangerous. For example, inmate Luis Felipe was assigned to ADX directly from the sentencing court and inmate Felipe was held in one of these "side pockets" after being sentenced in 1997 due to concerns about security and/or his future dangerousness as set forth by the sentencing court. It is my belief that other inmates, too, were housed in these "side pockets" in order to address concerns about security and/or future dangerousness in and before 1998.

12. I know of some other examples of inmates who, in 1998 and prior, were housed under strict conditions of confinement specifically in order to reduce or eliminate their potential future dangerousness. For example, Federal inmate Rodney Hamrick, a convicted bomber, was housed at USP Marion when I worked there. All

6

of Hamrick's mail, including his legal mail, was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Inmate Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the assessed risk that he posed to be a future danger by ordering crimes or violence while incarcerated. Other inmates that I can recall who, in 1998 and prior, were housed under very strict conditions of confinement due to security concerns include Thomas Silverstein and Clayton Fountain. * * *

14. Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and/or imposed both prior to 1998 and after, there is no doubt that the Bureau of Prisons had, at all times, the authority and ability to house inmates in the most restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's "future dangerousness." * * * Moreover, these strict conditions of confinement could be, and were, imposed for as long as the BOP deemed it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

(Ex. A to Johnson's Renewed and Amended Motion for Discovery).

Most of this information from Mr. Bezy is either directly contradictory or impeaching of Warden Vanyur's substantive testimony (and, perhaps as importantly, the government's argument to the jury based on Warden Vanyur's testimony). Yet none of this information contained in former Warden Bezy's affidavit – whether as to general BOP policies and authority, or as to case-specific practices – was disclosed to the defense in Darryl Johnson's case.

The government's primary retort to the Bezy affidavit consists of the following argument: "That Bezy knows of other inmates who were treated differently does not contradict Vanyur." Govt. Resp. at 10, ¶11. In light of the evidence of record (summarized above), this is a difficult argument to swallow on its face. But even if the raft of information in Mr. Bezy's affidavit doesn't directly "contradict" Vanyur, it most certainly impeaches Vanyur's testimony and casts great doubt on his credibility and/or bias. It is black-letter law that the prosecutor's "*Brady* duty extends to

*impeachment evidence* as well as exculpatory evidence." *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) (emphasis added), citing *United States v. Bagley*, 473 U.S. 667, 676 (1985). Notwithstanding the government's assertion, absolute "contradiction" is not a *sine qua non* to establish a violation under *Brady* and its progeny; impeachment evidence is sufficient.[4]

Indeed, evidence that undermines the credibility of a key prosecution witness is routinely the basis for successful *Brady* claims. *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Latham*, 874 F.2d 852 (1st Cir. 1989); *Bagley v. Lumpkin*, 798 F.2d 1297 (9th Cir. 1986). Most recently, the Seventh Circuit issued its decision in *United States v. Banks*, in which it held that the failure of the prosecution to disclose evidence of an unrelated internal investigation about credit card misuse by a DEA chemist who testified on behalf of the prosecution, identifying a substance as cocaine, was "material" and "impeaching" under *Brady* and warranted a new trial. 546 F.3d 507 (7th Cir. 2008). In the instant case, the facts are far more severe than *Banks*, as the suppressed impeachment information goes not only to the credibility of Warden Vanyur, but directly to the substantive heart of the prosecution's penalty-phase case.

There can be no doubt that in Darryl Johnson's case, the information set forth by former Warden Bezy (a) was well known to Warden Vanyur and the BOP, an agency of the Department of Justice; (b) is material to the central issue at Darryl Johnson's penalty-phase hearing; and (c) is, at a minimum, impeaching of the testimony of Warden Vanyur – even accepting, *arguendo*, the government's position that Vanyur testified only about "what was likely to happen, not what was

---

[4] In its response, the government again recites its hair-splitting mantra that Vanyur's testimony was limited to "what was likely to happen, not what was possible or impossible," (Govt. Resp. at 8, ¶8), suggesting that this distinction eliminates the viability of Johnson's *Brady* claim. Of course, that, too, is incorrect.

possible or impossible." *See* Govt. Resp. at 8, ¶8.

It cannot be overstated how incredibly powerful it would have been for the defense case had Johnson's counsel been told that not just one or two, but many inmates had been – and were being – held by the BOP under the very type of strict conditions of confinement they had posited were possible to be imposed for as long as necessary to alleviate any future dangerousness. Likewise, had the defense been informed of the BOP's policies and practices, as set forth by Mr. Bezy, Warden Vanyur's testimony could have been almost wholly devastated. There is no doubt that this information would have severely impeached Vanyur's both on the substance of his testimony and as to his credibility. And, particularly in the context of a death penalty hearing where it takes just one juror to stop a death sentence from being imposed (*Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996); 18 U.S.C. §3593(e) (requiring unanimous vote of jury to impose death sentence)), there is undoubtedly a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *Bagley*). The suppressed evidence was material, and Johnson deserves a new sentencing hearing on that basis.

Petitioner respectfully submits that he has demonstrated a *Brady* violation occurred in this case on the current record. To the extent, however, that the Court believes further evidence is necessary, we are entitled to get the discovery requested under Habeas Rule 6. "[W]here specific allegations before the court show reason to believe that the petitioner *may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief,* it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley,* 502 U.S. 899, 908-09 (1997) (emphasis added, citation omitted).

9

**B.** **The Government's Attempt to Create a "Catch-22" Regarding Discovery On The Brady Claim**

The government next urges the Court to discard Petitioner's *Brady* claim because, says the prosecutor, it is hopelessly inconsistent with his ineffective assistance claim, as to which the government has already conceded defense counsel's deficient performance. Govt. Resp. at 2-3. The government thus claims that Johnson's *Brady* claim is based on, *and limited to*, the same information that underlaid Johnson's ineffective assistance claim (*i.e.* the SAM's regulations; 18 U.S.C. §3582(d); and the case of Luis Felipe), "plus information regarding BOP inmates Thomas Silverstein and Clayton Fountain ..." Govt. Resp. at 2-3. Based on this (false) premise, the government argues:

> [Johnson's] *Brady-Giglio* claim is fundamentally at odds with the ineffective assistance claim. If counsel performed deficiently in failing to discovery this evidence on their own, which the government concedes, then it cannot have been suppressed. Further, it is bizarre, to say the least, to speak of an Act of Congress, a set of published regulations, and a court case [*Felipe*] open to the public as having been suppressed.

Govt. Resp. at 3, ¶3. Of course, the government's premise is false, and its conclusion unsupported.

In his Initial §2255 Petition filed in 2002, Johnson alleged that "the BOP and/or the Department of Justice were in possession of information and documents which were clearly material and impeaching of Warden Vanyur's testimony, yet none of that information was turned over to the defense." R.1 at 9. He further specified what he knew at the time about the policy, practices and inmates of the BOP that constituted *Brady* evidence. Specifically, Johnson alleged that "the BOP and/or the Department of Justice was, at the time of Johnson's penalty-phase hearing and for months prior thereto, housing Luis Felipe under the strict conditions of confinement that Warden Vanyur testified were impossible to impose or carry out for any indefinite period of time; (b) the BOP and/or the Department of Justice was, at the time of Johnson's penalty-phase hearing and for years prior

10

thereto, housing Thomas Silverstein [and Clayton Fountain] under the strict conditions of confinement that Warden Vanyur testified were impossible to impose or carry out for any indefinite period of time. ...” R.1 at 9-10 (Johnson’s §2255 Petition). Suspecting that this might not constitute the only information possessed by the DOJ/BOP that was impeaching of Warden Vanyur, Johnson further alleged, *“There may well be other instances of such confinements being imposed which, likewise, were not turned over to the defense. This is a subject of requested discovery pursuant to this petition.”* R.1 at 10.

Thus, the government is incorrect in asserting that Petitioner argued a failure to disclose the publicly-available SAM’s regulations and §3582(d) are the basis of his *Brady* claim. They are not. Rather, the *Brady* claim was based on information about then-existing *policies*, *practices*, and *inmates* that the Department of Justice and the BOP had housed, and were then housing, under the type of strict conditions of confinement that Johnson’s counsel had argued could be imposed for as long as necessary, but which Warden Vanyur testified, alternatively, would not and could not be imposed. This was the central issue at the penalty phase hearing in Darryl Johnson’s case. And we now know that there were any number of such inmates who had those conditions imposed on them for extended periods of time, and specifically to address concerns about their future dangerousness. *See*, *e.g.*, Bezy Affidavit (Ex. A to Renewed and Amended Motion for Discovery); Govt. responses to discovery (Group Ex. C to Renewed and Amended Motion for Discovery). Mr. Bezy identified not only the policies and practices of the BOP which are inconsistent with, if not directly contradictory to, Warden Vanyur’s testimony, but also named several individual inmates he recalls who were housed under the same strict conditions of confinement at issue in Darryl Johnson’s case. Even without benefit of any of the records requested in discovery, Mr. Bezy was able to identify at

least a dozen inmates who, in 1998 and prior, were held under the type of strict conditions of confinement at issue in Petitioner's case, due to future dangerousness concerns, and for as long as the BOP deemed necessary to ensure security and safety of the institution, staff, other inmates, and the public. These inmates include: Barry Mills, T.D. Bingham, Ed Wilson, Jonathan Pollard, Christopher Boyce, Luis Felipe, Rodney Hamrick, John Gotti, Manuel Noriega, Thomas Silverstein, Clayton Fountain, other high ranking members of the Aryan Brotherhood gang and other gangs, domestic terrorists, and organized crime figures. (Bezy Affidavit). Bezy further described the policies and practices of the BOP which further impeach and/or directly contradict Warden Vanyur's testimony. Yet exactly *zero* information about any of the inmates held by the DOJ and BOP under these types of strict conditions of confinement, and *zero* information about the existing policies and practices of the BOP, was ever disclosed to the defense. This is the essence of a *Brady* violation.

Second, the hidden assumption in the government's argument is that if a Petitioner doesn't recite *all* the evidence that was suppressed, item by item, in his initial petition, then he has no right to get discovery which might reveal *additional* suppressed evidence beyond that which he was able to allege at the very outset of the case. Of course, if the additional evidence, in fact, was suppressed and further, as here, it is solely in the possession of the government, it is difficult to fathom how a petitioner could *ever* get that information except through discovery. Indeed, if the government's hidden assumption were correct, there would be no need for the discovery provisions of Habeas Rule 6 in the first place; a §2255 petitioner would have to already have marshaled all the evidence supporting his *Brady* claim before he could even file his suit.

Here, Petitioner alleged at least three specific pieces of information that the government failed to disclose: (1) the strict conditions of confinement the Luis Felipe was being held under by

the BOP/DOJ; (2) the strict conditions of confinement that Thomas Silverstein was being held under, and had been held under for more than a decade at that point, by the BOP/DOJ; and (3) the strict conditions of confinement that Clayton Fountain was being held under, and had been held under for more than a decade at that point, by the BOP/DOJ. R.1 at 9-10. Johnson then further specifically alleged "[t]here may well be other instances of such confinements being imposed which, likewise, were not turned over to the defense. This is a subject of requested discovery pursuant to this petition." R.1 at 9-10. This is precisely the situation in which discovery is appropriate – to illuminate the full scope of the information that was suppressed when good cause has been shown to believe that such evidence exists and is relevant to the petitioner's claims. The discovery requested here goes directly to the heart of the alleged *Brady* violation. Indeed, if discovery is not warranted in this situation, it is difficult to imagine when it would be.

C.  **The Prosecution Is Responsible Under *Brady* For Information Known to The DOJ, the BOP and Warden Vanyur**

The government next claims that neither the BOP (Warden Vanyur's agency) nor Warden Vanyur were "part of the prosecution team in [P]etitioner's case" nor were they "involved in the investigation or the prosecution" of Petitioner's case. Govt. Resp. at 4. This argument, too, is without merit.

First, notwithstanding the government's contention to the contrary, it is clear that Warden Vanyur was "involved in the investigation or prosecution" of Johnson's case. He was a Warden at the Bureau of Prisons, an arm of the Department of Justice – the same Department of Justice that oversees the prosecutors' office. (Discussed further below). He was called to consult with the prosecutors on the case, and did so. At the behest of the prosecutors, he attended the testimony of

13

defense expert Dr. Mark Cunningham the day before his own testimony. (*E.g.*, Tr. 2467, 2468, 2475, 2482). On information and belief, he met with the prosecutors and discussed the case and his analysis of Dr. Cunningham's testimony with them before his testimony; he never met with the defense. He then testified as an "expert" for the prosecution and, on information and belief, did so without seeking or receiving any compensation beyond his regular pay as a Warden. Finally, based on the evidence adduced thus far in this proceeding which severely impeaches the most critical aspects of his testimony, it is becoming apparent that his role at the trial was that of an advocate for the prosecution's position, not a neutral. Given the facts, the suggestion that he was a detached, third-party witness with no ties to or relationship with the prosecution of this case strains credulity.

Cases analyzing *Brady* claims with analogous relationships further make plain the faulty nature of the government's position. For example, in *United States v. Wood*, the court found a *Brady* violation in the government's failure to disclose exculpatory material contained in FDA reports because the FDA was charged with administering the statute at issue and consulted with the prosecutor during the prosecution. 57 F.3d 733, 737 (9th Cir. 1995). Wood and his co-defendant were charged with conspiracy in violation of 18 U.S.C. § 371 to defraud the FDA by obstructing the FDA's function of ensuring that prescription drugs are safe and effective and dispensed pursuant to a prescription from a practitioner licensed by law to administer such drugs. The drugs in question were GHB and Clenbuterol, each alleged to be prescription drugs within the meaning of 21 U.S.C. §353(b)(1)(B).

In order to prove that GHB was a prescription drug the government called an FDA doctor to testify about tests he had run on cats and how the cats acted like they were hallucinating. While the FDA doctor testified he had never done human tests, the thrust of his testimony was that GHB was

14

a dangerous drug which would have hallucinogenic affect on humans. What the FDA did not reveal is that GHB had, in fact, been studied in humans for 20 years and was found to have no habituation, addiction, or side effects. The written results of these human studies were in the FDA's files. The court held the failure to locate and turn over these human test results, which were inconsistent with, or at a minimum impeaching of, the FDA doctor's testimony, constituted a *Brady* violation and granted relief to the defendant.

Similarly, in *United States v. Bhutani*, the Seventh Circuit held that "[w]hile the government does not have the duty to disclose information of which it is unaware, if a government agency is charged with the administration of a statute and has consulted with the prosecution in the case, the agency will be considered part of the prosecution, and its knowledge of *Brady* material will be imputed to the prosecution." *Bhutani*, 175 F.3d 572, 577 (7th Cir. 1999) (citing *Wood*, 57 F.3d at 737; *United States v. Anderson*, 31 F.Supp.2d 933, 948 (D. Kan. 1998). "The government cannot with its right hand say it has nothing while its left hand holds what is of value." *Bhutani* at 577, quoting *Wood* at 737. As in Wood, in *Bhutani*, the Court held that the information known to the relevant agency was properly imputed to the prosecution. *Id*. at 577. This principle is reinforced in other cases we have previously cited. *E.g.*, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others *acting on the government's behalf in the case*.") (emphasis added); *United States v. Andrews*, 824 F.Supp. 1273, 1289-90 (N.D. Ill. 1993) (prosecution team responsible under *Brady* for exculpatory and impeachment information known to the BOP, and the prosecution's failure to disclose the impeaching material "deprived defense counsel of the opportunity to independently investigate and fully develop a defense to these serious charges."). *See generally*, *United States v. Auten*, 632 F.2d

478 (5th Cir. 1980) ("If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government. This we decline to do.").

Here the same result must enure. Just as the FDA was the agency charged with administering the statutes and regulation at issue in *Wood*, it was the BOP that was (and is) charged with administering the statutes and BOP regulations at issue in Darryl Johnson's case. In Johnson's case, it was the BOP, through Warden Vanyur, that advised and consulted with the prosecutors during the penalty-phase of the prosecution, and Warden Vanyur then testified as an expert on the prosecution's behalf in the name of the BOP. Under these circumstances, it would be a perverse result to find that the government cannot be charged with the knowledge of the BOP in this case, under these facts, as to these issues.

Moreover, as we have argued previously, the government's attempt here to dissociate itself from the BOP is further undercut by the very structure of the Department of Justice (of which the BOP is a part), and the substantive procedural requirements of the DOJ in federal death penalty cases. As a starting point, *the BOP is an agency of the Department of Justice*. *See* R.4 (Initial Memorandum, Exhibit D, Organizational Chart from the DOJ website). According to the DOJ's own document, the BOP is under the direct supervision of the Attorney General. *Id.* And the Attorney General has a specific and substantive role in federal death penalty cases. Pursuant to Title 9, §9-10.000 *et seq.* of the United States Department of Justice Manual, the federal death penalty may only be sought upon the written approval of the head of the Department of Justice, the Attorney General of the United States. That is, the Attorney General has the sole ultimate responsibility for deciding which cases to prosecute as death penalty cases. Thus, there is a defining difference

between the run-of-the-mill criminal case and that in which the federal death penalty is sought in terms of the prescribed role of the Attorney General and his staff in death penalty prosecutions. The Department of Justice is, indeed, an integral part of the prosecutorial team in every federal death penalty case and, under the law, therefore, the knowledge of the Department of Justice is imputed to the prosecutors in each death penalty case. Likewise, the prosecutors in this case were employees of the Department of Justice, and they are imputed with knowledge in the possession of other employees of that same agency. *See United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) ("The Justice Department's various offices ordinarily should be treated as an entity, the left hand of which is presumed to know what the right hand is doing."); *see generally*, *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984) ("a prosecutor's office cannot get around *Brady* by keeping itself ignorant, or compartmentalizing information about different aspects of a case").

D.     **The Government's Assertion That There Is No Basis to Revisit Johnson's *Brady* Claim**

Finally, the government argues that Judge Conlon previously rejected the *Brady* claim and makes the following remarkable claim:

> Petitioner offers no reason to reopen [the *Brady*] issue. He cannot point to anything Judge Conlon overlooked, or any intervening event that casts her ruling into question. The only thing that has changed between March 11, 2003, and now is the prejudice standard applicable to the ineffective assistance claim.

Govt. Resp. at 6. This contention is easily disposed of, as there are at least three highly significant things that have changed since March 11, 2003 and make plain that this Court should review Johnson's *Brady* claim.

First, after noting that the materiality standard under *Brady* is the same as the prejudice

17

standard for an ineffective assistance of counsel claim under *Strickland*, Judge Conlon's March 11, 2003 decision rejected Johnson's *Brady* claim, stating, "For the same reasons Johnson failed to establish prejudice for his ineffective assistance of counsel claim, he fails to establish materiality for is *Brady* claim." (Mem. Opin. and Order at 13-14). Of course, now even the government now agrees that the ineffective assistance of counsel claim is viable, and has conceded the deficient performance prong. Thus, the basis for the March 11, 2003 decision rejecting Johnson's *Brady* claim (*i.e.* the lack of a viable claim of "prejudice" on the ineffective assistance claim) is no longer in place. That change alone suffices to defeat the government's argument that Johnson's *Brady* claim doesn't warrant review.

Second, last Summer, the Court directed the government to provide certain discovery to the Petitioner. In doing so, the government disclosed that not less that six other individuals – in addition to the four that Petitioner had previously identified (Yousef, Felipe, Silverstein and Fountain) – had been held under the same kind of strict conditions of confinement that were the primary focus of Johnson's penalty-phase hearing. These disclosures, obviously, had not been made in March, 2003.

Third, the Court now has before it the detailed affidavit of former BOP Warden Mark Bezy detailing the policies and practices of the BOP that were in place at and before the time of Darryl Johnson's sentencing, as well as identifying at least a dozen other inmates who were held under the conditions of confinement that Warden Vanyur testified would not, or could not, be imposed.

Both the legal landscape and the factual record of this case has changed markedly since March 2003. Review of Petitioner's *Brady* claim in light of those changes is certainly warranted and appropriate.

18

### E. The Relevant Time and Scope of Discovery Materials Previously Ordered

Finally, the government that the scope of the discovery previously ordered by the Court is smaller than what Petitioner understood. The government produced discovery using a cutoff date of November 17, 1997, the date of the original sentencing (Govt. Resp. at 8-9), while we believe the Court agreed that the operative cutoff date for the previously ordered discovery should be July 27, 1998 – the date the death sentence was formally imposed at the conclusion of the post-trial proceedings.

Second, it was clear from the arguments that we believe we are entitled to get information about inmates held under these types of strict conditions of confinement in response to future dangerousness concerns (a) regardless of whether they were imposed directly from the sentencing court, or after the inmate was already in the BOP (*see* Ex. B to Renewed and Amended Motion at 32-33); and (b) regardless of whether they were imposed pursuant to SAM's, §3582(d), the BOP's inherent authority, or otherwise. (June 3, 2008 Transcript at 27-28; Aug. 26, 2008 Transcript at 6-9). Each of those situations is relevant to the fundamental argument – *i.e.* whether the BOP had the authority, facilities, policy, and practices in place that allowed it to house an inmate under these types of strict conditions of confinement for as long as necessary to alleviate the future dangerousness concerns. We respectfully suggest that these issues can be addressed at the Court's direction when we appear before the Court on February 4, 2009.

19

Respectfully submitted,


/s/ Terence H. Campbell                          /s/ Lorinda M. Youngcourt

Terence H. Campbell                              Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.              1773 Huron Williams Road
33 North Dearborn Street, Suite 600              Mitchell, Indiana  47446
Chicago, Illinois  60602                         (812) 849-9852
(312) 263-0345

Counsel for Darryl Lamont Johnson

**CERTIFICATE OF SERVICE**

       Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1.       Reply in Support of His Renewed and Amended Motion for Discovery on Petitioner's Ineffective Assistance of Counsel and *Brady* Claims, and His Motion For Leave to Seek Expert Funding *Ex Parte*

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.

                     /s/  Terence H. Campbell
                     Terence H. Campbell