IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**PETITIONER'S SUPPLEMENTAL BRIEF IN SUPPORT
OF HIS INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM**

Petitioner, Darryl Lamont Johnson, by his counsel, Terence H. Campbell of Cotsirilos, Tighe

& Streicker, and Lorinda Meier Youngcourt, respectfully files this Supplemental Brief in Support of

His Ineffective Assistance of Counsel Claim.

I.      INTRODUCTION

Based on the prior pleadings and hearings, the Court is now familiar with the substantive and

procedural background of this case.  In short, in 1997, Darryl Johnson was convicted of a large drug

conspiracy and ordering the murders of two fellow gang members.  The government sought the death

penalty on the two murder counts, and a penalty-phase trial was held before the jury to determine

whether he would be sentenced to life without parole or to death, the only two options available

under the law.

The penalty-phase hearing was held in November, 1997.  During that hearing, the central issue

in dispute between the parties, and the focus of the evidence presented, was Johnson's alleged "future

dangerousness" and the potential conditions of confinement which could (or could not) be imposed

and implemented by the Bureau of Prisons in order to eliminate any such future danger.  At the

penalty-phase hearing, the government called BOP Warden John Vanyur, a long-time veteran of the BOP who had formerly served as Assistant Warden at the BOP's SuperMax ADX facility, to testify about a number of matters relating to the authority and capabilities of the BOP to house inmates under restrictive conditions of confinement in order to alleviate or eliminate their potential future dangerousness.

In sum, Warden Vanyur told the jury in no uncertain terms that if the jury spared him from death, Johnson would necessarily have access to telephone privileges, to in-person visits, to correspondence, and would inevitably be housed in an open-population environment. Ex. A, Tr. 2474-78. (A copy of Warden Vanyur's testimony at Petitioner's penalty-phase trial is attached hereto as Exhibit A.) Warden Vanyur testified that even inmates in the Control Unit of the Supermax facility – the most restrictive environment within the BOP – get one fifteen-minute phone call per month, five visits per month, and virtually "unlimited correspondence with the outside world." Ex. A, Tr. 2485. According to Warden Vanyur, these privileges could be revoked only if Johnson was caught actually violating the rules while incarcerated. Ex. A, Tr. 2478. Warden Vanyur further testified that even if Johnson were to be placed at SuperMax, or in a Control Unit or similar segregation, such placement could only be for some short period of time because "those are both temporary holding patterns" that cannot be used for extended periods of time. Ex. A, Tr. 2482-2483. According to Warden Vanyur, it was inevitable that Johnson would ultimately be placed in an open-population penitentiary. Ex. A, Tr. 2472, 2485, 2490. In that open-population setting, Warden Vanyur testified, Johnson "would have as many phone calls as he could pay for or get someone to accept them as collect charges, so he would have virtually unlimited phone access if he has the time to make the phone calls. And he would have unlimited correspondence privileges." Ex. A, Tr. 2477. *See also*

Ex. A, Tr. 2477 (describing how an inmate "would have a great deal of open contact visiting with his family, probably in excess of twelve visits a month"); Ex. A, Tr. 2475-76 (testifying that because segregation is never a permanent option, it was "virtually impossible" to prevent Johnson from interacting with other members of the Gangster Disciples).

In its closing argument to the jury in the penalty-phase, the government focused on Warden Vanyur's testimony. The government asserted that all Johnson needed to kill others was a telephone, and that there was no BOP facility or regulation that could possibly prevent him from having access to one. (Tr. 2647-48). The government argued, "nobody is safe; no witness, no witness's family, anybody who stands in his way, they are not safe. It doesn't matter where he is locked up." Tr. 2593-94 (emphasis added). The prosecutor later returned to this point, urging again that "[n]o prison system can stop him," and "no one is safe as long as the defendant, Darryl Lamont Johnson, is allowed to live." (Ex. A, Tr. 2648, 2598).

After hearing this evidence and argument, the jury *unanimously found* that Johnson "would commit serious acts of violence in the future which would be a continuing and serious threat to society." (*See* Init. Memo in Support of His §2255 Petition [Docket No. 4], Ex. C, Johnson Special Verdict forms at Part III). At the same time, the jury *unanimously rejected* the defense's proposed finding that Johnson "will not be a serious and continuing danger to society because the government has the power to imprison him for the rest of his life in a maximum security federal prison designed to control and monitor his behavior." *Ibid*. Although many of the jurors found that many mitigating factors were present, the jury nonetheless returned verdicts of death against Johnson.

Johnson's direct appeal was denied, and he timely filed a petition under 28 U.S.C. §2255, asserting a number of claims, including a claim of ineffective assistance of counsel. It is that claim

which is the subject of this supplemental brief.

II.     JOHNSON'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

Darryl Johnson's ineffective assistance of counsel claim is premised primarily on his trial counsel's failure to adequately investigate, research and present evidence, law and regulations that were readily available and would have directly refuted and/or severely impeached the testimony of Warden Vanyur. As summarized in Petitioner's Initial Memo in Support of His §2255 Petition, trial counsel was ineffective in that they:

1.     did not cross-examine Warden Vanyur with respect to BOP regulation 501.3 which specifically allows exactly the type of conditions of confinement that Vanyur testified on direct were impossible and likely illegal;

2.     did not cross-examine Warden Vanyur as to the sentence and conditions of confinement imposed on Luis Felipe in a case decided *more than eight months prior* to the sentencing hearing in Johnson's case;

3.     did not cross-examine Warden Vanyur as to the conditions of confinement available under 18 U.S.C §3582(d) and 28 C.F.R. 501.3, particularly after Vanyur had been allowed to testify about the law on direct[1];

4.     did not offer a jury instruction based on or that set out the relevant law (*i.e.* 18 U.S.C. §3582(d) and 28 C.F.R. 501.3) for the jury to consider in making its decision;

---

[1] As an example, Warden Vanyur testified on direct as follows:

Q:     Is it, under the law, even a possibility to place Darryl Johnson directly into that 68-bed control unit [at ADX]?

* * *

A:     *It is not.* 28 CFR Section 541 is very clear that inmates cannot be placed in a control unit solely on the basis of the offenses they committed in the community.

(Ex. A, Tr. 2484 (emphasis added)).

5.    did not object to the jury instructions which omitted the law under 18 U.S.C §3582(d) and 28 C.F.R. 501.3;

6.    did not satisfactorily investigate the conditions of confinement which were *at the time* both being imposed by federal courts and administered by the BOP; and

7.    did not object to certain of Vanyur's testimony about the state of the law which testimony was elicited by the government on direct examination and was found to be improper by the Seventh Circuit.

Both the BOP regulations contained in §501.3 and §541.41(b)(2), and the statutory authority conferred by§3582(d) make clear that the sentencing court and the BOP each have the independent authority to order and impose, for as long as necessary, precisely the strict conditions of confinement that Warden Vanyur testified could not possibly occur.  Moreover, there was evidence available to defense counsel that not only did the BOP and the courts have this authority, but such strict conditions of confinement were, in fact, being imposed and carried out on other inmates by Warden Vanyur's BOP *at the very same time* he testified unequivocally to Darryl Johnson's jury that those conditions were impossible to impose or carry out.  ***Indeed, we now know that the BOP had been imposing precisely those types of conditions on any number of prisoners for years prior to Warden Vanyur's testimony at Johnson's trial***.  (*See* Ex. C, First Affidavit from Mark Bezy (previously attached as Ex. A to Petitioner's Renewed and Amended Motion for Discovery [Docket 51]); Ex. D  attached hereto, Supplemental Affidavit from Mark Bezy dated Dec. 14, 2009; Ex. F, Letter from BOP employee Zgrodnik).

In addition, earlier in 1997, prior to Johnson's trial, the government had forcefully argued to the Second Circuit that both the court and BOP had the express authority, under those same BOP regulations and statutory provisions cited above, to impose precisely the strict conditions of confinement that were disavowed by Vanyur.  (*See* "Petitioner's Response to the Government's

5

Motion to Reconsider the Court's March 11, 2003 Opinion and Order in Light of the Supreme Court's Subsequent Decision in *Massaro*," [Docket No. 29], Ex. A at 36-45 (Govt. Br. in *United States v. Felipe*, Case No. 97-1155)). None of this, however was brought to the attention of the trial court or the jury. In fact, Johnson's trial counsel did virtually nothing to confront or refute Warden Vanyur's inaccurate and misleading testimony on this central issue of future dangerousness. Trial counsel's failure to investigate was then compounded by the fact that they allowed the government's BOP "expert," Warden Vanyur, offer, without objection, improper (and inaccurate) legal opinion testimony regarding the BOP's power and authority to impose and maintain these strict conditions of confinement for as long as necessary – testimony which, likewise, has been shown to be flatly inaccurate. (Ex. C, First Affidavit of Mark Bezy; Ex. D, Supplemental Affidavit of Mark Bezy dated December 14, 2009.

As discussed further below (and in our prior briefs), for some time now, the government has conceded that Mr. Vanyur's testimony on these matters was inaccurate, "incomplete" and may well have "left the jury with a mistaken impression" of BOP's authority, policy, and actual practices with respect to the housing of inmates and the conditions of confinement available to be imposed. (*See* Init. Mem. in Support of §2255 Pet., Ex. A, Govt. Opp. to *cert*. at 14, 20, 21, 28-29 [Docket No. 4]). Indeed, the government has now conceded before this Court that defense counsel's performance in failing to challenge, rebut, and refute the demonstrably inaccurate testimony of Warden Vanyur was constitutionally deficient under the first prong of *Strickland v. Washington*. (*E.g.*, Transcript of 2/29/08 hearing at 4-5; Transcript of 6/3/2008 hearing at 10). 466 U.S. 668, 692,104 S.Ct. 2052, 2067 (1984). The government, however, persists in its contention that Mr. Johnson has not shown that he suffered "prejudice" as a result of his counsel's constitutionally deficient performance (*i.e.* the

second prong of *Strickland*). *Id*.

Thus, the lone issue yet to be resolved by the Court with respect to his ineffective assistance claim is whether his counsel's now stipulated errors – errors which went to the heart of the penalty phase case – were prejudicial to Johnson under *Strickland*. In its May 15, 2009 Order, the Court described the posture of the case on this issue as follows:

> The parties agree that Johnson's trial counsel was ineffective in failing to impeach the testimony of the government's expert regarding Johnson's future dangerousness and dispute only whether this failure prejudiced Johnson. In order to succeed on this claim, Johnson must establish that but for counsel's failure, there is a reasonable probability that a jury may have declined to reject Johnson's proposed finding on future dangerousness and reached a different outcome in its decision to sentence him to death. *Eckstein v. Kingston*, 460 F.3d 844, 848-50 (7th Cir. 2006). ***And because 'it takes only one juror to nix a death sentence," United States v. Johnson, 223 F.3d at 670, that threshold is even lower here***.

(Ex. B, Memorandum Opin. and Order dated May 15, 2009 at 6 (emphasis added)). We submit this brief, therefore, to highlight the facts and law that overwhelmingly support a finding of prejudice under *Strickland*.[2]

III.    THE LEGAL STANDARDS UNDER *STRICKLAND* AND ITS PROGENY

As has been discussed in Johnson's prior submissions, in order to establish prejudice, it is required only that Petitioner establish that, absent counsel's errors, there is a "***reasonable probability***" that the outcome of the sentencing hearing may have been different. *Strickland v. Washington*, 466 U.S. 668 (1984), *United States v. Cronic*, 466 U.S. 648 (1984)*, Strickler v. Greene*, 527 U.S. 263 (1999), *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510

---

[2] By highlighting the issues addressed herein and in the contemporaneously filed motion relating to his *Brady/Napue* claim, Petitioner does not intend to, nor does he, waive any of his other arguments or issues that have been presented in this case.

(2003); *Rompilla v. Beard*, 545 U.S. 374 (2005) (discussed below). *See also*, Init. Memo in Support of §2255 Pet. at 6, 33-35, 45 [ Docket No. 4] (discussing standard). If there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting its verdict, "then we *must* find prejudice." *Strickland*, 466 U.S. at 695 (emphasis added).

Notably, the Supreme Court has made clear that *a "reasonable probability" is a lesser burden than a preponderance standard*. *Strickland* at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the trial."); *see also Williams,* 529 U.S. at 405-06 (2000) (O'Connor, J., concurring) (state court rejection of ineffectiveness claim on grounds that prisoner failed to establish by "a preponderance of the evidence" that the outcome would have differed would be contrary to clearly established precedent).[3]

For all the reasons set forth herein, as well as those in our prior submissions, we respectfully submit that a "reasonable probability" of a different result is plainly and certainly established by the factual evidence and legal authority already of record in this §2255 proceeding. This is particularly so in light of the fact that **the death penalty would have been avoided had the defense been able to "convince only one of twelve jurors to refuse to go along with a death sentence.**"[4] *Emerson v.*

---

[3] Moreover, the Supreme Court's decision in *Cronic*, 466 U.S. 648 holds that where defense counsel "fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable" – and therefore, *no additional showing of prejudice is required*. *Cronic*, 466 U.S. at 659. Clearly, the lack of meaningful adversarial testing has been established as to the evidence offered by Vanyur which was, even according to the government, incomplete and quite possibly misled the jury on the critical issue of "future dangerousness." (*See*, *e.g.*, Init. Memo in Support of §2255 Pet. at 4, 21-22, 31-32 (discussing *Cronic* in argument on ineffective assistance claim at pp. 3-48)).

[4] The bases for Petitioner's ineffective assistance of counsel claims are set forth in further detail in his §2255 Petition and supporting memoranda (*see* Initial §2255 Memo in Support at 3-48; Reply Mem. at 6-24) and have been further buttressed by the facts that have come to light

*Gramley*, 91 F.3d 898, 907 (7th Cir. 1996) (emphasis added). *See also*, 18 U.S.C. §3593(e) (requiring unanimous vote of jury to impose death sentence); *Strickland*, 466 U.S. at 706 ("counsel's general duty to investigate * * * takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death; claims of ineffective assistance in the performance of that duty should therefore be considered with commensurate care.") (Brennan, J., concurring in part and dissenting in part); *California v. Ramos*, 463 U.S. 992, 1009 (1983) (stressing need that capital juries receive only "accurate information for its deliberation in selecting an appropriate sentence"); *Monge v. California*, 524 U.S. 721, 732 (1998) (recognizing an "acute need for reliability in capital sentencing proceedings"); *Gardner v. Florida*, 430 U.S. 349, 363-64 (1977) (imposition of the death penalty gives rise to a special "need for reliability in the determination that death is the appropriate punishment") (White, J., concurring); *see also*, *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (reversing death sentence where "the jury was allowed to consider evidence that has been revealed to be materially inaccurate").

IV.  JOHNSON HAS DEMONSTRATED PREJUDICE UNDER *STRICKLAND* AND ITS PROGENY

A.  Warden Vanyur's Testimony and The Issue of "Future Dangerousness"

As the Court is now well-aware, the central issue at the penalty phase of Johnson's trial was the issue of "future dangerousness" and, more particularly, the facilities, authority, and practices of the BOP that could eliminate the possibility of Johnson posing a future danger to anyone, whether

---

since the filing of the Petition, including the information contained in former BOP Warden Mark Bezy's two affidavits, and the information obtained from the BOP regarding other inmates who were, at the time of Johnson's trial, housed under the very conditions of confinement that Warden Vanyur testified were not possible.

inside or outside a BOP prison.[5] This issue was the subject of significant testimony, and was central to the arguments to the jury, both for the prosecution and the defense.

There is now no doubt that Warden Vanyur testified falsely about several matters relating directly to *the* material issue of future dangerousness and the authority, abilities, policies, and practices of the BOP with regard to housing inmates under strict conditions of confinement whenever it is deemed necessary. The false, inaccurate, and/or misleading testimony of Warden Vanyur includes, *inter alia*, the following:

> (a) Vanyur testified that the BOP cannot hold any prisoner indefinitely in segregation without access to telephone or correspondence privileges. According to Vanyur, strict segregated detention is only available as a *temporary* option. Ex. A, Tr. 2482-83 ("But in either case, administrative detention or administrative segregation, those are both temporary holding patterns, those are not permanent statuses for inmates.").

> (b) Warden Vanyur testified, "When you are in this special housing unit, you don't have the same access as the rest of the inmate population to programs, educational opportunities, and so forth. There is definitely a degree of deprivation inside there. *And so it is not permissible, by the Bureau of Prisons policy, to keep an inmate in that status indefinitely.*" Ex. A, Tr. 2483 (emphasis added).

---

[5] As discussed in Petitioner's Initial Memo in Support of His §2255 Petition [Docket No. 4], it is well established that the issue of "future dangerousness" is generally the single most critical issue for juries considering whether to impose the death penalty. *See generally* Sally Costanzo and Mark Costanzo, *Life or Death Decisions: An Analysis of Capital Jury Decision Under the Special Issues Sentencing Framework*, 18 L.& Hum. Behav. 151, 168 (1994) ("[F]uture dangerousness plays a prominent, if not central role * * *. Jurors clearly perceived the penalty decision as hinging on this issue."); James W. Marquart et al., *Gazing Into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?*, 23 L.& Soc. Rev. 449, 463 (1989) ("[D]ata show[s] that the decision to give life versus death in Texas rests squarely on Question 2--future dangerousness."). *See generally, Skipper v. South Carolina*, 476 U.S. 1, 5 n.1 (1986) (discussing importance of ensuring that the jury understands the actual facts to assess the "prosecutor's closing argument, which urged the jury to return a sentence of death in part because petitioner could not be trusted to behave if he were simply returned to prison").

(c)  Warden Vanyur testified that even inmates at ADX Florence would ultimately have "a lot of contact with inmates" and "frequent and constant contact with staff unrestrained." Ex. A, Tr. 2489-90.

(d)  After declaring that strict conditions of confinement could only be imposed as a temporary measure, Warden Vanyur testified that even the most dangerous inmates would end up in general population maximum security prisons.  In describing the freedoms of inmates at those general population prisons, Warden Vanyur testified, "in open population penitentiary, you have constant contact, unrestrained with other staff and inmates. ...  you are out and about in large recreation areas; you have movement unrestrained to and from the dining hall; there is virtually unlimited access to telephones and a great deal of open visiting contact." Ex. A, Tr. 2472.  Warden Vanyur later stated, "the inmate would have a great deal of open contact visiting with his family, probably in excess of twelve visits a month.  He would have as many phone calls as he could pay for or get someone to accept them as collect charges, so he would have virtually unlimited phone access if he had the time to make the phone calls.  And he would have unlimited correspondence privileges." Ex. A, Tr. 2477.

(e)  Warden Vanyur testified that even in the Control Unit at ADX Florence, "you have one fifteen-minute phone call per month" as well as "five visits per month" and "virtually unlimited correspondence with the outside world." Ex. A, Tr. 2485.

The meaning, import, and substance of Warden Vanyur's testimony was unmistakable:  the BOP, said Warden Vanyur, was entirely incapable of housing Darryl Johnson under conditions of confinement which would alleviate or eliminate his future dangerousness.  Indeed, according to Warden Vanyur, it was prohibited from doing so both by its policies, the law, and its own regulations.

Based on Warden Vanyur's now discredited testimony, the prosecutor dramatically told the jury in closing that, ***"[a]s long as the defendant has the ability to convey his orders to his followers, either on the street or in prison with him, nobody is safe; no witness, no witness's family, anybody who stands in his way, they are not safe.  It doesn't matter where he is locked up."*** Tr. 2593-94 (emphasis added).  The prosecutor returned to this theme again later in his closing, again pointedly

11

arguing to the jury, ***"No one is safe as long as the defendant, Darryl Lamont Johnson, is allowed to live."*** Tr. 2598. The power of this argument, backed by the false, but unchallenged, testimony of a high official from the BOP, can not be overstated.

As noted above, the government has now honorably and candidly admitted that Warden Vanyur's testimony was inaccurate and may well have misled the jury on the central matter at issue in the penalty phase. (*See* Transcript of 2/29/08 hearing at 4-5; Transcript of 6/3/2008 hearing at 10; Govt. Opp. to Cert. Pet., Ex. A to Petitioner's Initial 2255 Brief, [Docket No. 4] (Vanyur's testimony may well have "left the jury with a mistaken impression" of the BOP's true authority and actual practices). The government has further conceded that Johnson's counsel provided ineffective assistance satisfying the first prong of *Strickland*. (*See* Transcript of 2/29/08 hearing at 4-5; Transcript of 6/3/2008 hearing at 10).

B.      The Supplemental Affidavit of Former BOP Warden Mark Bezy

The breadth of Warden Vanyur's inaccurate testimony now has been further laid bare by the two affidavits submitted to the Court by Mr. Mark A. Bezy, a former BOP warden and 28 year veteran of the BOP, as well as the additional admissions of the government regarding any number of inmates who were then, and are now, being housed under the very conditions of confinement Warden Vanyur testified were not possible to impose for any extended length of time. Former Warden Bezy's two affidavits submitted in this case demonstrate beyond peradventure that Warden Vanyur's testimony was both materially false, demonstrably misleading, and undoubtedly prejudicial to Mr. Johnson.

As the Court recalls, attached to "Defendant's Renewed and Amended Motion for Discovery on Petitioner's Ineffective Assistance of Counsel and *Brady* Claims" [Docket No. 53], Mr. Johnson

attached an affidavit from Mr. Bezy.  In his original affidavit, Mr. Bezy plainly exposed the

inaccurate, misleading and false testimony presented by Mr. Vanyur at Petitioner's penalty-phase trial.

In his initial affidavit, Mr. Bezy stated unequivocally that, at the time of Johnson's trial and before,

a good number of federal inmates were housed at various BOP facilities under the very types of strict

conditions of confinement that Warden Vanyur testified were not possible – and those inmate were

housed under those strict conditions of confinement **_for as long as was deemed necessary by the_**

**_BOP in order to alleviate the risk that the inmate would constitute either a security risk or a_**

**_future danger to either BOP staff, other inmates, or the public._**"  (Ex. C, First Bezy Affidavit at

¶¶7, 9, 11, 12, 13, and 14) (emphasis added).  Mr. Bezy detailed not only the available conditions of

confinement that were always at the disposal of the BOP, should the facts warrant it, but also

identified a number of federal inmates who were, in fact, held under those strict conditions of

confinement for extended, essentially indefinite, periods of time.  (*Id*.).

Attached to this brief is a Supplemental Affidavit from Mr. Bezy, further detailing the BOP's

policies, practices, and capabilities as it relates to the imposition of strict conditions of confinement.

(Ex. D, Supplemental Affidavit of Mark Bezy dated Dec. 14, 2009).  In his Supplemental Affidavit,

Mr. Bezy testifies, *inter alia*, to the following facts which further cement the false and misleading

nature of Warden Vanyur's testimony at Petitioner's trial, and make plain the prejudice suffered by

Petitioner as a result[6]:

> 4.     At the time I served as a captain at USP-Marion, that
> facility was the highest-security federal correctional facility in the country
> and housed many of what were considered the most incorrigible and

---

[6] We quote Mr. Bezy's affidavit at length here because it is, quite frankly, stunning to view
an accurate statement of the facts regarding the BOP's authority, capability, and practices side-by-
side with the testimony of Warden Vanyur at Johnson's trial.

difficult inmates in the BOP, and did so under highly secure and restrictive conditions of confinement. This included, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort. At USP-Marion, I was a member of the review and classification committee for the movement of high-security inmates through the facility's step-down process.

5. While the hope of the BOP was that inmates sent to the general population at USP-Marion would modify their behavior and cycle out of USP-Marion to a mainstream maximum-security facility after two to three years, there were many inmates who were housed at USP-Marion for much longer than three years and were unable to cycle out of the program. The BOP recognized that a small percentage of individuals would most likely require such restrictive security measures during the entire term of their incarceration because of the potential future dangerousness posed by those inmates. These inmates, such as T.D. Bingham, Barry Mills, and Jeff Fort, were later transferred directly to the United States Penitentiary Administrative Maximum Facility in Florence, Colorado ("ADX" or "SuperMax") when that facility opened in 1994, and they remain housed at ADX today. Although many inmates came to USP-Marion as a result of a demonstrated inability to function properly in other, less-restrictive environments, a number, such as John Gotti, were assigned directly to USP-Marion from the sentencing court.

\* \* \*

18. Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and imposed, there is no doubt that the BOP had, at all times, the authority and ability to house inmates in severely restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's future dangerousness. This includes, but is not limited to, housing inmates in conditions of confinement where they do not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or by mail. ***The BOP can, does, and did at the time of Mr. Johnson's trial in 1997, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deems it necessary to do so for the security of prison staff, other inmates, or the public.*** Under the BOP regulations, these are considered "privileges" – not "rights" – so they can, and could at the time of Mr. Johnson's trial in 1997, be taken away whenever it is deemed necessary by the BOP. ***Moreover, these strict conditions of confinement can be, and were at the time of Mr. Johnson's trial in***

14

*1997, imposed for as long as the BOP deems it necessary to ensure the security and safety of either prison staff, other inmates, or the public (i.e. to reduce or eliminate the inmate's future dangerousness).*

\* \* \*

20. ... Accordingly, the suggestion that Mr. Johnson was not eligible for placement at ADX immediately after sentencing, if deemed necessary and appropriate, is false and is belied by ADX's history. Similarly, the notion that the BOP is somehow powerless to prohibit specific inmates from committing serious crimes while incarcerated is also false.

21. ... Given the nature of Mr. Johnson's convictions, and if the BOP determined it was warranted based on his behavioral history and perceived "future dangerousness," he could have been placed in the control unit at ADX.

22. ***Regardless of whether Mr. Johnson was eligible for direct placement in ADX's general-population unit or its control unit, the BOP had both the authority and the ability to craft conditions of confinement that would alleviate any risk presented by Mr. Johnson that he would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public***. Indeed, the BOP individualizes conditions of confinement on a regular basis. The either/or proposition that an inmate receives a great deal of freedom if not incarcerated at ADX advanced in Mr. Johnson's trial by Dr. Vanyur (see Johnson T. at 2475 (general population means that an inmate would have "open and frequent contact unrestrained with staff and inmates"); Johnson T. at 2472 (inmates have "virtually unlimited access to telephones and a great deal of open visiting contact"); Johnson T. at 2477 (an inmate at high-security facilities has "a great deal of open contact visiting," "virtually unlimited phone access," and "unlimited correspondence privileges"); Johnson T. at 2485 (even in a control unit, inmates have "virtually unlimited correspondence with the outside world"); Johnson T. at 2504 (dangerous inmates cannot be separated at high-security institutions)) are at best serious misstatements and are at worst gross distortions and mischaracterizations of the BOP's role, function, authorities, and abilities, at the time of Mr. Johnson's trial and presently, to house prisoners under secure and restrictive conditions of confinement for as long as deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

15

* * *

24.     These strict conditions are not solely the province of ADX and are nothing unusual or novel in the BOP.  Every prison in the federal system has the ability, policies, and procedures to guard against future acts of violence by prisoners confined in BOP prisons, including, as discussed further below, imposing restrictions on contact with people on the outside by telephone and mail.

25.     For example, USP-Marion had what it termed the "K-Unit" from at least the mid-1980s through the mid-1990s.  The K-Unit held inmates who posed a high security risk and housed them under extremely strict conditions of confinement.  These inmates were held in single cells, recreated by themselves, and had no contact with other inmates.  There was one officer assigned for every six inmates (a very low guard-to-inmate ratio).  Additionally, K-Unit inmates conducted their work (electronic cable assembly) in their cells instead of reporting to a workshop within the prison.  Inmates housed in the K-Unit due to security and/or future-dangerousness concerns included convicted spies John Walker and Jonathan Pollard and former CIA operatives Ed Wilson and Christopher Boyce.  These inmates were held in the K-Unit for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

26.     Furthermore, USP-Marion maintained an inmate housing unit called the "I-Up Unit."  David Sahakian, an inmate affiliated with Aryan Brotherhood, who was accused of serious crimes, including ordering the murders of others, was held in the I-Up Unit during his pretrial detention in the mid-2000s in order to protect others and ensure that he did not commit, order, or direct any additional criminal activity. Sahakian and another Aryan Brotherhood member were separated from the rest of the prison population (they were held on the top floor of the prison hospital) and were continuously monitored by an officer.  The conditions of confinement created by the BOP for Sahakian were certainly available at the time of Mr. Johnson's trial in 1997.

27.     Thus, Dr. Vanyur's assertion that it would be "extremely difficult, at best" for officials at a BOP facility such as USP-Marion to separate Mr. Johnson from other Gangster Disciples is simply false.  At USP-Marion, we frequently and successfully separated inmates like Sahakian, Pollard, Walker, and others from the rest of the prison population.

16

\* \* \*

29.     There are numerous other examples of individuals who have been subject to special security measures due to the special challenges that they present. Rodney Hamrick, a convicted bomber, was housed at the USP-Marion when I worked there. I recall that all of Hamrick's mail was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Former Panamanian leader Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the risk that he would order crimes or violence while incarcerated. Other inmates that have been, or continue to be, housed under very strict conditions of confinement due to security concerns include T.D. Bingham, Terry Mills, Thomas Silverstein, Clayton Fountain, Eric Rudolph, Ramzi Yousef, Anthony Ayeni Jones, Terry Nichols, and Theodore Kaczynski. Silverstein has been held in conditions at various prisons – including USP-Atlanta, USP-Leavenworth, USP-Marion, and ADX – where he has had virtually no human contact since the 1980's. Unlike Mr. Johnson, many of these individuals have shown an inability to positively adjust to incarceration in the federal prison system. However, to my knowledge, the strict conditions of confinement detailed above have very successfully alleviated the risk that these inmates might pose a future danger to individuals inside or outside the prisons in which they are housed.

\* \* \*

32.     Moreover, most maximum-security federal prisons contain a Special Housing Unit ("SHU") where inmates can be placed when they have violated (or are suspected of violating) prison rules. A SHU is, in essence, a prison within a prison where security and conditions of confinement are stricter than those imposed on the general population within the maximum-security facility generally. Each BOP warden has the authority to place any inmate into a SHU if the inmate is under investigation for a serious violation of prison rules. Inmates can be housed in a SHU for a variety of reasons, including concerns about security and/or an inmate's future dangerousness. Inmates may be placed in the SHU for extended periods of time, with the only limitation being that facility administrators must periodically review placement to determine continued appropriateness.

33.     Special Administrative Measures ("SAM's") also allow the BOP to construct individualized conditions of confinement as are "reasonably necessary to protect persons against the risk of acts of violence or terrorism." See 28 CFR §501.3(a). Each SAM's order is

17

totally unique and is nearly limitless in terms of the conditions of confinement available to be imposed by BOP personnel (subject to the constraints of the United States Constitution, of course). *Although SAM's orders are required to be periodically reviewed, they may be extended for as long as conditions persist (i.e., indefinitely).* A number of inmates have been held under SAM orders for more than a dozen years. SAM's orders were available to the BOP and the Department of Justice at the time of Mr. Johnson's trial in 1997 had officials been concerned that Mr. Johnson presented a risk of violence while incarcerated.

34. Again, contrary to Dr. Vanyur's assertions at Mr. Johnson's trial, these strict conditions of confinement were (and are, to my knowledge) routinely imposed on high-risk inmates by the BOP for as long as it deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

35. Generally speaking, federal prison inmates do not have unlimited rights to visitation, correspondence, use of telephones, or contact with other inmates. As a matter of policy, the BOP grants access to these privileges consistent with the requirement of sound correctional management. These privileges can be revoked if they are abused or are deemed to constitute a threat to the security of the institution or the safety of individuals, whether inside or outside the prison. As Dr. Vanyur correctly stated in Beckford, inmates can have their phone privileges revoked for up to a year at a time in the case of significant misuse. Beckford T. at 27.[7] *There is no limit on the number of consecutive year-long revocations that can be imposed on a prisoner if it is deemed to be warranted.*

\* \* \*

39. Given facts underlying Mr. Johnson's convictions, including the use of telephones to commit crimes, intensive monitoring of and restrictions on his communications, whether they be in person or by telephone or mail, were clearly available to the BOP in 1997 (and are today) – no matter where his placement.

---

[7] Warden Vanyur's testimony in *United States v. Beckford* is attached hereto as Exhibit E. The jury verdict forms in Beckford's case are attached as Exhibit H.

40. Notably, it is my knowledge and understanding that during the term of his federal incarceration (more than 13 years at this point) the BOP has not deemed it necessary or appropriate to house Darryl Johnson under the strict conditions of confinement available to it as described above (*e.g.*, intensive restriction and/or supervision of communications by mail, phone, or in-person visitation; or segregation from staff and other inmates) whether based on any perceived "future dangerousness" or otherwise. In addition, the information available to me clearly suggests that Mr. Johnson has been housed by the BOP under conditions that have, in fact, negated any potential "future dangerousness," and he has demonstrated that he is a well-adjusted inmate, as evidenced, for example, by the affidavit of BOP Case Manager B. English previously submitted to the Court in this case which states, "I consider [Darryl] Johnson to be a well-adjusted inmate without any out of the ordinary management concerns. … Overall, Johnson is a quiet and civil individual." ([Ex. G,] BOP Case Manager B. English Affidavit 8/25/08).

(Ex. D, Supplemental Affidavit of Mark Bezy dated Dec. 14, 2009) (emphasis added).

Based on the admissions of the government that Warden Vanyur's testimony was incomplete and misleading, and the powerful testimony of former Warden Bezy in his affidavits, there can be no doubt that Darryl Johnson was sentenced to death by a jury that heard, and was then urged to rely on, evidence that now has been shown definitively to be inaccurate, if not outright false. These facts, under any circumstances, require reversal of his death sentence. *Johnson v. Mississippi*, 486 U.S. at 590 (reversing death sentence where "the jury was allowed to consider evidence that has been revealed to be materially inaccurate"); *United States v. Fields*, 483 F.3d 313, 337 (5th Cir. 2007) ("A defendant may not be sentenced on the basis of 'misinformation of constitutional magnitude.'").

Yet further support for a finding of prejudice is contained in the relatively recent statements and admissions of the government in this case. For example, on August 26, 2008, the government provided a letter written by Ann H. Zgrodnik, Senior Counsel of the Litigation Branch of the Federal Bureau of Prisons ("BOP"), within the U.S. Department of Justice ("DOJ"). Ms. Zgrodnik's letter details her contact with various employees of the Department of Justice and the Bureau of Prisons,

and indicates that there were several inmates housed under strict conditions of confinement due to security concerns and/or because of their future dangerousness, including inmates Thomas Silverstein and Clayton Fountain. As for inmates subjected to strict conditions of confinement pursuant to Special Administrative Measures ("SAMS"), the government provided an e-mail from Dominique Raia of the BOP to AUSA Bindi stating,

> As per our conversation this afternoon, I am providing the following information regarding the number of SAMs in BOP prior to 11/17/97:
>
> Five SAMs pursuant to 28 CFR 501.3 (terrorism); one SAM pursuant to 28 CFR 501.2 (espionage). Four of the terrorism SAMs were imposed in 8/96 and one in 3/97; the espionage SAM was imposed in 3/96. All of the aforementioned SAMs have been extended in accordance with the regulations and are currently still in place.

(Ex. F). As for inmates subjected to such strict conditions of confinement specifically by Court order under 18 U.S.C. §3582(d) and prior to November 1997, Ms. Zgrodnik reports that other than inmate Luis Felipe, the people she contacted within the BOP do not recall any inmates subjected to formal, court-ordered restrictions on communication and association under 18 U.S.C. §3582(d) prior to November 1997. Notably, Ms. Zgrodnik makes clear that there may well be other inmates who were subjected to such conditions of confinement in the relevant time period (Ex. F at ¶6 ("Thus, it is entirely probably that other inmates may be or have been in Bureau of Prisons custody with court imposed communication restrictions that [BOP staff] are not aware of."); *id*. at ¶10 (similar)) – and Mr. Bezy's two affidavits would seem to provide solid confirmation of her suspicions in that regard.

     C.     The Facts of Record And the Controlling Law Clearly Establish
          Prejudice to Johnson Under *Strickland*

Based on the facts of record – including (a) the admissions of the government that Warden Vanyur's testimony was inaccurate; (b) the two detailed affidavits of former Warden Mark Bezy (Exs.

C and D); (c) the further admissions of the government contained in the Ann Zgrodnik letter which impeach Warden Vanyur's testimony (Ex. F); (d) the pointed and chilling argument made to the jury by the government based on Warden Vanyur's inaccurate, misleading, and false testimony; (e) the fact that Warden Vanyur's inaccurate, misleading and false testimony went to the heart of the case (*i.e.* future dangerousness); and (f) the fact that it only takes a single juror to stop the death penalty from being imposed – there can be little doubt that Darryl Johnson has established a "reasonable probability" that a different outcome may have ensued absent the now admitted ineffective assistance of his counsel on these issues. *Strickland*, 466 U.S. 668; *Strickler*, 527 U.S. 263; *Williams*, 529 U.S. 362; *Wiggins*, 539 U.S. 510 and *Rompilla*, 545 U.S. 374.

1.     *United States v. Anthony Jones* Demonstrates The Prejudice

Further compelling support for a finding of prejudice in Johnson's case is the result in a similar case – indeed a factually more severe case than Darryl Johnson's – in which the jury was given full and accurate information regarding the options of the sentencing court and the BOP to eliminate the defendant's potential future dangerousness. *United States v. Anthony Jones,* No. WMN-96-0458 (D. Md) is a federal death penalty case that was tried to a jury shortly after Darryl Johnson's case. In *Jones*, similar to Johnson's case, the defendant was convicted of ordering the murders of federal witnesses. In addition, Jones was also convicted of ordering a murder *while he was incarcerated in a federal prison*.

In their special verdict forms, just as in Johnson's case, Jones' jury found several threshold eligibility factors and statutory aggravating factors including:

1.     "Anthony Ayeni Jones intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person * * * and [the victims] died as a result of the act." ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones

21

Special Verdict forms at 1-2 (threshold eligibility factor)). *Compare with id*., Ex. C, Johnson Special Verdict forms at Part I);

2. "Defendant Anthony Ayeni Jones committed the offense after substantial planning and premeditation to cause the death of Keith Westmoreland." ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones Special Verdict forms at 3 (statutory aggravator). *Compare with id*., Ex. C, Johnson Special Verdict forms at Part II, ques. 2);

3. "Defendant Anthony Ayeni Jones caused the death of Derrick Rivers after substantial planning and premeditation." ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones Special Verdict forms at 3 (statutory aggravator). *Compare with id*., Ex. C, Johnson Special Verdict forms at Part II, ques. 2);

4. "Defendant Anthony Ayeni Jones committed the offense after substantial planning and premeditation to cause the death of John Jones." ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones Special Verdict forms at 3 (statutory aggravator)). *Compare with id*., Ex. C, Johnson Special Verdict forms at Part II, ques. 2).[8]

In addition, the Jones jury -- just like Johnson's jury -- also unanimously found beyond a reasonable doubt that Jones was a "future danger." Thus, the jury unanimously answered "yes" to the non-statutory aggravator regarding the murders of Keith Westmoreland and Derrick Rivers stating:

"Defendant Anthony Ayeni Jones is a violent individual who constitutes a future danger to our community."

([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones Special Verdict forms at 5 (non-statutory aggravator)). *Compare with id*., Ex. C, Johnson Special Verdict forms at Part III, ques. 1)

---

[8] In addition, the Jones jury also found that additional aggravating factor that Jones had "procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value." ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones Special Verdict forms at 3). This factor was not found in Johnson's case, although it was presented and argued by the government. ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. C, Johnson Special Verdict forms at Part II, question 1).

("Darryl Lamont Johnson would commit serious acts of violence in the future which would be a continuing and serious threat to society."). Likewise, with respect to Anthony Jones' murder of John Jones, the jury also unanimously found:

> "Defendant Anthony Ayeni Jones is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society."

(*Id*. Ex. D, Jones Special Verdict forms at 6 (non-statutory aggravator)). *Compare with id*., Ex. C, Johnson Special Verdict forms at Part III, ques. 1.

Notwithstanding these facts and special findings, the jury in *Jones* spared the defendant's life after hearing about the conditions that had been imposed in *Felipe* and could be imposed on Jones.[9] The lone significant difference between the findings of the jury in Jones' case versus that of the jury in Johnson's case was that, after hearing accurate and complete information about the available conditions of confinement, seven jurors in *Jones* found that:

---

[9] In the aftermath of that verdict by the jury sparing Jones' life, consistent with its position in *Felipe*, the DOJ took the position that the court possessed the authority, under 18 U.S.C. §3582(d), to order:

> (1) that Jones be permanently "housed in solitary confinement, without contact with other prisoners;"
>
> (2) that he be "prohibited from corresponding with, or receiving visits from anyone except his attorney and close family members approved by the district court with notice to the United States Attorney's Office;"
>
> (3) that "all correspondence and visits with persons approved by the district court, with the exception of attorney visits and correspondence, be monitored;" and
>
> (4) that he be prohibited from telephone contact with anyone other than his court-appointed attorneys.

([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. E). In support of these proposals, the government relied extensively upon the *Felipe* decision.

> ***Any concern respecting future dangerousness of Anthony Jones is significantly reduced since the federal [BOP] is empowered to classify a prisoner serving a life sentence without possibility of release to the highest security level federal prison, under conditions of confinement that eliminate any reasonable probability that the prisoner will be a continuing and serious threat to society.***

([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones Verdict forms at 7, (mitigating factor #3) (emphasis added)). By contrast, after hearing Warden Vanyur's testimony, *zero jurors in Johnson's case found this mitigating factor*, and consequently he was sentenced to death. (*Id*., Ex. C, Johnson Special Verdict forms at Part IV, ques. 4 (Blunt Johnson murder); Part IV, ques. 5 (Charles Banks murder)).

The import of the evidence regarding the conditions of confinement available to the BOP and ordered in *Felipe* to the Jones verdict was apparent to all. The United States Attorneys in *Jones* acknowledged that "it is clear that at least a majority of the jury believed that he no longer would be a danger because they believed defense counsel arguments that Jones would be held at ADX Florence in the equivalent of solitary confinement."[10]  ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. E at 8, "Government's Motion to Restrict Conditions of Confinement"). Jones' counsel, as well, has no doubt about the import and effect that the evidence regarding the BOP's ability and practice of housing dangerous inmates in strict conditions of confinement had on the jury's decision to spare Jones' life. Attorneys Harry J. Trainor and William C. Brennan who represented Anthony Jones have stated under oath that "It is our firm belief that the evidence about the BOP's ability to house Mr. Jones at ADX Florence, or to otherwise restrict or prohibit outside communications, was extremely

---

[10] Notably, the Court followed the government's recommendations and sentenced Jones to confinement under the requested strict conditions *for an indefinite period of time*. ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. F, Sentencing Order in Jones).

powerful evidence that had a major impact on the jury's inability to unanimously recommend a sentence of death."  ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. G, Affidavit of Attorneys Harry J. Trainor and William C. Brennan).  The Anthony Ayeni Jones case is perhaps the clearest and most direct proof of prejudice based on trial counsel's failure to effectively research, challenge, and refute Warden Vanyur's testimony in this case.

2.       Other Cases Finding Prejudice Under <em>Strickland</em>

While the facts of record and the "on all fours" example of the Anthony Ayeni Jones case make clear the prejudice prong of *Strickland* has been satisfied, a brief review of some cases discussing what is sufficient to show prejudice further confirms the conclusion – particularly in the context of a failure to properly investigate the relevant facts and law, as is the case here.  Indeed, the importance of adequate research and investigation of mitigation evidence by defense counsel in preparation for capital sentencing hearings – indeed the constitutional requirement for such research and investigation – has been further emphasized and explained by the Supreme Court's decisions in *Wiggins* 539 U.S. 510, and *Rompilla*, 545 U.S. 374, both of which granted habeas relief based on trial counsel's inadequate research and investigation into mitigation.[11]

In *Wiggins*, the Supreme Court held that defense counsel rendered constitutionally ineffective assistance under *Strickland* by failing to properly research and present evidence in mitigation in that capital case.  On the issue of "prejudice," the Court found that, ***"[h]ad the jury been able to place [the evidence omitted by defense counsel] on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."***  *Wiggins*, 539 U.S. at

---

[11] Indeed, in both *Wiggins* and *Rompilla*, the Supreme Court found prejudicial ineffective assistance even under the stricter standard of review applicable to §2254 actions.

25

537 (emphasis added, citation omitted). In finding counsel's performance constitutionally deficient, the Court relied, in part, on the facts that "[t]he ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor,'" and that counsel had failed to live up to those standards. *Id*. at 524 (emphasis in original), citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989). And importantly, the Court noted that in making this determination of potential prejudice, the Court must "evaluate the totality of the evidence – 'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s].*'" *Wiggins*, 539 U.S. at 536, citing *Williams v. Taylor*, 529 U.S. at 397-98 (emphasis added by *Wiggins* Court). In Johnson's case, precisely the same analysis demands relief.

Notably, the issue of whether trial counsel's decision not to present and argue the omitted evidence was a "tactical decision" was hotly debated in *Wiggins*. *In Johnson's case, there is no such debate*. As Johnson's trial counsel has stated under oath:

> "There was no tactical or strategic decision by me not to elicit testimony ... about the BOP regulation contained in 28 C.F.R. 501.3, or about the conditions of confinement which could be and had in fact been imposed by federal courts under 18 U.S.C. Sec. 3582(d), or about the Luis Felipe case. Quite the opposite, had I known about the conditions of confinement and terms thereof which are permitted and/or had been imposed under 28 C.F.R. 501.3 and/or 18 U.S.C. Sec. 3582(d), or about the conditions of confinement imposed and implemented on Luis Felipe, for an indefinite period of time, I would have elicited that information ... because that information was crucially important to support our argument that the BOP had both the power, ability and practices in place to house Darryl Johnson for an indefinite period of time in a manner that would virtually eliminate any future dangerousness of Darryl Johnson."

([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. B, Atty Urdangen Affidavit at para. 6).

26

In light of the facts now of record, Mr. Urdangen's affidavit, and the standards set forth in *Wiggins* – including under the various ABA standards referenced in the *Wiggins* decision – there can be no doubt now that the performance of Johnson's counsel on this aspect of the case fell below *Strickland*'s "objective standard of reasonableness," and that that failure was prejudicial to Johnson. *Strickland*, 466 U.S. at 688.

In *Rompilla v. Beard*, the Supreme Court similarly held that trial counsel's failure to examine readily available public records that contained either mitigating evidence and/or evidence that would rebut aggravating evidence offered by the prosecution constituted ineffective assistance requiring relief on habeas (*i.e.* §2254). Specifically, in *Rompilla*, trial counsel failed to review a readily and publicly available file on the defendant's prior conviction, portions of which the prosecution presented in aggravation in seeking the death penalty. *Rompilla*, 545 U.S. 374. In the instant case, Johnson's trial counsel failed to review and research readily and publicly available BOP regulations, caselaw, statutory authority, and publicly available information on actual BOP practices relating to the primary contested issue at the penalty phase. Had they done that simple research, it would have shown plainly and unequivocally that the BOP had – and had exercised on multiple occasions – the authority to do exactly what government witness Warden John Vanyur declared to the jury it could not, would not, and did not do.

One need only substitute the phrase "BOP regulations, statutes, caselaw, and publicly-available information about BOP practices" for the word "transcript" or "file on the prior conviction" in the relevant portion of the *Rompilla* decision to see the striking similarity in counsel's failure here.

> With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices] they

were seriously compromising their opportunity to respond to a case for aggravation. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense. Reasonable efforts certainly included obtaining the Commonwealth's own readily available [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices] to learn what the Commonwealth knew about the [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices], to discovery any mitigating evidence the Commonwealth would downplay and to anticipate the details of the aggravating evidence the Commonwealth would emphasize. Without making reasonable efforts to review the [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices], defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices] ... Without making efforts to learn the details and rebut the relevance of the [Commonwealth's evidence in aggravation], a convincing argument [by the defense] was certainly beyond any hope.

*Rompilla*, 545 U.S. at 385-86 (with bracketed phrase substituted for emphasis). *See also*, *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984) ("Effective representation hinges on adequate investigation and pretrial preparation."); *United States v. Williamson,* 183 F.3d 458, 462-63 (5th Cir. 1999) ("[A] reasonable attorney has an obligation to research relevant facts and law.").

Later in its *Rompilla* opinion, the Court continued: "It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking." *Id*. at 389. Precisely the same analysis applies here where Johnson's counsel admittedly failed to conduct any research regarding the applicable BOP regulations, statutes, caselaw, and publicly-available information about BOP practices which were absolutely critical to a fair and effective presentation of the defense's mitigation case, as well as to directly rebut and disprove the government's case in aggravation.

28

In discussing its holding, the Court in *Rompilla* stated:

> The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense. As the District Court points out, the American Bar Association Standards for Criminal Justice in circulation at the time of Rompilla's trial describes the obligation in terms no one could misunderstand in the circumstances of a case like this one:
>
> > "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty."

*Rompilla*, 545 U.S. at 387, citing 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.). The Court noted that "we long have referred to these ABA Standards as 'guides to determining what is reasonable,'" in finding counsel's performance constitutionally ineffective. *Id*. at 387, quoting *Wiggins*, 539 U.S. at 524 and *Strickland*, 466 U.S. at 688.

In previous filings, we have cited a plethora of additional cases in which relief was granted based on a finding of ineffective assistance based on a failure to competently investigate, research, or present material facts or controlling legal authority – and most of those cases involve facts less severe, and issues less central to the defense, than the facts and issues presented here. For example, the Court in *United States v. Williamson* expressly held,

> [*A] reasonable attorney has an obligation to research relevant facts and law*, or make an informed decision that certain avenues will not prove fruitful. [citations omitted] * * *
>
> Williamson's [] counsel did not provide objectively reasonable assistance. An objectively reasonable attorney, keeping abreast of legal developments related to his case, as he should, would have discovered *Bellazerius* and would have noticed that we had applied *Bellazerius* in

29

> another case decided before Williamson's brief was submitted. [citation omitted] The cases squarely addressed an issue exactly on point for Williamson's appeal. *Regardless of the standard of review we wold have employed, Williamson's counsel, by failing to cite directly controlling precedent, rendered deficient assistance*

183 F.3d 458, 462-63 (5th Cir. 1999) (emphasis added). *See also*, *Dixon v. Snyder*, 266 F.3d 693, 703-05 (7th Cir. 2001) (discussed below); *United States v. Franks*, 230 F.3d 811, 814-15 (5th Cir. 2000) (counsel's failure to object to sentence enhancement in face of three court of appeals cases holding that enhancement was improper in similar circumstances was ineffective assistance); *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999) (counsel's ignorance of applicable sentencing law during plea negotiations was objectively unreasonable); *Trass v. Maggio*, 731 F.2d 288, 293 (5th Cir. 1984) (finding ineffective assistance where counsel's "grave lapse in failing to move for severance appears to have been due to an erroneous understanding of the law of severance, rather than to any conceivable 'strategic choice.'"); *Rios-Delgado v. United States*, 117 F.Supp.2d 581, 588-89 (W.D. Texas 2000) (counsel's failure to object to sentencing enhancement "reflect[ed] a failure to investigate the case * * *").

In *Dixon v. Snyder*, the Seventh Circuit granted habeas relief where the defendant's counsel was unaware of the controlling law on a mere evidentiary issue. The Court stated:

> It seems very likely that the district court was correct in finding that counsel was not aware of section 115-10.1. Indeed, the appellant has conceded that counsel was unaware of it. If counsel was unaware of the statute, then his decision not to cross-examine Carlisle cannot be accorded the same presumption of reasonableness as is accorded most strategic decisions because it was not based on strategy but rather on a "startling ignorance of the law."

*Dixon*, 266 F.3d at 703, quoting *Kimmelman*, 477 U.S. at 385. *See also*, *Pavel v. Hollins*, 261 F.3d 210, 218 n.11 (2d Cir. 2001) (collecting cases and discussing how decisions made in ignorance of

30

relevant facts and law cannot be characterized as strategic under *Strickland*); *Horne v. Trickey,* 895 F.2d 497, 500 (8th Cir.1990) (counsel must make "strategic choices * * * after thorough investigation of [the] law and facts relevant to plausible options") (quoting *Strickland,* 466 U.S. at 690).  *See also Emerson v. Gramley*, 91 F.3d 898, 906 (7th Cir. 1996) (counsel's failure to investigate and present certain mitigation evidence at capital sentencing was ineffective assistance); *Bean v. Calderon*, 163 F.3d 1073, 1079-81 (9th Cir. 1998) (counsel's failure to investigate and present mitigating evidence was ineffective assistance); *Holsomback v. White*, 13 F.3d 1382 (11th Cir. 1998) (counsel's failure to investigate medical evidence constituted ineffective assistance requiring reversal); *Bryan v. Gibson,* 276 F.3d 1163, 1183 (10th Cir.2001) (*reh'g en banc granted,* April 26, 2002) (Henry, J., concurring part and dissenting in part) (arguing that counsel's decision not to present certain mitigation evidence could not be considered strategic because the defense attorney "did not even realize that he could present" the evidence at issue).

Any number of recent cases reaffirm the principles underlying these cases, even in the more strict context of Section 2254 cases.  For example, last year, the Sixth Circuit in *Johnson v. Bagley* held the defendant had sufficiently proven the prejudice prong of *Strickland*, finding "[t]he errors of Johnson's attorneys, particularly their lack of investigation, had a serious impact on the mitigation theory presented to the jury.  Competent counsel could have put on evidence that 'differed in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing." 544 F.3d 592, 603 (6th Cir. 2008) (citation omitted).  Exactly the same rationale applies to the errors in the instant case.  Had Darryl Johnson's counsel properly investigated the mitigation evidence regarding "future dangerousness," there is no doubt that the penalty phase evidence would have "differed in a substantial way – in strength and subject matter – from the evidence actually presented

at sentencing." Similarly, the court in *Libberton v. Ryan*, recently held that "[e]vidence [counsel] could have discovered in the course of a proper investigation would have dramatically transformed the case for mitigation," and had that evidence been presented, "there is a reasonable probability that [the sentencing judge] would have imposed a different sentence." 583 F.3d 1147, 1171 (9th Cir. 2009). Again, the same reasoning holds true in this case, and similarly requires relief be granted.

The rationale underlying all of these cases squarely supports a finding that Darryl Johnson has established the necessary prejudice under *Strickland* and its progeny. Relief is warranted.

Finally, we also believe that *Strickland* prejudice has been established by the prior concessions of the government. For example, as discussed above, in its brief before the Supreme Court, the government acknowledged that several highly significant aspects of Warden Vanyur's testimony were inaccurate and misleading as to the material issue of future dangerousness and the authority, abilities, and practices of the BOP in housing inmates under strict conditions of confinement. Just as these stipulated facts regarding Warden Vanyur's testimony establish deficient performance, they likewise establish prejudice. It is simply not plausible to acknowledge, on the one hand, that material testimony on the central issue at the penalty-phase trial was demonstrably inaccurate, and that the jury was likely misled by that testimony, but then, on the other hand, to maintain that there is not even a reasonable probability that a different result would have enured had accurate information been given to the jury. The position is even more bereft of merit in the context of a death penalty case, where it takes just one juror to stop the death penalty from being imposed.

D.      Conclusion Regarding Ineffective Assistance of Counsel Claim

We respectfully submit that a "reasonable probability" of a different result is plainly, indeed overwhelmingly, established by the facts and legal authority already of record in this proceeding based

32

on trial counsel's now stipulated ineffective assistance.  This conclusion becomes undoubtable when the demonstrated failures of counsel are viewed in light of the fact that ***the death penalty would have been avoided had the defense been able to "convince only one of twelve jurors to refuse to go along with a death sentence.***"  *Emerson*, 91 F.3d at 907(emphasis added).

> As Justice Stewart wrote for a plurality of the Court in *Woodson v. North Carolina*:

> > [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long.  Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.  Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

428 U.S. 280, 305 (1976).

Albeit without any bad intent, Johnson's trial counsel failed to live up to the standards required to render effective assistance at Johnson's penalty phase.  Just as relief was ordered in *Wiggins*, *Rompilla*, and the many other cases cited by Petitioner above and in his prior pleadings based on trial counsel's failures, it is required here.

If the Court has any doubt that Petitioner has met his burden in proving his ineffective assistance claim, we respectfully request an evidentiary hearing be held on the issues.  28 U.S.C. §2255; *Massaro v. United States*, 538 U.S. 500, 504-506 (2003).

V.     JOHNSON HAS PROVEN THAT HE IS NOT, IN FACT, A "FUTURE DANGER"

One final point bears mention at this point in the proceedings.  The evidence of record before the Court clearly establishes that Darryl Johnson has proven over the past 13 years in the custody of the BOP that he is, in fact, *not* a danger to engage in future acts of violence.  As stated in the affidavit from BOP Case Manager B. English, previously submitted to the Court by the government, "I consider [Darryl] Johnson to be a well-adjusted inmate without any out of the ordinary management

33

concerns. … Overall, Johnson is a quiet and civil individual." (Ex. G, 8/25/08 Affidavit of BOP Case Manager B. English). While admittedly not dispositive of the issues addressed in this brief, in light of his record of conduct over the past decade-plus, reference to the dissent to the denial of a stay by Justice Marshall in *Evans v. Muncy*, 111 S.Ct. 309 (1990) is appropriate, at least with respect to Johnson's claim under the Eighth Amendment:

> Evans was convicted of capital murder and sentenced to death. At the sentencing phase, the jury's verdict was predicated on a *single* aggravating circumstance: that if allowed to live Evans would pose a serious threat of future danger to society. See Va. Code § 19.2-264.4(C) (1990). Without this finding, Evans could not have been sentenced to death. *See e.g., Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (WHITE, J., concurring) (existence of aggravating circumstance "distinguishing the few cases in which [the death penalty] is imposed" from those in which it is not is a constitutional prerequisite to death sentence); *Gregg v. Georgia, supra,* 428 U.S., at 188-189, 96 S.Ct., at 2932 (same).

> \*       \*       \*

> Evans filed a writ of habeas corpus and application for a stay of his execution before the United States District Court for the Eastern District of Virginia. He urged that the jury's prediction of his future dangerousness be reexamined in light of his conduct during the Mecklenberg uprising. Evans proffered that these events would prove that the jury's prediction was unsound and thereby invalidate the sole aggravating circumstance on which the jury based its death sentence. For this reason, Evans argued that his death sentence must be vacated. The District Court stayed the execution and ordered a hearing. Civ. No. 90-00559-R (ED Va. Oct. 13, 1990). The Court of Appeals reversed and vacated the stay. No. 90-4007 (CA 4, Oct. 16, 1990) (*per curiam*).

> Remarkably, the State of Virginia's opposition to Evans' application to stay the execution barely contests either Evans' depiction of the relevant events or Evans' conclusion that these events reveal the clear error of the jury's prediction of Evans' future dangerousness. In other words, the State concedes that the sole basis for Evans' death sentence – future dangerousness – in fact *does not exist.* [Emphasis in original].

34

*     *     *

In my view, the Court's decision to let Wilbert Evans be put to death is a compelling statement of the failure of this Court's capital jurisprudence. This Court's approach since *Gregg v. Georgia* has blithely assumed that strict procedures will satisfy the dictates of the Eighth Amendment's ban on cruel and unusual punishment. As Wilbert Evans' claim makes crystal clear, even the most exacting procedures are fallible. Just as the jury occasionally "gets it wrong" about whether a defendant charged with murder is innocent or guilty, so, too, can the jury "get it wrong" about whether a defendant convicted of murder is deserving of death, notwithstanding the exacting procedures imposed by the Eighth Amendment. The only difference between Wilbert Evans' case and that of many other capital defendants is that the defect in Evans' sentence has been made unmistakably clear for us even before his execution is to be carried out.

111 S.Ct. at 310-12.

## CONCLUSION

For all the reasons set forth above, as well as those contained in our prior pleadings with the Court, Petitioner Darryl Lamont Johnson respectfully requests that the Court grant Johnson's §2255 petition based on a finding of ineffective assistance of counsel (as well as on the other grounds raised in his Petition), vacate his sentence, order a new sentencing hearing, and grant whatever other relief it deems just and proper.

Respectfully submitted,

/s/ Terence H. Campbell
An attorney for Defendant Darryl Johnson

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois 60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, IN 47437-0206
(812)849-9852

35

## CERTIFICATE OF SERVICE

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1.      Petitioner's Supplemental Brief in Support of His Ineffective Assistance of Counsel Claim

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.


                                        /s/  Terence H. Campbell
                                        Terence H. Campbell