# EXHIBIT A

Vanyur - direct by Crowl                2462

yesterday, could not appear today because of a scheduling conflict.

Would the new witness please stand to be sworn.

THE CLERK:  Raise your right hand.

(Witness duly sworn.)

THE CLERK:  Please be seated.

JOHN VANYUR, GOVERNMENT REBUTTAL WITNESS, SWORN

DIRECT EXAMINATION

BY MR. CROWL:

Q      Tell us your name, please.

A      My name is John Vanyur, V-a-n-y-u-r.

Q      How are you employed?

A      I am a warden of the low security correctional institution in Butler, North Carolina with the Federal Bureau of Prisons.

Q      How long have you been a warden at that prison in North Carolina?

A      Since May of 1996.

Q      Before May of 1996, tell the members of the jury what your job was.

A      I was the associate warden of operations at the United States penitentiary administrative maximum facility in Florence, Colorado also called the ADX Florence.

Q      How many years altogether have you worked for the

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2463

Federal Bureau of Prisons?

A      18 years.

Q      Now, can you tell us, Warden Vanyur, what your responsibilities were in Florence, Colorado at the ADX, or the administrative maximum penitentiary?

A      While I was the associate warden of operations, I was responsible for the entire physical plant of the facility.  All the communications systems; physical security systems; the hiring training and evaluation of staff; all financial management matters; the delivery of services to inmates, such as health care delivery, food service delivery.  I was also the Chief spokesman for the institution.  I did more than thirty interviews on national television and newspapers.

Q      Who did you report to directly?

A      I reported directly to the warden of the facility.

Q      And how long were you the associate warden at the ADX?

A      From March of 1994 to May of 1996.

Q      When was the ADX opened?

A      In November of 1994.

Q      So were you part of the team that literally started the operations of the ADX?

A      Yes, I activated the facility.

Q      What is your educational background, Warden?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl 2464

A      I've a bachelor's degree in psychology and a masters and doctorate degree in social psychology.

Q      So when you say "a doctorate," do you have a Ph.D. in social psychology?

A      That's correct.

Q      What is the mission of the ADX, or the administrative maximum facility?

A      The mission of ADX is to house inmates that require a greater level of security and control because they proved from their behavior that they cannot function in an open prison environment, either through escape attempts, assaulted behavior, or other disruptive behavior.

Q      What is the capacity of the ADX facility in Florence?

A      484.

Q      Are you currently at capacity?

A      No, they are not.  There are 408.

Q      Why don't you have all of your 484 beds filled at ADX?

A      Well, we only put inmates in the ADX that require that level of security and control.  We don't just fill the beds to keep them filled.  In fact, Marion, United States Penitentiary at Marion, which was the Super-Max, if you will, before ADX, never operated at capacity

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                          2465

because the Bureau of Prisons only puts select inmates into that facility, inmates that require that level of security and control.

Q    And is it important to the Bureau of Prisons to keep some beds open and available?

MR. URDANGEN:  Objection to the leading, your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A    Yes, it is.

BY MR. CROWL:

Q    And can you explain to the members of the jury why.

A    Sure.  Well, first of all, in a correctional environment, we need some flexibility that if we have inmates that are involved in violence or escapes once they're in the system, that we have the capacity to accommodate those inmates when those events occur.  Also, if we put inappropriate inmates or inmates that don't require that level of security and control into the ADX, it disrupts the mission and really detracts fro what the your of the facility is, in items of management correctional environment.

Q    Why is that?

A    Well, the ADX, what it does is, it takes the most disruptive violent inmates from all over the country and

congregates them in one facility.  And what that does is, it reduces the amount of tension and violence in all the other prisons throughout the system, because we've taken the troublemakers, if you will, and consolidated them in one facility.  And some of the studies have shown when Marion went to a Super-Max lock-down, that not only did the amount of violence drop inside Marion, but it dropped throughout the entire prison system.

So ADX serves as both a consolidation of the troublemakers and also as a deterrent to all the inmates, all 101,000 inmates we have in our system, that if they don't follow the rules, if they are disruptive, violent or escape-prone, they will be dealt with in a severe manner, and that is placement in ADX.

Q     So if there are 101,000 federal inmates in the system, what percentage of those inmates could possibly be housed at the ADX in Florence?

A     Less than one half of 1 percent.

Q     Can you tell the members of the jury the percentage of those inmates who come not directly from a conviction in court, but come from another institution.

A     Greater than 90 percent are from within the system.

Q     And the greater than 90 percent within the system, how have they arrived or what have they done to get themselves to ADX?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2467

A    That vast majority has shown by their behavior, once they've entered the prison system, that they can't function in a normal prison environment and they've been involved in one of several areas: escape or attempted escape, serious assault of staff or inmates, murder of staff or inmates, or leaders of a disruptive or a riotous event; those are the primary reasons that an inmate is placed at ADX.

Q    And what determines that policy?

A    The Bureau of Prisons sets that out as the mission and goals of ADX.

Q    Now, were you in court yesterday when Dr. Cunningham told us that 3.1 percent of inmates at the ADX came directly from a court conviction to ADX?

A    Yes, I was.

Q    Tell the members of the jury what that 3.1 percent represent, what kind of inmates they are.

A    The small number of inmates that come directly into ADX from the street, if you will, are inmates that require such a high degree of security because of the complex nature of the crimes they've been involved in. And those are typically one of three types of individuals: very high-ranking organized crime figures, such as Nikadema Scarfo as the head of the Philadelphia mafia; international and domestic terrorists; and then

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2468

high-ranking drug cartel members.

Q      Were you also present when Dr. Cunningham indicated

that the United State's Attorney's Office somehow could

play a role in getting somebody to the ADX?

A      Yes, I was.

Q      Could you explain to the members of the jury how

that works.

A      Well, the United States Attorney's Office can make

a recommendation to the Bureau of Prisons as to where to

house a particular individual, but that final call, the

authority to place an individual in a specific facility,

rests solely with the Bureau of Prisons.

Q      The entire time that you were the associate warden

of the ADX, did you have any gang leaders who were

directly committed to the ADX?

A      No.  We housed a number of very high-ranking gang

members: the head of the Mexican mafia; the head of the

Mexicana Mi, a Texas-Mexican gang; or the head of the

Aryan Brotherhood.  But those individuals were not at ADX

solely because they were gang leaders, they were at ADX

because once they were in our system, they committed

either violent or escape-prone behavior and that's why

they were placed at ADX.

Q      Can you tell the members of the jury how many gang

members or suspected gang members or associates are

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2469

currently a part of this 101,000 federal inmates in your system.

A       I believe we track more than 9,000 gang members in our Bureau of Prisons.

Q       Would it be possible for you simply to place gang members or gang leaders, as a matter of course, in the ADX without compromising the mission of the facility?

A       No, and obviously we don't have the capacity.  You are talking over 9,000 versus 484.

        The Bureau of Prisons is a little different than a lot of state systems.  We don't lock inmates into a more secured facility just because they are a gang member.  We deal with the behaviors that they exhibit inside the system.  So you could be a gang member, but as long as you're not trying to be disruptive, as long as you're not violent, you can go on and stay in an open prison population.  It's when your behavior indicates that you are a problem or a troublemaker, that is when you move into a more secured environment.

Q       Why don't you simply lock up gang members in segregation or in the ADX simply because they are gang members?

A       Well, for a variety of reasons.  Our ultimate goal, and I think it's what the public would expect of us, is that we would like an inmate to eventually withdraw from

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                    2470

his gang, if you will, or decline to be a member of that gang in the future. And so we try to reinforce positive behavior in that individual in the hopes that he will renounce gang membership at sometime. We see that as a very positive goal. And if you continually lock up and don't offer programming and positive reinforcement to gang members, you are never going to get that declination in the long-term.

Q      Now, yesterday were you also present when Dr. Cunningham put a chart, which I think they have marked as Defendant's Exhibit 149, up on the overhead that was called custody options?

A      Yes, I was.

Q      I want to show you a photocopy I made of that particular chart. I'd like to ask you about the options that Dr. Cunningham said would be the defendant's options, Darryl Johnson's options upon conviction in Federal Bureau of Prisons.

First of all, are you familiar with the Bureau of Prisons designation system?

A      Yes, I am.

Q      Tell us what it is.

A      Well, the Bureau of Prisons has a security classification and designation system where we look at an inmate's behavior while in prison and also his previous

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2471

offenses and we literally calculate a point score for that inmate, and then that point score tells us what level of security that inmate needs to be housed in.

Q     And you say what level of security, what are the different levels of security in the Federal Bureau of Prisons?

A     We have five levels of security.  The lowest is a minimum security prison camp; then a low security institution; medium; high, which is a penitentiary level such as Leavenworth or Atlanta; and then a maximum security prison, and the only one of those is ADX Florence.

Q     And that is the one with the 484 beds?

A     That's correct.

Q     Now, based on this point system, just because someone happens to be a street gang member, would that be a reason why they would automatically be in a high level facility such as a penitentiary?

A     Not necessarily.  We only have nine penitentiaries throughout the entire system and you got more than 9,000 gang members to track.  So they're spread out throughout the entire Bureau of Prisons.  In fact, in my low security correctional institution Butler, I have a number of gang members.

Q     How about the fact that you are convicted of

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2472

murder, would that assure, given that you are convicted of murder, that you would placed and remain in a penitentiary which is the high level facility in a Bureau of Prisons?

A    No, it would not.  I look at the data of June of this year, the Bureau of Prisons has 1,257 inmates that have been convicted of murder, 158 of those are in ADX, 579 of those are in open population United States penitentiaries, and 520 of them are spread out in facilities other than high security facilities or Super-Max.

Q    Can you tell the members of the jury, when you say that 579 are in open population penitentiaries, what kind of contact do those inmates have with other inmates and with staff?

A    Well, in open population penitentiary, you have constant contact, unrestrained with other staff and inmates.  You have a job that you are assigned to, whether it's in a factory or food service; you are out working typically during the day; you have education programs and access to the libraries and so forth; you are out and about in large recreation areas; you have movement unrestrained to and from the dining hall; there is virtually unlimited access to telephones and a great deal of open visiting contact.

Vanyur - direct by Crowl                    2473

Q    You just mentioned that 520 of the murderers in the system aren't even in the penitentiaries, is that right?

A    That's correct.

Q    They are in the low to medium facility prisons?

A    That's correct.

Q    How many do you have at your low facility prison in Butler, North Carolina?

A    I have nine inmates with a history of murder.

Q    Explain to the members of the jury what kind of contact you would have with other inmates and with staff in the low to medium facility institutions.

A    It would be similar to the open population high security institutions even with greater contact with establish.  For example, in low security facility, I have cubicle housing for the inmates, open bay cubicles.  So they're not even locked down in the evenings, they are locked in the housing unit but they have access to about 150 other inmates virtually all night with one officer in each housing unit.  And they have constant movement during the day, in terms of moving to job assignments, moving to food service, moving to recreation.

Q    And that is for the 1200 or so of people convicted of murder in the system, is that right?

A    That's correct.

Q    Are you also familiar with the number of people in

Blanca I. Lara - Official Court Reporter - (312) 435-5895

the Federal Bureau of Prisons who have life sentences?

A      Yes, I am.

Q      How many of those are in the system?

A      We have 3,181 inmates that are serving life sentences.

Q      So is it possible to concentrate all those individuals in the ADX?

A      Obviously not, there's only 484 beds.  In fact, there is only 94 inmates serving life in ADX currently, the rest are in open population facilities.

Q      So getting back to the chart that Dr. Cunningham put together on custody options, the first thing that he listed on the custody options was the United States penitentiary, which is the highest level of security, is that right?

A      No, it would be -- the highest would be the ADX, this would be the second highest.  This would be Leavenworth, Atlanta, Terre Haute, open population penitentiary.

Q      Now, based upon what you know about the Bureau of Prisons' assignment system or scoring system and also the defendant's background, what is your understanding of where he would be assigned?

A      It's my opinion looking, at the things that he has been convicted of, his prior violence in terms of

Vanyur - direct by Crowl                                    2475

manslaughter conviction, his involvement in a drug

conspiracy, continuing criminal enterprise, that he would

probably fall into that first option, which is a United

States penitentiary general population.

Q      And by "general population" you mean what?

A      That he would have open and frequent contact

unrestrained with staff and inmates.

Q      Dr. Cunningham then listed that this penitentiary

assignment could be a separatee from other Gangster

Disciple inmates.  Could you tell the members of the jury

what a separatee is.

A      A separatee is when we try to house an inmate in a

facility where he has no contact with other inmates that

he may have a problem with.  The most common example is,

I may testify against you in a court and now we are both

being locked up in the Bureau of Prisons.  Well,

obviously, you and I can't be in the same facility or

we're going to have a problem.  So we'll make sure that

the two separatees are housed in totally different

correctional facilities.

Q      Is it a realistic option to have the defendant as a

separatee from other Gangster Disciples in a federal

penitentiary?

A      It would be virtually impossible.  We have over 500

Black Gangster Disciples in the federal system.  And I

Vanyur - direct by Crowl                                    2476

have looked at recent studies and statistics that we have that show that every single penitentiary in the system has some Black Gangster Disciples already in it.

Q     Now, are there are two penitentiaries that do not have Gangster Disciples in them?

A     No, I looked at that.  Even the ones that we run as gang-free have some Black Gangster Disciples or former Black Gangster Disciples members in there.

Q     There is also a listing on here as U.S. Penitentiary Separatee And Graphically Remote.  What do you understand that to mean?

A     I am unsure.  Again, it's an option where he would have to be separated from other Gangster Disciples.  And with the high number of Black Gangster Disciples that we have in the system, that would be virtually impossible to do.

Q     Now, the prisons, in the Federal Bureau of Prisons, are there some that are geographically remote from the City of Chicago?

A     It depends on how you define "geographically remote."  We have institutions in California, basically all over the country, except for Alaska and Hawaii, so there would be some that would be removed from Chicago by 1500 or 2000 miles.

Q     And at those institutions, what visitation phone

Blanca I. Lara - Official Court Reporter - (312) 435-5895

2477

privileges do inmates have?

A    In an open population penitentiary, let's say Lompoc, California which would be about as far removed from Chicago as you could get, the inmate would have a great deal of open contact visiting with his family, probably in excess of twelve visits a month.  He would have as many phone calls as he could pay for or get someone to accept them as collect charges, so he would have virtually unlimited phone access if he had the time to make the phone calls.  And he would have unlimited correspondence privileges.

Q    Why not just cut off those privileges, that contact with the outside world with regard to convicted gang leaders?

A    Well, one philosophy in the Bureau of Prisons is we try to keep the inmate in touch with his family for a variety of reasons.  It provides a support system for the inmate in order to help them do their time and allows the inmate to try and keep community contact and some normalization, if you will, to the best extent possible, of family and outside life.

Q    Have there been instances when you have tried to limit the contact, for instance at the ADX, limit the contact that an inmate, who is a gang leader, would directly have with other visitors and on the telephone?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

2478

A     The only time we would limit his telephone access or his visiting privileges is if the inmate actually tried to violate the rules in the process of a visit or in the process of a phone call.  In other words, if we picked up, through phone monitoring, that he was trying the make a drug deal over the phone, we would give that inmate an incident report and begin to restrict his telephone privileges.

Q     And what difficulties, if any, do you have with gang leaders in the Bureau of Prisons in terms of trying to monitor their telephone or their in-person visits?

A     Well, one of the problems we have with gang leaders and other sophisticated inmates in the prison system is, even though we monitor, to a large degree, their mail and their telephones, they are ingenious about developing code systems and crypt systems to try to beat us in terms of our monitoring.  And some of them are just old army-type incription systems.  We picked up at ADX one time where they were trying to learn an ancient alphabet so the inmates would send their correspondence out so that we would not be able to translate or interpret. They will use a variety of ways and code words to still communicate their messages outside the facility.

Q     Is there something known as drop-calling that you are familiar with?

2479

A     Yes, a lot of the inmates when they are trying to communicate to a inmate in a different facility, they will actually communicate to someone on the street, and that someone on the street will be the drop and they'll communicate to the other inmate in the other facility. So they'll get their message to different prisons throughout the country by using a go-between out in the community.

Q     And has that happened at the ADX even though you are monitoring the telephone calls that they place?

A     Yes, it has.

Q     Can you give us an example of that.

A     Well, unfortunately we had an incident this year where intelligence has shown us that the head of the Aryan Brotherhood from inside the ADX Florence ordered the murder of two African-American inmates in Louisberg, Pennsylvania, and those inmates were brutally murdered by two Aryan Brotherhood members.

Q     Now, how does the leader of the Aryan Brotherhood from inside the ADX be able to give such orders?

A     He communicated to an individual in California through code words.  It appeared from the intelligence that he was going to have a baby, is what he was saying. If it was a girl there was not going to be a murder, if it was a boy, then the murders were to occur.  And

Blanca I. Lara - Official Court Reporter - (312) 435-5895

2480

through the letters and monitoring, we found out that he declared that he had a prince, and shortly thereafter these two inmates were murdered.

Q    And who did he communicate that to ultimately?

A    He communicated to an inmate by the name of Benton in Louisberg and also an inmate by the name of John Campbell in Louisberg.

Q    Now, Louisberg is what level facility?

A    It is a high security penitentiary.

Q    And when Benton --

And what was the other individual?

A    Campbell.

Q    When Benton and Campbell, when they received the message, not directly from him but on the street, what happened?

A    They stabbed two inmates to death.

Q    Inside the --

A    Inside the federal prison in Louisberg.

Q    Were you familiar with either of those two inmates in Louisberg at the time that the other Aryan Brotherhood leader was in Colorado?

A    I personally know John Campbell.

Q    And where had John Campbell been in the Federal Bureau of Prisons?

A    He had been in ADX.

Blanca I. Lara - Official Court Reporter - (312) 435-5895

2481

Q    Why wasn't he still in ADX?

A    He worked his way through the program.

ADX is not meant to house inmates on a permanent basis.  It's a program where we put you in there and we expect you to, through good behavior, modify your disruptive behavior, modify your violence, and over several years you will work your way out and back into an open prison population.

Q    In fact, what is the average time span that an inmate stays at ADX Florence, Colorado?

A    Just over 3 years.

Q    Now, another thing on Dr. Cunningham's custody options chart was United States Penitentiary Marion High Security Separatee.  Can you tell us what that is and whether or not that is a viable option for the defendant.

A    Well, Marion has changed its mission and is closer to an open population penitentiary now, sort of in between -- I think Dr. Cunningham accurately portrayed this -- in between the ADX and a typical penitentiary. The problem will be at United States penitentiary at Marion, there are already 7 Black Gangster Disciples being housed in Marion.

Q    So would it be possible to have a separatee status for any Gangster Disciple at Marion?

A    It would be extremely difficult, at best.

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                      2482

Q     He then lists a penitentiary in administrative segregation.  Can you tell us what that is.

A     Well, administrative segregation is a misnomer. Every prison has what is called a special housing unit, including my prison.  It's a jail within a prison.  And inmates can be in that jail within a prison for two reasons: they are either in disciplinary segregation, and that means they committed an infraction inside the prison, they've gone through a discipline hearing officer and they've received so many days of segregation.  If you want to use the Hollywood term "the hole," they go into the hole for thirty days, whatever it may be.  So they are at disciplinary status for a temporary period.

      The other status, which would be I think probably where Dr. Cunningham is coming from, is what is called administrative detention.  And we place inmates temporarily into this jail within a prison, whether they are pending an investigation of a charge, whether they are pending a transfer or we think they need to be reclassified to a higher level, we'll lock them up in this temporary holding facility inside the prison until we sort out the investigation of a transfer.

      But in either case, administrative detention or administrative segregation, those are both temporary holding patterns, those are not permanent statuses for

Vanyur - direct by Crowl                           2483

inmates.

Q     Why not a permanent status?  Why isn't it an option

for you simply to place the defendant in administrative

detention or segregation for the rest of his life?

A     Because the litigation would more than likely show

that it would be considered cruel and unusual punishment.

When you are in this special housing unit, you

don't have the same access as the rest of the inmate

population to programs, educational opportunities, and so

forth.  There is definitely a degree of deprivation

inside there.  And so it is not permissible, by the

Bureau of Prisons policy, to keep an inmate in that

status indefinitely.

Q     The last three options on Dr. Cunningham's custody

options table are all the ADX in Florence, Colorado, is

that correct?

A     That's correct.

Q     And you've already indicated that the defendant

does not fit the profile for a person to be assigned to

the ADX, is that correct?

A     That's correct.

Q     Can you tell us a little bit, though, about the ADX

so that the jury can understand the different levels that

an inmate will cycle through in the approximately 3 years

that he stays there.

Blanca I. Lara - Official Court Reporter - (312) 435-5895

A     Okay.  Well, there is sort of two tracks inside the ADX.  The most secured track is the control unit, that was discussed a little bit yesterday.  That is a 68-bed unit.  That's the most secured unit in the entire federal system.  An inmate can be placed in a control unit primarily because of what he did since he's been in the prison system.  And, in fact, the code of federal regulations is quite clear that an inmate cannot be placed in a control unit simply because of the offenses they committed out in the community.

Q     So if there is any suggestion that the defendant could be placed in this control unit, where I believe -- were you here when Dr. Cunningham said that he found it inconceivable that any organized gang activity could take place from that control unit, did you hear him make that comment?

A     Yes.

Q     Is it, under the law, even a possibility to place Darryl Johnson directly into that 68-bed control unit?

MR. URDANGEN:  Your Honor, I object this witness interpreting the law.

THE COURT:  Overruled.

BY THE WITNESS:

A     It is not.  28 CFR Section 541 is very clear that inmates cannot be placed in a control unit solely on the

Vanyur - direct by Crowl                                   2485

basis of the offenses they committed in the community.

Q    Can you go ahead and continue to explain the levels in the ADX.

A    Let me just make one other comment about the control unit because one of the options is permanent control unit status.  Inmates are never placed in a control unit on a permanent status.  They are given a determinate sentence based on what they committed inside the system.  4 years or 6 years is usually the longest sentence given as a determinate sentence.  And then once the inmate completes his determinate sentence he is taken out of the control unit.

Q    And even if you are in the control unit, do you have any access to staff or to telephone calls or visits?

A    Yes, you have one fifteen-minute phone call per month.  Of course, that phone call is monitored and tape-recorded.  You have up to five visits per month.  The visits are non-contact.  And you have virtually unlimited correspondence with the outside world.

Q    And to what extent in the control unit or any other lock-down units in Florence do inmates have contact with staff?

A    Inmates have contact with staff on a frequent and daily basis.  They're constantly coming in contact with staff.  And I think you got a good depiction, the jury

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2486

got a good depiction yesterday of what these cells look like.

If you notice in the cell, there is a solid outer door, then a small vestibule, and then an inner grill or open bar door, I don't know if you recall what that looked like. Any of the staff that have contact with the inmate, whether it's delivering the inmate's food, delivering the inmate's laundry, delivering any services, psychological health services, even services when I was the associate warden I would have to go down and speak with inmates, the staff have to step into that vestibule and see the inmate through that open bar grill. And that open grill provides the opportunity for the inmate to potentially assault staff.

Q    Have you ever had incidents where inmates even at the ADX in Florence, Colorado in his cell has nonetheless tried to assault staff?

A    Oh, yes. We have frequent assaults.

Q    And can you give us examples of how that could happen when someone is in their cell?

A    Well, a very common one is for the inmate to save up their fecal matter and their urine, and when the officer walks into the vestibule, it would be thrown in the officer's face.

We had a serious assault earlier this year,

Vanyur - direct by Crowl                    2487

potentially serious assault where an inmate took a steel bar out of the typewriter. We are required by law to give access to law libraries to inmates. He took the steel bar out of the typewriter, sharpened it, made a handle out of several magazines, and when the officer stepped into the vestibule to give him his food tray, he tried to stab the officer in the neck with that piece of steel. Fortunately he did not succeed.

Q    There was also discussion yesterday by Dr. Cunningham about how each inmate is in a separate cell which limits communication between inmates. Nonetheless, in your experience as the associate warden, do inmates still communicate with each other even though they are in separate cells?

A    Yes, they do.

Q    How do they do that?

A    Oh, they yell through the vents, they fish notes through the toilets, through the plumbing systems. We have a lot of inmates that started learning sign language, because many of the cells look onto recreation yards through a window. And so when another inmate was out on the recreation yard, the inmate inside the cell was communicating to them through sign language. So they will find ingenious ways to communicate with each other.

Q    Apart from this 68-bed control unit, what are your

Vanyur - direct by Crowl                                    2488

other levels at ADX?

A      The next level most common is the general population. And there are four units that operate as the general population.

Q      And in the general population, do they have increased contact with staff or other inmates?

A      They have increased contact with inmates. When they leave their cells in the general population, they are still cuffed from behind and escorted by two staff. But in the general population, they recreate -- and Dr. Cunningham I think mentioned this -- in groups of 8 to 12 in a small rec yard.

Q      And has this recreation in groups of 8 to 12 in the rec yard, does that limitation prevent assault among inmates?

A      Unfortunately it does not.

Q      In fact, have you observed one of those assaults?

A      Unfortunately I saw a very serious assault in one of those rec yards.

Q      Can you tell us what happened.

A      I happened to be in the unit at the time the inmates were out on the rec yard and witnessed three inmates push a fourth inmate to the ground and then they commenced to stomp him on his head with their sneakers, and in fact continued to stomp him on his head so much

Vanyur - direct by Crowl                    2489

that their sneakers were basically covered with blood by the time the assault was over.

Q     Why didn't you use your weapon to stop that assault?

A     We have no weapons inside any federal facility.

Q     What did you do while this is happening?

A     Unfortunately, we can't enter a recreation yard until we have at least 3 staff members for every inmate in that yard.  Because if we go rushing out to a rec yard outnumbered or even equally numbered, there is a great likelihood that the inmates would assault the staff or would try to take staff hostages.  So we could not go into that rec yard until enough staff responded, that we had a 3 to 1 ratio, before we could open that door and go in and save that inmate.

Q     So you have to have 24 staff members before you could even go in the yard?

A     That's correct.

Q     What are the lower levels of security beyond the general population.

A     The general population is really the beginning of the ADX program.  An inmate has to spend a minimum of one year there.  Then he moves down to an intermediate unit where he has to spend a minimum of 8 months.  At that level, he would have a lot of contact with inmates in

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                    2490

terms of eating and recreating, still limited contact with staff without being restrained.  Then in the next phase, the transitional phase, which is a four month minimum, he would have unrestrained contact with staff on a daily basis.  And then in the final phase, which is the last year of the program, the pre-transfer phase, it would be very similar to an open population penitentiary. The inmate would go to a work detail in a factory, would eat in a dining hall and would have frequent and constant contact with staff unrestrained.

Q     Even though the ADX is the highest level facility for these 400 some inmates, are you familiar with the fact that there is still an assault rate even at the ADX?

A     Yes.

Q     And can you tell us how the assault rate, without weapons, compares to the assault rate in a penitentiary, the high level security?

A     The assault rates have consistently, over the last couple of years at ADX, been about double that in terms of assaults on staff without weapons than those that exist in high security penitentiaries.

Q     Have you even had, apart from the typewriter that was used as a kind of knife, have you had other instances where there have been weapons in the ADX?

A     Yes, they tried to fashion weapons with pieces of

Vanyur - direct by Crowl                               2491

staplers that are in the law library.  We had an inmate that introduced a wooden shank or knife, we never figured out where he got that piece of wood.  The problem with a wooden knife is that it is not picked up on a metal detector, so the inmate was able to get out on a recreation yard and pull that shank.

Q     What happened when he pulled that shank in the rec yard?

A     Well, unfortunately for him, the individual he assaulted took the shank away from him and then used it to assault him back and stab him several times.

Q     And, Doctor, finally, there was a chart that was placed up by Dr. Cunningham yesterday, which was defense Exhibit 150, and in that he talked about how you can manage prison groups like gangs.  Do you recall him putting that up on the overhead?

A     Yes.

Q     And in that exhibit, he listed several methods that might help manage prison gangs.  I'd like to ask you about those methods and find out from you whether or not those methods are in use and whether or not you found them effective to stop gang leadership within the Bureau of Prisons.  The first one was strip-search.

A     Well, we strip-search every inmate that comes into a facility and goes out of a facility, even a low

Vanyur - direct by Crowl                    2492

security facility.  And, yes, strip-searches is a sound method.  I'm sure the marshals use it here on prisoners that they bring in and out.  But inmates can introduce items even when they are strip searched.  We had an inmate that came into ADX that had a cuff key, and he had it in his stomach.  What he had been doing is defecating the cuff key and then swallowing it again over several weeks until he entered the ADX.  And the only reason we caught it is because we x-rayed him coming into the control unit and saw it in his digestive system.  So inmates will swallow things, they will introduce them into their nasal cavities.  They will, even with strip-searching, beat you.

Q    How about shaking down the cells, that was the second thing he mentioned.  What is that?

A    Again, that is not a procedure that is to be used specifically for gang members.  That is a shakedown of a cell, a very thorough search of the cell.  You go through everything that is in that cell, look up in every crevice and corner.  And we do that as a matter of routine in every prison facility.

Q    How about no contact visits, that was one thing that he had in his chart.

A    I think no contact visits are very effective.  The only place we have no contact visits is at ADX Florence,

Vanyur - direct by Crowl                    2493

and they may still have some no contact visits at Marion.

Q     And did that solve your gang problems at the ADX by having no contact visits?

A     No, it did not.  They just don't use visiting at the ADX to pass messages and so forth, they come up with other systems that can beat the system.

Q     He also listed monitoring inmate's accounts.  What is that?

A     Inmates have a bank account or a commissary account where someone in your family could send money that could be added to their account and they can purchase hygiene items and so forth through a commissary, similar to a PX, if you will; they could purchase phone call credits, and things like that.  So we monitor their accounts to see if you have huge influxes of money or if spending has gone up.  It indicates to the correctional manager some potential trends.  But again, that is a tool that would be used for every inmate, not just gang members.

Q     Of all the things that you listed, have you found that any of those have been able to stop the gang activity in the Federal Bureau of Prisons?

A     Unfortunately it has not, because we still have a large degree of gang activity.  It helps, but it is not 100 percent full proof, by any means.

        MR. CROWL:  Can I have a moment, your Honor?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                    2494

THE COURT:  Yes.

(Brief pause.)

MR. CROWL:  No further questions, Judge.

THE COURT:  Cross-examination.

CROSS EXAMINATION

BY MR. URDANGEN:

Q       Good morning, Mr. Vanyur.

A       Good morning.

Q       As a high official in the Bureau of Prisons, I assume you got a great deal of confidence in the way that your Bureau decides on the classification of prisoners.

A       Yes, I do.

Q       I mean, that involves, I'm sure, statistical analysis, extensive history, comparative numbers, consultation with prosecutors and the like, right?

A       Primarily it is a manual-driven system, as I have discussed, where there is a number of factors that are scored on an inmate, looking at their PSI, their presentence investigation, and other things.

Q       So when evaluating a prisoner or an inmate who has just been convicted and placement is being determined, you carefully consider all of those factors right, in the manual?

A       Yes, sir.

Q       And you brought up Darryl Johnson.  You have

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                    2495

reviewed his background, right?

A    I'm aware of the convictions that he has as far as his prior history.

Q    All right.  And you have discussed with prosecutors some of the history in the indictment?

A    Yes, sir.

Q    And you are familiar with his record at the MCC?

A    Yes, I am.

Q    And any other state penitentiary he's been in, right?

A    I'm not familiar with his disciplinary record in the state penitentiary.

Q    You're not.

     There was a great deal of discussion, much of the cross-examination was about assaultive behavior, right?

A    Correct.

Q    And you gave us a bunch of examples of how people have been assaulted, right?

A    Yes, sir.

Q    Now, Darryl Johnson, as you know, has no history of assaultive behavior while incarcerated, isn't that correct?

A    Not to my knowledge.

Q    I'm correct, right?

Vanyur - cross by Urdangen                                    2496

A       I'm not familiar with his disciplinary record in the state penitentiary, as you mentioned, so I would not know if he had anything while there.

Q       But didn't you give us an assessment of where you think he would go, didn't you tell that to the jury?

A       Yes, because I'm aware of the inmates that we house at ADX.

Q       But to really make that assessment, you want to know as much information as possible, right?

A       Yes, I would prefer to look at his PSI.

Q       I mean, you are not satisfied that the amount of research you have done in this case gives you confidence in a prediction of where he is going to go as you sit there, are you?

A       I'm not 100 percent confident, no.

Q       I'm not saying 100 percent.  You need a great deal more information and study, don't you?

A       Yes, but I'm aware of the typical inmates that have been housed over the years at ADX.  He does not fit that model.

Q       And the reason he wouldn't fit that model is because, based on the extensive research and your manual, all the consultations that you do, he would not pose the kind of threat that an inmate who goes to ADX would pose, isn't that right?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

A      He would not fit the mission of the facility.

Q      And the mission is to control dangerous inmates, right?

A      The mission is to control inmates who have not functioned inside other open population penitentiaries.

Q      So you're saying, then, that an assessment of an inmate after conviction who is thought to be dangerous, notwithstanding that assessment, you would send him to general population, is that what you are saying?

A      I'm saying that our penitentiaries, open population penitentiaries, are full of extremely dangerous individuals.

Q      And if there is ever an incident in a federal maximum security penitentiary that increases the likelihood of danger, where does that individual go?

A      If he commits some act inside an open population penitentiary?

Q      Right.

A      He would more than likely go to ADX or possibly Marion.

Q      By the way, are you aware that from the moment Darryl Johnson was arrested in this case, in July of 1995, he was placed in administrative segregation at the MCC?

A      Yeah, administrative detention.

Vanyur - cross by Urdangen                    2498

Q    Detention.  The most restrictive and severe type of detention offered at the MCC, right?

A    That's correct.

Q    And you're also aware that he's been there consistently for the last two years and five months, correct?

A    Yes.

Q    And you're aware that there has been no assaultive behavior, right?

A    That's correct.

Q    With his background and what you know and your assessment of when he is placed, you would consider this an inmate likely not to engage in assaultive behavior, isn't that fair?

A    No, I wouldn't say that is fair.

Q    All right.  So what -- if that is not fair, then why would he go to a general population?

A    Because he hasn't done anything in the system yet. We believe he is going to assault an inmate or we believe that he is a dangerous inmate or we wouldn't even put him in a high security penitentiary, we would put him in a medium security or lower.  The fact that he goes to a high security penitentiary implies that you are a dangerous inmate.

Q    Right.  And that's where you would go if you were

Vanyur - cross by Urdangen                                    2499

considered to be a dangerous inmate, right?

A     Correct, an open population penitentiary.

Q     Sorry?

A     An open population penitentiary.

Q     Now, did you say that 9 percent of prisoners who go to ADX are direct referrals?

A     That was the number I am familiar with. Dr. Cunningham presented a figure of 4 percent.

Q     So actually your percentage is much higher than his, isn't it?

A     Yes.

Q     And it would suggest that there is a greater likelihood that somebody after conviction would go straight to Florence, isn't' that right?

A     If they fit those three categories that we discussed.

Q     Right.

A     Yes.

Q     And there is a greater likelihood, is what you are saying by your figures than Dr. Cunningham, that an inmate would go directly to Florence?

A     Yes.

Q     So you would only go to ADX or a high security system setting, once you're in the system, if your Bureau determined that there was a need for the inmate to go

Vanyur - cross by Urdangen                          2500

there, right?

A       That's correct.

Q       If it was determined that the inmate's activities did not suggest a danger to anybody on the inside or the outside, then that inmate would not go to a high security setting, isn't that right?

A       You're confusing terms, sir.  You've got a maximum security setting and a high security setting; two distinct settings.

Q       Well, let's talk about maximum, then.

         If it was determined that an inmate posed a danger, he would go to a maximum security setting, correct?

A       Not necessarily.  As I say, high security penitentiaries -- and if you've ever been to Leavenworth or Atlanta you can see what they look like, there's 40 foot walls around them -- are full of murderers, drug conspirators, high-ranking gang members; very dangerous people.

Q       Isn't it true that 61 percent of the inmates at Florence are serving 21 years to life?

A       Yes, I believe that's correct.

Q       All phone calls are monitored in high security penitentiaries, aren't they?

A       No, all phone calls are taped, only a percentage of

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                    2501

them are monitored.

Q    I see.  But if it becomes necessary, they are
monitored, isn't that right?

A    That's correct, each institution maintains a list
of high profile inmates that they monitor and would
record all phone calls.

Q    Right.  And that is based on a careful assessment
of their background, right?

A    Yes.

Q    Now, you talked about, you said, gang leaders and
other sophisticated inmates.  Now, I think Mr. Crowl said
something like "have you ever been beaten," do you
remember him saying that, in a sense that they got away
with something?

A    Yes.

Q    Now, you told us about one incident at Florence
where someone got away with something, right?

A    Uh-huh.  Right.

Q    This murder on the outside, correct?

A    Murder in another prison.

Q    Now, how long has Florence been open?

A    Since November of 1994.

Q    So it's been open for 3 years?

A    Yes.

Q    And what's been the typical population of Florence

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                    2502

during those 3 years, if you can give us that estimate?

A        Between 3- and 400.

Q        So for 3- to 400 inmates, 365 days a year, for 3 years, can you tell us where there's been any other incident other than the one incident you told us about where someone was murdered as a result of communication through Florence?

A        Yes, we had a number of incidents.  Every week at Florence we have what is called an intelligence briefing where the executives in the institution, along with the investigative staff, go over phone calls, go over correspondence, and we're constantly trying to piece together the intelligence to figure out what is going on in the gang activity, what is going on in the community.

Q        Maybe I didn't make my question clear enough.  Tell us how many murders, other than the one you've told about since Florence has been open, are directly attributable from communication of an inmate from Florence?

A        None that I'm aware of, though I would argue that one is quite sufficient.

Q        Yes, it's a bad situation, wasn't it.

A        Yes.

Q        If there are disruptive prisoners, they can be spread out to other institutions with high security administrative segregation, isn't that correct?

Vanyur - cross by Urdangen                          2503

A       They could be spread out to other high security

prisons?

Q       Yes.

A       Yes, we can disperse inmates.

Q       Aren't there eight separate administrative

detention facilities spread out throughout the federal

system?

A       No.

Q       How many are there?

A       There is an administrative detention facility in

every single prison.

Q       All right.

A       You are talking about high security penitentiaries,

I assume, and there are nine.

Q       All right.  There are nine security penitentiaries?

A       Correct.

Q       And each in those penitentiaries, what is the

typical population of them?  Can you just give us a rough

range of the population of each of the high security.

A       Some of the older ones are much larger.

Leavenworth is probably close to 2,000 inmates; Atlanta

is very large, 1800; and then they go down to the smaller

ones that may be 1500.

Q       And so many of those have separate wings on them,

correct?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                                    2504

A    That's correct.

Q    So there is ample opportunity to separate so-called dangerous prisoners at various high security penitentiaries, isn't that right?

A    No, because the wings may recreate together or have other contact with each other.  Just because they are housed in a different wing, when there is open recreation moves or open recreation yard, those inmates within those units would commingle.

Q    Right.  But then, again, actually, that type of consideration is only important if you are talking about an inmate who's considered assaultive, right?

A    What type of consideration?

Q    It's only -- when I talk about danger, we are talking about assaulting another inmate, right?

A    No, when I talk about danger, I'm talking about inciting a riot, assaulting an inmate or staff, attempting to escape; there's a lot of dangerous --

Q    How many attempts to escape does Darryl Johnson have in his penal history?

A    None that I'm aware of.

Q    How many examples of assault does Darryl Johnson have in his entire penal history?

A    I believe he was convicted of manslaughter.

Q    Sir, I'm talking about while incarcerated.  And so

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                                    2505

are you, isn't that right?

Incidents of assault in his penal history while incarcerated.

A     I'm not aware he has any.

Q     And how many incidents in his penal history does he have of inciting a riot?

A     None that I'm aware of.  That's probably why he would go to an open population penitentiary.

Q     Because he is not considered a risk to do these things, right?

A     At this point.

Q     And you have a great deal of confidence in your risk assessment procedures, don't you?

A     We don't call them that.

Q     Well, do you have confidence in your decision-making process?

A     Yes.

Q     At ADX all correspondence, except for legal mail, is opened and read, isn't that right?

A     That's correct.

Q     And I assume that when there are any kind of incidents that you've told us about, that you learn from those incidents, don't you?

A     I would hope so.

Q     You meet together and you have these procedures in

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                              2506

place to rectify those types of problems, right?

A     That's correct.  But for every solution that we

find, the inmates seem to find another method to use.

Q     It's true, is it not, that it is entirely up to the

Bureau of Prisons' internal decision-making as to where a

prisoner will be assigned?

A     With the exception of control unit placement, yes.

Q     And you do accept input from United State's

Attorney's Office and the Justice Department, right?

A     Recommendations yes.

Q     And you do factor that in, correct?

A     Yes.

Q     You don't factor in recommendations from, say, for

example, the inmate's lawyer, do you?

A     I would think not.

          MR. URDANGEN:  If I may have a moment, please,

Judge?

          THE COURT:  Yes.

          MR. URDANGEN:  Thank you.

     (Brief pause.)

BY MR. URDANGEN:

Q     Now, the Gangster Disciple membership in the

federal prisons -- let me back pick up for a minute.

          There is only about 7 or 8 percent of the

federal prison population are categorized by your Bureau

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                    2507

as gangs, right?

A     A little over 9,000 that's my understanding.

Q     Is that about 7 or 8 percent?

A     Under -- yes, under 1001 inmates.

Q     And when you compile that number, you consider not only members that you can identify, but suspected members, right?

A     That's not included in that number.  You have associates and suspects also.  And I think that a later witness will be able to provide much greater detail in that area.

Q     Okay.  Then we'll save that for him.  Thank you.

It's a policy of the Bureau of Prisons to remove gang leaders from general population as a strategy to weaken the gang structure, isn't that right?

A     When they have been involved in behavior that indicates.

Q     Right.  And this would send a message to the gangs that proliferation of their activity will not be tolerated, correct?

A     That's correct.

Q     And you implement that policy, do you not?

A     Yes; if we find a gang member that is involved in disruptive activity, we will take appropriate action.

Q     You're aware that about 30 to 40 percent of the

Vanyur - cross by Urdangen                                    2508

Illinois population is gangs, Illinois state system, aren't you?

A       I'm not familiar with the Illinois state system at all.

Q       You haven't looked at documents from the Justice Department which discuss that?

A       No, I have not.

Q       Okay.  You're not telling us -- let me strike that, please.

        This is true, isn't it, that prison gangs and gang members do not have a higher rate of disciplinary incidents and violence than unaffiliated inmates, isn't that true?

A       No, I don't believe it is true.

Q       You don't believe that is true?

A       I believe that -- and I believe that there will be a later witness that will show you the degree -- that gangs are involved in activities.

Q       All right.  Then we will wait for him.

        So you are not familiar with the figures as the later witness who has more handle on the statistics?

A       I'm not an intelligence expert.  I'm just a prison warden.

Q       All right.

        MR. URDANGEN:  That's all I have, Judge.

Blanca I. Lara - Official Court Reporter - (312) 435-5895