# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-02471-PAB-KMT

VIDEOCONFERENCED DEPOSITION OF JOHN MARTIN VANYUR
February 27, 2009

THOMAS SILVERSTEIN,
Plaintiff,
v.
FEDERAL BUREAU OF PRISONS, et al.,
Defendants.

APPEARANCES

For the Plaintiff: LAURA ROVNER, ESQ.
Nicole Godfrey, Student Attorney
Steve Baum, Student Attorney
2255 East Evans Avenue
Suite 335
Denver, Colorado 80208
For the Defendants: MARCY E. COOK, ESQ.
U.S. Attorney's Office
1225 17th Street
Suite 700
Denver, Colorado 80202
Also Present: Christopher Synsvoll, Esq.
Rachel Proctor
Katie Stevens

Page 2

Videoconferenced deposition of JOHN MARTIN VANYUR, the Witness herein, called by the Plaintiff in the above-entitled matter on Friday, the 27th day of February, 2009, commencing at the hour of 8:34 a.m., at 901 19th Street, Courtroom 201, Denver, Colorado, before Wendy Evangelista, Registered Professional Reporter and Notary Public within and for the State of Colorado, said videoconferenced deposition being taken pursuant to Notice and the Federal Rules of Civil Procedure.

INDEX

Page Number

Examination by Ms. Godfrey     3

EXHIBITS

Exhibit Letter     Initial Reference

9* Memorandum to File from Gomez, 6/20/06    70

23* Memorandum to Executive Staff from Nalley, 10/15/04    37

39 A Summary of Interactions Between Thomas Silverstein and Staff at USP Leavenworth (FY'03)    47

40 Program Statement 5180.05, Central Inmate Monitoring System, 12/31/07    51

*Exhibit marked in a previous deposition; no photocopy substituted

Page 3

PROCEEDINGS

MS. GODFREY: Hi, Mr. Vanyur. My name is Nicole Godfrey, and I will be deposing you today.

Marcy, did you show him the protective orders and sign the affirmations already?

MS. COOK: Yes, we have.

MS. GODFREY: Okay. Thank you.

Mr. Vanyur, if you could just state your name for the record.

MS. COOK: Before we start, could you just identify who all you have with you there? I've just got Mr. Synsvoll on my left here off camera.

MS. ROVNER: Hi, Chris.

MR. SYNSVOLL: Good morning.

MS. GODFREY: Yes, of course. It's myself, Nicole Godfrey and my supervising attorney, Laura Rovner; and my other case partners: Katie Stevens, Rachel Proctor, and Steve Baum; and then the court reporter.

MS. COOK: Thank you.

JOHN MARTIN VANYUR,
the Witness herein, having been first duly sworn, was examined and testified on his oath as follows:

EXAMINATION

Q (By Ms. Godfrey) Mr. Vanyur, could you

Page 4

please state your name for the record.

A Sure. My name is John, J-O-H-N, M for Martin, and the last name is Vanyur, V-A-N-Y-U-R.

Q Thank you. Because we're taking this deposition via video, it might be a bit awkward. I'm sure you've noticed there seems to be a little bit of a time delay. Given that, I'll do my best not to speak over you, and I would ask that you do the same.

You were just sworn in by the court reporter, so you're giving sworn testimony, and you're obligated to give full and complete testimony. If you could, answer all questions unless you're instructed by Marcy not to. If you don't understand the question, please tell me; otherwise, I'm going to assume that you do.

I have two preliminary questions: Are you under the influence of any drugs or medication?

A No.

Q And have you consumed alcohol in the last eight hours?

A No.

Q Okay. Thank you. Do you understand that you are here today to give testimony in a civil case regarding the conditions of confinement of Tom Silverstein?

A Yes.

1 (Pages 1 to 4)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334

Page 5

Q   Have you ever given a deposition before?
A   Yes.
Q   Do you know how often -- how many? I'm sorry.
A   I do not know the exact number. I would guess, if you include EEO cases and other administrative cases, probably 12, 14 times.
Q   Okay. Thank you. What was the most recent deposition you've given?
A   The most recent deposition I gave was in a case in New York. One of the inmate's names was Icbaum (phonetic). And it dealt with detainees.
Q   Okay. Thank you. And have you ever testified in court before?
A   I have.
Q   Do you know how often?
A   In two cases.
Q   Do you remember the case names?
A   Actually, three cases that I can recall. One case was with an individual named Darrell Johnson. And then the other two cases -- I don't know the name of the defendants. One was a death penalty case out of Richmond for multiple defendants. And the other one dealt with Washington, DC, inmates.
Q   Okay. Thank you. Who have you spoken to

Page 6

about your testimony today?
A   Just to counsel, to Chris and Marcy.
Q   Okay. Thank you. And what documents have you reviewed in preparation for your testimony today?
    MS. COOK: Objection, foundation.
Q   (By Ms. Godfrey) Have you reviewed any documents in preparation for your testimony today?
A   I have.
Q   And what documents are those?
A   A number of documents. I reviewed two depositions, one by Mr. Nalley in this case. The other one -- it was my deposition from a prior case unrelated to this case. I also reviewed an information paper from 2004 and then a number of memorandum from ADX staff and others and a number of Sentry transaction sheets and probably a few other miscellaneous documents.
Q   Okay. Thank you. For the -- your deposition in the prior unrelated case, do you know what the issues in that case were?
A   Yes. These -- the case involved individuals who were convicted primarily of terrorism offenses prior to 9/11. And it dealt with their conditions of confinement and their transfer to ADX Florence, among other things.
Q   Do you know who those inmates were?

Page 7

A   There were three, I believe. I want to say it was Nosair and Salameh (sic). But I may be -- the case was being deposed by UD law students, so it's -- you're probably more familiar with it than I am.
Q   Okay. Thank you. Can you please describe your educational background since high school?
A   Sure. I graduated college in 1973 from the University of Scranton with a Bachelor of Science Degree in psychology and sociology, then received a master's degree in psychology from the University of Maryland in 1980 -- I'm sorry, I graduated from college in 1977. I received my master's degree from the University of Maryland in 1980 and then received my doctorate in psychology from the University of Maryland in 1985.
Q   Okay. Thank you. Are you currently employed?
A   I am.
Q   Where?
A   I am employed with a company called Management and Training Corporation, MTC.
Q   And what do you do for that company?
A   I'm the senior director of federal customer relations.
Q   And what are your duties in that position?
A   My duties are to help them manage current

Page 8

customers, federal customers, in the private detention business -- they run contract confinement prisons -- and also to help them out with some state contracts they have and to see if I can get them more business in that arena.
Q   And how long have you been in this position?
A   Just under two years; about 21 months, roughly.
Q   And what was your job prior to this?
A   Prior to that, I was the assistant director of the Correctional Programs Division for the Federal Bureau of Prisons.
Q   And when did you first become the assistant director of the Correctional Programs Division of the BOP?
A   In June 2004.
Q   Did you have any positions with the BOP prior to that?
A   I did.
Q   Can you tell me what they were?
A   Sure. Prior to that position, I was the deputy assistant director of the Correctional Programs Division. Prior to that, I was the warden of the federal detention center in Philadelphia, Pennsylvania. Prior to that, I was the warden at the low-security

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334

Page 9

correctional institution in Butner, North Carolina. Prior to that, I was the deputy assistant -- I'm sorry. Prior to that, I was the associate warden of the administrative maximum facility in Florence, Colorado.

Prior to that, I was the deputy assistant director of human resources for the Bureau. Prior to that, I was the personnel director for the agency. Prior to that, I was the chief of management development. Prior to that, I was the executive assistant to the warden at the federal correctional institution in Terminal Island, California. Prior to that, I was the chief of personnel policy and analysis for the Bureau. Prior to that, I was a science research analyst for the Bureau.

Q   Okay. Thank you. You said that you -- prior to becoming assistant director, you were the deputy assistant director. Do you recall the dates that you were the deputy assistant director?

A   Yes, from January 2001 to when I became the assistant director.

Q   Okay. And you also said you were the associate warden at the ADX at some point. Do you recall the years that you were there?

A   Yes, 1994, which is the year it opened, through 1996.

Page 10

Q   Okay. Thank you. When you were associate warden of the ADX, what were your job duties?

A   I was the associate warden of operations. So I had personnel, financial management, facilities management, safety, food service, and that's probably it; mainly the logistics and services piece of the facility.

Q   Okay. Thank you. During this time when you were associate warden, was there a special housing unit at the ADX?

A   There was.

Q   And at that time was there an area in the special housing unit known as Range 13?

A   Yes.

Q   And how was Range 13 -- was Range 13 different than the rest of the special housing unit?

A   Yes.

Q   How so?

A   It -- the cells on that particular range were -- had their own recreation areas and visiting areas built actually into the cells, which was different from the rest of the institution.

Q   Different from the entirety of the rest of the institution?

A   Yes.

Page 11

Q   Okay. Would you say that an inmate housed on Range 13 is completely isolated from all other prisoners?

A   No.

Q   Why not?

A   Well, there's four adjoining cells on Range 13. So to the degree that there were other inmates on that range, they could converse with each other. They couldn't have physical contact, but they could certainly have verbal contact.

Q   Would they ever see one another?

A   Not normally. If an individual was being moved down the range, they could see each other. But other than that, I would think that their sight would be very limited in terms of seeing other inmates.

Q   Okay. Why was Range 13 built?

A   I don't know. I was not involved in the design of the facility.

Q   Do you know what its purpose was when you were associate warden?

A   We didn't have anybody on that range during the time I was the associate warden.

Q   Okay. Do you know why an inmate would have been confined on that range?

A   Not without knowing a specific inmate, why

Page 12

the decision would be made to put him on that range.

Q   Okay. Do you know, in your time with the BOP, how many inmates have ever been confined on Range 13?

A   There's two that I'm aware of -- three that I'm aware of, but there could have been additional ones, since I didn't work at the facility for those years, between '96 and now.

Q   And of those three, do you know how long they were confined there?

A   I don't.

Q   Okay. What were your job duties as deputy assistant director of the Correctional Programs Division?

A   I had oversight over a number of departments in the division, including correctional services, correctional programs, religious programs, psychology services, inmate systems management.

Q   Okay. And what were your job duties as assistant director of the Correctional Programs Division?

A   Well, I had oversight over those same departments, in addition to privatization management, and community corrections, and detention, were the other departments. And then I had policy control, if you

3 (Pages 9 to 12)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334

Page 13

will, or policy oversight over any of those different functional areas.

Q   Can you explain to me a little more what you mean by "policy oversight"?

A   Well, my job was to make sure that the policies that were under the span of control of my division were up to date. If they needed to be modified, we were the ones that wrote the modifications. We were the ones who would provide input to the program review division on how our policies should be audited or reviewed out in the field. And some of my staff would negotiate with the union when we made policy changes that were under our span of control.

Q   Okay. Thank you. You had said some of your job duties included correctional services. Can you expand on what that means more, please?

A   Meaning -- is your question: What does correctional services include?

Q   Yes.

A   Okay. Correctional services is basically the same as the security of the Bureau of Prisons. It includes policies related to tool and key control, inmate accountability, special housing operations, inmate transportation and movement, emergency planning, and intelligence gathering, among other things.

Page 14

Q   Okay. And for this intelligence gathering, does this include intelligence about gang-related activities?

A   Yes.

Q   Does the BOP receive intelligence from any other law enforcement agencies regarding gang-related activities within the prison system?

A   Yes.

Q   What other law enforcement agencies?

A   Well, I mean, dozens and dozens. I mean, we get information from other state systems, other state departments of corrections, and from the Federal Bureau of Investigation, Drug Enforcement Authority -- Administration, Alcohol Tobacco & Firearms. We'll take intelligence from basically anyone that will give us information. So as I said, it's dozens and dozens of states and just about every federal law enforcement agency that's out there.

Q   And how does the BOP receive this intelligence from those agencies?

A   Well, it would vary agency by agency. Sometimes we receive, for lack of a better word, bulletins over whether there is a particular gang problem at a state system that may bleed into our system. Sometimes we get specific intelligence about a

Page 15

specific individual. And that can come through different reporting systems; from the FBI and others.

The Bureau has a liaison in the National Gang Intelligence Center at the FBI and also at the National Joint Terrorism Task Force and also has representation on a lot of local task forces throughout the country. So we're constantly liaisoning with other law enforcement agencies to share information.

Q   Okay. You said some of this information comes in the form of bulletins. What happens to those bulletins?

A   They would be received by staff that work for the intelligence office and then they would be analyzed. This is what analysts do. They look at that information, try to determine how credible it is, and then try to determine its relevance to the Bureau of Prisons.

Q   And then after those bulletins are received, are they filed somewhere within the BOP?

A   I'm not sure. You would have to ask the intelligence staff that, as to how actually that piece of paper is handled and managed.

Q   Okay. You had mentioned the National Joint Terrorism Task Force. Is there a law enforcement entity for gangs that would be equivalent to that?

Page 16

A   There are several that are not the same size and scope but have similar functions. The National Gang Intelligence Center, NGIC, in the FBI of fairly recent creation, probably four years old -- three or four years old -- that's becoming more like the JTTF in terms of structure. There's also in many cities what are called Safe Streets Task Forces that deal a lot with gang issues in addition to violent crimes and other things of which the Bureau is involved in. So there's similar structures out there.

Q   Okay. For the National Gang -- I'm sorry. I just wrote down an acronym, NGIC, and I don't recall exactly what you said that stands for. What is the purpose of that entity?

A   The purpose is to try to enhance systems to share intelligence across different agencies and between states, local jurisdictions and federal jurisdiction.

Q   And how would that entity inform intelligence decisions within the BOP?

A   Could you repeat your question, please?

Q   Sure. How would the NGIC inform intelligence decisions within the BOP?

A   Well, they wouldn't inform decisions. They would provide intelligence. And then decisions based on intelligence would be done by the Bureau. The Bureau of

4 (Pages 13 to 16)

Page 17

Prisons has a staff member that's stationed inside the National Gang Intelligence Center as the liaison full time.

Q   Okay.  What other agencies are involved in this entity?

A   There's dozens.  I don't even know them all.  I mean, there's dozens of states, and a lot of other federal agencies have staff assigned to the NGIC.  I don't know the complete menu of who is there.

Q   Okay.  Thank you.  Does the BOP ever use intelligence received from entities such as this to make conditions of confinement decisions?

A   We'll use intelligence as part of an assessment of an individual inmate's threat and risk to the safety and security of an institution.  It would be one piece of information that we may use.  And then manager's -- correctional managers would use that threat assessment, that information, to make decisions regarding where the inmate should be housed, how they should be classified and so forth.

Q   Okay.  Can you tell me what types of intelligence would guide these sort of decisions?

MS. COOK:  Objection, vague.

Q   (By Ms. Godfrey)  You can answer.

A   I mean, any type of intelligence, whether

Page 18

it's the person's criminal activity, whether it's who they're communicating with, whether it's who their affiliations and associations are -- I mean, there's dozens and dozens of types of intelligence that could be gathered.

Q   Okay.  Are you familiar with the Aryan Brotherhood?

A   Yes.

Q   What is the Aryan Brotherhood?

A   The Aryan Brotherhood is a security threat group, which is really what the prison terminology is now, rather than "gangs."  You'll hear that term.  These are groups that are a threat to the safety and security of the institution.  The Bureau has a higher level beyond security threat groups for a very small number of groups that are particularly disruptive, and they call them "disruptive groups."

The Aryan Brotherhood is a disruptive group.  And in most analyses that you'll see, the Bureau creates a threat index for each security threat group.  The Aryan Brotherhood is consistently at the top of that threat index as the most violent and disruptive group in the federal prison system.

The Aryan Brotherhood started in California.  There's multiple Aryan Brotherhoods throughout the

Page 19

country, in Texas and Arizona.  The one in the federal system that we call the Aryan Brotherhood is a California product that originated back -- you probably could trace it back to the late '60s, early '70s.

Q   Okay.  Thank you.  Do you believe that Mr. Silverstein has an association with the Aryan Brotherhood?

A   I believe he has more than an association.

Q   What do you mean by "more than an association"?

A   He's a validated member of the Aryan Brotherhood, so he has gone through an extensive objective validation process and literally been scored to determine whether he is a certified member of the disruptive group.  And he is a certified member of the Aryan Brotherhood.

Q   Okay.  You said something about an objective validation process.  Can you just expand on that a little bit more?  What does that mean?

A   Sure.  Most prison systems now -- and the Bureau is one of the leaders in this -- have devised scoring systems where you look at a number of criteria to determine whether an individual is a validated member of a group so that they're not just a look-alike or a wannabe.  And those criteria are published.

Page 20

They look at things such as affiliations, tattoos, photographs of individuals, and different pieces of intelligence that can be looked at.  And then based on that validation score, the individual is determined to be a member or not a member.

Q   Okay.  Are you aware of any evidence that Mr. Silverstein has had any contact with members of the Aryan Brotherhood in the past 25 years?

A   I have no evidence of that.  I don't -- I only see what the scoring that was produced for him shows.

Q   When was that scoring done for Mr. Silverstein?

A   I don't know.

Q   Okay.  Do you know if it was done before 1990?

A   I do not.

Q   Once an individual is determined to have an affiliation with a group like the Aryan Brotherhood, is that -- are they always -- will they always be determined to have that affiliation?

A   No.  There are inmates that sometimes separate themselves from security threat groups or disruptive groups.

Q   And how do they do that?

5 (Pages 17 to 20)

Page 21

A   There's multiple ways of doing that. Typically, or many times, inmates will what we call debrief, and that is that they will give up large amounts of information about the gang that proves to be credible. They renounce any membership and affiliation with it. But typically the way we do that is to not only listen to what the inmate says, but observe their behavior over a lengthy period of time to make a determination as to whether they should not be a validated member anymore. It's -- the number of people that are invalidated is probably not a large number.

Q   Okay. Has Mr. Silverstein's association with the Aryan Brotherhood factored into the BOP's decision on his conditions of confinement over the past 25 years?

A   Yes. If you are a disruptive group -- a validated disruptive group member, regardless of Silverstein or others, that will impact how you're classified and what security level of institution you're going to be placed at.

Q   Okay. When we were talking about -- you were talking before about how some inmates can invalidate themselves. What would the BOP look for behavior-wise in determining if they are no longer a validated member?

A   Well, I'm not an intelligence expert. But we would closely watch who they communicate with, possibly

Page 22

who they are assaulted by is an indication, unfortunately, who they associate with, whether they're still involved in drugs and other activity inside the prison that's associated with the gang. You know, we're going to watch and see how the person does.

Q   If the inmate doesn't debrief or renounce the organization, can they be invalidated?

A   I'm not sure. That's a question that's really better answered by an intelligence guy who has actually been through the process of devalidating somebody.

Q   And who would that be?

A   Either someone from the central office intelligence or a special investigative agent at a facility.

Q   Would invalidation occur at the institutional level or at the national level?

A   It would be initiated at the local level. But for a disruptive group member, it's going to have to be reviewed at higher levels because it's -- each of these security threat groups is very different in how they're structured and how organized and committed the members are. So if you're in a loosely structured group like a Surreno, it's going to be easier to drop out.

If you're in a group like the Aryan

Page 23

Brotherhood, which is an extremely structured group and one that is punitive to anyone who tries to drop out, then it's going to be -- the bar is going to be significantly higher for that type of group to prove that you're no longer a member. So it's -- but a disruptive group would have to be reviewed at a higher level in the institution.

Q   Okay. Thank you. Earlier when we were talking about your job duties, you also mentioned psychology services as one of your job duties. What exactly does this entail?

A   That entails the provision of mental health services in each of the institutions, with the exception of psychiatry. Psychiatry is done through the medical department of a prison. But the rest of the mental health care -- whether it's treatment, psychological assessments, suicide assessment and prevention, and some group counseling and therapy -- would fit under the mental health care that I had oversight for.

Q   Okay. How much, if any, would this job duty require interaction with inmates?

A   Which job are you speaking about?

Q   When you are providing oversight for psychology services.

A   You mean my job when I was the assistant

Page 24

director?

Q   Yes.

A   Okay. Well, I mean, I was based in the headquarters in Washington, DC, but I visited facilities frequently. And as I walked through facilities, I interacted with staff and inmates.

Q   Would you interact with them specifically about the provision of psychology services?

A   No. I would just interact with them in terms of how things were going in the institution. And if someone raised a concern to me about psychology services, obviously, I would speak to them about that. But I did not seek them out specifically for that issue.

Q   Okay. During the time that you worked for the BOP, did you ever receive any training regarding the psychological effects of incarceration?

A   Yes.

Q   What did that training entail?

A   Well, I mean, we -- I went through the basic correctional officer academy in Glynco, Georgia. And it started there and then carried on every year, going to annual training with the Bureau where we would teach staff to observe inmate behavior and interpret how they were behaving and speaking and interacting to see if an individual was having problems with decompensating, was

6 (Pages 21 to 24)

Page 25

not dealing with stress, was -- looking for depression issues or suicidal issues.

That was drummed into us, to pay attention to that. And then if we became aware that an individual was having difficulties with their confinement, to notify mental health providers specifically. And then in my background as a social psychologist, I also have a fair knowledge of the issues of mental health and conditions of confinement.

Q Okay. During the time that you worked for the BOP, did you ever receive any training regarding the psychological effects of isolation?

A No, because there's nobody in the Bureau that's isolated, so it's not really an issue.

Q Can you define for me what you would determine to be "isolated"?

A "Isolated," to me, means that there is no human contact, no social interaction at all with people, no communication with the outside world. That would be my definition of "isolation."

Q Okay. Do you have an understanding of the term "solitary confinement"?

A I do not.

Q Okay. Have you ever used the term "solitary confinement"?

Page 26

A Not that I'm aware of.

Q Okay. Earlier when we were talking about your job duties, you also mentioned case management. What exactly does that entail?

A Case management -- the Bureau has a case manager assigned to each inmate. The case manager is the one that initially determines the best housing placement, job assignments and programs that the inmate should be involved in, and then follows up with the inmate periodically to make sure that the programming and the jobs and the assignments are working properly. And then as the inmate gets towards the end of his sentence, the case manager would work with the individual on discharge planning, at least to the community, sort of future steps, if you will.

Q And what type of oversight would you, in particular, as assistant director of correctional programs, provide with regard to case management?

A My oversight would be primarily from a policy perspective at the national level.

Q Are there any inmates for whom you would be more involved with case management?

A There are inmates that I would be more involved -- there would be a very small number of inmates where I may get involved in their classification

Page 27

and designation.

Q Why would you be involved?

A Typically those inmates would be either high profile inmates, inmates that may be in the media frequently, or inmates that present very unique security issues or threats to the safety and security of a facility.

Q Can you explain to me a little more what you mean by "high profile inmates"?

A Most high profile inmates are people that are media people. You know, let's say, Martha Stewart; I was involved in her designation. You'll also get cases of former law enforcement people or congressmen who are incarcerated. They present very unique challenges. And then, as I said, you had certain individuals who, because of the nature of their threat assessment or the nature of their crime, present very challenging security and safety issues.

Q Would Mr. Silverstein have been one of those inmates who, through the nature of his threat assessment or the nature of his crime, you would have been more involved in?

A Yes.

Q Can you elaborate on more specifically what you mean by the nature of his particular threat

Page 28

assessment?

A Well, of course, his threat is fairly well documented as a matter of record. First, he's a validated Aryan Brotherhood member, attempted escape from a federal correctional institution on Terminal Island, California. He's an escape threat. Extensive armed robbery, bank robbery cases. And then most particular, convicted of three murders while incarcerated in the federal prison system, two of which occurred in the control unit at Marion, which at the time was the most secure unit in the entire Bureau of Prisons, one of those murders involving a horrendous murder of a staff member in the control unit.

Q Okay. So how, in particular to Mr. Silverstein, were you more involved in his case management?

A Well, I was involved in discussions as to where he should be designated once we were going to move him from Leavenworth, and then I was involved in periodic reviews of him while he was in ADX Florence.

Q Okay. Thank you. Is there any classification assignment within the BOP that is a no-human-contact assignment?

A Not that I'm aware of.

MS. GODFREY: Okay. I would like to take a

7 (Pages 25 to 28)

Page 29

five-minute break, if we could.

MS. COOK: That's fine.

MS. GODFREY: Thank you.

(A recess was taken from 9:20 a.m. until 9:32 a.m.)

Q (By Ms. Godfrey) Okay. Does the BOP have an executive staff?

A Yes.

Q What is the executive staff?

A It is made up of the director, the assistant directors, the regional directors, and then the senior deputy assistant director of the program review division, and the director of the National Institute of Corrections.

Q Okay. Were you ever a member of the executive staff?

A I was.

Q When?

A From June 2004 through May 2007.

Q Okay. And does the BOP have an executive panel?

A Yes.

Q What is the executive panel?

A That's a panel to review control unit inmates on a periodic basis. The panel is the assistant

Page 30

director of the Correctional Programs Division, the regional director of the north central region -- it's really a two-person panel -- and then the warden of the control unit. I don't know if he's officially a member of the panel or not. But that's basically it.

Q Okay. And as assistant director of correctional programs, you were a member of the executive panel, then?

A Yes.

Q Okay. And then does the BOP have an executive committee?

A I don't -- I'm not familiar with that term.

Q Okay. I want to talk a little bit more about the executive staff. Does the executive staff ever meet?

A Yes.

Q How often do they meet?

A It varies year to year, but typically three to four times a year. Then they occasionally have teleconferences at interim times and as needed.

Q Okay. What is the purpose of these meetings?

A Well, the purpose of the meetings is for the director to give an update on what's going on in the Bureau and to have each assistant regional director give an update on what's going on in their -- under their

Page 31

particular span of control. The exec staff will also review a number of papers that vary on all sorts of topics but could deal with major policy changes or programmatic changes that the agency is considering, and they'll have discussions about that. The group will also make selections or recommendations to the director for selections of high ranking positions throughout the agency.

Q Okay. And then you also said that the executive staff will have teleconferences as needed. What would require a teleconference?

A Well, it could be, for lack of a better word, sort of crisis situations -- not particularly crisis, but let's say there's -- the federal budget has come out and there's going to be a lot of major changes that need to happen or we're going to make a major policy change or programmatic change and we don't -- we need to get that implemented before our next scheduled meeting, or the director really feels the need to keep everybody up to date on a particular issue or concern, so he will have a teleconference.

Q Okay. Thank you. And then at the scheduled meetings, is there a general procedure that's followed at those meetings?

A Yes. There's an agenda, a structured agenda.

Page 32

Q And who determines that agenda?

A It's determined -- the senior deputy assistant director of the program review division is really the coordinator of the meeting. They put the agenda together. I would assume at some point they go to the director and he approves the agenda, although I don't know that. But it's the director's meeting, but it's really logistically run by the program review guy.

Q Okay. And are members of the executive staff provided with a copy of the agenda prior to the meeting?

A Yes.

Q And will that agenda include all the topics that will be discussed at the meeting?

A No. It's a -- the topics that are on the agenda will likely be discussed. But there are many other topics that come up. And there's a variety of ways that the topics can come up, either that -- the conversation on one topic, just like anything other thing, leads to another topic.

Each member, at some point, that goes to the meeting, as I mentioned, gets to sort of give an update or tell people what's going on in their area. At that time, they could raise a particular issue or even bring in a brief memorandum or paper about an issue that they wanted to share. So the agenda would certainly not be

8 (Pages 29 to 32)

Page 33

all-inclusive.

Q   Okay.  You had said earlier that the executive staff reviews a number of papers that deal with a number of different topics at these meetings.  Can you -- would these papers be disseminated to the executive staff before -- prior to the meeting?

A   Most are, but there are some papers that are hand delivered at the meeting.

Q   Is there a reason that a particular paper would be hand delivered at the meeting?

A   There's a variety of reasons, some of which is, the deadline to get the paper submitted is several weeks prior to the meeting.  So it may be that you didn't get your paper in on time or that the particular topic occurred in the interim before the due date.  And then there's some issues that are more sensitive that they may not want to disseminate in advance.  Most regional and assistant directors let their staff review the papers that are sent out in advance to get their feedback on them.  And so there may be papers or issues that you don't want disseminated like that.

Q   Can you give me an example of a topic that you wouldn't want disseminated like that?

A   Yeah.  I mean, I'll give you a perfect example.  We were -- because of budget situations, we're

Page 34

actually going to eliminate hundreds of positions in the Bureau, and it would force people out of their jobs and to take jobs outside of their current assignment.  That is not the kind of paper you want floating around or out in the public domain, if you will, or have other employees be aware of until you've made a decision and communicated it.

Q   Okay.  Are these papers called information papers?

A   They're different types of papers.  There's some papers that are called decision papers, there are some papers called concept papers, there are some that are called information papers, and then sometimes they just come in as memorandum that may not even have that type of title at the top of them.

Q   Is there a reason that a particular paper would be called a decision paper?

A   Yes.  Usually you're talking about a major policy change where there's multiple options that the Bureau is going to look at.  And so the paper will lay out the various options and the cost benefit of each option and then look for a decision as to which option we were going to pursue in that policy area.  So it's very structured.

Q   And how is a concept paper different?

Page 35

A   A concept paper is more of an idea paper.  Let me give you a perfect example.  The Bureau, years ago, was looking into creating faith-based units.  And so the initial paper that went in was to sort of lay out what that unit might look like and determine whether there was interest in that concept.  And then if you had an interest in that concept, you would probably come back later, the next meeting or two, with a decision paper that now begins to lay out, We buy into the concept of a faith-based unit.  Where is it going to be?  How is it going to be structured?  How is it going to be funded?  How is it going to be operated?  So you sort of move into a decision paper.

Q   Okay.  And how would an information paper differ from those?

A   An information paper usually is what it sounds like.  It's informing someone of the status of a particular project or a particular issue.  It may or may not -- sometimes it doesn't ask for any response back from the executive staff.  It may have a brief recommendation or suggestion at the end of it.  But it wouldn't be as detailed in terms of options and cost benefit analysis as a decision paper.

Q   Okay.  I'm going to introduce -- actually, first, have you ever heard of anything called an

Page 36

executive staff paper?

A   I mean, all the papers I'm talking about would be executive staff papers.

Q   Okay.  So as assistant director of correctional programs, did you ever attend the meetings of the executive staff of the BOP?

A   I did.

Q   And at any of those meetings, did the executive staff discuss the conditions of confinement of Mr. Silverstein?

A   Yes.

Q   Were the conditions of confinement of any other inmates ever discussed at those meetings?

A   Yes.

Q   How many other inmates?

A   Oh, I don't know.  But specifically -- I mean, we had discussions regarding a lot of the inmates and detainees related to terrorism cases.  We had discussions on inmates that were high ranking drug cartel and security threat group members.  I mean, there were discussions on occasion about -- sometimes specific inmates; sometimes, for lack of a better word, sort of groups of inmates.

Q   Okay.  And at those meetings where you would discuss the conditions of confinement of

9 (Pages 33 to 36)

Page 37

Mr. Silverstein, what was the purpose of that discussion?

MS. COOK: Objection, foundation and misstates prior testimony as to "meetings."

Q   (By Ms. Godfrey) You can answer.

A   I don't recall that there were multiple meetings involved in that. I can't recall one meeting. What was the rest of your question?

Q   You had said earlier you discussed the conditions of confinement of Mr. Silverstein at an executive staff meeting. What was the purpose of that discussion?

A   The purpose was to review his current status at the time there that dates far before my placement on the executive staff. There was an annual review of his status. And there was a paper -- an information paper related to that review.

MS. GODFREY: Okay. I'm going to introduce an exhibit. It was previously marked as Plaintiff's Exhibit Number 23. The Bates numbers are US 16364 to US 16366.

Marcy, it was Exhibit I in the e-mail.

MS. COOK: Okay.

MS. GODFREY: Okay. This portion of the deposition should be "Confidential for Attorney's Eyes

Page 38

Only."

I want to introduce a new exhibit. The Bates number is 2402. Marcy, it was marked as Exhibit D in the e-mail I sent to you.

MS. COOK: Okay.

(Exhibit Number 39 was marked for identification.)

Q (By Ms. Godfrey) Mr. Vanyur, do you recognize that document?

A I don't. I've never seen it before yesterday.

Q Okay. So this document was not used in the executive staff reviews of Mr. Silverstein?

A I've never seen it.

Q Okay. Thank you. Have you ever seen a document like it?

A No.

Q Okay. Do you know if Mr. Silverstein ever knew that these executive staff reviews were conducted?

A I don't know.

Q Do you know if Mr. Silverstein was ever

Page 48

notified of the results of this review?

A I do not.

Q At these executive staff reviews -- or at the one that you attended, what role did Director Lappin play?

A I don't recall him serving in any other role than the rest of the members; to listen to the paper and then concur with the recommendation.

Q How are decisions made to accept or reject a recommendation by the executive staff?

A It is usually done through concurrence, not through any type of vote. Depending on how complicated the issue or how contentious the issue is, sometimes the discussions will go on for lengthy periods of time; sometimes they won't. Usually we're looking for concurrence. And if the director believes there is concurrence and he agrees, then the issue moves on.

Q So would the director be determining if the concurrence was there?

A Yes. Typically he's trying to get a feel for where the group is headed on a particular issue.

MS. GODFREY: Okay. All right. I would like to take another five-minute break, if we could.

MS. COOK: That's fine.

MS. GODFREY: Thank you.

12 (Pages 45 to 48)

Page 49

(A recess was taken from 10:09 a.m. until 10:16 a.m.)

Q (By Ms. Godfrey) Okay. Mr. Vanyur, have you ever heard of the term "regional director special interest case"?

A Not before yesterday, no.

Q Okay. Do you know if there are particular inmates for which a regional director will, for lack of a better term, take a special interest in?

A Yes. I believe that there are certain inmates that the regional director will want to be notified about if the person is leaving the institution or has a medical emergency or has a significant event.

Q And why would the regional director need to know about those particular inmates?

A Well, I mean, either they're -- similar to the group we talked about before, that they're either high-profile people that are likely to be in the media or they're complicated security cases -- maybe witness security cases -- where the regional director just wants to be sure that he's in the loop of what's going on with that particular inmate.

Q Do you know if Mr. Silverstein would have been one of those inmates?

A I don't know that, other than when I was

Page 50

prepping yesterday for this.

Q Okay. Thank you. Can you tell me what a CIM assignment is?

A It's Central Inmate Monitoring assignment. It is an information tool that allows us to track inmates with special security issues so that when we move them somewhere or we assign them to a facility or we take them out for a medical emergency, we have to clear that person to make sure we don't make a mistake and that we're managing their security properly.

I'll give you an example. You can have seperatees in Central Inmate Monitoring; there are certain inmates that cannot mix with certain other inmates. And so if you were going to transfer that person to another prison, you're going to need to check Central Inmate Monitoring that one of their separatees is not in the facility that you're trying to transfer them to, as an example.

Q Okay. Thank you. Have you heard of the CIM assignment "special supervision"?

A Yes.

Q Can you tell me what is it?

A Special supervision is a category of inmates that require special security needs, complicated security needs, such as an ex-law enforcement officer is

Page 51

maybe someone who is under special supervision. There's probably a number of people. And again, it's an information tool so that before we do anything with that individual, we're going to make sure we know they have some special supervision issues and then make our plans appropriately based on that assignment.

MS. GODFREY: Okay. I'm going to introduce a new exhibit. Marcy, it was Exhibit V in the e-mail I sent to you.

MS. COOK: V, as in Victor?

MS. GODFREY: Yes.

(Exhibit Number 40 was marked for identification.)

MS. COOK: Okay. Just write a number 40 on this.

MS. GODFREY: Marcy, you got that it's Exhibit 40, right?

MS. COOK: Yes.

Q (By Ms. Godfrey) Mr. Vanyur, do you recognize this document?

A Yes. It's the program statement on Central Inmate Monitoring system.

Q Okay. I would like to turn your attention to the fourth page -- I actually think it's the fifth page of the document. It just says page 4 at the top.

Page 52

A Yes.

Q The second paragraph says, "Special supervision." Do you see that?

A Yes.

Q It says, "Inmates who require special management attention."

A Uh-huh.

Q Can you --

A Yes.

Q Okay. Can you tell me what is meant by "special management attention"?

A Well, I mean, it's the correctional management, so it has anything to do with how the inmate is housed and where he's housed, how he's transported, how he's escorted around the institution, how his movement in an emergent -- medical emergency would be done. Anything that deals with how that inmate is housed, transported, and escorted would fit into his correctional management.

Q Okay. Thank you. Once an inmate is designated as "special supervision," how long does that inmate have that designation?

A He has it until the assignment is removed.

Q And how would the assignment be removed?

A Well, I think it's laid out specifically on

13 (Pages 49 to 52)

Page 53

page 6 in the program statement that talks about removal.

Q Okay. Do you know if Mr. Silverstein had the CIM assignment of "special supervision"?

A I did as of yesterday, yes.

Q But you -- did you know that when you were assistant director?

A I don't know that he had that specific Central Inmate Monitoring assignment. I knew he was a Central Inmate Monitoring case, but what his specific assignments were, I did not know.

Q Okay. I want to turn back to page 5 of this where it says page 5 at the top.

A Yes.

Q Number 3, "Special Supervision," it says, "Placement in this assignment may be made only upon the authorization of a Regional Director or the Assistant Director, Correctional Programs Division." Do you see that?

A Yes.

Q So if Mr. Silverstein had received this assignment while you were assistant director, would you have known?

A Not necessarily because it's an either/or. It's the regional director or the assistant director.

Page 54

Q Okay. So if the regional director put this assignment onto an inmate, he wouldn't necessarily have to notify the assistant director?

A That's correct.

Q Okay. Are you familiar with security threat group assignments?

A Yes, in broad terms.

Q Can you tell me how security threat group assignments are determined?

A As I mentioned earlier when we discussed the validation process, if there is any indication or intelligence that an individual may be a member of a security threat group, then the special investigative supervisor or special investigative agent at a facility will begin to do a validation process on the individual to determine if they're a member; and if they're a member, a member of what particular group.

Q Okay. Have you heard of the security threat group assignment of "BOP Top 40"?

A Not prior to yesterday, no.

Q Okay. When you were assistant director of the Correctional Programs Division, would you have known if there was a security threat group assignment of "BOP Top 40"?

A I'd never heard the term in my life prior to

Page 55

yesterday.

Q Right. But would you have known in your position if it existed?

A I can't speculate whether I would or should have known. One would think I would know, but I can't say that I should have or I would absolutely know.

Q Okay. Thank you. Mr. Vanyur, I want to talk about Mr. Silverstein's confinement at Leavenworth. Did you ever see the areas where Mr. Silverstein was confined while he was confined at USP Leavenworth?

A I did not.

Q Did you ever see those areas of confinement after Mr. Silverstein was transferred from Leavenworth?

A No.

Q Okay. I want to talk about Mr. Silverstein's transfer from Leavenworth to ADX. And you had said earlier that you were involved in that decision. How were you involved?

A I spoke with Mr. Nalley about where the proper place would be to house him.

Q Okay. So Mr. Nalley was also involved in that decision. Was anyone else involved?

A No. It was really -- other than, I'm assuming, members of Mr. Nalley's staff and other people under his chain of command -- no, it was really him and

Page 56

I that reviewed the options.

Q Okay. And when you say "reviewed the options," what were the options?

A Well, I mean, one option would have been to leave him at Leavenworth, which we felt was inappropriate because Leavenworth was changing missions to a medium-security prison, and their perimeter security was going to decrease significantly. One of the other options would be to retrofit another facility with the type of cell that Mr. Silverstein required. And then the option which we agreed on was to move him to the administrative maximum penitentiary in Florence, Colorado.

Q Okay. You said "the type of cell that Mr. Silverstein required." What type of cell is that?

A Structurally it's the type of cell that requires us to have the least amount physical contact between him and staff in terms of movement and escort around the facility.

Q Okay. And you said you determined that the ADX would be able to meet his security needs. Were there -- are there any other areas of confinement in BOP facilities that would have met those needs?

A Not really, because the administrative maximum penitentiary is the -- their mission is to

14 (Pages 53 to 56)

Page 57

manage maximum-custody inmates and inmates that are particularly threatening to the safety and security of institutions; so ADX's sole mission is that. And it was really the ideal place to move him to.

Q Okay. When this decision was being made, was it ever contemplated that Mr. Silverstein no longer required these type of security controls?

A I think that's fair. As part of the review in terms of moving him to ADX, did he still require that type of structural cell design that minimized staff physical contact? And our belief at that time was that he still required that type of structural cell design.

Q What was that belief based on?

A That belief was based on his prior pattern of behavior in terms of the murders, particularly the murders that occurred while in the control unit in the most secure unit in the Bureau of Prisons.

Q Was Mr. Silverstein's clear conduct while confined at Leavenworth considered at all?

A Yes, to some degree.

Q In what way?

A Well, he has maintained clear conduct. But as a correctional manager, you can't look at that in the vacuum of a file. You have to also look at that he has not been given the opportunity or we've minimized, to

Page 58

the extent possible under current policies and regulations, to minimize the opportunity for him to assault or murder other people. So one has to look at the clear conduct in the context of how he's being managed and also the historical context of his prior behavior.

Q Okay. If UPS Leavenworth had not changed from a high to a medium security, would Mr. Silverstein still be confined at Leavenworth?

A I don't know that. That's an interesting question. I don't know.

Q Do you know if any inmates have been confined in areas where Mr. Silverstein was confined at Leavenworth since his transfer?

A I don't know.

Q Okay. Who made the decision to house Mr. Silverstein on Range 13 once he was transferred to ADX?

A That decision was made by Mr. Nalley and with my concurrence.

Q Was Director Lappin involved in that decision at all?

A Director Lappin was informed that it was our plan to move Silverstein to ADX Florence and where we would house him. And he raised no objection to that

Page 59

plan, so we moved ahead with it.

Q If he had raised objections to that plan, would the decision have changed?

A I mean, it could have. He's the director of the Bureau of Prisons and we are his subordinates. So certainly at the end of the day, if he disagrees with a decision or raises objections, we're going to have to respond to that.

Q Okay. Was it ever considered that Mr. Silverstein be placed in a general population unit at ADX rather than Range 13?

A I don't recall a specific discussion of that. Mr. Nalley and I spoke about that in more hypothetical terms. And one of the advantages to sending him to ADX Florence is that if he adjusted well in Range 13, that we do have the option at ADX, which we wouldn't have at any other facility, really, to move him into general population. So we -- I think, as part of our decision making, saw that down the road as a potential change.

Q Just so I'm clear, that possibility was contemplated when you were deciding where to transfer Mr. Silverstein from USP Leavenworth?

A I believe so. I believe that we saw down the road that at some point, he may be able to move off of Range 13.

Page 60

Q Okay. What in particular were you looking for to determine that he could be moved off of Range 13?

A The same things we would look at for any inmate; again, how he adjusts to his new environment, whether he continues to be behaved properly, how he interacts with staff. Again, we're going to defer a lot of this to the people who deal with him every day and make a individualized judgment as to whether we may be able to house him somewhere else and give him a little more opportunity to see if he still does present a threat.

MS. GODFREY: Okay. Thank you, Mr. Vanyur. Would you guys be okay with breaking for lunch now?

MS. COOK: How long do you want to take?

MS. GODFREY: Forty-five minutes.

MS. COOK: We can do that.

MS. GODFREY: Okay. Thank you.

(A recess was taken from 10:38 a.m. until 11:26 a.m.)

Q (By Ms. Godfrey) Okay. I want to go back to a few things we discussed before lunch. First, you talked about -- that you had testified in a number of different depositions. And I was wondering if you could remember any of the issues or inmates involved in the cases that were not involving the EEO issues?

15 (Pages 57 to 60)

Page 61

A    Well, it's the case that I'm sure your familiar with, Nosair -- is it Saleh or Salameh? I always get confused. And Elgabrowny, I guess, is the third. Those guys were convicted of terrorist-type activities prior to 9/11. We moved them to ADX Florence after 9/11, so there was issues there; why they were moved to ADX and so forth.

The other case was on 9/11 detainees. These were not convicted fellows. These were people that were detained mainly for immigration charges after 9/11. And they were detained at some Bureau of Prisons facilities. And there was questions as to how they were detained, why they were detained in a special housing unit, and a bunch of very complicated issues as to whether they were cleared from any concern and being related to terrorist organizations.

Prior to that -- I'm trying to remember prior depositions. The testimony in court cases, two of them were in the penalty phase of death penalty cases where I was an expert witness. The other one was a case involving a haircutting policy imposed on DC inmates housed at a Virginia contract prison. Those are the ones that come to mind. I'm sure if you LexisNexis me, you'll be able to dig up a few cases.

Q    Okay. Thank you. Do you recall if you gave

Page 62

depositions when you were the associate warden at the ADX?

A    Not that I recall.

Q    Okay. Thank you. And then I want to talk -- I have one more question about the executive staff review that we talked about of Mr. Silverstein. And could any changes to Mr. Silverstein's conditions of confinement have been made without the executive staff approving?

A    Yes. I mean, the warden has discretion over a lot of different conditions on the day-to-day level. I think it's fair to say that movement to a different type of cell or different unit in the facility would have required certainly the regional director's concurrence.

Q    Okay. So if Mr. Silverstein would have been moved to a different area of confinement, would that have been at the regional director's discretion or at the executive staff's discretion?

A    It's really the regional director's call. You know, he would inform people. He would probably seek my concurrence on it when I was the assistant director, and inform the director. But it's really the regional director who has authority over his confinement.

Page 63

Q    Okay. Thank you. And then I just want to clarify: With the transfer to ADX, the decision was made to transfer Mr. Silverstein from Leavenworth to ADX because ADX had Range 13?

A    Well, yeah, because ADX had the physical structure that I was told was similar to Leavenworth in terms of his being able to access recreation, visitation, and other services without requiring the physical escort by staff. And also, ADX is really the appropriate place for a maximum-custody guy like Silverstein. I mean, that's the mission of that facility, is to house the most dangerous inmates inside the Federal Bureau of Prisons. And he certainly fits into that category. So it's both the structural issues in Range 13 and also the mission and security provided by ADX in general.

Q    Okay. Why if the mission -- if Mr. Silverstein's security needs to fit into the mission of ADX, was he not moved prior to 2005?

A    I don't know. Because it's -- that's a good question. I don't know why he -- once we opened ADX, why he would not have been moved there. And I don't have an answer for that.

Q    Okay. And when this decision was being made to transfer Mr. Silverstein from Leavenworth to ADX, you

Page 64

had said that you were involved in the decision with Mr. Nalley. When you were making this decision, was this a meeting in person that you had with Mr. Nalley?

A    No. I think most of it was done by -- via telephone.

Q    Okay. And is there -- aside from what we've discussed already, is there anything else that you remember about that conversation with regard to Mr. Silverstein?

A    No.

Q    Did you take any notes during that conversation?

A    Not that I recall.

Q    Okay. Now I want to talk about Mr. Silverstein's reviews at ADX. Did you attend any reviews of Mr. Silverstein at ADX?

A    I did.

Q    How many?

A    I don't know exactly. I would -- if I were to guess, I would say at least two and probably three, that I was actually at ADX. Sometimes we did the reviews for the control unit in general via picture-tel like we're doing now. But I definitely had in-person interactions with him at least twice and possibly three times.

16 (Pages 61 to 64)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

Page 65

Q   Okay. And how often did these reviews of Mr. Silverstein occur?

A   I believe they were every six months.

Q   And was this different than the process for reviewing Mr. Silverstein when he was confined at USP Leavenworth?

A   Yes. I believe that his in-person reviews were done just by someone from the regional office and other staff and not necessarily by the -- by the regional director and the assistant director of correctional programs.

Q   Do you know why that changed?

A   I don't recall exactly. It made his reviews more consistent with a control unit level of review. It also really gave him greater access -- in-person access to higher ranking officials in the BOP, which I think is a positive. And that's really the primary reasons.

Q   Do you know who decided to change this review process?

A   I think Mr. Nalley proposed that; that when we moved him, we could build into that move this type of review process that, again, is more similar to a control unit type of review. So I think it was part of that decision-making process.

Q   Okay. And after Mr. Silverstein was

Page 66

transferred to ADX, did his conditions of confinement continue to be reviewed annually by the executive staff?

A   I don't recall. I don't specifically remember that paper coming up again, but I could be mistaken.

Q   Okay. But if it had been reviewed by the executive staff, you would have continued to be a part of that review process also?

A   I would have. And let me backtrack a little bit. I don't believe that it -- I don't believe that the -- I believe the reviews stopped by the exec staff at some point. I don't know what the timing was in relation to his movement to ADX, how soon thereafter we stopped doing the full executive staff reviews.

Q   Do you --

A   But there did come a point when we did not review him at the full exec staff.

Q   Okay. And do you know why he was no longer reviewed with the full exec staff -- executive staff?

A   We just felt that with the higher level of review, in-person, by two members of the executive staff, there really was no need to involve 16 other people in this discussion who really don't have any direct contact or review with the individual. So it just made sense to us to manage it, just as we manage

Page 67

other high profile inmates that -- such as those that are in the control unit that would be more consistent.

Q   Okay. And for the reviews at ADX, what was your role in those reviews of Mr. Silverstein?

A   My role was to sit on a review board with Mr. Nalley and usually the warden of the facility next to us. We would be briefed by the staff at ADX in terms of Mr. Silverstein's progress and behavior, any psychological issues or any other issues that might be raised. And then he was brought into the review panel room, given an opportunity to discuss or raise any issues or questions that he had that we would then respond to. And then we would make a decision after he left the room as to whether we were going to continue his current conditions or make a move to change him significantly.

Q   Okay. And earlier you said that you stopped working for the Bureau of Prisons in, I believe you said, May 2007; is that correct?

A   That's correct.

Q   And who was your successor as the assistant director of correctional programs?

A   Joyce Conley.

Q   Do you know if she is still in this position?

A   She is.

Page 68

Q   Okay. And would Ms. Conley have continued to play the same type of role that you did in these reviews?

A   I wouldn't know that, as a matter of fact. I would assume so.

Q   Okay. You also said when you were talking about the reviews that the warden of ADX was next to you. Do you know who this was during that time period?

A   It was definitely Warden Wiley. I'm trying to remember if he was there the entire time. That's going back. But Warden Wiley -- I don't remember, going back. I can't quite remember, going back to 2004.

Q   And what -- does the warden play any role in these review processes?

A   Yes. I mean, the warden gives input because he's the most familiar with the inmate. He basically briefs the regional director and assistant director on issues that the inmate's raised, how those issues have been resolved or not resolved, what's the status of the inmate, what's their current progress. So he performs a critical role.

Q   Okay. And then when it comes time to make the decision whether or not for Mr. Silverstein you would change the conditions, did Warden Wiley play a role in that?

17 (Pages 65 to 68)

Page 69

A  Yes. We would ask for his recommendation.

Q  And then would you follow his recommendation?

A  We would not be bound to follow his recommendation. But when you look across all the inmates in the control unit, I would venture to say we followed his recommendation the majority of the times.

Q  Do you know if you followed his recommendation with regard to Mr. Silverstein?

A  I believe we did.

Q  Okay. Did you take any notes during these reviews of Mr. Silverstein?

A  No, I did not take any notes.

Q  And did you review anything in advance of the reviews of Mr. Silverstein?

A  Yes.

Q  What would you review?

A  For each inmate that was being reviewed, we got a summary document that basically gave their background, their reason for placement at ADX, their progress to that time; you know, in essence a thumbnail sketch and an update of how the inmate was doing.

Q  Okay. Do you know if these reviews of Mr. Silverstein were recorded in any manner?

A  I do not believe there was any type of audio or video recording. There are summary minutes or

Page 70

summary -- a summary of the review and the recommendation of the panel.

Q  Okay. Did Director Lappin ever attend these reviews?

A  Not while I was doing them.

Q  Okay. Do you know of any time that he attended them when you were not doing them?

A  I don't know of any time.

Q  Okay. You had said that these would be done in conjunction with the control unit reviews. Are there any -- aside from the inmates in the control unit and Mr. Silverstein, were there any other inmates that would be given these six-month reviews in front of the executive panel?

A  No, not that I'm aware of.

Q  Why Mr. Silverstein, then?

A  Well, because as I've articulated, he presents very special security needs. He's housed in a unique portion of the institution, certainly, that we just felt that we could review him, we could be more familiar with his case, more familiar with his progress, and give him greater opportunity and access to in-person hearings with top executives in the agency.

MS. GODFREY: Okay. I want to introduce an exhibit. It was previously introduced as Plaintiff's

Page 71

Exhibit Number 9. The Bates number is US02306. Marcy, it was Exhibit G.

Q  (By Ms. Godfrey) Mr. Vanyur, do you recognize this document?

A  Only from seeing it yesterday.

Q  Can you tell me what it is?

A  It appears to be a file or a memo by Thomas Gomez, the unit manager of the control unit.

Q  Okay. If you look at the first paragraph, the last sentence, it says, "John Vanyur, assistant director, was present at the review." Do you recall being present at this review?

A  In general terms, yes.

Q  Okay. I want to direct your attention to the third paragraph where it says, "Inmate Silverstein was assured that he was not transferred to ADX Florence as punishment." Do you see that?

A  Yes.

Q  Do you recall Mr. Silverstein asking you about this?

A  Yes.

Q  Do you recall why Mr. Silverstein thought that he was transferred to ADX Florence as punishment?

A  Yes. He felt that he had more privileges and less restrictions while he was at Leavenworth.

Page 72

Q  Okay. You had said earlier that you -- after Mr. Silverstein was brought into the review and he raised issues, you would then make a decision to change the -- whether or not to change his conditions of confinement. Do you recall that?

A  Yes.

Q  Okay. Do you know what you would consider in making this determination?

A  Well, we would consider the legitimacy of the inmate's issues that he's raising. For example, some inmates will raise issues that -- Hey, I've had a dental problem and the dentist has had me on a waiting list for three months. And we would investigate whether that's the case. And if the inmate needs dental care, we would basically tell the warden to get him some dental care.

So we would look at each individual who comes in and the issues they raise to determine their legitimacy, first of all; and second, determine what the appropriate action needs to be made on that issue that he raised.

Q  Okay. Do you recall during these reviews of Mr. Silverstein if Mr. Silverstein ever raised any issues about his continued confinement on Range 13?

A  Yes.

Q  Do you recall what he said?

18 (Pages 69 to 72)

Page 73

A He said in general terms that he believed he didn't require that kind of security anymore, that he'd had clear conduct for a long period of time, and that he had interest in moving out to the general population and through the step-down program.

Q And do you recall whether or not you considered whether or not to move him into the step-down program at these reviews?

A We did. We considered whether he should continue where he was at and -- or whether we should make a move. And we told Silverstein several times that we are open to looking at where he should be placed in the future and that if he would demonstrate continued compliance with institutional rules and programs, that the panel would be open to looking at changes in his placement in the facility.

Q How long would Mr. Silverstein need to demonstrate continued compliance with the institutional programs in order for the panel to determine he was ready to be moved?

A Well, as I mentioned before, there's no fixed time period on that. We've got to make a judgment, based on our correctional management experience, when the best time is. It's my understanding that he has since been moved from Range 13. But that was after my

Page 74

time.

Q When you stopped working for the Bureau of Prisons in 2007, did you think that Mr. Silverstein would be moved from Range 13 in the near future?

A I never really thought about it.

Q Okay. You had just said that you know that Mr. Silverstein is now in the general population unit -- in a general population unit at ADX. Do you think that Mr. Silverstein should remain in the general population at ADX indefinitely?

A Well, I can't make that judgment. I don't have the information or access to any issues of his progress or how he's doing at ADX. So it would not be fair for me to answer -- that's a hypothetical question to me since I'm really not involved in his case anymore.

Q Okay. Do you know anything about the step-down program at ADX?

A I do.

Q What do you know?

A Well, I know that it's clearly laid out -- or at least it was in the '90s when we first opened the place. The criteria for inmates who can work their way from general population eventually, hopefully, out to an open-population penitentiary down the road, it's a program based on incentives. The more the inmate

Page 75

follows the institution rules and programs for periods of time, he can be moved into another unit, stepped down to another unit where he has greater access to privileges, such as recreation, and greater access to communal activities, recreation with small groups of others and so forth.

And then as they move down each step, greater privileges, less restrictions on movement, greater access to communal activities, to see if the inmate is able to adjust to that. If they violate the institution rules, have other problems at any phase of the step-down, then they can be stepped back up into prior units.

Q Okay. If Mr. Silverstein -- if Mr. Silverstein was meeting all of those institutional guidelines, do you know of any reason that he wouldn't be able to move through the step-down program at ADX?

A Yeah. There are some inmates -- and I think if you look at the institution supplement, from my recollection, there are some inmates that present such significant security threats that it may be that they end up at some phase of the program that they may not be able to work their way to a lower phase.

Q And do you think Mr. Silverstein possesses those security threats?

Page 76

A I think he did at the time I retired from the Bureau.

Q Do you know of a way that Mr. Silverstein could show that he no longer has those security threats?

A Again, as I mentioned before, if he complies, if his interactions with staff are positive, if he continues to program, then they'll make decisions of whether he can change into a different unit, as they already have, apparently. So I would expect that that same process will continue.

MS. GODFREY: Okay. I would like to take a five-minute break, please.

MS. COOK: That's fine.

(A recess was taken from 11:57 a.m. until 12:07 p.m.)

Q (By Ms. Godfrey) I just have a couple more questions for you. Earlier I had asked you about whether or not you took notes of the reviews, and you said that there was a summary created. Do you know if the exhibit I had you look at, Exhibit 9, is that the summary that's created from those reviews?

A Now, I seem to recall -- and again, I can't recall specifically for Silverstein -- but for the other guys in the control unit, there was a shorter sort of summary statement made at the end of this profile that I

19 (Pages 73 to 76)

Page 77

sort of laid out before. Remember, I told you we sort of had the picture of the inmate, his background, his current progress. My recollection is they later went in and put a paragraph or two summary in that. But content-wise, it's not going to differ substantially from what this looks like. But I remember a different format.

Q Okay. Just so I'm clear, you would receive, before the reviews a, like, profile summary of the inmates to be reviewed; and then you think after the reviews, they would put something in about those inmates?

A That's my recollection, yes.

Q Okay.

A Now, I'm speaking in broader terms about control unit reviews.

Q Right.

A I don't remember if Silverstein's looked like that or not.

MS. GODFREY: Okay. Marcy, I think we have the profile for Tommy. I'm not sure if -- for Mr. Silverstein. I'm not sure if we have anything after the review. So if those exist, we would like them.

MS. COOK: Right. And as Mr. Vanyur has indicated, he doesn't remember if that existed for

Page 78

Mr. Silverstein. We'll look to see if it does. And if it does, we'll produce it.

MS. GODFREY: Okay. Thank you.

Q (By Ms. Godfrey) And then I just have one other question. You were saying that Mr. Silverstein would need to maintain clear conduct and continue programming in order to show that he no longer needs the security controls. What about Mr. Silverstein's complying with the programming would show that he was no longer a security threat?

A Well, I mean, we -- the programming, his interactions with staff, his clear conduct -- I mean, it's all sort of part of the profile of the picture of the individual and how he's adapting to the institution rules and regulations. So in the programming piece, if his case manager is recommending he needs anger management or whatever other type of programming, we expect him to comply and be active in that program. We expect him to be active in betterness of and keeping himself busy while he's -- not just him, but all these guys -- while they're incarcerated. So we look at that.

MS. GODFREY: Okay. Thank you, Mr. Vanyur. That's all I have for right now. We would like to reserve the rest of our time, though.

MS. COOK: For what purpose?

Page 79

MS. GODFREY: In the event that more documents are produced that we would like to ask him about.

MS. COOK: Have you asked for any, other than those -- so you mean the limited documents that you just recently identified at the end of the deposition?

MS. ROVNER: Well, documents continue to trickle in. We just received some yesterday. So to the extent that any of those are relevant to the testimony that Mr. Vanyur has given today or to his knowledge about the events related to this case, we're leaving it open to be able to inquire about those.

MS. COOK: Right. But you designated those documents you received yesterday as potential exhibits for this deposition. So I'm just asking you to identify what you want to leave the deposition open for, with some specificity.

MS. GODFREY: Well, Mr. Vanyur referenced, when he was deputy assistant director, seeing other information papers that we have yet to see. So, something like that.

MS. COOK: All right. That's fine. I would like five minutes to determine if I will ask any follow-up questions.

MS. GODFREY: Okay.

Page 80

(A recess was taken from 12:12 p.m. until 12:15 p.m.)

MS. COOK: We're ready if you guys are.

MS. GODFREY: We are.

MS. COOK: Okay. I don't have any follow-up questions for Mr. Vanyur.

MS. GODFREY: Okay. Thank you, Mr. Vanyur.

THE WITNESS: Okay. Thank you very much.

MS. ROVNER: Mr. Vanyur, thank you for your assistance with the service of the subpoena. We appreciate your cooperation with that.

THE WITNESS: Oh, not a problem at all. Thanks. I'm getting to know the server now by name.

MS. ROVNER: Thanks again.

MS. COOK: Thank you.

(The videoconferenced deposition was concluded at 12:16 p.m., on Friday, January 27, 2009.)

20 (Pages 77 to 80)

Page 81

I, JOHN MARTIN VANYUR, do hereby certify that I have read the above and foregoing videoconferenced deposition, and that the above and foregoing transcript and accompanying Amendment sheet(s), if any, constitute a true and complete record of my testimony.

Amendment sheet(s) attached [ ]
No changes, therefore no Amendment sheet(s) attached [ ]

_____
JOHN MARTIN VANYUR

Subscribed and sworn to before me this _____ day of _____, 2009.
My commission expires: _____.

_____
Notary Public

_____

_____

Page 82

VIDEOCONFERENCED DEPOSITION OF
JOHN MARTIN VANYUR

REPORTER'S CERTIFICATE

I, Wendy Evangelista, Registered Professional Reporter and Notary Public in and for the State of Colorado, do hereby certify that prior to the commencement of the examination the Witness was by me first duly sworn to testify the truth; that said videoconferenced deposition was taken in shorthand by me at the time and place hereinabove set forth and was thereafter reduced to typewritten form under my supervision, as per the foregoing transcript; that the same is a full, true, and correct transcription of my shorthand notes then and there taken.

I further certify that I am not related to, employed by, nor counsel for any of the parties or attorneys herein, nor otherwise interested in the event of the within action.

My commission expires August 12, 2012; and I have hereunto set my hand March 11, 2009.

_____
Registered Professional Reporter
and
Notary Public

21 (Pages 81 to 82)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334