# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION


- - - - - - - - - - - - - - - - - - - -
UNITED STATES OF AMERICA,          :
                                   :
                                   :
-vs-                               : CRIMINAL ACTION
                                   : NO. 3:96CR66
DEAN ANTHONY BECKFORD, et al.,     :
                                   : July 21, 1997
                    Defendants     :
- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROBERT E. PAYNE
UNITED STATES DISTRICT JUDGE


APPEARANCES:

DAVID J. NOVAK, Assistant United States Attorney
ANDREW G. McBRIDE, Assistant United States Attorney
STEPHEN W. MILLER, Assistant United States Attorney
Richmond, Virginia

        Counsel on behalf of the United States

GERALD T. ZERKIN, ESQ.
Richmond Virginia

WAGNER & WAGNER, ESQS.
Richmond, Virginia
BY:  ROBERT J. WAGNER, ESQ.

        Counsel on behalf of the Defendant Beckford

JOHN C. JONES, ESQ.
Providence Forge, Virginia

SCOTT BRETTSCHNEIDER, ESQ.
Kew Gardens, New York

        Counsel on behalf of the Defendant Dennis

SANDRA M. BEVERLY, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

REGINALD M. BARLEY, ESQ.
Richmond, Virginia

BOWEN & BOWEN, ESQS.
Richmond, Virginia
BY:   CARY B. BOWEN, ESQ.

          Counsel on behalf of the Defendant Cazaco

MORCHOWER, LUXTON & WHALEY, ESQS.
Richmond, Virginia
BY:   ELIZABETH D. SCHER, ESQ.

DAVID P. BAUGH, ESQ.
Richmond, Virgninia

          Counsel on behalf of the Defendant Thomas

RICE, EVERHART & BABER, ESQS.
Richmond, Virginia
JEFFREY EVERHART, ESQ.

          Counsel on behalf of the Defendant Smith


                    I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| John Vanyur | 2 | 19 | 36 | 41 |


                    SANDRA M. BEVERLY, RPR
                    OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT

(The following is an excerpt from trial day 7-21-97)

MR. McBRIDE: Call Mr. John Vanyur.

JOHN VANYUR, having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MR. McBRIDE:

Q. Good afternoon, sir. State your full name for the record, please.

A. My name is John Martin Vanyur.

Q. How are you presently employed?

A. I'm employed by the Federal Bureau of Prisons.

Q. What is your present duty assignment?

A. I'm the warden of the low security federal prison in Butner, North Carolina.

Q. Mr. Vanyur, how long have you been with the Bureau of Prisons?

A. Over seventeen years.

Q. Could you briefly list the facilities that you have been at for the jury?

A. Prior to my current assignment, which I have been in one year, I was the associate warden of operations for the United States Penitentiary Administrative Maximum in Florence,

Colorado, and I opened that facility and been there for two and a half years. I have also worked in a medium security federal correctional institution and a number of other posts at headquarters at the Bureau of Prisons.

Q. Now, you indicated the Ad-Max facility, when did that open?

A. We took our first inmates in November 1994.

Q. And prior to joining BOP or during the time at BOP, just summarize, if you would, your educational background for the jury.

A. I've got a bachelor's degree in psychology and a master's and doctorate degree in social psychology from the University of Maryland.

Q. And have you also taken the basic officer correctional course for BOP?

A. I have.

Q. Let's talk about Ad-Max if we could. You were the first deputy warden at Ad-Max; is that correct?

A. That's correct.

Q. And could you tell the jury how many inmates is Ad-Max capable of housing?

A. Our capacity was 484.

Q. How many inmates are there now?

A. 388.

Q. And do you know, out of that 388. How many inmates have homicides in their background?

A.   Just over 150.

Q.   Now, Ad-Max is a maximum security facility in BOP; is that correct?

A.   That's correct.  It's the most secure facility in the system.

Q.   Then there are also a number of United States penitentiaries that are labeled high security; is that correct?

A.   That's correct.

Q.   How many of those are there?

A.   There are eight others, in addition to Ad-Max.

Q.   Could you tell us what those are?

A.   I can try.  United States penitentiaries in Lewisburg, Leavenworth, Atlanta, Lompoc, Marion, Terre Haute, Allenwood, I believe, and Beaumont.

Q.   You got it.  At what is the total population that BOP has under its control right now?

A.   Roughly 110,000 inmates.

Q.   Do you know how many of that group have homicide in their background?

A.   Just over 1,200, but that's a slight underestimate because that only includes inmates that are doing time for federal crimes of murder.  If an inmate has state murder charges somewhere in their past, that doesn't show up in that listing; so over 1,200.

Q.   Now, how many inmates are presently at the Ad-Max facility?

A. 388.

Q. And could you tell us what is the purpose of the Ad-Max facility?

A. The purpose of the Administrative Maximum is to house inmates that are not functioning properly inside the federal prison system. Either they have attempted escape or escaped from secured prisons or they have seriously assaulted inmates or staff or they have murdered inmates or staff. And because they cannot function in a normal, open population environment, we move them for a temporary basis to a more restrictive environment.

Q. What percentage of inmates at Ad-Max come from other institutions?

A. Over 91 percent.

Q. And where do the other 9 percent come from?

A. The other 9 percent are direct court commitments. They are very special cases, typically, high ranking organized crime figures, high ranking drug cartel individuals or international terrorists, people that would have the potential to have resources enough to garner an outside assisted escape.

Q. Now, for instance, is John Gotti at Ad-Max?

A. No, but he's at Marion, which is a similar program.

Q. Now, is the purpose of Ad-Max for people to go there and remain there?

A. No, it's not. Ad-Max is a correctional program. It's meant

to bring an inmate into a more restrictive environment, and then over several years, three years, four years, depending on the individual, allow them to work their way out of that prison and into an open population penitentiary.

Q. What is the goal time frame to move them from the highest level of security, Ad-Max, out to another institution?

MR. BAUGH: Objection to the goal, Your Honor. That's speculative, has no relevance to this case.

THE COURT: Overruled.

BY MR. McBRIDE:

Q. What is the time frame that the Bureau of Prisons has set as its goal?

A. To move from general population to outside the Ad-Max, three years is our goal.

Q. And within Ad-Max, there are different levels of security; is that correct?

A. That's correct.

Q. And the highest level of security is the controlled area for those who have violated the rules at Ad-Max; is that correct?

A. The control unit -- or committed murder, serious assault or escape inside BOP facilities.

Q. If I could have the assistance -- we saw some pictures before, Mr. Vanyur. The jury has already seen these photographs. They have been admitted. Since you have been at Ad-Max, maybe you could describe what we are seeing there.

Could you tell the jury what that is?

A. That is a typical cell inside Ad-Max. There are 500 or 602 cells. Over 400 resemble this type of cell. You are looking from the back of the cell out towards the front door, out towards the range or hallway.

Q. Is that, in fact, one of the control area cells for people who have violated the rules within Ad-Max?

A. It's a similar cell. A control unit cell would have a 12 inch black and white television. This cell has a radio. So it's the administrative detention part of the special housing unit.

Q. That's for the worst of the worst?

A. This is the most secure cells, yes.

Q. And what percentage of the cells at Ad-Max are designed like this?

A. Over two-thirds.

Q. What are the other cells like? How do they differ?

A. Well, they are just not as self-contained. They don't have a shower facility inside them, and they are slightly smaller. Other than that, they still have a poured concrete cell. Some of them just have one steel door, instead of two steel doors, but they are not all that dissimilar.

Q. Now, let's take the most secured area, the area you have described with the control area. Even in that area, are inmates allowed to recreate?

A. Yes. Every inmate is required to recreate by law.

Q. And, also, do they have access to a law library?

A. Yes. We operate nineteen law libraries inside the institution. We are required to provide access.

Q. Now, when the inmates, even in the most secured area, recreate, where do they do that?

A. In the control unit, they recreate by themselves, and we have both indoor and outdoor recreation yards. The indoor room is probably about 15 by 20 feet. And the outdoor room is probably 20 by 15. It's a triangular shape with two story walls around it.

Q. In the general population at Ad-Max, how long are the inmates allowed to recreate each day?

A. Two to two and a half hours a day.

Q. How do they recreate?

A. They recreate in small groups of eight to twelve in a larger rec area, probably about the size of this courtroom.

Q. Entire courtroom?

A. Yes.

Q. And what sports are they allowed to play?

A. They have a basketball and a hand ball.

Q. How many inmates are allowed out there at one time?

A. At the most twelve.

Q. Now, is there a metal detector that's used prior to inmates going out there to recreate?

A. Yes, there is. There is a hand-held metal detector.

Q. Even with that, have you had incidents of shivs, knives, homemade knives being used in the recreation area?

A. We had an incident where an inmate introduced a wooden shank, which, of course, the metal detector did not pick up, and he assaulted another inmate with that shank. Unfortunately for him, the individual he assaulted took that shank away from him and then used it on him.

Q. And have you also had violence occur in that recreation area without weapons involved?

A. Yes.

Q. Have you witnessed that yourself, sir?

A. Yes. I witnessed a very serious assault where three inmates literally stomped on the head of an inmate for several minutes.

Q. You mentioned the law library. Have you had occasion to view homemade knives or instruments that inmates at Ad-Max have manufactured from items in law libraries?

A. Yes. I have seen one. It was a flat piece of steel that came out of the inside of a stapler. There is a sort of U-shaped piece of steel in a stapler. The inmate removed it and then got it back to his cell and then flattened it out into a shank.

Q. What did the inmate do with that?

A. That particular shank we found in his property before he got to use it.

Q. And was there another shank that was made from a typewriter piece?

A. Yes. After I left, they discovered the steel rod from a typewriter had been taken out, and the inmate did attempt to stab an officer with that weapon.

Q. Now, are you generally familiar with the assignment procedures for BOP, the program statement in the various prisons where people would go?

A. Yes, I am.

Q. Now, if I could put up the program statement. As to assignment to ADX Florence, where you worked, if that comes up on your screen, the criteria for assignment to U.S.P. Marion and ADX Florence -- I don't know if you are going to be able to do that, if it's going to work. I will just hand it to the witness, if I could.

MR. BAUGH: I have no objection to counsel reading it if it would help.

BY MR. McBRIDE:

Q. I will read this and ask you if this is a correct statement of BOP policy. ADX Florence: ADX Florence general population units are used for those inmates who have demonstrated an inability to function in a less restrictive environment, without being a threat to others, or to the secure and orderly operation of the institution. Is that the general criteria for assignment to ADX?

A. Yes.

Q. So, essentially, to put it colloquially, you have to mess up, have some kind of incident in some other institution before you'd even get to ADX; is that correct?

A. That's correct, the vast majority of cases.

Q. Is that also true of Marion?

A. That's correct.

Q. So, for instance, take someone who is convicted of homicide in furtherance of a drug enterprise and has a significant violence -- excuse me, significant background of dealing drugs and firearm violence. In your opinion, where would that person go to start out their incarceration at BOP?

A. Probably to an open population United States penitentiary.

Q. Of which there are how many, you indicate before?

A. Not including ADX, there would be eight others.

Q. Now, let's talk about those high security facilities. Do they have recreation where they recreate with other inmates?

A. Oh, yes. They would have open access to large recreation yards, similar to what you would see on television, and a full recreation program.

Q. Would they have double bunking?

A. Probably.

Q. Two inmates to a cell?

A. Yes, probably.

Q. And would feeding be done in a dormitory fashion at a high

security facility?

A. They would eat in a dining hall, similar to a military style dining hall.

Q. So there would be access to utensils then?

A. That's correct.

Q. Would they also have an opportunity to work in uniform?

A. Yes. They would be required to work at some job.

Q. So there would be access to tools as well?

A. That's correct.

Q. Now, even at Ad-Max, once you have advanced in the program, you do receive certain liberties; is that correct?

A. That's correct.

Q. And so are there inmates at Ad-Max who are allowed to eat in a dormitory type fashion with other inmates?

A. Yes, and there are also inmates that work in a factory setting.

Q. So even during the three year program at Ad-Max, the liberties increase over time; is that correct?

A. That's correct.

Q. Now, let me ask you, have you had a look at the statistics on the rates of violence in the high security facilities at BOP?

A. I have.

Q. If I could put up the first chart. If you would look at your screen, is that the BOP statistics for high security facilities for the period from May '95 to May '97, a two year

period?

A. Yes, it is.

Q. Now, does that population include Ad-Max?

A. Yes, it would.

Q. And it includes Marion as well?

A. That's correct.

Q. And then the other less restrictive high security facilities, correct?

A. Yes.

Q. What was the average daily population in those high security facilities for that two year period?

A. I cannot read it, 9,981.

Q. Almost 10,000 inmates; is that correct?

A. That's correct.

Q. And how many total assaults occurred in that two year period?

A. I did some tallying. If I could pull my --

Q. Sure. How many total assaults out of almost 10,000 inmates?

A. 1,462.

Q. So assuming that no inmate committed more than one assault, what percentage of inmates committed assaults in the high security facilities?

A. Roughly 14 percent.

Q. And of those assaults, those 1,500 assaults, how many involved a weapon of some kind?

A.   384.

Q.   What percentage is that of the total assaults?

A.   26 percent.

Q.   And how many of those assaults were on staff?

A.   800, both with and without weapon.

Q.   And that was one two-year period in the high security facilities; is that correct?

A.   That's correct.

Q.   If we could go to the next one.  If we could go back to that one.  How many homicides were there in high security facilities for that two year period?

A.   Nine.

Q.   How many of those involved staff?

A.   One.

Q.   If we could go to the next one then.  Now, this is for the period 1993 through 1995, same statistics.  How are those statistics generated by the Bureau of Prisons?

A.   Any time an incident occurs within a facility, we generate something similar to a police report, whether there was an assault or any kind of serious misconduct.  So those are automated, and then they are fed into a computer system and tallied.

Q.   For this period 1993 through 1995, for most of that period, or some of that period, Ad-Max was not operating; is that correct?

A. That's correct.

Q. So this would include Marion and then the other high security prisons?

A. Except for Beaumont, which is also brand new.

Q. Except Beaumont?

A. That's correct.

Q. What was the average daily population of inmates during this two year period?

A. 7,912.

Q. And how many total assaults occurred among that group?

A. 1,572.

Q. And, again, assuming that no inmate was charged with more than one assault, what percentage of inmates committed assaults in the BOP high security prisons?

A. 19 percent.

Q. And how many of those assaults were with a weapon?

A. 420.

Q. What percent of that is of the total assaults?

A. 26 percent again.

Q. How many assaults were committed on staff members in that two year period?

A. 921.

Q. Now, how many murders were committed in that two year period in your high security facilities?

A. Sixteen.

Q. And how many of those homicides involved corrections officers?

A. One.

Q. If we could go to the last statistics. Have you also reviewed the statistics for the years 1991 through 1993 for high security facilities?

A. Yes, I have.

Q. And that would not include Ad-Max at all; is that correct?

A. That's correct.

Q. It was not even open at that point. What was the average daily population of the Bureau of Prisons high security level institutions for that two year period.

A. 7,274.

Q. And, again, how many total assaults occurred in that population?

A. 586.

Q. Assuming that only one assault per inmate, what percentage of inmates committed some kind of assault?

A. 8 percent of them.

Q. And what percentage of those assaults involved a weapon of some kind?

A. Over one third.

Q. And how many deaths, homicidal deaths, occurred in BOP high security facilities in that period of time?

A. Ten.

Q. Did you also keep statistics regarding drug use in high security federal prisons?

A. Yes, we do.

Q. In your experience, sir, is the distribution and use of drugs in federal prisons associated with violence in those prisons?

A. Yes, it is.

Q. Could you tell the jury why that is?

A. Well, you sort of have the direct effect of the inmate who is using drugs, if he's using amphetamines or another drug that would get him hyped up, you've got to deal with that individual in a confined setting. So you have the immediate violence.

But probably more important to that is the secondary violence that you get. You have turf wars with gangs over who is going to distribute the drugs inside the institution, just as you would have on the street. And then people sometimes don't pay their debts for drugs they bought or they made promises they couldn't keep. So there is retribution based on that failure to pay debts or failure to follow through on distribution promises.

Q. Now, let me ask you to look, if you could, at the 1993 to 1995 statistics on your drug testing program and how many -- what was the average daily population in that period?

A. Again, 7,912.

Q. And how many total positive tests did you have?

A. 1,980.

Q. Now, a lot of those are repeat offenders; is that correct?

A. That's correct.

Q. So what percentage of positive tests for controlled substances did you have in random testing of this population?

A. About 3 percent of the random tests were positive.

Q. So 3 percent of the people in your high security prisons test positive for drugs?

A. Randomly, yes.

MR. McBRIDE: If I could have Exhibit DAB-11, that's been admitted into evidence.

BY MR. McBRIDE:

Q. Mr. Vanyur, take a look at that item. In your experience, in your seventeen years with the Bureau of Prisons, have you ever seen an item like that before?

A. Similar.

Q. Many times, in fact?

A. Yes, usually with a tooth brush handle is the most common.

Q. In other words, the razor welded onto the toothbrush?

A. Yes. A toothbrush handle is typically longer, and you get more leverage with it.

Q. How do people shave at Ad-Max?

A. With a disposal razor.

Q. Similar to that one right there?

A. Yes.

MR. McBRIDE: Thank you. I have nothing further.

CROSS EXAMINATION BY MR. BAUGH:

Q. Mr. Vanyur, all the statistics you gave us have to do with all of the inmates in the maximum security prison; am I correct?

A. High security prisons.

Q. High security. How many homicides have there been in your Florence ultra security section?

A. None so far.

Q. None so far. Are you expecting any?

A. With the type of population we have, one never knows.

Q. Also, you told this jury that usually people are sent there after they misbehave in another facility; am I correct?

A. That's correct.

Q. Do you mean to tell me that if the Bureau of Prisons decides that someone is so dangerous that they should either be executed or sentenced to a cell, you people wouldn't stick him in there immediately?

A. As I said, about 9 percent of the inmates are direct court commitments.

Q. So you don't mean to tell this jury that someone cannot be committed there immediately if the United States is of the opinion they are that dangerous?

A. That's correct.

Q. Now, concerning inmate violence at Ad-Max, am I correct, sir, that not in your open population -- well, strike that. In

your high security jails, Beaumont, Marion and all those, they have a section that's just open, like on television, a yard, right?

A. That's correct.

Q. And people can mingle?

A. That's correct.

Q. And they can have visitors?

A. Contact visiting.

Q. Contact visiting. They can actually meet with loved ones and friends in a room and pass things back and forth sometimes?

A. That's a fact.

Q. Now, when someone is in Ad-Max security, that doesn't happen, does it?

A. No. The visiting is noncontact.

Q. In fact, not only is it noncontact, but you people, meaning BOP people, had the kind of glass you can't even break through with a hammer hitting on it for two hours.

A. That's a fact.

Q. They must speak over the telephone?

A. Correct.

Q. And the cells at Ad-Max, am I correct, they are approximately, what, 6 feet 6 inches by 9 feet 6 inches?

A. The controlled units are 90 square feet. The general population area is 85 square feet.

Q. And in that 90 square feet, you got your bunk?

A. Correct.

Q. Your toilet?

A. Yes.

Q. And your shower?

A. Correct.

Q. You have one window, 5 inches by 24 inches, looking outside?

A. That would be about right.

Q. Then you got a set of bars?

A. Correct.

Q. And then you got a solid metal door with another small window about the same size?

A. Yes, with a small vestibule in between the bars and the solid door.

Q. And am I correct that the vestibule is there so that the inmate can be fed in their cell?

A. That's correct. The staff steps into the vestibule.

Q. So the staff can't even -- I mean, there is a row of bars between the staff when they feed them.

A. That's a fact.

Q. In fact, because of the lessons that were learned at other facilities, when Ad-Max was designed, you can even change the light bulb without going inside the cell through a little --

A. Through a pipe chase.

Q. So it is possible that if someone is particularly dangerous, it is possible that that person could live, breathe, shower, eat

and never have direct contact with another human being in the Bureau of Prisons.

A. That's not possible.

Q. Well, am I correct that the only time you take them out would be for recreation, right?

A. For recreation, medical examinations, visiting.

Q. Well, am I correct that if someone doesn't play by the rules, they lose visitation rights?

A. That's a fact.

Q. And if it's a medical necessity, the doctors can go to them, right?

A. For very limited care. If they need an x-ray or dental care, obviously, they have to come out.

Q. If someone had appendicitis, you might want to move them. I mean, if someone has complaints, to determine if the complaint is valid, the doctor can actually go look at them, right?

A. They have to go into an open area to see the inmate.

Q. And, further, when Ad-Max was designed, wasn't it originally designed that there wouldn't even be bar soap? Didn't they originally decide to use powder soap?

A. That's correct.

Q. Do you all still do that?

A. Yes, we do.

Q. There is not even a little roller for the toilet paper to go on; is that correct?

A. That's correct.

Q. Because that might turn into a weapon?

A. That's correct.

Q. And, further, if someone -- you get fifteen minutes on the phone per month?

A. That's correct.

Q. And if you don't play by the rules, that can be cut back too, can't it?

A. That's correct.

Q. All your mail is opened?

A. Correct.

Q. Any pictures that you might receive from loved ones that are viewed to be suggestive or racy are confiscated?

A. That's true bureau-wide.

Q. All mail has to be read, coming in and going, except for legal mail?

A. That's a fact.

Q. Even a letter from a lawyer though has to be opened in the presence of the inmate?

A. Correct.

Q. By a guard. The officer opens it, makes sure there is nothing in it and then hands it to them?

A. That's bureau-wide also.

Q. So all these statistics you were talking about with homicides and stuff, those include those facilities that have a

yard where people mingle and have contact with others and all that?

A.   That's correct.

Q.   Now, of the 9,000 -- I'm sorry, 10,000 inmates who are in high security, how many of them are in segregation?

A.   I don't know that.  It would vary from day to day.  I would say a safe estimate would probably be 10 percent.

Q.   About a thousand.  And of the thousand, about 400 of them are at Florence?

A.   That would be in addition.  Florence is not segregation.

Q.   When I say segregation, for instance, at Marion there was a bank of cells that are very small and people aren't let out of very often; am I correct?

A.   If it's disciplinary segregation, they are let out one hour five days a week.

Q.   And in Florence, how often are the inmates let out of the Ad-Max security area?  How long are they let out?

A.   It depends on the unit.  In the control unit, the most secure unit, one hour a day, seven days a week.

Q.   And if they are good, they get to go to the outside room.  If they are not so good, they go to the inside room?

A.   No.  They rotate.

Q.   When the cell is opened to let them go to the recreation room and they are in maximum security, they recreate by themselves, don't they?

A. That's correct.

Q. And when the cell door is opened, they are shackled, right?

A. That is correct.

Q. And for people who don't know what shackling is, it's like handcuffs on the ankles, right, with a long chain?

A. In the control unit, they have leg irons and they are cuffed from behind.

Q. And they are cuffed from behind. Is there a belly chain?

A. No, not on recreation escort.

Q. When they get to the recreation room, they are put inside the door. And then the little doors open up, and they put their hands through the locked door, and they are uncuffed from the outside of the locked door?

A. That's correct.

Q. And then they are allowed to sit there in that room. And then when it comes time for them to remove, they come back, put their hands back through the hole in the door and are handcuffed before the doors is ever opened.

A. That's correct.

Q. And then somebody escorts them back to their cell?

A. Correct.

Q. And, further, only one of those metal doors at a time is opened as the inmates are let out, am I correct, to go to the recreation area?

A. Only one inmate would go out to recreation, be escorted at a

time.

Q. Plus, the inmates at Florence in the high security area, they are kind of shuffled periodically, am I correct, so that they can't communicate possibly with people next door to them?

A. We have mandatory cell rotation.

Q. How often do you rotate?

A. Fourteen days typically.

Q. So every two weeks everybody gets moved?

A. Right, but on the same range, they just rotate the cells in that range.

THE COURT: Mr. Baugh, didn't we cover most of this with Doctor Cunningham? It seems to me like I have heard a good deal of this before recently.

MR. BAUGH: Forgive me.

BY MR. BAUGH:

Q. Am I correct, sir, that the cell walls at Florence are 5,000 test concrete, reinforcing bar every 6 inches?

A. Class A wall, what the prisons defines as a Class A wall, precast concrete, 8 inch rebar.

Q. So that nobody can get through them.

A. Well, we've only been open two years. So we don't know all the possibilities that can happen over the course of history.

Q. The doors, not the bar door, but the metal door, that's electronic, isn't it?

A. That's correct.

Q. And in the time that it has been open, has anyone gotten out?

A. No.

Q. If an inmate does not abide by the rules, other than cutting off his visits or limiting his visits, can they also limit his telephone time?

A. Yes, if the offense is related to misuse of the telephone.

Q. And what is the -- can you cut off the telephone completely to him?

A. Probably for a year, if the misuse was significant.

Q. What would be a misuse on the telephone?

A. Conducting business on the telephone, discussing escape plots or introduction of contraband.

Q. Telephone calls are monitored?

A. That's correct.

Q. In the language of the person speaking?

A. Generally. You mean if it's a foreign language?

Q. Yes.

A. We try to have people on the monitors that can speak foreign languages.

Q. Am I correct that if inmates want to use the telephone, he must file a written request identifying the person to whom he's going to speak?

A. That's correct.

Q. So that everyone knows ahead of time when it's going to

happen so it can be approved?

A. Yes.

Q. And the reason for Florence is not only to protect officers but, am I correct, also to protect inmates from each other?

A. Yes.

Q. Because inmates have been known to hurt each other?

A. That's a fact.

Q. Would you say that, in the world, based upon your knowledge, that there is a safer facility for an inmate than Florence?

A. There are similar facilities, about twenty-seven states operate super maximum facilities that are similar. So we are on par, I think, with where technology is heading.

Q. Would you say that those are the safest institutions there can be?

A. As far as I can tell.

Q. And Beaumont is how old?

A. Brand new.

Q. Beaumont, Texas?

A. Yes, within the last couple months.

Q. And does it have a segregation unit, like we are talking about here, where single cells exist?

A. Yes. Every penitentiary -- my prison, current prison, will have a segregation unit.

Q. So we are building more of these?

A. We are not building Florences.

Q. But Florence has a capacity of 484. So you have empty bunks in Florence.

THE COURT: Segregation is different than maximum.

BY MR. BAUGH:

Q. They call them different things in different facilities. So there is still room in Florence. There are empty bunks.

A. Yes. We only use Florence for people that require that level. We don't just fill it up to fill it up.

Q. Now, you say there are 150 people at Florence with homicides in their background. Are they there for murder or are they there for other crimes and they have committed murders in the past?

A. They are there primarily for what they have done inside the prison system. Some of them have committed murder once they have entered the prison system.

Q. And others --

A. Others, it's just part of their history. They are there for other reasons, whether they tried to riot or --

Q. What percentage of the inmates at Florence are in Florence because they committed a homicide while a prisoner?

A. I don't know that number.

Q. Could you estimate it less than ten?

A. No. I would say it's higher than that. I would say it's probably thirty or forty.

Q. Of those thirty or forty, some of them come from high

security facilities, right?

A.   That's correct.

Q.   Others come from medium security or low security facilities?

A.   If they were involved in types of behavior that would place them in Florence, they could come from any other facility.

Q.   So, hypothetically, if someone were sentenced to prison in a minimum security facility for some significant felony, but nothing involving violence, and they defended themselves and hurt someone, they could get sent to Florence?

A.   They defended myself --

Q.   If they defended themselves from assault from other inmates.

A.   Then they would not have been charged with assault, and they would not end up in Florence.

Q.   They wouldn't be charged with assault?

A.   Not if we can prove that they were -- or they can prove that they were defending themselves.

Q.   Oh, I'm sorry, if they can prove that they were the victims, they don't get sent, right?

A.   Right.

Q.   But if they were the victims and they can't prove it, they go, right?

A.   Well, you are twisting my words.  What I'm saying is that if the individual is found guilty of a serious assault, then he is punished like anyone else would be punished when they are

involved in that type of behavior.

Q. Would spitting on an officer be an assault?

A. To be put in Florence?

Q. Is it classified as a serious assault and be in that stat you just read?

A. On occasion.

Q. Yes. Would pushing an officer out of the way, would that be considered an assault?

A. Yes.

Q. Would that be considered in your statistics?

A. Yes.

Q. So any misdemeanor touching would be classified as an assault and would fit in those statistics you just went over with Mr. McBride, right?

A. Any physical use of force against an individual would be considered an assault.

Q. Would you consider spitting at someone use of force?

A. I consider it an assault, yes.

Q. Okay. So that could get you -- you could get on that statistical pool that Mr. McBride just read from?

A. Right.

Q. Is there any rule that prohibits a new inmate who has been classified as dangerous from being sent to Ad-Max in Florence?

A. No, but that's not the Bureau's goal in Ad-Max.

Q. Okay. This will got faster if you answer my question. Is

there any rule that says they can't go there?

A.   No.

MR. BAUGH:   Thank you.   Pass the witness.

CROSS EXAMINATION BY MR. ZERKIN:

Q.   Good afternoon.   When you talk about turf wars against gangs, the gangs you are talking about in the federal prison system are things like the Hells Angels, Pagans, Arian Nation; am I correct?

A.   Not necessarily.   The broader group is actually what we call disruptive groups, and sometimes they are street gangs as you mentioned.   Other times they are just loosely geographic gangs. African American inmates from Washington, D.C., if they are in one facility, may get together to run turf issues.

Q.   And you have the ability in your classification system to determine who might align themselves with other inmates; is that correct?

A.   We attempt to.

Q.   And you attempt to disassociate people who were involved in crime on the outside from being with each other on the inside; is that right?

A.   That's correct.

Q.   In fact, that would be one of your clear criteria you would rely upon when you are making assignments?

A.   Yes, codefendants.  We usually try to separate codefendants.

Q.   And what information -- when you determine what level of security is necessary for an inmate coming into the system, what sources of information do you have?

A.   We have the presentence investigation report.  We rely heavily on that.

Q.   That's done by a probation officer and the court; is that correct?

A.   That's correct.

Q.   What else do you have?

A.   Their instant offense.  Those are the primary sources.

Q.   Do you do a psychological assessment?

A.   We do a screening.  And if that screening indicates that the individual may have some issues, then we do further assessment.

Q.   When you say screening, what are you talking about?

A.   It's both a written tool, and then we do a brief diagnostic with a psychologist, a brief interview.

Q.   And that's a psychological profile to determine whether the person would be at high risk for committing violence in the institution; is that correct?

A.   That would be putting it too strongly.  Mainly, we're looking at tendencies toward suicide and then whether the individual has some severe mental functioning.  That's about it at that point.

Q.   If the gentlemen to my right, the United States Attorneys in

this case, thought that a particular defendant posed a high risk of danger in the prison system, do they have a means of communicating that to the prison system for classification purposes?

A.   Yes, they do.

Q.   I assume that you would willingly accept such information from them; is that correct?

A.   We'll accept the information, yes.

Q.   Is there, in fact, a form for that purpose?

A.   I'm unsure, but given that it's the Government, I would believe there probably is a form.

Q.   Touche.  These programs, like Florence, and which I guess is in similar form at Marion; is that correct?

A.   We took all the inmates out of Marion, most of them, and moved them to Florence.  So Marion's program is very different than it was several years ago.

Q.   But the basic concept existed at Marion before Florence?

A.   That's correct.

Q.   And that program, in fact, with this goal of thirty-six months being able to release them back to the population, has been quite successful, hasn't it?

A.   It has been very successful.

Q.   In fact, you only have a return rate, once they are released, of about 15 percent?

A.   That's correct.

Q.   Isn't it also true that most murderers in the system are not classified as -- when I say murderers in the system, I mean people convicted of murder, serving terms for murder -- are not classified as appropriate for settings such as Ad-Max and Florence or at Marion; is that correct?

A.   That's correct.  The vast majority of them are in open population facilities.

Q.   In fact, if I got your numbers -- do you know what the percentage would be?

A.   Well, there is roughly just over 1,250 inmates in our system that have a current offense of murder, and only 158 of those are in ADX.

Q.   So it comes out to about 12 and a half percent; does that look about right?

A.   Yes.

Q.   Mr. Baugh asked you about the definition of assault.  What's the definition of weapon in those statistics you showed us?

A.   It would require some piece of hardware that's actually used on an individual.

Q.   I mean, anything other than your fist; is that right?

A.   That's correct.

          MR. ZERKIN:   That's all I have, Judge.

          THE COURT:   Any other questions?

REDIRECT EXAMINATION BY MR. McBRIDE:

Q.  Now, Mr. Vanyur, you mentioned that you HAD taken soap, hard soap away at Ad-Max, and you have taken the rollers for the toilet paper out of the cells; is that correct?

A.  That's correct.

Q.  Do you think you've thought of all the things that an inmate could make a weapon out of?

A.  Not at all.

Q.  Now, by law, these inmates have to go to the law library; is that correct?

A.  That's correct.

Q.  And by law, they have to recreate?

A.  That's correct.

Q.  Now, Mr. Baugh indicated that in the high security part of Ad-Max, people are cuffed behind their back, and they have these leg irons on; is that correct?

A.  That's correct.

Q.  But there are inmates at Ad-Max who are not moved around in that fashion; is that correct?

A.  That's correct.

Q.  In fact, at the latter stages of the program, they are allowed to move about freely to some extent; is that correct?

A.  Yes.  They move about unrestrained.

Q.  And receive cable television and other privileges at that

point; is that correct?

A. Well, they see that in even the most secure units.

Q. Cable television?

A. That's correct.

Q. Now, let me ask you this. There was a lot of questioning about Ad-Max and Marion and high security. Based upon the crime of homicide, is there any limit as to how low an inmate could work himself in the BOP system over the years if they were incarcerated for a long period of time?

A. If it's just homicide?

Q. Just homicide.

A. I have nine in my low security facility. So I would assume a low security facility would probably be as low as they could go.

Q. And you're at a low security facility?

A. That's correct.

Q. How many inmates in total are at your facility?

A. 1,160.

Q. And nine of them --

A. Have homicide in their background.

Q. How about someone who is sentenced to prison for life without parole, what is the lowest they could work themselves in the system?

A. They could work themselves down to a medium security facility.

Q. Then by rule they could go no further; is that correct?

A. That's correct.

Q. What is the difference between a medium security facility and a high security like the U.S.P.

A. More the level of control of movement and the perimeter security. But in terms of open movement to recreation areas, access to education programs, access to open feeding, they are going to be very similar.

Q. Now, BOP has to house international terrorists and leaders of drug cartels from South America; is that correct?

A. That's correct.

Q. And those people pose a threat from the outside as well as the inside; is that correct?

A. That's correct.

Q. Now, these four defendants here who have been convicted of serious crimes, drug murder and participation in a continuing criminal enterprise, in your opinion, with your seventeen years experience in BOP, where are they going to be sent if they are sentenced?

MR. BAUGH: Objection, Your Honor, irrelevant.

MR. ZERKIN: It's way beyond -- I think way beyond the cross.

MR. McBRIDE: I don't think it is at all, Your Honor.

MR. ZERKIN: It's certainly beyond mine.

MR. BAUGH: It's speculative, Your Honor, in that Mr.

Vanyur --

THE COURT: Come up here.

BENCH CONFERENCE:

MR. ZERKIN: I just think it was beyond cross, that's all, Judge.

MR. BAUGH: Mine is, Your Honor, that Mr. Vanyur has indicated that the criteria for the determination of that placement, all of which involved, he mentioned input from the United States Attorney's Office, presentence report, all those things, without that information, that is a pure guess he's been asked to give.

THE COURT: Also, I haven't heard anything about them being involved in the decisional process. Maybe I missed it. Is there anything in his background that had him involved in placement?

MR. McBRIDE: Well, he's familiar with the regulations. Those are what he quoted about Ad-Max and Florence. And I think Mr. Baugh certainly suggested that all these guys are going to Florence, based upon a number of criteria. Mr. Zerkin's cross suggested that the U.S. Attorney's Office would have some influence on that. I think I'm entitled to ask him, as a BOP professional, where do you think these guys are going to go.

MR. BAUGH: If I might, Your Honor, the purpose of my questioning was not to show that they would go there, but the purpose of my questioning was to show, if the Bureau of Prisons deemed them dangerous enough, they could. That is all. I don't think anyone can say they are going there.

THE COURT: I don't think direct assignment is appropriate. So I will sustain the objection. You are not going to argue anything beyond what you just said.

MR. BAUGH: Yes, sir.

END BENCH CONFERENCE

BY MR. McBRIDE:

Q. Out of your total population of 110,000, how many inmates have homicide in their background?

A. Roughly 1,250.

Q. And the vast majority of those are in high security facilities?

A. 579 are at the highest.

Q. And where are the rest of them?

A. They are spread out in the system. As I said, I have nine in my low security. We have eighty-five facilities. So I'm sure they are spread out, medium, low and high.

Q. Now, that razor item that I showed you earlier, would you classify that as a weapon?

A. Definitely.

Q. Have you ever seen anyone do arts and crafts with an item like that?

THE COURT: All right, let's go.

MR. McBRIDE: I have no further questions.

MR. BAUGH: I have very few, Your Honor, if I may.

RECROSS CROSS EXAMINATION BY MR. BAUGH:

Q. Just so people in the audience don't misunderstand, when you say cable television, am I correct that at Florence each inmate gets a 12 inch black and white television and religious services and education channels and some entertainment are broadcast over those?

A. That's correct.

Q. They are not getting HBO or CSPAN or anything like that?

A. Well, they have ESPN and several other channels similar to that.

Q. In black and white?

A. In black and white.

THE COURT: ESPN?

THE WITNESS: Yes, sir.

MR. BAUGH: That's what he said.

By MR. BAUGH:

Q. Is one thing, can you cut off their television?

A. Yes. We have had some destroy their televisions.

MR. BAUGH: Thank you, sir.

THE COURT: All right.

MR. JONES: Your Honor, a couple questions if I might.

RECROSS EXAMINATION BY MR. JONES:

Q. Mr. Vanyur, you indicate that you have nine prisoners who have been charged with murder, or is that in their history or is that a federal charge of murder?

A. That's in their history.

THE COURT: Are you talking about in his facility?

BY MR. JONES:

Q. At your facility.

A. It's somewhere along their criminal --

Q. Okay. So they are not in the federal system for murder?

A. Not necessarily, no.

Q. And do you know individually how long they have been in the system before they got to the security level that you are at?

A. No. They have to have generally less than seventeen years left to serve to get down to a low security.

Q. Do you know the average age of the individuals that -- these nine individuals that are in your facility?

A. I do not. The average age of my total inmate population is around thirty-seven or thirty-eight.

Q. Okay. But your total inmate population -- Butner has a special treatment program; is that correct?

A. That is the facility next door to mine. There are two facilities at Butner.

Q. Okay. But we don't consider that program as part of your inmates?

A. No, I do not.

MR. BAUGH: In light of that, may I?

RECROSS EXAMINATION BY MR. BAUGH:

Q. Sir, when you talk about these gangs, does the occurrence of gang violence drop off --

THE COURT: He didn't talk about gangs. Mr. Jones didn't ask --

BY MR. BAUGH:

Q. Sir, do you find older inmates involved in gang activity, like fifties and sixties?

A. Yes. Most of the gang leaders typically are older. It takes them a few years to work their way up.

MR. BAUGH: Thank you, sir.

THE COURT: Can he be excused?

MR. McBRIDE: Yes, Your Honor.

THE COURT: Thank you for being with us and giving us your evidence. You are excused from your subpoena.

44

(The witness was excused from the witness stand.)

I, Sandra M. Beverly, certify that the foregoing transcript is a correct record of the proceedings taken and transcribed by me to the best of my ability.

_____     _____
SANDRA M. BEVERLY, RPR          Date