# EXHIBIT D

STATE OF ARIZONA )
                            ) ss

COUNTY OF PINAL )

### SUPPLEMENTAL AFFIDAVIT OF MARK A. BEZY

MARK A. BEZY, after being duly sworn deposes and states under oath as follows:

1.      I am over the age of eighteen, and I am competent to testify to the matters stated herein. The statements in this affidavit are based upon my personal knowledge.

2.      I am the principal/owner of Mark A. Bezy and Associates, LLC, a consulting firm specializing in corrections management; conditions of confinement; correctional facility activation, operation, and management; inmate transportation; correctional work programs; prison gangs and security threat groups; and institutional disturbances and crisis management. Additionally, I worked as a consultant to Creative Corrections, LLC, a company charged with inspecting state and local correctional facilities housing detainees under the auspices of the federal Department of Homeland Security and Bureau of Immigration and Customs Enforcement.

3.      Prior to these positions, I was employed by the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006. I began my BOP career as a correctional officer at the Federal Correctional Institution in Oxford, Wisconsin. Three years later, I was promoted to the rank of lieutenant and served in that capacity at the Federal Prison Camp in Duluth, Minnesota and the Federal Correctional Institution in Phoenix, Arizona. In 1988, I was promoted to the rank of captain and served in that capacity at the Federal Correctional Institution in Ray Brook, New York, the Federal Medical Center in Lexington, Kentucky, and the United States Penitentiary in Marion, Illinois ("USP-Marion").

1

4.　At the time I served as a captain at USP-Marion, that facility was the highest-security federal correctional facility in the country and housed many of what were considered the most incorrigible and difficult inmates in the BOP, and did so under highly secure and restrictive conditions of confinement.　This included, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.　At USP-Marion, I was a member of the review and classification committee for the movement of high-security inmates through the facility's step-down process.

5.　While the hope of the BOP was that inmates sent to the general population at USP-Marion would modify their behavior and cycle out of USP-Marion to a mainstream maximum-security facility after two to three years, there were many inmates who were housed at USP-Marion for much longer than three years and were unable to cycle out of the program.　The BOP recognized that a small percentage of individuals would most likely require such restrictive security measures during the entire term of their incarceration because of the potential future dangerousness posed by those inmates.　These inmates, such as T.D. Bingham, Barry Mills, and Jeff Fort, were later transferred directly to the United States Penitentiary Administrative Maximum Facility in Florence, Colorado ("ADX" or "SuperMax") when that facility opened in 1994, and they remain housed at ADX today.　Although many inmates came to USP-Marion as a result of a demonstrated inability to function properly in other, less-restrictive environments, a number, such as John Gotti, were assigned directly to USP-Marion from the sentencing court.

6.　From 1995 to 1999, I served as correctional services administrator for the BOP North Central Regional Office in Kansas City, Kansas.　In that management position, I provided

2

on-site advice and consultation to 18 BOP facilities in that region. I also created and implemented the tactical inmate movement plan for "Flo-Max II," the final movement of high-security offenders from USP-Marion to ADX. In this position, I administered the disciplinary transfer program and was responsible for evaluating and classifying all disciplinary transfers and close supervision and protective custody cases – some 4,000 cases in all.

7.      In 1999, I was named associate warden at the United States Penitentiary in Leavenworth, Kansas, an institution housing up to 2,500 inmates. At USP-Leavenworth, I directed the "KC Model Program" which effectively managed disruptive and violent inmates within the general population through identification, classification, and housing changes. The KC Model Program has since been successfully implemented in other penitentiaries.

8.      In 2002, I was named the chief executive officer (warden) of the Federal Correctional Institution in Elkton. There, I managed the safe and secure operation of this low-security facility and was responsible for providing programs and services to 2,300 adult male offenders. I supervised a staff of 300 and managed an annual budget of $42 million.

9.      In August 2004, I became chief executive officer (Warden) of the Federal Correctional Complex at Terre Haute, Indiana ("FCC-Terre Haute"). At FCC-Terre Haute, I managed programs and services provided to 1,500 adult male high-security offenders at the U.S. Penitentiary ("USP-Terre Haute"), 1,200 adult male medium-security offenders at the Federal Correctional Institution, 450 minimum-security adult male offenders at the Federal Prison Camp and 37 adult offenders under death sentences, including Darryl Lamont Johnson. I oversaw 675 personnel and managed an annual budget of $64 million. At FCC–Terre Haute, I implemented a number of security enhancements that have now been adopted throughout the BOP. Moreover, I

3

managed several emergency situations that occurred while I was warden at FCC-Terre Haute, including a homicide, and numerous inmate assaults and emergency lockdowns. As warden, I received top-secret clearance in order to review classified documents relating to particular inmates. I retired from the BOP in October 2006.

10. I received a number of awards during my service with the BOP, including being selected for the Senior Executive Services, a merit-based special compensation program; being named Associate Warden of the Year for the North Central Region in 2001; and receiving the Director's Award in 1997 for my contributions to security technology. As that honor demonstrates, I am very familiar with the security capacity of BOP facilities and have in fact pioneered the use of some of the security protocols and equipment that the BOP employs to this day.

11. For example, when I activated the current USP-Terre Haute in March 2005, that facility was the first in the nation to deploy a wireless microwave camera system. That system was part of my changes in the deployment and accessibility of emergency response equipment which were designed to allow the facility to deal better with serious disturbances. Subsequently, other BOP facilities adopted the use of wireless microwave camera systems. In fact, the equipment at USP-Terre Haute was transferred to and installed at ADX after I retired from BOP.

12. After my retirement from the BOP in 2006, I served as the warden of Central Arizona Correctional Facility, a private prison for sex offenders in Florence, Arizona.

13. I previously have been certified as an expert in BOP policies and procedures by the United States District Court for the Eastern District of Missouri and as an expert in prison

4

adjustment by the United States District Courts for the Central District of California and the Eastern District of Pennsylvania.

14.     In the instant case, I have been retained by counsel for Darryl Lamont Johnson and have been asked to provide my opinion and evaluation, based on my thirty-year history in corrections, regarding the following matter:

    A.     The ability of the Bureau of Prisons to neutralize inmates deemed to be a threat to institutional security and/or to alleviate the threat to the safety and well-being of other individuals, whether inside or outside prison walls, at the time of Mr. Johnson's 1997 trial (*i.e.* future dangerousness).

15.     In the course of my evaluation, I have reviewed the following materials:

    a. Portions of the trial record, including the opening and closing statements of the government and the defense and the testimony of John Vanyur, Ph.D. and Mark Cunningham, Ph.D.;

    b. July 21, 1997 Testimony of John Vanyur, Ph.D. in United States v. Dean Beckford et al, Case No. 3:96CR66 (E.D. Va.);

    c. The direct appeal opinion affirming Mr. Johnson's convictions and sentences;

    d. The Affidavit of BOP Case Manager B. English, filed in Mr. Johnson's current case;

    e. Various BOP regulations and Program Statements.

16.     The BOP's primary mission is to safely and securely house individuals accused and/or convicted of federal criminal offenses, ranging from nonviolent drug and fraud-related offenses to more serious offenses, such as treason, acts of terrorism, racketeering, and murder.

5

The 200,000 inmates in federal custody are classified according to their criminal history; history and circumstances of incarceration; the circumstances of the current offense(s); affiliations with gangs, militant organizations, or other security threat groups; medical and mental health needs; and length of sentence(s) for the current offenses. The stated purpose of the BOP's classification system is to "place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." Program Statement 5100.08, p. 1.

17. As Dr. Vanyur correctly noted during his testimony in Mr. Johnson's case, prior convictions and prison behavior are part of the BOP's classification calculus. Johnson Trial Transcript at 2470-2471 (hereinafter "Johnson T. at __"). As it did during my entire tenure, the BOP retains a great deal of discretion to fashion conditions of confinement and classify inmates to meet its penological objectives and mission, including to ensure the safety and security of BOP facilities and people both inside and outside such facilities. The BOP's discretion is not absolute – it must comply with the United States Constitution as well as those mandates handed down by Congress, the courts, and the Department of Justice. In keeping with these principles, the BOP has many tools in its arsenal that it may use to deal with inmates presenting both commonplace and extraordinary threats to the security of prison staff, other inmates, and those in society at large.

18. Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and imposed, there is no doubt that the BOP had, at all times, the authority and ability to house inmates in severely restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's future

6

dangerousness. This includes, but is not limited to, housing inmates in conditions of confinement where they do not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or by mail. The BOP can, does, and did at the time of Mr. Johnson's trial in 1997, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deems it necessary to do so for the security of prison staff, other inmates, or the public. Under the BOP regulations, these are considered "privileges" – not "rights" – so they can, and could at the time of Mr. Johnson's trial in 1997, be taken away whenever it is deemed necessary by the BOP. Moreover, these strict conditions of confinement can be, and were at the time of Mr. Johnson's trial in 1997, imposed for as long as the BOP deems it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

**I.      Inmate Classification and Placement and Facilities**

19.      One way in which the BOP can deal with the dangers posed by prisoners at the outset is through the initial classification process. At the time of Mr. Johnson's trial in 1997 (the same is true today), inmates convicted of federal offenses could, generally speaking, be sent to four types of federal institutions (in increasing order of security): (1) Federal Prison Camps (minimum security); (2) Federal Correctional Institutions (low/medium security); and (3) United States Penitentiaries (high security); and (4) ADX (high security/control unit).[1] Due to the circumstances of Mr. Johnson's offenses, he would not have been eligible for placement anywhere besides a United States Penitentiary (high security) or ADX (the SuperMax facility),

---

[1] There are a number of other specialty prisons, such as medical and reception centers, but the vast majority of federal inmates have no contact with these specialty institutions.

7

despite Mr. Vanyur's suggestion that an individual with Mr. Johnson's history could be sent to a medium- or low-security facility. Johnson T. at 2471-2473. As described further below, in my professional opinion, ADX is a facility that maintains security protocols capable of neutralizing the threats of future danger that the Government alleged warranted Mr. Johnson's death sentence, and placement at that facility could have effectively limited or eliminated his contact with any individual, both within and outside the confines of the prison, absent consent from the BOP (*i.e.* for mail, telephone or correspondence privileges with particular individuals). Indeed, given the circumstances of his current convictions, his history and his status as a high-ranking gang leader, Darryl Johnson was one of those "very special cases" (a phrase used by Dr. Vanyur in his Beckford testimony) eligible for direct ADX placement if deemed necessary and appropriate by the BOP.

20. Although direct court commitments to ADX are not the norm, they are neither prohibited nor unheard of. The vast majority of ADX inmates come directly from other institutions. However, at the time of Mr. Johnson's trial, approximately ten percent of ADX inmates were direct commitments from the sentencing courts. In a capital trial that occurred a few months before Mr. Johnson's (United States v. Dean Beckford, et al.), former ADX Associate Warden Vanyur testified that some nine percent of ADX's 388 inmates were direct court commitments. According to Dr. Vanyur, that nine percent was composed of "very special cases, typically, high ranking organized crime figures, high ranking drug cartel individuals or international terrorists." Beckford T. at 5. Dr. Vanyur's testimony on this point in Beckford was accurate and consistent with my knowledge and experience. Similarly, his affirmative response to the question, "So you don't mean to tell this jury that someone cannot be committed [to ADX]

8

immediately if the United States is of the opinion that they're dangerous?" was also accurate and consistent with my knowledge and experience. Beckford T. at 19. Accordingly, the suggestion that Mr. Johnson was not eligible for placement at ADX immediately after sentencing, if deemed necessary and appropriate, is false and is belied by ADX's history. Similarly, the notion that the BOP is somehow powerless to prohibit specific inmates from committing serious crimes while incarcerated is also false.

21.     In the Beckford case, Dr. Vanyur correctly testified that ADX is "the most secure facility" in the federal prison system. Beckford T. at 4. All the cells at that facility – whether they are in the general-population area of the prison or in the control unit – hold a single inmate. Generally speaking, in 1997, inmates in general population had the opportunity to recreate with other inmates, but there was no requirement that they be allowed to do so and, as discussed below, there are a multitude of examples where inmates are prohibited from congregating or having any contact whatsoever with other inmates. Indeed, now, inmates in the general population at ADX do not have the privilege of recreating with other inmates; rather, they recreate individually. Moreover, those in the control unit have no opportunity to recreate or otherwise have any contact whatsoever with other inmates and have no interactive human contact with anyone except guards during cell extractions or staff rounds. Given the nature of Mr. Johnson's convictions, and if the BOP determined it was warranted based on his behavioral history and perceived "future dangerousness," he could have been placed in the control unit at ADX.

22.     Regardless of whether Mr. Johnson was eligible for direct placement in ADX's general-population unit or its control unit, the BOP had both the authority and the ability to craft

9

conditions of confinement that would alleviate any risk presented by Mr. Johnson that he would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public. Indeed, the BOP individualizes conditions of confinement on a regular basis. The either/or proposition that an inmate receives a great deal of freedom if not incarcerated at ADX advanced in Mr. Johnson's trial by Dr. Vanyur (see Johnson T. at 2475 (general population means that an inmate would have "open and frequent contact unrestrained with staff and inmates"); Johnson T. at 2472 (inmates have "virtually unlimited access to telephones and a great deal of open visiting contact"); Johnson T. at 2477 (an inmate at high-security facilities has "a great deal of open contact visiting," "virtually unlimited phone access," and "unlimited correspondence privileges"); Johnson T. at 2485 (even in a control unit, inmates have "virtually unlimited correspondence with the outside world"); Johnson T. at 2504 (dangerous inmates cannot be separated at high-security institutions)) are at best serious misstatements and are at worst gross distortions and mischaracterizations of the BOP's role, function, authorities, and abilities, at the time of Mr. Johnson's trial and presently, to house prisoners under secure and restrictive conditions of confinement for as long as deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

23. For many years, the BOP has maintained and set aside facilities, units, and cells for difficult and dangerous inmates. For example, ADX and numerous other prisons have cells that are termed "side pockets." These side pockets, which operate separate from the general population housing, provide for the holding of inmates under highly-secure control-unit type conditions. For example, Luis Felipe – considered by the BOP to be exceptionally dangerous

10

and sent to ADX directly by the sentencing court – was held in a side pocket at ADX immediately upon his arrival there. In the side pocket, Felipe was kept in total isolation from other inmates and all of his communications were both severely restricted and strictly monitored. Similarly, ADX has a wing known as "bombers' row" where those inmates (such as Theodore Kaczynski) convicted of using bombs and other explosive devices to commit their crimes are held under strict, individualized conditions.

24.     These strict conditions are not solely the province of ADX and are nothing unusual or novel in the BOP. Every prison in the federal system has the ability, policies, and procedures to guard against future acts of violence by prisoners confined in BOP prisons, including, as discussed further below, imposing restrictions on contact with people on the outside by telephone and mail.

25.     For example, USP-Marion had what it termed the "K-Unit" from at least the mid-1980s through the mid-1990s. The K-Unit held inmates who posed a high security risk and housed them under extremely strict conditions of confinement. These inmates were held in single cells, recreated by themselves, and had no contact with other inmates. There was one officer assigned for every six inmates (a very low guard-to-inmate ratio). Additionally, K-Unit inmates conducted their work (electronic cable assembly) in their cells instead of reporting to a workshop within the prison. Inmates housed in the K-Unit due to security and/or future-dangerousness concerns included convicted spies John Walker and Jonathan Pollard and former CIA operatives Ed Wilson and Christopher Boyce. These inmates were held in the K-Unit 1for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the

11

public.

26.     Furthermore, USP-Marion maintained an inmate housing unit called the "I-Up Unit." David Sahakian, an inmate affiliated with Aryan Brotherhood, who was accused of serious crimes, including ordering the murders of others, was held in the I-Up Unit during his pretrial detention in the mid-2000s in order to protect others and ensure that he did not commit, order, or direct any additional criminal activity. Sahakian and another Aryan Brotherhood member were separated from the rest of the prison population (they were held on the top floor of the prison hospital) and were continuously monitored by an officer. The conditions of confinement created by the BOP for Sahakian were certainly available at the time of Mr. Johnson's trial in 1997.

27.     Thus, Dr. Vanyur's assertion that it would be "extremely difficult, at best" for officials at a BOP facility such as USP-Marion to separate Mr. Johnson from other Gangster Disciples is simply false. At USP-Marion, we frequently and successfully separated inmates like Sahakian, Pollard, Walker, and others from the rest of the prison population.

28.     The BOP has likewise used other facilities within the system to hold pretrial defendants with special security needs. For example, Timothy McVeigh and Terry Nichols were held at the Federal Correctional Institution at Englewood, Colorado prior to their trials on charges stemming from the 1995 bombing of the federal building in Oklahoma City, Oklahoma. An entire wing of the facility was cleared out to accommodate the two defendants.

29.     There are numerous other examples of individuals who have been subject to special security measures due to the special challenges that they present. Rodney Hamrick, a convicted bomber, was housed at the USP-Marion when I worked there. I recall that all of

12

Hamrick's mail was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Former Panamanian leader Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the risk that he would order crimes or violence while incarcerated. Other inmates that have been, or continue to be, housed under very strict conditions of confinement due to security concerns include T.D. Bingham, Terry Mills, Thomas Silverstein, Clayton Fountain, Eric Rudolph, Ramzi Yousef, Anthony Ayeni Jones, Terry Nichols, and Theodore Kaczynski. Silverstein has been held in conditions at various prisons – including USP-Atlanta, USP-Leavenworth, USP-Marion, and ADX – where he has had virtually no human contact since the 1980's. Unlike Mr. Johnson, many of these individuals have shown an inability to positively adjust to incarceration in the federal prison system. However, to my knowledge, the strict conditions of confinement detailed above have very successfully alleviated the risk that these inmates might pose a future danger to individuals inside or outside the prisons in which they are housed.

30. Additionally, the BOP maintains specialty units at various prisons that are designed to deal with problematic inmates. The Special Management Unit at the United States Penitentiary in Lewisburg, Pennsylvania has controls similar to those found at ADX and is designed to house inmates who have had difficulty abiding by the rules and regulations of other institutions.

31. USP-Terre Haute's Communications Management Unit ("CMU") isolates inmates away from the general population and is designed to monitor any and all inmate communication. That prison also maintains a Special Confinement Unit ("SCU"). Although the SCU is home to the federal government's death row, the BOP may also place non-condemned

13

inmates with disciplinary problems in that unit if deemed necessary and appropriate given the facts. Indeed, as FCC-Terre Haute warden, I housed individuals in the SCU who had previously been involved in an incident at another prison. For example, Hakeem Shaheed and Tyrone Davis were involved in a major disturbance at USP-Marion in 2005 and were immediately transferred to USP-Terre Haute, where I was warden at the time. My superiors at the BOP instructed me to put Shaheed and Davis into the SCU indefinitely so that they could be closely monitored. I followed these instructions, and these two men were not involved in any incidents, violent or otherwise, while they were in the SCU.

32. Moreover, most maximum-security federal prisons contain a Special Housing Unit ("SHU") where inmates can be placed when they have violated (or are suspected of violating) prison rules. A SHU is, in essence, a prison within a prison where security and conditions of confinement are stricter than those imposed on the general population within the maximum-security facility generally. Each BOP warden has the authority to place any inmate into a SHU if the inmate is under investigation for a serious violation of prison rules. Inmates can be housed in a SHU for a variety of reasons, including concerns about security and/or an inmate's future dangerousness. Inmates may be placed in the SHU for extended periods of time, with the only limitation being that facility administrators must periodically review placement to determine continued appropriateness.

33. Special Administrative Measures ("SAM's") also allow the BOP to construct individualized conditions of confinement as are "reasonably necessary to protect persons against the risk of acts of violence or terrorism." See 28 CFR §501.3(a). Each SAM's order is totally unique and is nearly limitless in terms of the conditions of confinement available to be imposed

14

by BOP personnel (subject to the constraints of the United States Constitution, of course). Although SAM's orders are required to be periodically reviewed, they may be extended for as long as conditions persist (*i.e.*, indefinitely). A number of inmates have been held under SAM orders for more than a dozen years. SAM's orders were available to the BOP and the Department of Justice at the time of Mr. Johnson's trial in 1997 had officials been concerned that Mr. Johnson presented a risk of violence while incarcerated.

34. Again, contrary to Dr. Vanyur's assertions at Mr. Johnson's trial, these strict conditions of confinement were (and are, to my knowledge) routinely imposed on high-risk inmates by the BOP for as long as it deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

## II. Telephone, Visitation, and Correspondence Restrictions

35. Generally speaking, federal prison inmates do not have unlimited rights to visitation, correspondence, use of telephones, or contact with other inmates. As a matter of policy, the BOP grants access to these privileges consistent with the requirement of sound correctional management. These privileges can be revoked if they are abused or are deemed to constitute a threat to the security of the institution or the safety of individuals, whether inside or outside the prison. As Dr. Vanyur correctly stated in Beckford, inmates can have their phone privileges revoked for up to a year at a time in the case of significant misuse. Beckford T. at 27. There is no limit on the number of consecutive year-long revocations that can be imposed on a prisoner if it is deemed to be warranted.

15

36.     Misuse of telephone, mail, and visitation privileges are of particular concern to BOP personnel because of the possibility that a federal inmate will facilitate the commission of a crime through communications with other inmates or associates in society at large. The BOP retains a large amount of flexibility in dealing with this potential threat, as well. As the Justice Department's Inspector General found in a 1999 report:

> According to the BOP's program statement "Telephone Regulations for Inmates," conditions and limitations may be imposed on an inmate's telephone use to ensure that it is consistent with the BOP's correctional management responsibilities. Additionally, *inmate telephone use is subject to any limitations that individual wardens determine are necessary to ensure the security or good order of the institution or to protect the public.* Restrictions on inmate telephone use may also be imposed as a disciplinary sanction.

> BOP regulations direct wardens to refer incidents of unlawful inmate telephone use to law enforcement authorities. According to BOP regulations, telephone "misuse" refers to such things as using the telephone to intimidate a potential witness or for other criminal purposes. Using another inmate's phone access code (PAC) or providing a PAC to another inmate is considered "misuse" and is subject to discipline. *Inmates who violate the telephone rules may have their privileges restricted or revoked.*

> Each warden is required by BOP's program statement to establish procedures to enable monitoring of inmate telephone conversations on any telephone located within the institution. The term "monitoring" is not defined in the BOP program statement, so it is not clear whether this means recording of calls or live-monitoring by the BOP staff. According to the BOP's program statement, the purpose of monitoring is to preserve the security and orderly management of the institution and to protect the public.

> In all BOP facilities, a notice is placed on inmate telephones advising the user that all conversations are subject to monitoring. Use of the telephones by inmates, therefore, constitutes their consent to this monitoring. Inmate calls to attorneys are an exception to this rule and will not be monitored by BOP staff if the

16

inmate follows proper procedures, established by the warden at each institution, to arrange and place attorney calls.

BOP Headquarters has not issued any policy detailing how much "live monitoring" or review of recorded calls staff at each institution should conduct. Rather, determinations about the amount and methods of monitoring are left to individual wardens. Some institutions have remote monitoring locations. At these locations, officers randomly listen to some calls as they are occurring. This monitoring is in addition to their regular duties. Most of these institutions require the officers to monitor a minimum number – usually five – telephone calls during their shift. The officers are required to fill out a form describing the content of each monitored call and submit these reports to the institution's SIS office. The SIS offices are supposed to review the reports and decide if any further action is required.

Most institutions without remote monitoring locations have established a fixed listening post where a staff member assigned as the telephone monitor listens to inmate calls in addition to other duties, such as reviewing inmate mail. This telephone monitor normally works only during the day shift. However, wardens at several institutions have assigned a telephone monitor to the evening shift as well.

In its "Special Investigative Supervisors Manual" (SIS Manual), the BOP encourages a proactive approach to deterring criminal conduct by inmates. The SIS Manual directs SIS staff to use threat analysis, risk assessment, analysis of connections between inmates, and intelligence sources to prevent illegal conduct by inmates while still in the planning stage. The manual also states that the SIS should determine which inmates are engaged in activities that pose a threat to the welfare of the community. The SIS Manual provides examples of how the current version of ITS can assist staff in this task.

In August 1997, the Intelligence Section at BOP Headquarters issued an Inmate Telephone Monitoring field guide for wardens and SIS staff. The guide states that one of the BOP's primary concerns is to ensure that inmates who were convicted for playing leadership roles in major drug trafficking organizations do not continue their criminal operations using prison telephones. The guide stresses that

17

inmates should not be permitted to talk on the telephone when they should be at their job or educational assignments. The guide notes that some inmates may require reassignment from orderly jobs or similar positions that provide them a great deal of flexibility and autonomy so that their time is more fully engaged. The guide also cautions against permitting a small number of inmates to dominate the telephones.

In addition, the guide suggests that "population profiling" should be a major component of an institution's monitoring operations. For example, the guide acknowledges that it is not possible for staff to consistently listen to 100 percent of inmate calls. For this reason, the guide states that any inmate telephone monitoring should place the highest priority on identifying and tracking inmates with the greatest likelihood of using their telephone privileges to engage in criminal or illicit activity. Inmates identified as having a high likelihood of engaging in crime while incarcerated, such as drug dealing and escape plots, should be targeted and their telephone conversations subject to intense review.

See USDOJ/OIG Special Report: A Review of the Bureau of Prisons' Management of Inmate Telephone Privileges, August, 1999 (Found online at: http://justice.gov/oig/special/9908/) (emphasis added).

37. As a captain, associate warden, and warden at numerous federal correctional facilities, I recall numerous instances where prison management (myself included) completely suspended or otherwise severely restricted telephone privileges because of concern that an inmate was abusing the privilege. While no system is 100 percent foolproof, we were successful in curbing inmate abuse of telephones in the overwhelming majority of cases where the issue arose through the use of targeted and contemporaneous monitoring and severe restrictions on numbers of calls and to whom inmate calls could be made.

38. The same can be said for inmate abuse of correspondence and visitation privileges. In his testimony in the Beckford case, Dr. Vanyur correctly noted that mail, phone,

18

and visitation privileges can be severely restricted. Beckford T. at 22-24. He did not testify similarly in Mr. Johnson's case. Indeed, as a senior manager or head of numerous correctional facilities, I was involved in countless decisions to closely monitor visitation of, and correspondence to and from, specific individuals where there was a concern about institutional or individual safety. Actions taken to deter or detect unlawful conduct included, among other things, real-time monitoring and recording of visitation, review of correspondence, and the interception and translation of letters written in foreign languages or code. For example, at USP-Marion, Yu Kikumura, a member of the Japanese Red Army, a terrorist organization, had all incoming and outgoing mail inspected and translated. It was not uncommon for prison officials to inspect every piece of incoming and outgoing mail pertaining to a targeted inmate. Gotti and Felipe are additional examples of inmates who received this sort of treatment.

39. Given facts underlying Mr. Johnson's convictions, including the use of telephones to commit crimes, intensive monitoring of and restrictions on his communications, whether they be in person or by telephone or mail, were clearly available to the BOP in 1997 (and are today) – no matter where his placement.

40. Notably, it is my knowledge and understanding that during the term of his federal incarceration (more than 13 years at this point) the BOP has not deemed it necessary or appropriate to house Darryl Johnson under the strict conditions of confinement available to it as described above (e.g., intensive restriction and/or supervision of communications by mail, phone, or in-person visitation; or segregation from staff and other inmates) whether based on any perceived "future dangerousness" or otherwise. In addition, the information available to me clearly suggests that Mr. Johnson has been housed by the BOP under conditions that have, in

19

fact, negated any potential "future dangerousness," and he has demonstrated that he is a well-adjusted inmate, as evidenced, for example, by the affidavit of BOP Case Manager B. English previously submitted to the Court in this case which states, "I consider [Darryl] Johnson to be a well-adjusted inmate without any out of the ordinary management concerns. ... Overall, Johnson is a quiet and civil individual." (BOP Case Manager B. English Affidavit 8/25/08).

       Further affiant sayeth naught.

Mark A. Bezy

Subscribed and sworn to
before me this _14_ day
of December, 2009.

Notary Public

OFFICIAL SEAL
TERESA SEVERSON
NOTARY PUBLIC · State of Arizona
MARICOPA COUNTY
My Comm. Expires Oct. 2, 2011

20