IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff – Appellee – Respondent, | ) | |
| | ) | No. 02 C 6998 |
| vs. | ) | |
| | ) | Hon. William J. Hibbler |
| DARRYL JOHNSON | ) | |
| | ) | Death Sentence Imposed |
| Defendant – Appellant – Petitioner. | ) | |

**DARRYL JOHNSON'S MOTION FOR CONSIDERATION OF HIS**
***BRADY v. MARYLAND* AND *JOHNSON v. MISSISSIPPI* CLAIMS**
**and**
**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT**

Defendant Darryl Johnson, by his attorneys, Terence H. Campbell of Cotsirilos, Tighe &

Streicker, and Lorinda Meier Youngcourt, moves the Court for consideration of his *Brady v.*

*Maryland*[1] and *Johnson v. Mississippi*[2] claims. In support thereof, Mr. Johnson presents the

following supplemental memorandum of law.

**I.      Motion requesting the court to reconsider the *Brady* and *Johnson* claims.**

In its Memorandum Opinion and Order (Doc 71 filed 5/15/2009) ruling on Mr. Johnson's

renewed and amended motion for discovery, the Court stated that the reason it was denying the

discovery request with respect to Mr. Johnson's *Brady* claims was because "he has not formally

moved the Court to reconsider the decision regarding the *Brady* claim and that claim is not

---

[1] This argument was originally set out at pages 47-53 of his §2255 motion timely filed on
September 30, 2002.

[2] This claim was originally set out at pages 54-56 of his §2255 motion.

1

currently pending." Op. at 2. Pursuant to the Court's Order. Mr. Johnson formally requests that the Court reopen and reconsider the *Brady* claim.

Both the legal and factual landscape of this case have changed markedly since Judge Conlon issued her March 11, 2003 Memorandum Opinion and Order denying Mr. Johnson's *Brady* claim, stating

> The materiality standard under *Brady* is the same as the prejudice standard for an ineffective assistance of counsel claim under *Strickland*. *See Id.* at 694 (the standard of materiality applicable to withheld impeachment evidence was adapted from the formulation of prejudice in *Strickland v. Washington*, 466 U.S. 688, 694 (1984). For the same reasons Johnson failed to establish prejudice for his ineffective assistance of counsel claim, he fails to establish materiality for his *Brady* claim.

Op. at 13-14 (Doc 20).

The legal landscape changed when the United States Supreme Court issued its opinion in *Massaro v. U.S.*, 538 U.S. 500, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), holding that a federal criminal defendant may properly bring an ineffective assistance claim for the first time in a §2255 motion. "In most cases a motion brought under §2255 is preferable to direct appeal for deciding claims of ineffective-assistance" because "[w]ithout additional factual development . . . an appellate court may not be able to ascertain whether the alleged error was prejudicial." *Id.* at 504-505, 123 S.Ct. at 1694, 155 L.Ed.2d at 720-721.

Since the reopening of the ineffective-assistance claims, Mr. Johnson has established new facts regarding information that was in the possession of the government at the time of his trial -- information the government did not disclose to the defense, and information which would have significantly impeached, if not outright refuted, Warden Vanyur's testimony. *See, e.g.,* Supplemental Brief in Support on Ineffective Assistance Claim (filed 12/17/2009). As this Court remarked in its May 15, 2009 ruling on discovery:

> The affidavit of the BOP Warden [Mark A. Bezy] provides a factual foundation for Johnson's claim that the government expert's testimony misled the jury regarding the BOP's ability to confine him immediately and indefinitely while at the same time minimizing the risk that Johnson would continue to be a danger to society. Moreover, the government has produced some information regarding other inmates held in strict conditions of confinement, also which seems to contradict the testimony of the government's expert and which could lend credibility to the testimony Johnson's expert might provide.

Op. at 7 (Doc 71). These new facts warrant reconsideration of the *Brady* claim because they substantially undermine the two arguments that the March 2003 opinion relied upon in denying the claim: (1) that the government did not suppress evidence, and (2) that the evidence was not material.

Mr. Johnson has demonstrated that the government *was* in possession of significant impeachment evidence that it failed to turn over to the defense. This includes the information which the government has belatedly disclosed regarding other inmates held in strict conditions of confinement, as well as all the extensive information contained in Warden Bezy's two affidavits regarding the policies and procedures in place at the time of Mr. Johnson's trial that were routinely used to neutralize the risk of future dangerousness posed by certain inmates, and a large and growing number of inmates who were, at the time of Mr. Johnson's trial, being held under those conditions. EX C and EX D. It is indisputable that the government failed to disclose this information to trial counsel. Additionally, as this Court recognized, this information would have constituted relevant impeachment evidence with respect to Warden Vanyur's testimony. As such, it was material to a central issue in the case – namely, the "future dangerousness" aggravating factor, and more specifically, the credibility of Warden Vanyur's testimony regarding the BOP's inability to impose strict conditions of confinement as long as was necessary to alleviate a risk of future danger posed by an inmate.

The government would not be unduly prejudiced by Mr. Johnson's request to reopen the *Brady* claim. As this Court acknowledged in its May 15, 2009 order on the discovery motion, the IAC claim and the Brady claim are "intertwined," Op. at 2, and in light of the significant factual overlap with respect to these claims, reopening the *Brady* claim would not burden the government's ability to litigate its interests in this §2255 proceeding. Indeed, the legal analysis with respect to the materiality of the *Brady* claim is essentially identical to the prejudice analysis of the ineffective assistance of counsel claim. *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985) (opinion of Blackmun, J.) (the standard of materiality applicable to withheld impeachment evidence was adapted from the formulation of "prejudice" in *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Given the significant similarity in both the underlying facts and the applicable legal test dispositive of these two claims, Petitioner respectfully requests that the Court reopen and reconsider the *Brady* claim.

For the same reasons as those articulated above, we also respectfully request that the Court reopen and reconsider Johnson's claim under *Johnson v. Mississippi*, 486 U.S. 578 (1988). *See* Initial Memorandum in Support of §2255 Motion, 54-56 (Doc 4, filed 9/30/02). As with the IAC and *Brady* claims, this issue relies on the same operative facts regarding Warden Vanyur's false and misleading testimony. Moreover, resolution of this claim will necessarily rely on similar legal analysis to that involved in determining *Strickland* prejudice – namely, whether there is a reasonable probability that the incorrect and misleading testimony provided by Warden Vanyur affected the outcome of the sentencing proceedings.

Finally, it should be noted that despite the March 2003 ruling on the *Brady* and *Johnson* claims, a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure was never entered in Mr. Johnson's case. In other words, the judgment technically need not be "reopened"

because it was never final to begin with. This Court has maintained jurisdiction over all the claims in this proceeding since inception, and it maintains the inherent authority to reconsider any and all rulings in this matter until a final judgment is entered. *See Ruehman v. Village of Palos Park*, 842 F. Supp. 1043, 1062-63 (N.D. Ill. 1994); Rule 54(b), Federal Rules of Civil Procedure ("any order or other decision, however designated, that adjudicates fewer than all the claims or rights and liabilities . . . does not end the action as to any of the claims . . . and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

**II.    The Government Violated *Brady* by failing to turn over evidence concerning inmates housed under special conditions of confinement**

### A.    Applicable Law

Due process requires that the prosecution disclose any evidence favorable to the accused where the evidence is "material either to guilt *or to punishment"*. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215, 218 (1963) (emphasis added).    The *Brady* disclosure requirement extends to evidence that impeaches the credibility of prosecution witnesses. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

In short, a defendant is entitled to relief under *Brady* when he establishes that "1) the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and 3) that the evidence was material to an issue at trial." *United States v. Earnest*, 129 F.3d 906, 910 (7th Cir. 1997).

### B.    Mr. Johnson was established the government violated *Brady v. Maryland*

The government, whether through its prosecutors or the Department of Justice, suppressed evidence. The record clearly shows that at the time of Mr. Johnson's penalty phase

trial, a number of inmates were housed by the BOP under conditions that virtually eliminated any contact with other inmates, prison staff, and particularly the outside world.

In the mid-1980's through the mid-1990's, USP-Marion had what it termed the "K-Unit" where inmates who posed a high security risk were housed under extremely strict conditions of confinement. They were single celled, recreated alone, and had no contact with other inmates. EX D at 13.

Eight months prior to Mr. Johnson's sentencing hearing, the defendant in *United States v. Luis Felipe*, (Case No. S16-94CR395 (S.D.N.Y.)) was sentenced in a conspiracy case involving murders and drug trafficking similar to that alleged in Mr. Johnson's case. At the sentencing hearing, the district court noted that based on the record developed at trial, it found that there was a great danger that the defendant might attempt to order additional murders of others unless necessary conditions of confinement were imposed to limit his contact and communication with other individuals. For that reason, the district court issued a special direction to the BOP that the defendant be confined so that:(1) he could not have any contact with other prisoners; (2) he could only correspond with and have visits from family members that were approved by the district court; (3) any and all correspondence and visits, other than with counsel, were to be monitored and copies of each piece of correspondence were to be sent to the United States Attorney's Office for the Southern District of New York; and (4) the defendant was not permitted to have telephone contact with anyone. Luis Felipe was sent directly to ADX by the sentencing court and housed in a side pocket cell in total isolation from other inmates. EX D at 12.

In *United States v. Anthony Jones*, (Case Nos. WMN-96-0458 and WMN-97-0355 (D. Md.)), the district court, pursuant to 18 U.S.C. § 3582(d), imposed special conditions of confinement on the defendant at his sentencing. These conditions included: (1) no contact with

6

other inmates; (2) no telephone privileges other than with counsel, and only at times and under conditions to be set by the BOP; (3) no visiting privileges other than legal visits with counsel, and supervised visits with his mother to the extent approved by the BOP, and only at times and under conditions to be set by the BOP; (4) all ingoing and ongoing mail is to be reviewed by the BOP.

In *United States v. Peter Rollack*, (Case No. 97CR1293 (S.D.N.Y.)), the court entered a sentencing order pursuant to a plea agreement that included the following conditions of confinement: (1) no communication with any co-defendants or any member of the racketeering enterprise (i.e., gang) charged in the indictment; (2) outside of counsel, no correspondence or visits with anyone other than family members and significant others approved by the court and the BOP, and that any such correspondence and visits will be subject to monitoring; (3) the prosecution will be given notice of any family members or significant others the defendant seeks to place on his visiting list and will have the right to file objections with the court as to those visitors being approved. Rollack was also sent directly to a "special housing unit" (i.e., a control unit) from his sentencing for a minimum of 18 months, after which his housing designation could be reviewed by BOP.

In *United States v. Ramzi Yousef*, (Case No. S12-93 CR 180 (S.D.N.Y.)), the district court stated that there was an identifiable risk that the defendant might try to order additional acts of violence from prison, and therefore imposed special conditions of confinement to neutralize that risk. Those conditions included: (1) that the defendant be incarcerated in an administrative detention facility (i.e., control unit); and (2) outside of counsel, the defendant was only allowed to visit with family members that could positively proof they were related to the defendant.

For more than 20 years, Thomas Silverstein was incarcerated at USP-Leavenworth in solitary confinement under a "no human contact" order. EX D at 15. He was housed in a cell underground, where his cell lights were kept on 24 hours of the day, and was constantly monitored by correctional officers. In 2005, when USP-Leavenworth was downgraded to a medium-security facility, Silverstein was transferred to ADX Florence, where he continues to be housed – indefinitely -- under the strictest conditions of confinement in an area of the facility known as "Range 13." *See* Deposition of John Vanyur, *Silverstein v. Federal Bureau of Prisons*, Case No. 07-CV-2471 (D.Colo. February 27, 2009) at 58 (Attached as Exhibit A). Indeed, even Warden Vanyur admits that Silverstein, one of the most notorious inmates in the federal prison system, has had a clean conduct record due to controls placed on him by the BOP. *Id.* at 57-58.

In addition to the aforementioned individuals, there are other BOP inmates who have been incarcerated under strict conditions of confinement for indefinite periods of time, in excess of 12 to 15 years, including Clayton Fountain, Barry Mills, Norman Matthews, Adolph Reynoso, and T.D. Bingham. Contrary to Warden Vanyur's testimony, it is not only legal for the BOP to impose such conditions on inmates indefinitely, it is – and was at the time of Johnson's trial -- a well-established practice. Notably, these conditions – such as no telephone use and severely limited visitation and correspondence privileges – are precisely the measures which Warden Vanyur testified would be illegal and unavailable to the BOP in the imposition of Mr. Johnson's sentence.

The conditions of confinement created for Aryan Brotherhood inmate David Sahakian were available at the time of Mr. Johnson's trial. During his pre-trial detention, Sahakian was held in the USP-Marion I-Up Unit where he was separated from the rest of the prison population and continuously monitored by an officer. EX D at 13-14.

8

Whether it come as an order of the sentencing court or is constructed by the BOP under Special Administrative Measures ("SAM's"), federal inmates were being held at the time of Mr. Johnson's trial and continue to be held today under conditions which either severely or totally restrict their communication with other inmates and the outside world. EX D.

As set out in the March 2003 Order and Opinion, the government has never contested that evidence relating to BOP practices was favorable to the defense. Op. at 13.

The materiality standard under *Brady* is the same as the prejudice standard for an ineffective assistance of counsel claim under *Strickland*. *See United States. v. Bagley*, 473 U.S. 667, 693(1984) (Evidence is material under *Brady* if there is a reasonable probability that the result of the proceedings would have different had the evidence been disclosed).

While there were a number of aggravating and mitigating circumstances raised by the parties, the most powerful penalty phase evidence was devoted to Mr. Johnson's potential for future dangerousness and whether a sentence less than death could prevent that potential danger. In the government's opening statement to the penalty phase, the prosecutor argued to the jury that Mr. Johnson had to be executed in order to keep others safe:

> You will hear that simply by uttering the words, the defendant will have ended the lives of three people. You've already heard how he can order brutal beatings, in addition to these murders, simply by saying so. Tr. 1772.

> [T]hese threats and orders did not stop once the defendant was jailed on this charge. Tr. 1774.

> Richie Wash told [Delano Finch] that the [Mr. Johnson] wants you to find someone to knock off somebody in Roger Stewart's family so that they know that we're serious, and he wants to you have somebody knock off Lance Cleaton because he saw who killed Blunt and he saw who killed Jello. Tr. 1775.

> That, ladies and gentlemen, will be the evidence regarding the defendant's future dangerousness. Tr. 1776.

9

During the defense penalty case, Mr. Johnson presented the testimony of Dr. Mark Cunningham to testify that Mr. Johnson could be housed by the BOP in such a manner as to virtually eliminate the potential for future acts of violence. Tr. 2248-2332. Anticipating this evidence, the government had Warden Vanyur present in the courtroom to hear Dr. Cunningham's testimony. *E.g.*, Tr 2467, 2468, 2475, 2482. The next day, Vanyur testified as an expert rebuttal witness for the prosecution. Tr. 2462-2509. As set out in detail in Johnson's Reply in Support of his His §2255 Motion (Doc 19, filed 3/6/2003), Vanyur testified: that the BOP could not hold any prisoner indefinitely without telephone and correspondence privileges, Tr. 2482-83; that even inmates at ADX Florence had " a lot of contact with inmates", "frequent and constant contact with staff unrestrained", TR 2489-90, and "one fifteen-minute phone call per month" as well as "five visits per month" and "virtually unlimited correspondence with the outside world" Tr. 2485; that even the most dangerous inmate would eventually end up in general population with "in excess of twelve visits a month", "as many phone calls as he could pay for or get someone to accept as collect charges", and "unlimited correspondence privileges", Tr, 2472, 2477.

In its closing, the government painted a terrifying future in the event the jurors returned a verdict for anything other than the death penalty.

> [L]adies and gentlemen, as long as the defendant has the ability to convey his orders to his followers, either on the street or in prison with him, nobody is safe; no witness, no witness's family, anybody who stands in his way, they are not safe. It doesn't matter where he is locked up.
> \* \* \*
> [I]nmates with no out-dates, those inmates that are facing life, like the defendant, they are the most dangerous, they have nothing to lose. And that's why people like Mr. Johnson poses {sic} this threat. Tr. 2593
>
> Now, couple that with his background that you've heard about of all the other orders he gave, he truly poses a future dangerousness. . . . There is no way to completely shut somebody off in the prison with communicating with somebody

10

on the outside. And as you heard, there is very ingenious ways that they even communicate among one another in prison. That is why Mr. Johnson, no matter where he is, no matter when he is, is a future danger, he poses it to society as a whole, because through his own actions, his own words, and use your common sense, that no one is safe from the defendant. Tr. 2594.

[A]fter he is locked up when we as a society should feel safe, he is out there ordering more people killed. That is the type of evidence that is here. And that is why no one is safe as long as the defendant, Darryl Lamont Johnson, is allowed to live. Tr. 2598.

In its rebuttal closing argument, the government continued to bang the drum and openly stated that in order to insure everyone's safety, Mr. Johnson had to be executed.

[T]he federal regulations do not allow somebody to go directly to the control unit. That's what they're describing. That's what those pictures were. The control unit at ADX Florence, you know he will not be going there. Tr. 2646.

And is there any system, any prison system under the laws of our Nation that can stop the violence when your weapon is only one thing, your voice? That is the weapon that the defendant uses. Tr. 2647.

The evidence in this case shows beyond any reasonable doubt that there is a substantial danger that another witness or a witness's family member will be dead, because the defendant is a danger in prison. As long as he is alive he cannot be stopped from communicating, and that is all he needs. He does not need a weapon . . . all he needs is a telephone.

\* \* \*

[T]here is no innocent bystander who is safe as long as the defendant can communicate with the outside world. No prison system can stop him. Tr. 2647-48.

Given all this focus on future dangerousness by the Government, it is clear they knew the evidence regarding supposed "future dangerousness" was the key to winning a death verdict. As amply demonstrated by the special findings at the conclusion of the sentencing phase, the jury found the government's future dangerousness arguments – based on the now discredited testimony of Warden Vanyur -- to be extremely persuasive. On each count the jury unanimously found, beyond a reasonable doubt, that Mr. Johnson "would commit serious acts of violence in the future which would be a continuing and serious threat to society." Conversely, not a single

11

juror found that that Mr. Johnson "will not be a serious and continuing danger to society because the government has the power to imprison him for the rest of his life in a maximum security federal prison designed to control and monitor his behavior." Thus, it is abundantly clear that the jury rejected the testimony of Dr. Cunningham, and fully credited the testimony of Warden Vanyur on the issue of the BOP's ability to impose strict conditions of confinement on "dangerous" inmates.

Numerous social science and empirical studies of juror attitudes in capital cases highlight the importance future dangerousness plays in a jury's deliberations and return of a death sentence. *See*, *e.g.*, John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always At Issue*, 86 CORNELL L. REV. 397, 398 (2001) (noting that future dangerousness is on the minds of most jurors in most cases and this is true regardless of whether the prosecutor argues future dangerousness explicitly). Indeed, the more likely that jurors believe that the defendant will be a future danger, the more likely the jury is to impose a death sentence. *See*, *e.g.*, Eisenberg & Wells, Deadly *Confusion: Juror Instructions in Capital Cases*, 79 CORNELL L. REV. 1, 7 (1992). ("[O]ver three-quarters of the jurors believe that the evidence in their case established that the defendant would be dangerous in the future. And the more the jurors agree on this fact, the more likely they are to impose a death sentence."); Constanzo & Constanzo, *Life or Death Decision: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework*, 18 LAW & HUM. BEHAV. 151, 160 (1992) ("[N]early all [Oregon] jurors also offered the observation that the penalty decision hinged on the issue of whether the defendant will pose a continuing threat to society."); *id.* at 168 ("[F]uture dangerousness plays a prominent, if not central role. . . . Jurors clearly perceived the penalty as hinging on this issue."); John Blume, Theodore Eisenberg, Stephen P. Garvey, *Lessons from the*

*Capital Jury Project*, in BEYOND REPAIR? AMERICA'S DEATH PENALTY 144 (2003) (32% of jurors believed that the law required them to impose the death penalty if they believed the defendant would be dangerous in the future); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do jurors think?* 98 COLUM. L. REV. 1538, 1542 (1998) (many jurors wrongly think they must return a death sentence if they find the defendant is especially likely to present a risk of future danger); *id.* at 1559 (noting that future dangerousness evidence is highly aggravating and that 60% of jurors interviewed were more likely to vote for death if they believed that the defendant might be dangerous in the future); Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *Jury Responsibility in Capital Sentencing: An Empirical Study*, 44 BUFF. L. REV. 339, 360 (1996). ("Nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness, a result replicated in the multi-state study of the interview data.").

As stated by this Court in its March 2003 opinion, had Mr. Johnson's trial counsel presented evidence that, in direct contradiction to Warden Vanyur's testimony, other BOP inmates were, in fact, being subject to severe restrictions on communication and contact "the jury might not have rejected Johnson's proposed finding on future dangerousness." Op. at 3. In fact, it would have taken only one juror to find that a death sentence was not the only way to keep everyone safe from Mr. Johnson, and vote for a life sentence. *See United States v. Johnson*, 223 F.3d 666, 670 (7th Cir. 2000) (the threshold for establishing a reasonable probability that the jury would not return a death verdict is lower because "it takes only one juror to nix a death sentence.").

**C. Mr. Johnson was also denied a fair trial when the government presented misleading, inaccurate and prejudicial testimony which was not corrected**

Darryl Johnson was denied due process because the government presented misleading, inaccurate and prejudicial testimony at his capital sentencing hearing. As set out above, the government presented evidence through its expert witness Warden John Vanyur on the issue of "future dangerousness" that created the false impression that no legal authority existed to allow the Bureau of Prisons ("BOP") to limit Mr. Johnson's communications and contacts while in prison in order to curtail his alleged future dangerousness. The government then relied on this evidence throughout its closing argument to convince the jury that unless it sentenced Mr. Johnson to death, "no one is safe," (Tr. 2598), because, argued the government, as long as Mr. Johnson had access to a telephone, correspondence, or visitors while in prison, he would be able to order others to commit acts of violence "simply by uttering the words." Tr. 1772.

However, after the Seventh Circuit Court of Appeals affirmed Mr. Johnson's convictions and death sentences, the government conceded that Warden Vanyur's testimony was "incomplete" and that based on the evidence it heard during the sentencing proceedings, "the jury may have held the mistaken impression that no legal authority existed to limit [defendant's] communications and contacts while in prison in order to curtail his future dangerousness." Gov't. Opp. to Cert. at 21 (attached as Exhibit A to Johnson's Initial Memorandum in support of his §2255 Motion). As explained in more detail below, there is no question that the government presented materially inaccurate testimony that created a false impression on the most critical issue in the jury's sentencing deliberation – namely, whether the only way to prevent Mr. Johnson from committing future violence was to execute him. In light of these facts, Mr. Johnson is entitled to a new sentencing hearing.

**1.  Warden Vanyur's Testimony was Substantially Misleading and Created a False Impression Regarding BOP's Ability to Limit Mr. Johnson's Communications and Contacts While Incarcerated**

There is no question that Warden Vanyur's testimony regarding BOP's ability to limit Mr. Johnson's communications and contacts while in prison was substantially misleading and created a false impression.  Contrary to the testimony elicited by the government, the BOP has both the legal ability and prison facilities to house inmates under strict conditions of confinement *for as long as necessary* in order to protect against any reasonable possibility of "future danger." Indeed, even the government has now conceded this point.

In its opposition to Mr. Johnson's Petition for a Writ of Certiorari to the Supreme Court, the government admitted that Warden Vanyur's testimony was "incomplete" with respect to the authority of the BOP to house inmates under strict conditions of confinement, Gov't. Opp. to Cert. at 20, and "that § 3582(d) and the SAMs regulation were relevant, and that without them, 'the jury may have held the mistaken impression that no legal authority existed to limit [defendant's] communications and contacts while in prison in order to curtail his future dangerousness.'"  Gov't. Resp. to § 2255 Motion at 21.  *See also* Govt. Opp. to Cert. at 21 ("As we have acknowledged, there is in fact such authority [to limit petitioner's communications and contacts while in prison in order to curtail his future dangerousness].");  *id.* at 14 ("the jury may have held the mistaken impression that no such legal authority existed.");  *id.* at 28-29 (the prosecutor's closing argument "could have left the impression that, absent the death penalty, there was no legal authority to limit the defendant's communications.").  As set forth in various of Petitioner's pleadings, Warden Vanyur's testimony was substantially misleading in a number of material respects and undoubtedly created a false impression for the jury about the BOP's

15

ability to effectively neutralize any risk of "future dangerousness" posed by Mr. Johnson while incarcerated.

To the extent the government is tempted to argue that Warden Vanyur's testimony was merely "incomplete" and therefore "technically true," such an argument is unavailing. As one circuit court has explained, the government's duty to correct false testimony is not limited to situations where a witness commits perjury, but extends to testimony that is "substantially misleading:"

> We do not believe, however, that the prosecution's duty to disclose false testimony by one of its witnesses is to be narrowly and technically limited to those situations where the prosecutor knows that the witness is guilty of the crime of perjury. Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is *substantially misleading.* This is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness' responses on cross examination. However, when it should be obvious to the government that the witness' answer, although made in good faith, is untrue, the government's obligation to correct that statement is as compelling as it is in a situation when the government knows that the witness is intentionally committing perjury.

*United States v. Harris*, 498 F.2d 1164, 1169 n.14 (3d Cir. 1974). Indeed, there is a long line of Supreme Court cases that deal with due process violations centered on testimony that creates false impressions or that is misleading. *See*, *e.g*., *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Miller v. Pate*, 386 U.S. 1 (1967) (due process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact); *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) (*Napue* doctrine applies to "misleading evidence important to the prosecution's case in chief" as well as to evidence that is simply false); *Alcorta*

*v. Texas*, 355 U.S. 28, 31 (1957) (finding a due process violation where witness testimony "taken as a whole" gave a "false impression").

Similarly, there is a long line of circuit precedent that establishes that the government violates due process when it presents material testimony which is either misleading or creates a false impression. *See Drake v. Portuondo*, 553 F.3d 230, 243 (2d Cir. 2009) (*Napue* violation found where prosecution's question elicited "literal accuracy while conveying [a] false impression" about witness's qualifications); *Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) (finding *Napue* violation where prosecution elicited "technically accurate testimony" that was "probably true but surely misleading" and the jury was left with "mistaken impression"); *United States v. Sutton*, 542 F.2d 1239, 1243 (4th Cir. 1976) (*Napue* violation found where prosecution "allowed a false impression to be created at trial when the truth would have directly impugned the veracity of its key witness."); *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967) ("Evidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true."); *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979) ("under the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications."); *United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978) ("The long-settled rule has been that the knowing use by the prosecution of false evidence or perjured testimony which is material to the issues in a criminal trial is a denial of due process. A conviction obtained by the use of such evidence cannot be permitted to stand. The same rule applies if the prosecution, although not actively soliciting false evidence, passively but knowingly allows it to go uncorrected or allows the jury to be presented with a materially false impression.") (internal citations omitted); *United States v.*

17

*Boyd*, 55 F.3d 239, 243 (7th Cir. 1995) (due process violation does not require finding that witness committed perjury; "It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false."); *United States v. Iverson*, 637 F.2d 799, 805 n.19 (D.C. Cir. 1980) ("[I]t makes no difference whether the testimony is technically perjurious or merely misleading."). *See also Blanton v. Blackburn,* 494 F.Supp. 895, 899 (M.D. La. 1980), *aff'd* 654 F.2d 719 (5th Cir. 1981) ("The fact that the answer given [by the witness] may have been technically correct is not sufficient where the answer is incomplete.").

Warden Vanyur's testimony regarding the BOP's ability to impose strict conditions of confinement to neutralize the alleged risk of "future danger" posed by Mr. Johnson was substantially misleading and presented a false impression to the jury. Not only did the BOP's own regulations and sections of the United States Code authorize the BOP to impose the very kinds of strict conditions of confinement that Warden Vanyur testified were illegal and unavailable, the BOP routinely imposed such conditions on inmates at the time of Mr. Johnson's sentencing hearing. Moreover, a former warden and 28-year BOP veteran, Mark A. Bezy, has reviewed Warden Vanyur's testimony on this matter and detailed the manner in which that testimony was substantially misleading and false with respect to BOP practices and procedures. Taken together, this information clearly establishes that Warden Vanyur's testimony was false within the meaning of *Napue* and its progeny.

### 2. Both the BOP's own regulations and the U.S. Code permitted the BOP to implement strict conditions of confinement.

The government's admission in its Brief in Opposition to Certiorari identifies two sources of authority that existed at the time of Mr. Johnson's sentencing hearing that expressly would have allowed the BOP to implement and administer exactly the kinds of strict conditions of confinement which Warden Vanyur told the jury were impermissible under BOP policy,

18

impossible to maintain for any extended time, and illegal under the law: (1) the Special Administrative Measures ("SAMs") regulation, codified at 28 C.F.R. §501.3, and (2) 18 U.S.C. §3582(d). A plain reading of these two provisions plainly contradicts Warden Vanyur's testimony to the jury about the BOP's ability to neutralize the threat posed by an inmate misusing phone and correspondence privileges to commit future acts of violence.

The SAMs regulation provides in pertinent part:

(a) Upon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury. *These procedures may be implemented upon written notification* to the Director, Bureau of Prisons, by the Attorney General or, at the Attorney General's direction, by the head of a federal law enforcement agency, or the head of a member agency of the United States intelligence community, *that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons*, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. *These special administrative measures ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism.*

28 C.F.R. § 501.3 (emphasis added). As the above provision makes clear, BOP Warden Vanyur's testimony to the jury that the BOP lacked the authority to prospectively limit an inmate's telephone, visiting and correspondence privileges was false and misleading. The same is true of Warden Vanyur's testimony that the BOP could only limit those privileges if it caught an inmate misusing those lines of communication. The SAMs regulation explicitly provides that the BOP is authorized to implement any procedures that are "reasonably necessary to protect persons against the risk of acts of violence," including "limiting certain privileges" such as "correspondence, visiting, … and use of the telephones," and that the implementation of such

19

procedures is not contingent on the inmate getting caught misusing these privileges. Rather, such "procedures may be implemented upon written notification" to the BOP by the Justice Department or any other federal law enforcement agency "that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons."

Contrary to Warden Vanyur's testimony that the BOP could do nothing to limit an inmate's use of the phones or other correspondence or visiting privileges until after an inmate had already committed an improper act, the BOP's regulations, not surprisingly, do not require it to sit idly by until that time. If the jury had been properly informed about the BOP's regulations, it would have learned that, in fact, the BOP was authorized to use any and all "reasonably necessary" measures to curtail Mr. Johnson's "communications or contacts with persons could [that] result in death or serious bodily injury to persons," and that these measures could be implemented immediately, upon written notification by the appropriate governmental authorities. In other words, under 28 C.F.R. § 501.3, the BOP was authorized to do exactly what Warden Vanyur testified it could not do: eliminate the risk of acts of violence by prospectively limiting Mr. Johnson's ability to communicate with others, whenever and for as long as deemed necessary.

Warden Vanyur's testimony was particularly pernicious because in the course of his testimony, he specifically referenced the Code of Federal Regulations for the purpose of arguing that these regulations *constrained* the BOP's ability to implement strict conditions of confinement prospectively. Specifically, Warden Vanyur cited to 28 C.F.R. § 541 in his testimony that this regulation prohibits the BOP from prospectively assigning an inmate to a control unit based on dangerous behavior the inmate exhibited prior to being incarcerated. See

Tr. 2484-85 ("28 CFR Section 541 is very clear that inmates cannot be placed in a control unit solely on the basis of the offenses they committed in the community.")  However, as noted in section 541.41(b)(2), a defendant may be placed in a control unit if he "expressed threats to the life or well-being of other persons," regardless of whether such threats occurred prior to his imprisonment.  Moreover, the BOP itself recognizes that under Section 541,

> This placement is ordinarily recommended only for an inmate already in a federal institution; *however, there may be occasion where an inmate recommended for federal custody requires placement in a control unit.*  In *Bono v. Saxbe*, 620 F.2d 609, at 611 (7th Cir. 1980), the United States Court of Appeals opinion recognized that "Prisoners may be placed in the Marion Control Unit *directly from the federal courts,* from the general population at Marion or from other federal and state prisons."

49 Fed. Reg. 32990 (1984) (emphasis added).  In other words, Warden Vanyur's testimony that the BOP was prohibited from directly assigning Mr. Johnson to a control unit as a means to neutralize the possibility of "future dangerousness" was contrary to what the law actually states on this matter, and undoubtedly created a false impression for the jury in this regard.

The source of authority mentioned in the government's admission is 18 U.S.C. § 3582(d), which authorizes a district court to impose strict conditions of confinement as part of a defendant's sentence.  It provides, in pertinent part:

> The court, in imposing a sentence to a term of imprisonment upon a defendant convicted of a felony set forth in chapter 95 (racketeering) or 96 (racketeer influenced and corrupt organizations) of this title or in the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 801 et seq.), or at any time thereafter *upon motion by the Director of the Bureau of Prisons or a United States attorney, may include as a part of the sentence an order that requires that the defendant not associate or communicate with a specified person, other than his attorney, upon a showing of probable cause to believe that association or communication with such person is for the purpose of enabling the defendant to control, manage, direct, finance, or otherwise participate in an illegal enterprise.*

21

18 U.S.C. §3582(d) (emphasis added). As this provision makes clear, both the BOP and a United States Attorney's Office are authorized to request that the sentencing court impose strict conditions of confinement prospectively to limit an inmate's ability to communicate with others. The government's elicitation of testimony from Warden Vanyur that suggested otherwise was thus grossly misleading and unmistakably created a false impression for the jury about the BOP's authority to limit Mr. Johnson's communications while incarcerated.

> **3.** **The BOP had a practice of imposing precisely the kind of strict conditions of confinement that Warden Vanyur testifies were not available or otherwise allowed.**

As has now been extensively documented in Mr. Johnson's Initial Memorandum in support of his § 2255 Motion ("Init. Memo."), and in his Initial Reply in support of his § 2255 Motion ("Init. Rep."), and in the two Affidavits of former BOP Warden Mark Bezy, the BOP routinely imposes strict conditions of confinement on inmates for as long as it deems necessary – and did so at the time of Petitioner's penalty-phase hearing. Moreover, these measures have been implemented pursuant to BOP regulations and statutory law that were in existence and operative at the time of Mr. Johnson's sentencing hearing. See Init. Memo. at 17-20, 49; Init. Rep. at 21-23. See section II(b)(i) above, and the two Bezy Affidavits (Exs. C and D, hereto) for a recitation of individuals held under strict conditions of confinement at the time of Mr. Johnson's trial.

> **4.** **The Government Knew of Should Have Known that Warden Vanyur's Testimony was Misleading and Created a False Impression, But Failed to Correct the Testimony.**

In *United States v. Augurs*, 427 U.S. 97, 103 (1976), the Supreme Court held that in cases where the government "knew *or should have known*" of false testimony, a conviction obtained with such testimony is "fundamentally unfair, and must be set aside if there is any reasonable

likelihood that the false testimony could have affected the judgment of the jury." *Id*. at 103 (emphasis added, footnotes omitted). *See also United States v. Kaufmann*, 803 F.2d 289, 291 (7th Cir. 1986) (adopting "knew or should have known" standard). That standard is easily met here.

First, the government has already conceded that the SAMs procedures and 18 U.S.C. § 3582(d) were relevant to Mr. Johnson's sentencing hearing. The government's acknowledgment of these regulatory and statutory provisions demonstrates that the government knew or should have known Warden Vanyur's testimony regarding the BOP's inability to impose necessary conditions of confinement to limit Mr. Johnson's communications and contacts while incarcerated was misleading and created a false impression for the jury. Indeed, both the SAMs procedures and § 3582(d) articulate the authority the Justice Department has in pursuing special conditions of confinement against inmates. Under 28 C.F.R. § 501.3(a), the Attorney General is authorized to direct the BOP to implement special administrative procedures, including limiting an inmate's phone, visiting and correspondence privileges, against inmates that it believes pose a "substantial risk" of misusing those privileges to seriously injure or kill others. Under § 3582(d), a United States attorney is authorized to move the sentencing court for an order imposing special conditions of confinement, including specifying the only persons with whom the defendant will be allowed to communicate, outside of counsel, if the United States attorney has "probable cause" to believe that the defendant's communications with a particular person is for the purpose of managing, directing or controlling an illegal activity. Indeed, under § 3582(d), even the BOP can file such a motion with the sentencing court. Given that the government is charged with executing these laws and regulations, it is reasonable to assume that the government is aware of them. The government cannot credibly disclaim knowledge of regulations and statutes that

23

authorize it to impose exactly the conditions of confinement which it presented to the jury as unavailable or illegal in Mr. Johnson's case.

Second, Warden Vanyur was presented as an expert witness on BOP policies and procedures with respect to conditions of confinement. Having cited to the Code of Federal Regulations in his own testimony, it strains credulity to believe that Warden Vanyur was not aware of the BOP's regulation codified at 28 C.F.R. § 501.3. This is particularly so given Warden Vanyur's position at ADX, where many of the inmates were (and are) held under SAMs orders pursuant that very regulation. Similarly, one would reasonably expect that Warden Vanyur would similarly be aware of § 3582(d), precisely because it specifically mentions the BOP's authority to file a motion in federal court demonstrating probable cause to impose necessary conditions of confinement to prevent an inmate from manipulating communications privileges to direct or manage illegal activities. Likewise, considering Warden Vanyur's role in making ADX operational – a facility that was, by design, intended to impose the strictest conditions of confinement to neutralize the risk of danger imposed by inmates who are adept at abusing communications privileges – it seems quite unlikely that Warden Vanyur would not know about BOP's regular practice of imposing strict conditions of confinement on dangerous inmates, as detailed by Warden Bezy and as articulated in the specific cases noted above.

Indeed, just prior to testifying at Mr. Johnson's sentencing hearing, Warden Vanyur was called as an expert BOP witness at the capital sentencing hearing in *United States v. Dean Anthony Beckford*, No. 3:96CR66 (E.D. Va.) on July 21, 1997. At that hearing, Warden Vanyur gave testimony under cross-examination that was at odds with his testimony in Mr. Johnson's case. For example, Warden Vanyur conceded at the Beckford trial that an individual who has been identified as posing a danger can be sent to the control unit at ADX immediately:

24

Q:     So you don't mean to tell this jury that someone cannot be committed there [the "Florence ultra security section"] immediately if the United States is of the opinion they are that dangerous.

A:     That's correct.

EX B at 19.

Q:     Is there any rule that prohibits a new inmate who has been classified as dangerous from being sent to Ad-Max in Florence?

A:     No, but that's not the Bureau's goal in Ad-Max.

Q:     Okay.  This will got (sic) faster if you answer my question.  Is there any rule that says they can't go there?

A:     No.

*Id*. at 31-32.  Warden Vanyur's testimony is directly contrary to the testimony he gave at Mr. Johnson's trial that "under the law, [it is not] even a possibility to place Darryl Johnson directly into that 68-bed control unit [at ADX]."  Tr. 2484.  Given that Warden Vanyur was the government's own expert witness, it knew or should have known that his testimony at Mr. Johnson's trial was substantially misleading, if not outright false, given that he had just testified on the very same topic only months before as a government expert.  The prosecutors in this case were employees of the Department of Justice, and they are imputed with knowledge in the possession of other employees of that same agency.  *See United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) ("The Justice Department's various offices ordinarily should be treated as an entity, the left hand of which is presumed to know what the right hand is doing."); *United States v. Barkett*, 530 F.2d 189 (8th Cir. 1976) ("[O]ne office within a single federal agency must know what another office of the same agency is doing. … This is no more than to hold the Government

25

to the same standard of conduct as governs private individuals in transmitting notice from agent to principal.").

Moreover, any knowledge which Warden Vanyur possessed should be imputed to the prosecution. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case."). Indeed, it is a well-settled principle of law that the government is responsible for the knowledge of a government agent who actually testifies as a witness. *See*, *e.g.*, *Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977); *Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir.), *cert. denied*, 458 U.S. 1109 (1982); *United States v. Rosner*, 516 F.2d 269 (2d Cir. 1975); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973); *Curran v. State of Delaware*, 259 F.2d 707, 712-13 (3d Cir. 1958); *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995); *United States ex rel. Kowal v. Attorney General of Illinois*, 550 F. Supp. 447, 451 (N.D. Ill. 1982); *United States v. Andrews*, 824 F. Supp. 1273, 1289 (N.D. Ill. 1993). *See also United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) ("If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government. This we decline to do.").

Finally, under the law, Mr. Johnson need not demonstrate that the prosecutors who tried his case were personally aware of the falsity of Warden Vanyur's testimony. The Supreme Court has held that the presentation of false evidence against a defendant violates due process even if the falsity was unknown to the prosecutor. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). This is because the underlying purpose of *Napue* and *Giglio* is not to punish prosecutor for the misdeeds of a witness, but rather to ensure that jury is not misled by any falsehoods. *See*, *e.g.*, *United States v. Meinster*, 619 F.2d 1041, 1044 (4th Cir. 1980). Nevertheless, in light of the fact

26

that the basis for determining the falsity of Warden Vanyur's testimony was extant regulatory and statutory law within the purview of the United States Attorney's Office, as well as ongoing practices and procedures within the institutional knowledge of the BOP and the Justice Department, it is clear that the government knew or should have known that Warden Vanyur's testimony was substantially misleading and created a false impression for the jury.

**5.     Warden Vanyur's Testimony was Material and Prejudicial.**

In order to establish materiality under *Napue*, one must demonstrate "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, (1976). That standard is easily met here. The central argument upon which the government relied in arguing to the jury that it should sentence Mr. Johnson to death was his alleged "future dangerousness." It was the centerpiece of the government's argument in closing at the sentencing phase of the trial, and as reflected in the special findings of the jury, it was an argument that the jury found to be exceedingly persuasive. The government's ability to make that argument rested almost exclusively on the testimony it elicited from Warden Vanyur. There is simply no question, therefore, that his misleading testimony was highly material and prejudicial. The arguments set out above in section III(b)(iii) further demonstrates the material and prejudicial nature of Warden Vanyur's testimony.

**III.     Johnson's death sentence violates the 8th Amendment as it is Based upon Materially Incomplete, False and Inaccurate Information**

The Eighth Amendment forbids basing a death sentence on materially false or inaccurate information. The Supreme Court has held that "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a *special need for reliability* in the determination that death is the appropriate punishment in

27

any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) (citations and internal quotations omitted; emphasis added). Accordingly, while there is no "perfect procedure for deciding in which cases governmental authority should be used to impose death," the Court "[has] made it clear that such decisions cannot be predicated [on] factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Id.* (emphasis added).

In *Johnson*, the Court reiterated that one such "constitutionally impermissible" factor is materially false or inaccurate information. *Johnson*, 486 U.S. at 586. In finding the materially inaccurate information required reversal of the death sentence, the Court noted that "the prosecutor repeatedly urged the jury to give [the materially inaccurate information] weight in connection with its assigned task of balancing aggravating and mitigating circumstances 'one against the other.'" *Id.* "Even without that express argument," the Court continued, there would be a possibility that the jury's belief in the inaccurate information "would be 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id.* (citing *Gardner v. Florida*, 430 U.S. 349, 359 (1977).

This recognition of prejudice by the *Johnson* Court reflected a principle established in the law at least since *Townsend v. Burke*, 334 U.S. 736 (1948) (due process requires resentencing where "materially untrue" allegations form part of the basis for the defendant's sentence), and which had been forcefully restated on numerous occasions since *Townsend*. *See*, *e.g.*, *United States v. Tucker*, 404 U.S. 443 (1972). *See also*, *e.g.*, *Roussell v. Jeane*, 842 F.2d 1512, 1524 (5th Cir. 1988), citing *Tucker* (where "the sentencing authority relies on incorrect or unsupported assumptions [and] such reliance is manifest in the record due process requires that the defendant be resentenced"); *Bourgeois v. Whitley*, 784 F.2d 718, 721 (5th Cir. 1986) (due process entitles

defendant to resentencing if court is "unable to find that the invalid [prior] convictions did not influence" the sentence imposed for a subsequent offense, citing *Tucker*).

Due process is violated, even in a non-capital case, where "the sentence rests on a foundation of confusion, misinformation, and ignorance of facts * * *" *United States v. Espinoza*, 481 F.2d 553,556-557 (5th Cir. 1973), quoting *United States v. Malcolm*, 432 F.2d 809, 816 (2nd Cir. 1970). "If justice is to be done, [the sentencer] should know all the material facts," because the "[f]air administration of justice demands that the sentencing judge will not act on surmise, misinformation and suspicion * * *" *Id.* The *Malcolm* court put it succinctly: "[M]aterial false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process." *Malcolm*, 432 F.2d at 816, citing *Townsend v. Burke*.

As Mr. Johnson has demonstrated throughout these proceedings and specifically in this memorandum and in his Supplemental Memorandum In Support of His Ineffective Assistance of Counsel claim (filed 12/17/2009), material portions of the testimony of Government witness Warden John Vanyur were inaccurate, incomplete and/or materially misleading. As set forth above, Warden Vanyur's testimony was the centerpiece of the government's case regarding Mr. Johnson's "future dangerousness" and was forcefully argued to the jury as a primary reason to impose the death penalty. Johnson's death sentence, because it is based in whole or in part on Vanyur's inaccurate, incomplete, materially misleading, and/or fundamentally unreliable testimony, violates the Eighth Amendment.

### VI. Conclusion and Prayer for Relief

For all the reasons set out herein as well as in the previously filed motions and pleadings in support of the claims for relief, Mr. Johnson respectfully requests the Court (1) reconsider his

*Brady v. Maryland* claim and grant relief on the same, ordering his sentence vacated and a new jury penalty trial and (2) reconsider his *Johnson v. Mississippi* claim and grant relief on the same. If the Court has any doubt that Mr. Johnson has met his burden in proving any of the claims set out herein, Mr. Johnson respectfully requests an evidentiary hearing be held on the issues. 28 U.S.C. §2255; *Massaro v. United States*, 538 U.S. 500, 504-506 (2003).

Respectfully submitted,

/s/ Terence H. Campbell_____          /s/ Lorinda M Youngcourt_____

Terence H. Campbell                            Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.            Youngcourt Law Office
33 North Dearboen Street, Suite 600            P.O. Box 206
Chicago, Illinois 60602                        Huron, Indiana 47437-0206
(312) 263-0345                                 (866) 274-3218

Counsel for Darryl Lamont Johnson

### Certificate of Service

Terence H. Campbell, an attorney, hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1. Darryl Johnson's Motion for Consideration of His *Brandy v. Maryland* and *Johnson v. Mississippi* claims and to amend his 28 U.S.C. §2255 Motion To Vacate Conviction And Sentence and Supplemental Memorandum of Law in Support

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.

/s/ Terence H. Campbell_____
Terence H. Campbell