# EXHIBIT C

STATE OF ARIZONA     )
                        ) ss
COUNTY OF PINAL     )

## AFFIDAVIT OF MARK A. BEZY

MARK BEZY, after being duly sworn, deposes and states under oath as follows:

1. I am over the age of 18, and I am competent to testify to the matters stated herein. I make the statements in this affidavit based upon my personal knowledge.

2. I worked for the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006, starting my career as a Correctional Officer and working my way up. During that time, I held a number of positions, including: (a) Warden of the Federal Correctional Complex at Terre Haute, Indiana from August, 2004 through October, 2006; (b) Warden of the Federal Correctional Institution in Elkton, Ohio from December, 2002 through August 2004; (c) Associate Warden at the United States Penitentiary in Leavenworth, Kansas, a high security facility, from July, 1999 through November, 2002; (d) Correctional Services Administrator of the North Central Regional Office of the BOP in Kansas City, Kansas from May, 1995 through July, 1999; and (e) Captain at the maximum security U.S. Penitentiary in Marion, Illinois ("USP Marion") from February, 1992 through May, 1995.

3. I received a number of awards during my service with the Bureau of Prisons, including being named a Member of the Senior Executive Services; being named Associate Warden of the Year for the North Central Region; and receiving a Director's Award in 1997.

4. While I was Warden at Terre Haute, I was responsible for the operation of, among others, the high security penitentiary and the Federal Death Row which is located at the FCC in Terre Haute. As Warden at Terre Haute, I oversaw 1,500 adult male high security offenders, as well as 37 inmates who were under death sentences. I managed several emergency situations that

occurred while I was Warden at Terre Haute, including a homicide, and numerous inmate assaults and emergency lockdowns.

5.      As Correctional Services Administrator for the North Central Regional Office of the BOP, my duties included providing consultation, advice and on-site assistance to 18 federal correctional institutions within the North Central region of the United States, which included at the time the states of Illinois, Wisconsin, Minnesota, Missouri, South Dakota, Kansas, and Colorado. I also oversaw the regional disciplinary transfer program for the North Central Region, and the Control Unit Hearing Program for the entire BOP.

6.      When I worked at USP Marion, that facility was the highest security prison in the United States.  USP Marion housed the "worst of the worst" of federal prisoners in its general population, and did so under highly secure and restrictive conditions of confinement, including, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.  While the hope of the BOP was that inmates sent to the general population at USP Marion would modify their behavior and return to a mainstream maximum security facility after two to three years, there were many inmates who were housed at USP Marion for many years, including some who were housed at USP Marion for years and then transferred directly to the Administrative Maximum ("Super-Max" or "ADX") facility in Florence, Colorado when that facility opened.  In addition, there were some inmates who were assigned directly to USP Marion from the sentencing court.  For example, John Gotti was an inmate sent directly to USP Marion from the sentencing court.

7.      While I worked there, USP Marion had units within the facility where the most dangerous and/or high security risk inmates were housed under even more strict conditions of

confinement than those imposed on USP Marion's general population. These even more strict conditions of confinement were imposed for as long as the BOP and/or the Warden deemed necessary to ensure security and to reduce or eliminate the inmate's risk of violence or future dangerousness. For example, USP Marion had a Control Unit within the prison where the most violent offenders, including particularly those who were deemed to pose a future danger of violence and/or criminal activity, were housed prior to the opening of the Super-Max ADX facility in Florence, Colorado. Typically, inmates could be assigned to the Control Unit at USP Marion for a specific amount of time, up to five years, based on their offense. The specific amount of time that an inmate was committed to the Control Unit was determined by the BOP. Moreover, if an inmate engaged in additional criminal or violent activity, they could be re-committed to the Control Unit for additional time beyond the five years. Inmates assigned to the Control Unit were housed in that Unit for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

8. The Super-Max ADX facility in Florence, Colorado opened in approximately 1994. I know that a number of inmates who, due to security and/or "future dangerousness" concerns, had been housed at Marion under very strict conditions of confinement for years prior to the opening of the ADX facility in Colorado, were then transferred to the ADX facility where they continued to be held under very strict conditions of confinement due to the same long-standing security and/or future danger concerns. Inmates who fit this description that I can recall at this time include Barry Mills, and T.D. Bingham, high ranking members of the Aryan Brotherhood gang, as well as leaders of other gangs and disruptive groups. In addition, shortly after ADX was opened, a number of other

-3-

violent inmates, including gang members, domestic terrorists, and organized crime figures, were also were transferred directly from USP Marion to the ADX facility. At ADX, both before and after 1998, these types of inmates were housed in conditions that were even more restrictive than the conditions had been at USP Marion in terms of their ability to interact or communicate with staff, other inmates, or persons outside the facility.

9. USP Marion also had what was called the "K-Unit" from at least the mid-1980's through the mid-1990's in which inmates who were a security risk were housed under extremely strict conditions of confinement. Inmates housed in the K-Unit due to security and/or future dangerousness concerns that I can recall included John Walker, a convicted spy, Ed Wilson, a former CIA operative, Jonathan Pollard, a convicted spy, and Christopher Boyce, a former CIA operative. These inmates were held in K-Unit because of security and/or future danger concerns, and were held there for as long as the BOP deemed it necessary to ensure security and that these individuals did not constitute a future danger. Inmates housed in K-Unit were housed in single cells and had no physical interaction with other inmates. All their mail was screened by BOP officers, all telephone calls had to be arranged through BOP officers who would bring the phone to the inmate in his cell. Those calls could only be made to people who were on an approved phone list, and all such calls were recorded and monitored by the BOP. All visitors to any inmates on K-Unit had to go through a somewhat intensive background screening process, and had to be pre-approved by the BOP before they could visit.

10. Also at the USP Marion, there is an inmate housing unit above the hospital called the "I-Up Unit". Similar to the K-Unit, in the I-Up Unit, all inmate mail was screened and/or copied, and all telephone calls were recorded and monitored. I know, for example, that gang leader David

Sahakian, whose crimes included ordering the murders of others, was held in the I-Up Unit during his pre-trial detention in order to protect others and ensure that he did not commit, order or direct any additional criminal activity. I believe this was after 1998, but inmate Sahakian was held under conditions of confinement that were available to the BOP at USP Marion in and prior to 1998.

11. The Super-Max facility in Florence, Colorado, was designed to hold the most dangerous inmates under extremely strict conditions of confinement, including with strict limitations on any communications with people outside the prison, whether by phone, mail, or visits, whenever deemed necessary by the BOP. It is my understanding that inmates were in 1998 and prior thereto (and have been from 1998 through the present) held at the ADX facility under strict conditions of confinement, including severe restrictions on their communications, whether by mail, phone or visitation, whenever that was deemed necessary by the BOP or the ADX Warden, and for as long as necessary to deal with the security or future danger concern raised by a particular inmate. I also know that some inmates have been assigned to the ADX facility directly from the sentencing court, when the circumstances warranted. The ADX facility also has areas within the prison that are referred to as "side pockets" or "special cells," which are used to hold prisoners who are deemed to be exceptionally dangerous. For example, inmate Luis Felipe was assigned to ADX directly from the sentencing court and inmate Felipe was held in one of these "side pockets" after being sentenced in 1997 due to concerns about security and/or his future dangerousness as set forth by the sentencing court. It is my belief that other inmates, too, were housed in these "side pockets" in order to address concerns about security and/or future dangerousness in and before 1998.

12. I know of some other examples of inmates who, in 1998 and prior, were housed under strict conditions of confinement specifically in order to reduce or eliminate their potential future

dangerousness. For example, Federal inmate Rodney Hamrick, a convicted bomber, was housed at USP Marion when I worked there. All of Hamrick's mail, including his legal mail, was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Inmate Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the assessed risk that he posed to be a future danger by ordering crimes or violence while incarcerated. Other inmates that I can recall who, in 1998 and prior, were housed under very strict conditions of confinement due to security concerns include Thomas Silverstein and Clayton Fountain. Again, these strict conditions of confinement were (and are, to my knowledge) imposed on high security inmates by the Bureau of Prisons for as long as the BOP deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness). In the years after 1998, there have been a great many more federal inmates housed under such strict conditions of confinement in order to address security and/or future dangerousness concerns.

13. All maximum security BOP facilities also have what is called a Special Housing Unit ("SHU") within the facility. SHU's are, in essence, a prison within a prison where security and conditions of confinement are more strict than those imposed on the general population within the maximum security facility generally. Both before and after 1998, inmates could be and were housed in a SHU for a variety of reasons, including because of concerns about security and/or an inmate's "future dangerousness."

14. Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and/or imposed both prior to 1998 and after, there is no doubt that the Bureau of Prisons had, at all times, the authority and ability to house inmates in the

most restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's "future dangerousness." This included, but was not limited to, housing inmates in conditions of confinement where they did not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or mail. The BOP could, and did, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deemed it necessary to do so for the security of either prison staff, other inmates, or the public. Under the BOP regulations, these are considered "privileges" and not "rights," so they could be taken away whenever it was deemed necessary. Moreover, these strict conditions of confinement could be, and were, imposed for as long as the BOP deemed it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

15. When strict conditions of confinement, such as being sent to the Control Unit or a SHU, or having mail, visiting and/or phone privileges taken away, were imposed on federal inmates for security reasons or concerns about violence, documentation of that action would normally be created and maintained in one or more places within the BOP. Information about both the restrictive conditions imposed and the reason(s) for imposing those conditions could be contained in one or more of the following: (a) in the DHO (Disciplinary Hearing Officer) record which is kept at the individual BOP facilities; (b) in the SIS (Special Investigation Supervisor) Files, which are kept at all high and maximum security BOP facilities; and (c) when the Warden imposed such conditions, s/he would write a memo which should be contained both in the inmate's file and the files of the BOP facility where the conditions were imposed. In order to ascertain all the inmates on whom these types of restrictive conditions were imposed based on security and/or "future dangerousness"

-7-

concerns, at a minimum, one would need to review the above files at each of the high and maximum security BOP facilities.

16.     While restrictive conditions of confinement, including taking away communication privileges such as mail, phone and correspondence, could be imposed for a variety of reasons, I know that, in 1998 and prior thereto, those conditions were imposed on a number of inmates specifically in order to address security and violence/future danger concerns, and that those strict conditions of confinement were maintained for as long as the BOP deemed necessary to address the security of violence concerns regarding the particular inmate. I do not know the names of all the inmates who had strict conditions of confinement imposed on them in order to address security and/or future dangerousness concerns, but believe that, in 1998 and prior, there were a number more such inmates beyond those that I have recalled and described in this affidavit.


Further, Affiant sayeth not.

_____
Mark A. Bezy

Subscribed and sworn to
before me this 21st day
of November, 2008.

_____
Notary Public

AARON HALLSTROM
Notary Public - Arizona
MARICOPA COUNTY
My Comm. Exp. 04-30-2011

-8-