UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,   )
     Respondent,   )
           )
 vs.          ) No.  02 C 6998
           ) Judge William J. Hibbler
DARRYL JOHNSON,    )
     Petitioner   )

**GOVERNMENT'S RESPONSE TO**
**PETITIONER'S SUPPLEMENTAL BRIEFS**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD,

United States Attorney for the Northern District of Illinois, responds to petitioner's

supplemental briefs as follows.

**I. Motion to Consider *Brady* and *Johnson* Claims**

Petitioner moves this Court to consider Judge Conlon's rejection of his claims that

the government suppressed material favorable evidence that could have been used to

impeach Warden Vanyur at the sentencing hearing, in violation of the rule of *Brady v.*

*Maryland*, 373 U.S. 83 (1963), and that Warden Vanyur's testimony created a false

impression regarding the means available to the BOP to curb petitioner's future

dangerousness, in violation of the Eighth Amendment as construed in *Johnson v.*

*Mississippi*, 486 U.S. 578 (1988).  The motion should be denied.

Before proceeding to the argument, an aside is advisable.  Petitioner asserts that this

Court need only consider, not reopen, these claims, because no judgment pursuant to

Fed.R.Civ.P. 58 was ever entered.  Motion at 4-5.  He is wrong.  A Rule 58 judgment

denying all of his claims with prejudice, except one, was entered on the docket on March 12, 2003. R21. The only claim that survived is the claim that petitioner is ineligible for the death penalty because he is mentally retarded within the meaning of *Atkins v. Virginia*, 536 U.S. 304 (2002). R20, 16-17. Judge Conlon found that the claim was not factually supported, but left the door open for petitioner to gather and present evidence. *Id.* Petitioner has done nothing to substantiate the *Atkins* claim in the seven years since, nor has he argued that Judge Conlon was wrong, and that his original submission was enough to prove his claim. This issue need not be reconsidered.

A partial final judgment, disposing of fewer than all of the claims raised by a single party, is appealable once it is entered. However, a partial judgment is final as to the claims it adjudicates "only if the court expressly determines that there is no just reason for delay." Fed.R.Civ.P. 54(b). Absent an express statement, there would have been no appellate jurisdiction had petitioner appealed the March 12, 2003 partial judgment. *Granack v. Continental Casualty Co.*, 977 F.2d 1143, 1144 (7th Cir. 1992). If a partial judgment is not final, it "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Rule 54(b). Judge Conlon's memorandum opinion and order does not contain an express statement that there is no just reason to delay an appeal from the claims she adjudicated. The partial judgment is therefore not a final judgment as to those claims.

### A.   Procedural Default

The *Brady* and *Johnson* claims could have been raised on direct appeal, but were not. They are therefore procedurally defaulted, as Judge Conlon held in her memorandum opinion and order (R20, 12-14), rejecting petitioner's only argument  that there was no procedural default. R19, 24-26. Petitioner does not address cause for the default. Instead, he contends the legal landscape has changed since Judge Conlon denied these claims, and he cites *Massaro v. United States*, 538 U.S. 500 (2003). Motion at 2. *Massaro* holds that ineffective assistance claims cannot be procedurally defaulted, and can always be raised in a motion under 28 U.S.C. § 2255. It says nothing about *Brady* claims, which the Seventh Circuit, after *Massaro*, still treats as procedurally defaulted if they could have been raised, but were not, prior to the collateral attack. *Lewis v. Sternes*, 390 F.3d 1019, 1028 (7th Cir. 2004). Petitioner cites no authority to the contrary, and his failure to deal with cause for the default is fatal to his motion to consider the merits.

Petitioner also says the factual landscape has changed, but finding additional evidence does not resuscitate a procedurally defaulted claim. Petitioner cites no authority that excuses a showing of cause on a procedurally defaulted claim because more evidence has been found.

### B.   The Evidence is not Impeaching

The additional evidence petitioner has presented in support of these claims is cumulative of what was available to him in the post-trial proceedings and on direct appeal.

The evidence petitioner says was suppressed is evidence of other inmates being subjected to long-term highly restrictive conditions of confinement. However, like the inmates referred to in the Initial Memorandum in Support of the § 2255 motion, the new names in the motion to reconsider fall into one of two categories: inmates who were punished for misdeeds in the BOP, in which case their examples do not impeach Warden Vanyur; and inmates who were ordered by district courts pursuant to 18 U.S.C. § 3582(d), to be housed in restrictive conditions immediately on entry into the BOP, in which case the information was public and so not suppressed.

### 1. Inmates Restricted Because of Conduct in the BOP

The original *Brady* claim was premised on the fact that the government did not disclose to the defense that the BOP was housing Luis Filipe, Thomas Silverstein, Clayton Fountain, Ramzi Yousef and Anthony Jones under strict conditions of confinement. R4, 49-50; R20, 12. (The Felipe, Yousef and Jones cases were argued in the post-trial motions stage of the criminal case, and on direct appeal, but the argument on appeal was that Warden Vanyur's testimony was false, not that the information was suppressed *United States v. Johnson*, 223 F.3d 665, 672 (7th Cir. 2000). Felipe was the only § 3582(d) sentence at the time of petitioner's sentencing hearing. Yousef and Jones came later.). Petitioner has added names to the list (Motion at 6-9), but this does not change the nature of the claim. Felipe, Silverstein, and Fountain, were all placed in restrictive conditions after committing serious crimes while in the BOP ordering murders to be committed outside of prison in

furtherance of a criminal enterprise (Felipe), and the murders of other inmates and guards (Silverstein and Fountain). These, and other inmates named in the Motion to Consider and the attached affidavit of Mark Bezy, who committed the acts that led to restrictions while in the BOP are not comparable to petitioner. The fact that an inmate who commits multiple murders in prison (Silverstein) is subjected to severe restrictions is not remarkable, and does not impeach Warden Vanyur.

The jury already knew, based on the testimony of petitioner's expert, Dr. Cunningham, that the BOP had at its disposal the control unit at ADX Florence. Tr2263-94. The control unit at Florence is reserved for the most dangerous inmates in the BOP, and the highly restrictive conditions imposed there were described at length. *Id*. They are similar to the conditions imposed on Silverstein, who is housed there. Warden Vanyur did not testify, as petitioner argues, that as a general matter the BOP lacks the ability to limit the human contact and communications privileges of dangerous inmates. See, *e.g.*, motion at 15-16. Indeed, Vanyur testified that such restrictions were placed on Aryan Brotherhood leader Barry Mills, who managed to circumvent them anyway. Tr2479-80.

Vanyur was not called to testify about what was possible or impossible within the BOP. He was called to testify about general policies and procedures, not specific instances. The upshot of Dr. Cunningham's testimony was that "conceivably"an inmate could be housed permanently under conditions such as the control unit at Florence, if that is what it took to mitigate future dangerousness. Tr2287. Vanyur testified that according to BOP

5

guidelines, initial designation of an inmate to an institution is done according to a point system taking into account the offense record and behavior while incarcerated (Tr.2470-71), and that based on his history and his crime, petitioner would probably be placed in a high security prison in the general population. Tr.2474-75. He further testified that 90% of the inmates in the general population at ADX Florence were transferred from other prisons, while the rest are direct commitments from the sentencing court. Tr.2466. Dr. Cunningham said that only 3.1% were direct commitments. Tr.2331. Vanyur testified that assignment to the control unit is for a determinate period, four to six years usually being the longest, and inmates are never placed there on permanent status. Tr.2485. The control unit at ADX Florence, like administrative segregation units at any prison, were never intended as places to permanently house inmates, and that is why the system is designed to cycle them through and gradually reduce the restrictions before returning them to other BOP facilities. Tr.2464-70. In this respect, Vanyur agreed with defendant's expert, Dr. Cunningham. Tr.2287. Dr. Cunningham did not testify that permanent placement in the ADX Florence control unit was an option within BOP guidelines. He only stated that the option was conceivable. Tr.2287.

The fact that inmate like Silverstein and Fountain, who committed murders while in the BOP, are subjected to extreme restrictions, does not impeach Vanyur's testimony that such restrictions were not likely to be placed on petitioner permanently at the outset of his sentence.

Petitioner recites a litany of things Vanyur testified about concerning conditions at

Florence which he contends is impeached by the new evidence (Motion at 10), but he is wrong. First, some of the points made by Vanyur pertain to conditions in the general population at Florence and elsewhere, not in control units. When Vanyur testified that inmates had unlimited phone and correspondence privileges (Tr2472, 2477), he was talking about general population inmates, not inmates confined to control units. The same is true of his testimony about inmate contacts with other inmates and staff. Tr2489-90. Further, the Seventh Circuit said that Vanyur's testimony, "though it did not track the regulations exactly, was not false. The impression that he conveyed of practice and legal policy was correct." *Johnson*, 223 F.3d at 672. The Court said this knowing about the Felipe, Silverstein, Fountain, Yousef and Jones cases, which were put on the record at the post-trial motions stage. Petitioner, paraphrasing, attributes to Vanyur the statement that "the BOP could not hold any prisoner indefinitely without telephone and correspondence privileges." Motion at 10. He contends this is impeached. What Vanyur actually said in the cited passage is that placement in administrative or disciplinary segregation, *i.e.*, a control unit, is "not permanent statuses for inmates." Tr2482-83. The Seventh Circuit noted that no law authorizes the BOP to commit a prisoner to a control unit for life, refusing to reassess risk periodically (*id*., at 672-673), as Dr. Cunningham said was conceivable. Tr2287. Bezy's affidavit says that restrictive conditions can be continued for a long time, not that they can be made permanent. Even Silverstein's case gets reviewed periodically (R61, Attachment at 15-16), and the restrictions on Felipe, imposed in 1997, were lifted by the time the direct

appeal was decided in 2000. *Johnson*, 223 F.3d at 673.

## 2. Inmates Ordered into Restrictive Conditions by Courts

Vanyur testified that inmates are sent to the ADX Florence control unit for conduct in other prisons, and federal regulations prohibit assignment to the control unit based solely on the offenses committed in the community. Tr.2484-85. *See* 28 C.F.R. § 541.40, *et seq.* (BOP criteria for referral to control units) and 28 C.F.R. 541.41(b)(7) (prohibition against control unit placement based solely on crime of conviction). He did not testify regarding regulations authorizing the Attorney General to direct the BOP Director to have an inmate housed in restrictive conditions straight from the sentencing court, 28 C.F.R. § 501.3 (special administrative measures SAMs), or a statute (§ 3582(d)), authorizing district courts to order restrictions on an inmate's communications privileges as part of the sentence. For this reason, the Solicitor General conceded at the *certiorari* stage on direct appeal the Vanyur's testimony was incomplete, and may have left the jury with the mistaken impression that no such authority existed. R4, Tab A at 13-14. This, however, does not give rise to a *Brady* claim because the government cannot be said to have suppressed a statute, a set of publicly published regulations, and public court cases applying them.

Inmates like Felipe, Yousef and Jones were ordered into restrictive conditions by the sentencing courts pursuant to the authority provided by § 3582(d), but, as is the case with SAMs, petitioner has no answer to the government's argument (R61, 3) that a statute, a set of regulations in the federal register, and public court cases cannot be said to have been

8

suppressed. This would open the door to a boundless doctrine requiring the government to do a defendant's research for him. If what is alleged to have been suppressed could have been found by the defendant himself exercising due diligence, then there has been no suppression. *United States v. Bland*, 517 F.3d 930, 934 (7th Cir. 2008) (*Brady* only applies to evidence defendant could not have discovered on his own using due diligence). Indeed, the government has conceded, in connection with the ineffective assistance claim, that counsel rendered deficient performance by failing to learn about SAMs and § 3582(d). The *Brady* claim is fundamentally at odds with the ineffective assistance claim. If the government "suppressed" this information, then counsel were not constitutionally obligated to learn of it on their own, and if they were, it was not suppressed.

### C.     The BOP Was Not Part of the Prosecution Team

Petitioner argues that knowledge of the information possessed by anyone in the Department of Justice, including all U.S. Attorneys offices and the BOP, is imputed to the prosecution team in any federal criminal case for purposes of applying the *Brady* rule. Motion at 5. He does not flesh out this argument. In his Initial Memorandum he made the same argument. R4, 53-54. The government responded that the cases he cited then, *United States v. Kattar*, 840 F.2d 118 (8th Cir. 1988), and *United States v. Barkett*, 530 F.2d 189 (1st Cir. 1976), were inapposite because they predate *Kyles v. Whitley*, 514 U.S. 419 (1995), in which the Supreme Court held that prosecutors have a duty to discover and disclose exculpatory information in the possession of the police department that investigated the

9

crime. *Id.* at 437. The Seventh Circuit, applying *Kyles*, has held that knowledge is imputed under the *Brady* rule if it lies within an agency that is "part of the team that investigated this case or participated in its prosecution." *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996). In his reply, petitioner simply cited more cases that predate *Kyles*. R19, 26-29. He did not cite or discuss *Morris*.

Neither the BOP, nor any U.S. Attorney's Office other than the one in the Northern District of Illinois, were part of the prosecution team that investigated this case, nor did they participate in the prosecution. Vanyur testified as rebuttal witnesses at the penalty phase. His testimony concerned BOP policies and procedures, inmate demographics, and security concerns and problems. He had no professional interest in the outcome, as would a member of the team that participated in the investigation or prosecution of the case. BOP has no investigative or prosecutive function outside disciplinary proceedings within the BOP.

### D.    The *Johnson* Claim

The Eighth Amendment prohibits the imposition of a death sentence based on constitutionally impermissible or inaccurate information. *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988). In that case, the jury found as an aggravating factor that the defendant had previously been convicted of a violent felony, based a certified copy of the judgment, when in fact the judgment had been reversed on appeal. *Id*., at 581-583.

As noted above, this claim is procedurally defaulted, and petitioner has never addressed procedural default. R20, 14. Further, this claim reprises the argument that

Vanyur's testimony was materially false and inaccurate, an argument the Seventh Circuit rejected on direct appeal. *Johnson*, 223 F.3d at 672 (Vanyur's testimony "was not false. The impression that he conveyed of practice and legal policy was correct."). The Seventh Circuit reached this conclusion knowing full well that information about SAMs, and § 3582(d), and the cases of Felipe, Yousef, Silverstein, Fountain, and Jones had not been presented to the jury. The additional information now presented by petitioner is cumulative of what the Court knew when it affirmed the judgment.

## II.     Ineffective Assistance of Counsel Claim

In the March 11, 2003 Memorandum Opinion and Order, Judge Conlon rejected petitioner's ineffective assistance claim on the merits, finding that petitioner was not prejudiced by his attorneys' failure to learn about the SAMs regulations and § 3582(d), and to cross-examine Vanyur with reference to these legal provisions and specific examples of their use. R20, 8-10. Judge Conlon did not address the performance prong of petitioner's claim, but the government has conceded deficient performance because counsel failed to discover a pertinent statute and set of published regulations.[1] At the time of petitioner's sentencing hearing, § 3582(d) had been invoked one time, in the Felipe case, and SAMs had

---

[1]Petitioner stretches the government's concession to cover what he says was "inaccurate" testimony by Vanyur. Supp. Br6, 12, 20, 32. The government has never said that Vanyur's testimony was "inaccurate," and, as argued below, Judge Conlon and the Seventh Circuit agree that it was not. The Solicitor General has admitted that in light of the SAMs regulations and § 3582(d), Vanyur's testimony was "incomplete" (R4, Ex A, 14), and that without information about SAMs and § 3582(d), "the jury may have held mistaken impression that no legal authority existed to limit petitioner's communications and contacts while in prison." *Id.*, 21.

been imposed in five terrorism cases and one espionage case.  Petitioner's Ex. F.

In finding no prejudice, Judge Conlon first noted Vanyur's testimony regarding the ways inmates confined in control units and subjected to communications restrictions circumvent those restrictions.  *Id*., 9.  She found that "the jury could have reasonably concluded there was no guarantee that the government could prevent Johnson from committing serious acts of violence in the future."  *Id*.  Second, Judge Conlon found that "the record provides strong support for the conclusion that Johnson would have been sentenced to death even if defense counsel impeached Vanyur with the BOP's policies and practices" because the jury found unanimously and beyond a reasonable doubt statutory and non-statutory aggravating factors other than future dangerousness, and did not unanimously find any mitigating factors using the preponderance standard.  *Id*., 10.

Judge Conlon also found that the claim was procedurally defaulted, and subject to the heightened cause-and-prejudice test of *United States v. Frady*, 456 U.S. 152, 170 (1982).  R20, 6-8.  A little more than a month later, the Supreme Court decided *Massaro v. United States*, 538 U.S. 500 (2003).  *Massaro* held that ineffective assistance claims are not procedurally defaulted, even if the record was complete at the time of direct appeal and the claim could have been raised then.  *Id*. at 504.  After *Massaro*, it is appropriate for this Court to reconsider the ruling on the ineffective assistance claim.

However, it is important to note that the ruling did not stand alone on the *Frady* prejudice standard.  Drawing on a quote from *Kyles v. Whitley*, 514 U.S. 419, 435 (1999),

Judge Conlon found that "Not one of the errors Johnson advances 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" R20, 8. *Kyles* was a case in the *Brady* line, but this is the same prejudice standard used in reviewing claims of ineffective assistance of counsel. Compare *Kyles* with *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Ultimately, Judge Conlon concluded that "Johnson fails to establish the cause and prejudice necessary to excuse his procedural default, as well as the required prejudice necessary to establish his ineffective assistance of counsel claim." R20, 10.

Petitioner's supplemental brief is strangely silent on the bases for Judge Conlon's ruling. He focuses on the perceived value of the cross-examination of Vanyur that would have taken place had counsel discovered the SAMs regulations, § 3582(d), and the cases in which they had been employed, but he overstates this value and ignores the significance of the other aggravating factors.

The jury in this case found, unanimously and beyond a reasonable doubt, two statutory aggravating factors with respect to both murders that had nothing to do with future dangerousness (there was substantial planning and premeditation, and the murder furthered a CCE that distributed drugs to persons under age 21), and a third statutory aggravating factor on the Banks murder (petitioner had a previous conviction for voluntary manslaughter using a firearm). It also found, unanimously and beyond a reasonable doubt, two non-statutory aggravating factors with respect to the Blunt Johnson murder that had nothing to

13

do with future dangerousness (petitioner ordered the murder to obstruct justice by preventing the victim from testifying, and the murder caused permanent harm to the victim's family). Using the preponderance standard, and given a list of 25 mitigating factors for each murder, the jury found not one of those factors unanimously. Only five mitigating factors were found by more than half the jury on the Blunt Johnson murder, and only one was found by more than half the jury on the Banks murder. 96CR379 R201-204.

Petitioner asserts that future dangerousness was the "central issue" at the sentencing hearing (Supp.Br1), and that it is "the single most critical issue for juries" in any capital case, but the jury here surely took the other aggravating factors seriously.

Petitioner's conduct prior to apprehension is itself justification for the sentence imposed, and although future dangerousness played an important role in the government's arguments at the sentencing hearing, the other aggravating factors on which we relied, and which the jury found, were not just a sideshow. As the government noted in closing argument (Tr2576), the jury heard detailed testimony about not only petitioner having ordered the murders of Charles Banks and Blunt Johnson, it also heard about several other acts of violence ordered by petitioner, including the murder of another board member, G Sharpe (Tr1944-56); a shooting in a McDonald's parking lot that left two people dead (Tr1881-87); the shooting of a truck driver who interrupted petitioner's security convoy at an intersection with four-way stop signs (Tr1891-93); and the murder of a rival gang member. Tr1888-90. The jury also heard testimony about several severe beatings ordered

14

by petitioner (Tr1793, 1812, 1897-1916), as well as the fact that he had been convicted of manslaughter in the shooting death of Jesse Simpson. Tr1847-53, 1975.

The government also emphasized that no conditions of confinement can make a prison totally secure. Even with contact and communications restrictions, inmates find ways to communicate. Tr2487 (describing how inmates in control units send notes through the plumbing system and signal through windows in sign language). The government's closing and rebuttal arguments emphasized that no prison can be made perfectly secure. Tr2593-94, 2598, 2647-48. In rebuttal, the government further argued that petitioner was facing a life sentence on the narcotics conspiracy and CCE convictions anyway, and that without a sentence of death, his decisions to have Blunt Johnson and Charles Banks murdered would be validated as good strategic moves — possibly ineffectual, but with no downside. Tr2625-48. Future dangerousness was not the only significant aggravating factor at this sentencing hearing.

Petitioner exaggerates the value of the cross-examination of Vanyur that might have been had counsel discovered the SAMs regulations and § 3582(d). His argument hinges on his assertion that the evidence now before this Court establishes that Vanyur's testimony was false because he told the jury that it was not possible under any circumstances to curtail his ability to communicate freely with the world. Supp. Br2-5, 9-10, 12-13. Petitioner is wrong. Vanyur's testimony was about the general policies and procedures of the BOP, and how inmates are typically housed. Petitioner's Ex A. The purpose of calling him was to

15

rebut the testimony of Dr. Cunningham that the government could conceivably put petitioner in the control unit at Florence and cut him off from the entire world for the rest of his life based solely on his convictions, whether or not he ever did anything wrong while in the BOP. Petitioner has been arguing since the post-trial stage that Vanyur's testimony was false in light of the SAMs regulations, § 3582(d), and the Felipe and Yousef examples, but Judge Conlon rejected that characterization, and the characterization that Vanyur testified it was impossible for the BOP to restrict petitioner's communication privileges under any circumstances. 96CR379 R270. The Seventh Circuit agreed. *Johnson*, 223 F.3d at 672 (Vanyur's testimony "was not false. The impression that he conveyed of practice and legal policy was correct.").

Bezy's affidavits do not change this. Boiled to its essence, what Bezy says is that any manner of restrictive conditions of confinement and limitations on communications ability can be, and have been, imposed on inmates, consistent with BOP policy, for as long as necessary to prevent an inmate from posing a danger to others   once the inmate has committed acts of violence and demonstrated an intent, while incarcerated, to pose a danger to others. Supp. Br12-20. Bezy does not say that an inmate who has done nothing wrong while in the BOP can, on the authority of the BOP, be put in a control unit and cut off from the entire world for the rest of his life. Nor does Bezy contradict Vanyur's testimony (Tr2470-75) that based on BOP policies and practices, the most likely housing option for petitioner, once he entered the BOP, would be the general population of a maximum security

16

prison.[2]

In his list of the seven reasons why counsel rendered ineffective assistance (Supp Br4-5), petitioner includes the failure to find Bezy, or someone else who would swear to what Bezy has sworn to in his affidavits, and to call that person to testify following Vanyur. Number 6 on his list is "did not satisfactorily investigate the conditions of confinement which were at the time both being imposed by federal courts and administered by the BOP." Supp. Br5. The government reads this as including both § 3582(d) and the Felipe case, and Bezy. However, counsel did find Dr. Cunningham, who testified at length about the control unit at Florence, and the types of restriction possible there. Further, petitioner does not state what steps counsel could have taken at the time to find someone like Bezy, given that Vanyur was a rebuttal witness. Bezy's three affidavits, Petitioner's Exs B, C, and D, are dated November 2008 and December 2009. Petitioner's conviction became final, and he began preparing for his collateral attack, in September 2001. It took him seven years to find Bezy, or to think of looking for someone like him. The government's concession of deficient performance extends only to the failure to learn of SAMs and § 3582(d). It does not extend to the alleged failure to locate a surrebuttal witness like Bezy in less than 24 hours. In any event, as argued above, Bezy does not impeach Vanyur because Vanyur never

---

[2]Vanyur testified that the BOP uses a point system to determine the most suitable placement of an incoming inmate, which takes into account, among other factors, the crimes of conviction and past behavior while incarcerated. Tr2470-71. Being a gang leader, or even a murderer, does not automatically qualify an inmate for maximum security. Tr2471-72. At the time Vanyur testified, there were 1,257 inmates in the BOP convicted of murder, and 520 of them were housed in less than maximum security settings. Tr2472-73.

17

said that communications restrictions were an impossibility.

Five of the other six points concern the failure to discover the SAMs regulations, and § 3582(d) and the Felipe case, the only case in which § 3582(d) had been invoked at the time of the sentencing hearing.[3] However, petitioner does not repeat all the arguments he made in his Initial Memorandum on SAMs, § 3582(d), and Felipe. His argument is primarily based on Bezy's affidavits. Supp. Br12-20. For the reasons stated above, Bezy's affidavits do not establish that Vanyur's testimony was false or inaccurate, and for the reasons stated here, and in the government's response to the § 2255 motion, and in Judge Conlon's Memorandum Opinion and Order of March 11, 2003, petitioner was not prejudiced by counsel's failure to discover and use at the sentencing hearing the SAMs regulations, § 3582(d), and the Felipe case.

Petitioner argues that had counsel known about SAMs, they would also have discovered that at the time of the sentencing hearing, SAMs had been imposed six times, in five terrorism cases and one espionage case. Supp. Br20-21. However, SAMs had not been imposed on gang leaders, many of who share the same characteristics that made petitioner dangerous, *i.e.*, leadership authority within a violent criminal organization.

Petitioner argues that in another federal capital case where the jury was informed

---

[3]The seventh point is frivolous. Petitioner says counsel were ineffective for failing to object when Vanyur testified about the law, because, as the Seventh Circuit pointed out, *Johnson*, 223 F.3d at 671, witnesses testify about facts, not law. Supp. Br5. There was no prejudice. The Seventh Circuit stated in the same paragraph that when a matter of law is relevant, the judge should instruct the jury. What came from Vanyur would not have been blocked had there been an objection. The substance would have come from the judge, and that would not have improved petitioner's position.

about SAMs and § 3582(d), the jury found the defendant to be a future danger, but that this fact was mitigated by the BOP's ability to prevent that danger. Supp. Br21-25. That defendant was sentenced to life, but each case and each jury is unique. The fact that in another case, another jury which heard evidence regarding SAMs and § 3582(d) sentenced defendant to life does not mean that there is a reasonable probability that the jury in this case, with the same information, would have done the same thing. As Judge Conlon found (R20, 8-10), there were significant aggravating factors found by the jury other than future dangerousness, significant evidence of petitioner's extremely violent past, and very little traction with the jury on 25 mitigating factors.

Petitioner cites other court decisions in which prejudicial ineffectiveness of counsel was found (Supp. Br25-32), but again, little can be gleaned from factually dissimilar cases. *Strickland* itself was a capital case, involving multiple murders, in which defense counsel presented no evidence in mitigation at all at the sentencing hearing, other than to point out that the defendant did not have a significant criminal history. 466 U.S. at 672-675. The Court let stand the death sentence, finding that counsel's conduct at and before the sentencing hearing was not unreasonable, and that even if it was, the defendant was not prejudiced. *Id*., at 698-699. The outcome of *Strickland* should tell this Court very little about what the outcome of this case should be.

Finally, petitioner argues that he has proven he is not a future danger. Supp. Br33-35. The government's position, consistent with Judge Conlon's ruling, is that the jury would

19

have found future dangerousness based on the evidence that even the most secure environment available in the BOP can be circumvented, and even if future dangerousness had not been found, or had been found to be mitigated, the outcome would have been the same. The other aggravating factors, the absence of any significant consensus on any mitigating factors, and the evidence of petitioner's life of violence, would have led the jury to impose the death sentence even it had rejected future dangerousness because of SAMs and § 3582(d).

### CONCLUSION

For all these reasons, and those stated in the government's other pleadings in this case, the government respectfully requests that this Court deny the § 2255 motion.

Respectfully Submitted,

PATRICK J. FITZGERALD,
United States Attorney

By:      /s/ David E. Bindi
DAVID E. BINDI
Assistant U.S. Attorney
219 South Dearborn Street
5th Floor
Chicago, Illinois 60604
(312) 886-7643

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA  )
            )
  vs.          ) No.  02 C 6998
            ) Judge William J. Hibbler
DARRYL JOHNSON     )

## **CERTIFICATE OF SERVICE**

David E. Bindi, an Assistant United States Attorney, hereby certifies that pursuant to Fed.R.Civ.P. 5(a), LR 5.5, and the General Order on electronic case filing, the Government's Response to Petitioner's Supplemental Briefs was served through the District Court's ECF system on the following counsel for the petitioner on May 10, 2010.

Terrence Campbell      Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.  P.O. Box 206
33 North Dearborn Street    Huron, Indiana 47437-0206
Suite 600
Chicago, Illinois 60602

Respectfully Submitted,

PATRICK J. FITZGERALD,
United States Attorney

By:  /s/ David E. Bindi
    DAVID E. BINDI
    Assistant U.S. Attorney
    219 South Dearborn Street
    5th Floor
    Chicago, Illinois 60604
    (312) 886-7643