IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff – Appellee – Respondent, | ) | |
| | ) | No. 02 C 6998 |
| vs. | ) | |
| | ) | Hon. William J. Hibbler |
| DARRYL JOHNSON | ) | |
| | ) | Death Sentence Imposed |
| Defendant – Appellant – Petitioner. | ) | |

**DARRYL JOHNSON'S CORRECTED FINAL REPLY IN SUPPORT OF HIS
*BRADY v. MARYLAND* AND *JOHNSON v. MISSISSIPPI* CLAIMS**

Defendant Darryl Johnson, by his attorneys, Terence H. Campbell of Cotsirilos, Tighe &

Streicker, and Lorinda Meier Youngcourt, respectfully submits this Reply in Support of His

*Brady v. Maryland* and *Johnson v. Mississippi* Claims.

**I.      Pursuant to Rule 54(b), This Court May, At Any Time Prior to Entry of a Final
Judgment, Reconsider The Prior Ruling on Johnson's *Brady* and *Johnson* Claims**

The government questions, in an "aside," whether this Court has the authority to revisit

the *Brady* and *Johnson* claims.  Govt. Resp. at 1 [Docket No. 99].  However, it is unclear where

the government comes out on this issue, as it then admits that "a partial final judgment is final as

to the claims it adjudicates "only if the court expressly determines that there is no just reason for

delay."  Govt. Resp. at 2, citing Fed.R.Civ.P. 54(b).  The government further acknowledges "[i]f

a partial judgment is not final, it 'may be revised at any time before the entry of a judgment

adjudicating all the claims and all the parties' rights and liabilities.'"  *Id*. (again citing Rule

54(b)).  The government concludes its aside by stating,

1

> Judge Conlon's memorandum opinion and order does not contain
> an express statement that there is no just reason to delay an appeal
> from the claims she adjudicated. ***The partial judgment is
> therefore not a final judgment as to those claims.***

Govt. Resp. at 2 [Docket No. 99] (emphasis added). Thus, it seems that the government agrees

with Petitioner that his *Brady* and *Johnson* claims **can** be revisited by this Court, pursuant to the

express language of Rule 54(b).

To the extent that the government's argument is that Petitioner's *Brady* and *Johnson*

claims are *not* reviewable by this Court because Judge Conlon previously denied those claims

(Govt. Resp. at 2 [Docket No.99]), that argument is without merit. Because that judgment was

not a "final judgment" on those claims – a fact acknowledged by the government – this Court

clearly retains the authority to revisit those claims.

Under the Federal Rules of Civil Procedure, judgment on a legal action involving

multiple claims is governed by Rule 54(b), which states as follows:

> **(b) Judgment on Multiple Claims of Involving Multiple Parties.** When an
> action presents more than one claim for relief – whether as a claim, counterclaim,
> or third-party claim – or when multiple parties are involved, the court may direct
> entry of a final judgment as to one or more, but fewer than all, claims or parties
> *only if the court expressly determines that there is no just reason for delay.*
> *Otherwise, any order or other decision, however designated, that adjudicates*
> *fewer than all the claims* or the rights and liabilities of fewer than all the parties
> *does not end the action as to any of the claims* or parties *and may be revised at*
> *any time before the entry of a judgment adjudicating all the claims* and all the
> parties' rights and liabilities.

Fed.R.Civ.P. 54(b) (emphasis added).

Under the plain text of Rule 54(b), a district court *may* direct entry of a final judgment as

to some, but not all, of the claims raised by an action "only if the court expressly determines that

there is no just reason for delay." Rule 54(b). The Seventh Circuit has therefore repeatedly

stated that in order for a partial judgment to be considered final, the judgment must literally

contain an express statement that states that there is "no just reason for delay" on those adjudicated claims:

> [A] partial final judgment under Rule 54(b) must contain "an express determination that there is no just reason for delay." The operation of Rule 54(b) is mechanical, and if the judgment does not contain an express statement, it is not final.

*Granack v. Continental Casualty Co.*, 977 F.2d 1143, 1144-1145 (7th Cir. 1992) (citation omitted).

In light of the mandates of both Rule 54(b) and the Seventh Circuit, it is clear that the judgment entered on March 11, 2003, by Judge Conlon was not a partial final judgment because it did not comply with the "express determination" requirement of Rule 54(b). The March 11, 2003 judgment stated:

> IT IS HEREBY ORDERED AND ADJUDGED that the § 2255 petition is denied with prejudice as to Grounds I-V and VII-VIII and without prejudice as to Ground VI.

Judgment [Docket No. 21]. *See The Construction Indus. Retirement Fund of Rockford v. Kasper Trucking, Inc.*, 10 F.3d 465, 468 (7th Cir. 1993) ("[W]e insist, in the language of the rule, that the determination and direction be 'express,' so that everyone knows exactly which mid-case decision are appealable and which are not.").

Moreover, if there were any doubt, the Seventh Circuit has counseled that it is particularly appropriate for a district court to exercise its inherent authority to reopen and reconsider a prior order when, as is the case here, there has been a significant change in the factual record since the initial submission of the issue to the court. *See Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) ("A further basis for a motion

to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court.") (citation omitted).

That condition has been met here. As this Court stated in its May 15, 2009 ruling on Mr. Johnson's motion for discovery:

> The affidavit of the BOP Warden [Mark A. Bezy] provides a factual foundation for Johnson's claim that the government expert's testimony misled the jury regarding the BOP's ability to confine him immediately and indefinitely while at the same time minimizing the risk that Johnson would continue to be a danger to society. Moreover, the government has produced some information regarding other inmates held in strict conditions of confinement, also which seems to contradict the testimony of the government's expert and which could lend credibility to the testimony Johnson's expert might provide.

Opinion & Order at 7 [Doc. No. 71].

For all these reasons, Petitioner's *Brady* and *Johnson* claims are properly before the Court, and consideration of them in light of the current law and facts of record is appropriate.

## II.     The Suppressed Evidence Is Impeaching Under *Brady*

The government argues that all of the evidence presented in these proceedings concerning Warden Vanyur's testimony and future dangerousness is merely cumulative to that available to Petitioner in his post-trial and direct appeal. Govt. Resp. at 3 [Docket No. 99]. The government goes on to claim that inmates held under precisely the type of strict conditions of confinement Johnson's trial counsel proposed, but which Vanyur claimed were not possible, do nothing to impeach Vanyur's testimony if the inmates so housed were put there for disciplinary reasons. Govt. Resp. at 4-7 [Docket No. 99]. The government further offers that inmates who were ordered to be housed under such strict conditions directly by the sentencing court were a matter

4

of public record, and therefore cannot be *Brady* material.  *Id.*  Each of these arguments is without

merit.

### A.      Inmates Held Under Highly Restrictive Conditions For Disciplinary Reasons

The government suggests that because BOP inmates Silverstein and Fountain committed

crimes while incarcerated, the fact that they were each placed into highly restrictive conditions of

confinement following their conviction and sentence would not impeach Vanyur's testimony.

The government is mistaken.  Both Vanyur and the government ignore the overall safety and

security policy reasons for such conditions of confinement.  Silverstein and Fountain were placed

in highly restrictive conditions of confinement, at least in part, to protect other inmates and staff

from their "future dangerousness." Tr. 2466.  Similarly, Felipe was so placed to protect others on

the street that he might have ordered killed.  In both situations, the additional punishment

suffered by the inmate, in the form of strict conditions of confinement, goes hand in hand with

the goal of insuring the safety of other inmates, staff, and the general public.  It is, in short, to

mitigate or eliminate the inmate's future dangerousness.

The BOP's ability to implement and maintain conditions of confinement necessary to

ensure the safety of others was the point of Dr. Cunningham's testimony, while the government's

goal with Vanyur's testimony and its arguments at the penalty phase was to convince the jury

that the BOP was simply powerless to do what was necessary to maintain the safety and security

of others, both inside and outside the prison walls.  Thus, the government repeatedly emphasized

Warden Vanyur's now discredited testimony in its closing arguments, stating, *inter alia*:

> [A]s long as the defendant has the ability to convey his orders to his followers,
> either on the street or in prison with him, nobody is safe; no witness, no witness's

family, anybody who stands in his way, they are not safe.  It doesn't matter where he is locked up.

* * *

[I]nmates with no outdates, those inmates that are facing life, like the defendant, they are the most dangerous, they have nothing to lose.  And that's why people like Mr. Johnson poses [sic] this threat.  Tr. 2593.

Mr. Johnson, no matter where he is, no matter when he is, is a future danger, he poses it to society as a whole, because through his own actions, his own words, and use your common sense, that no one is safe from the defendant. Tr. 2594.

[A]fter he is locked up when we as a society should feel safe, he is out there ordering more people killed. That is the type of evidence that is here. And that is why no one is safe as long as the defendant, Darryl Lamont Johnson, is allowed to live. Tr. 2598.

[T]he federal regulations do not allow somebody to go directly to the control unit. . . .The control unit at ADX Florence, you know he will not be going there.  Tr. 2646.

And is there any system, any prison system under the laws of our Nation that can stop the violence when your weapon is only one thing, your voice? That is the weapon that the defendant uses. Tr. 2647.

The evidence in this case shows beyond any reasonable doubt that there is a substantial danger that another witness or a witness's family member will be dead, because the defendant is a danger in prison. As long as he is alive he cannot be stopped from communicating, and that is all he needs. He does not need a weapon . . . all he needs is a telephone.

* * *

There is no innocent bystander who is safe as long as the defendant can communicate with the outside world.  No prison system can stop him.  Tr. 2647-48.

The government correctly points out that "no law authorizes the BOP to commit a prisoner to a control unit for life, refusing to reassess risk periodically."  (Govt. Resp. at 7 [Docket No. 99]).  However, the government uses this fact to shoot down an argument never advanced by Johnson.  Contrary to the government's suggestion, Darryl Johnson's argument has never been that these strict conditions can be ordered "permanently," never to be revisited no matter how much time passes, or regardless of what facts or conditions might change.  Rather,

6

Johnson's argument is now, and always has been, that the BOP has the power and the facilities to order and implement highly restrictive conditions of confinement "*for as long as the BOP deems it necessary* to ensure the security and safety or either prison staff other inmates, or the public (*i.e.* to reduce or eliminate the inmates' future dangerousness)." Pet. Mot. For Consideration of *Brady* and *Johnson* Claims, Ex. C, Bezy Affid. at ¶¶ 12, 14; Ex. D, Bezy Supp. Affid. at ¶¶ 18, 22, 25, 34 [Docket No. 88] (emphasis added). Johnson's longstanding position on this point has now been proven correct, and indisputably so, by former Warden Bezy's affidavits.

### B.  Warden Vanyur's Testimony About "Specific Instances" In the BOP

The government next says, Vanyur "was called to testify about general policies and procedures, not specific instances." Govt. Resp. at 5 [Docket No. 99]. This assertion both misstates Vanyur's testimony, and is largely irrelevant to the issue presented by Johnson.

First, Warden Vanyur *did* testify about any number of "specific instances" involving various gang-affiliated inmates with convictions similar to Johnson, as well as about "specific instances" of mayhem allegedly initiated by certain prisoners. He spoke specifically about the head of the Mexican mafia, the head of the Mexicana Mi gang, and the head of the Aryan Brotherhood, stating that they were not at ADX because they were gang leaders but because of "violent or escape-prone behavior" they engaged in after conviction and while incarcerated. Tr. 2468. Further, Vanyur offered a very fact-specific opinion that Darryl Johnson eventually – indeed in the near future -- would be housed in general population where "he would have open and frequent contact unrestrained with staff and inmates." Tr. 2475. He specifically opined that while in general population "it would be virtually impossible" to have Johnson "separate[d] from other Gangster Disciples." Tr. 2475. Vanyur testified that Johnson "would have a great deal of

open contact visiting with his family, probably in excess of twelve visits a month" and he "would have virtually unlimited phone access" and "unlimited correspondence privileges." Tr. 2477. "The only time we would limit his telephone access or his visiting privileges is if [he] actually tried to violate the rules in the process of a visit or in the process of a phone call." Tr. 2478 In short, Warden Vanyur told the jury in very specific terms that Darryl Johnson would have the unfettered ability to use his "weapon of choice," his voice, to communicate within the prison and to the outside world. All of this testimony was a means to drive home the points that "[No one] is safe as long as [Johnson] can communicate with the outside world. No prison system can stop him." Tr. At 2647-48.

According to Vanyur, the overwhelming majority of convicted murderers in the BOP were housed in "open population" where they have "constant contact, unrestrained with other staff and inmates" and "virtually unlimited access to telephone and a great deal of open visiting contact." Tr. 2472. This type of relatively liberal confinement, Vanyur said, is where Darryl Johnson was inevitably headed.

Vanyur testified that Johnson did "not fit the profile for a person to be assigned to the ADX." Tr. 2483, citing 28 CFR §541. Further, even if Johnson made his way to the ADX control unit, Vanyur testified he would "never [be] placed in a control unit on a permanent status" and even while he was there, he would have at least "one 15 minute phone call per month," "up to five visits per month," and "virtually unlimited correspondence with the outside world." Tr. 2485. Further, Vanyur testified that, given his convictions and history, Darryl Johnson almost certainly would be housed in general population facility, where "he would have open and frequent contact unrestrained with staff and inmates" and it would be a virtual certainty

8

that he would be housed with fellow Black Gangster Disciples. Tr. 2475. And even if he went to ADX temporarily, Vanyur said, Johnson would "have contact with staff on a frequent and daily basis. They're constantly coming in contact with staff," implying that great danger existed regardless of the facility, and the BOP had no precautions or procedures to deal with cases where dangerous conduct was truly a concern. Tr. 2485.

In sum, through Warden Vanyur, the government starkly, and under the authoritative auspices of a high-ranking officer of the BOP, told the jury that the only way to keep Johnson from ordering another murder was to put him to death. As the evidence now before this Court makes clear, that evidence and argument was, and is, false.

Based on Vanyur's testimony, both that quoted here and the more voluminous quotes in our prior pleadings, the government very pointedly argued to the jury that "the federal regulations do not allow somebody to go directly to the control unit. . . .The control unit at ADX Florence, you know he will not be going there." (Tr. 2646). "There is no innocent bystander who is safe as long as the defendant can communicate with the outside world. No prison system can stop him." Tr. 2647-48. In sum, the government argued, unless the jury ordered Johnson's execution, he would not be stopped ─ indeed, pursuant to BOP policies and practices, *could not* be stopped ─ from ordering further violence from prison. Again, this argument, the centerpiece of the government's closing argument, was based on grossly misleading, if not outright false, testimony by Warden Vanyur.

C. **Inmates Ordered By The Courts To Be Housed Under Highly Restrictive Conditions**

The government next argues that "the Solicitor General, conceded at the *certiorari* stage on direct appeal the [sic] Vanyur's testimony was incomplete and may have left the jury with the mistaken impression that no such authority existed" only because he did not testify about "regulations authorizing the Attorney General to direct the BOP Director to have an inmate housed in restrictive conditions straight from the sentencing court." Govt. Resp. at 8 [Docket No. 99]. Since these regulations and statute are publicly available, says the government, they cannot be the basis of a *Brady* claim.

Johnson has never asserted as the basis for his *Brady* claim that the government suppressed "a statute, a set of publicly published regulations, public court cases applying them," as the government suggests. Govt. Resp. at 8 [Docket No. 99]. To the extent this was not clear, let us be precise now. ***What was suppressed in this case that constitutes a Brady violation were the facts regarding the actual practices the BOP employed both before and at the time of Johnson's penalty phase hearing***. Johnson has now both discovered and proven that the BOP was routinely housing — for as long as the BOP deemed necessary — any number of inmates under the very types of strict conditions of confinement Vanyur testified were neither possible nor permissible to impose for any length of time, and the BOP was doing so fairly routinely at any number of different BOP facilities.

As set out in some detail in former Warden Bezy's two affidavits, the BOP was, prior to and at the time of Darryl Johnson's sentencing hearing, housing inmates in highly restrictive conditions of confinement whenever necessary and for as long as was deemed necessary by the

10

BOP. The government's argument reads as though we have discovered just one or two isolated instances of BOP prisoners being housed under strict conditions of confinement for as long as deemed necessary. Having obtained only a small amount of Court-ordered discovery from the government, we have identified no less than 24 specific inmates *by name*[1] who have been held under the very strict conditions of confinement that Warden Vanyur testified could not be imposed for any extended length of time. And, as former Warden Bezy's two affidavits makes clear, these situations are a normal part of the BOP's operations – and had been for a long time prior to Darryl Johnson's sentencing hearing.

Indeed, contrary to Vanyur's testimony that there were essentially no places to impose these highly restrictive conditions of confinement, the BOP was using "side pockets" or "special cells", and Special Housing Units ("SHU's") within every maximum security BOP facility, for inmates deemed exceptionally dangerous at the time of Johnson's trial. Pet. Mot. For Consideration of His *Brady* and *Johnson* Claims, Ex. C, Bezy Affid., at ¶11, 13; Ex. D, Bezy

---

[1] These inmates that we have been able to specifically identify include: (1) Barry Mills, (2) T.D. Bingham, (3) Jeff Fort, (4)John Walker, (5) Ed Wilson, (6) Jonathon Pollard, (7) Christopher Boyce, (8) David Sahakian, (9) Luis Felipe, (10) Rodney Hamrick, (11) Thomas Silverstein, (12) Clayton Fountain, (13) Theodore Kaczynski, (14) Manuel Noriega, (15) Eric Rudolph, (16) Ramzi Yousef, (17) Anthony Ayeni Jones, (18) Terry Nichols, (19) Hakeem Shaheed, (20) Tyrone Davis, (21) John Gotti, and (22) Yu Kikumura, (23) Norman Matthews, and (24) Adolph Reynoso. (*See* Ex. D. to Pet's Lead Brief, Bezy Supp. Affid. at ¶¶5, 23, 25, 26, 31, and 38). This number does not include the general knowledge about other, unnamed individuals who were housed under strict conditions of confinement, whether in a Control Unit, a SHU, the "K-Unit," the "I-Up Unit," or any other "side-pocket" or other detention unit where these types of strict conditions of confinement are "***routinely imposed*** on high-risk inmates by the BOP for as long as it deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness)." *Id.* at ¶34 (emphasis added); *see id.* at ¶¶23-33, 37-39.

Supp. Affid. at ¶¶23, 30-32 [Docket No. 88]. Other individuals deemed to be dangerous or a security threat were housed in "Control Units," sometimes for up to five years, based on their offense. Pet. Mot. For Consideration of His *Brady* and *Johnson* Claims, Ex. C, Bezy Affid. at ¶7 [Docket No. 88]. At the BOP's Marion facility, there were also housing units known as the "K-Unit" and the "I-Up Unit" where inmates who were deemed to be a future danger were housed under strict conditions of confinement. Pet. Mot. For Consideration of His *Brady* and *Johnson* Claims, Ex. C, Bezy Affid. at ¶9-10 [Docket No. 88].

The knowledge about, and documentary evidence of, these actions by the BOP were contained in confidential records maintained within the exclusive possession of the BOP, and thus were not discoverable by the defense thru any means other disclosure by the government. *See* Pet. Mot. For Consideration of His *Brady* and *Johnson* Claims, Ex. C, Bezy Affid., at ¶15 [Docket No. 88](records kept at individual BOP facilities and in inmate files). And there can be no doubt, in light of the testimony by Warden Vanyur and the closing arguments of government counsel, that this information was "favorable to the defense" and/or "impeachment evidence" that should have been turned over to the defense. As summarized in Johnson's lead brief,

> Mr. Johnson has demonstrated that the government was in possession of significant impeachment evidence that it failed to turn over to the defense. This includes the information which the government has belatedly disclosed regarding other inmates held in strict conditions of confinement, as well as all the extensive information contained in Warden Bezy's two affidavits regarding the policies and procedures in place at the time of Mr. Johnson's trial that were routinely used to neutralize the risk of future dangerousness posed by certain inmates, and a large and growing number of inmates who were, at the time of Mr. Johnson's trial, being held under those conditions.

Pet. Mot. For Consideration of His *Brady* and *Johnson* Claims at 3 [Docket No. 88].

12

In sum, in light of the information contained in the two Bezy affidavits, as well as the information turned over by the government pursuant to this Court's prior order, Johnson presents a textbook *Brady* claim. Johnson's *Brady* claim is premised not on "a statute, a set of publicly published regulations, and public court cases applying them" (Govt. Resp. at 8), but on the *factual matters* that have now come to light about the ***actual practices of the BOP*** and the numerous instances we have since discovered in which the BOP was housing inmates, for as long as deemed necessary, under exactly the type of strict conditions of confinement that Warden Vanyur testified it would not, could not, and did not impose. *See* Pet. Mot. For Consideration of His *Brady* and *Johnson* Claims [Docket No. 88]. Relief pursuant to *Brady v. Maryland* and its progeny is clearly warranted under these facts.

## III.    Under the Facts of This Case, Information Known To Vanyur and the BOP Falls Under *Brady*, Irrespective of the Good Faith of The Prosecutors

The government asserts that the *Kyles v. Whitley*, 514 U.S.419 (1995) holds that prosecutors only "have a duty to discover and disclose exculpatory information in the possession of the police department that investigated the crime." Govt. Resp. at 9-10 [Docket No. 88]. Because neither Warden Vanyur nor the BOP was a member of the "prosecution team that investigated" Johnson's case, they had no professional interest in the outcome, and therefore, argues the government, the prosecution was not required to disclose all of the evidence which contradicted and impeached Vanyur's testimony. Govt. Resp. at 10 [Docket No. 88]. The government's argument is contrary to *Kyles*.

In *Kyles*, the Supreme Court reiterated "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is

13

material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 514 U.S. at 432, quoting, *Brady v. Maryland*, 408 U.S. 786, 794-795 (1972). In discussing materiality, the Court stated that an "individual prosecutor has a duty to learn of any favorable evidence known to the ***others acting on the government's behalf in the case***, including the police." *Kyles*, 514 U.S. at 437 (emphasis added).

Here, there can be no doubt that Warden Vanyur, a high-ranking official of the BOP, was someone "acting on the government's behalf in the case." In Johnson's case, Vanyur and the BOP were assisting the government in attempting to secure a sentence of death. His assistance included meeting with prosecutors (Tr. 2495) gathering statistics concerning the prison population (Tr. 2466, 2469, 2472-74) reviewing Johnson's prison records (Tr. 2495, 2498), and listening to the testimony of Dr. Cunningham and commenting on the same (Tr. 2467-68, 2470, 2482, 2484, 2487, 2491). He works for an arm of the Department of Justice (*i.e.*, the BOP), just as the prosecutors did. And quite importantly, he acted as a DOJ-employed expert witness for the prosecution at Johnson's penalty phase trial. While the BOP may not have investigated the underlying crimes, it clearly participated in the prosecution of the death sentence against Johnson and was certainly "acting on the government's behalf in [Johnson's] case." *Kyles*, 514 U.S. at 437. The government's *post-facto* attempt to distance itself from Warden Vanyur rings hollow in light of the facts.

The government argues that the Seventh Circuit has further restricted responsibility of prosecutors to evidence or information in the hands of members of the prosecution team such as DEA and police, citing to *United State v. Morris*, 80 F.3d 1151, 1169 (1996). Govt. Resp. at 9-10 [Docket No. 99]. In *Morris*, the defendant in post-trial motions and on direct appeal argued

14

that the government suppressed material exculpatory information in the hands of the Office of Thrift Supervision, the Securities and Exchange Commission, and the Internal Revenue Service in violation of *Brady*. The district court found that the "defendants had failed to show that the government's prosecution team had been aware of the existence of the allegedly suppressed documents." *Id.* at 1168. According to the district court findings, there were over 700 boxes of documents which "were generally open and available to litigants and their counsel in this criminal prosecution" and "that defendants had been given the same opportunity as the government to discover the identified documents." *Id.* at 1168, n13. Further, the court found that the defendants "knew as much about the OTS, SEC, and IRS investigations as the prosecution team itself did" because they were part of separate litigation brought by those agencies. *Id.* at 1170.

The relevant facts of the instant case bear no resemblance to *Morris*. Here, unlike *Morris*, Vanyur was clearly "part of prosecution team" and certainly was "acting on the government's behalf." Here, unlike *Morris*, the information claimed to have been suppressed was not "generally open and available to [Johnson] and [his] counsel in this criminal prosecution." Here, unlike *Morris*, Johnson had no opportunity to "discover the identified documents" because the suppressed information was in the sole custody and knowledge of Warden Vanyur's BOP. Under these facts, to hold, as the government argues, that the government was not responsible for disclosing evidence that (a) was plainly and particularly within the knowledge of the BOP and Warden Vanyur, and (b) directly contradicted (or at least severely impeached) Warden Vanyur's testimony would run afoul of *Kyles*.

To find that the government was not responsible for disclosing evidence plainly in the hands of the BOP that directly contradicted Warden Vanyur's expert testimony given on behalf of the prosecution would fly in the face of *Kyles.* *Kyles* charges prosecutors with "a duty to learn of ***any favorable evidence*** known to ***the others acting on the government's behalf in the case***, including the police." *Kyles*, 514 U.S. at 437 (emphasis added). The government's argument that its prosecutors were exempt from any duty to disclose evidence that directly contradicted Vanyur's testimony is merely another attempt to direct this Court's attention away from the merits of Johnson's claim.

## IV.     There Is No Procedural Default

Finally, the government's argument that Johnson's *Brady* claim is procedurally defaulted is without merit. Pointing to Judge Conlon's memorandum opinion and order, the government asserts that because Johnson did not raise his *Brady* claim on direct appeal, it is procedurally defaulted. Govt. Resp. at 3 [Docket No. 99]. Further the government misconstrues Johnson's argument, claiming that Johnson merely argues that "the legal landscape has changed." Govt. Resp. at 3 [Docket No. 99].

The most significant import of the change in the legal landscape brought about by *Massaro v. United States*, 538 U.S. 500 (2003) is that this Court ordered certain discovery for Johnson. That discovery led to Johnson uncovering extensive facts in support of his *Brady* claim, including those directly disclosed by the government in response to the discovery ordered in this case and those discussed in the affidavit of former BOP Warden Mark A. Bezy. Pet. Mot. For Consideration of *Brady* and *Johnson* Claims, Exs. C and D [Docket No. 88]. As noted by

16

this Court, Mr. Bezy's affidavit "provides a factual foundation for Johnson's claim that the government expert's testimony misled the jury regarding the BOP's ability to confine him immediately and indefinitely while at the same time minimizing the risk that Johnson would continue to be a danger to society" and "outlines a pattern of evidence that appears to contradict much of what the government's expert testified to." Opinion & Order at 6-7 [Docket No. 71]. These facts were not discovered prior to direct appeal, nor could they have been. As stated in *Strickler v. Greene*, 527 U.S. 263, 287 (1999), "In the context of a *Brady* claim, a defendant cannot conduct the "reasonable and diligent investigation" mandated by *McCleskey*[1] *[v. Zant]* to preclude a finding of procedural default when the evidence is in the hands of the State."

The government cites *Lewis v. Sternes*, 390 F.3d 1019, 1028 (7th Cir. 2004) for the proposition that *Massaro*, "says nothing about *Brady* claims, which the Seventh Circuit . . . still treats as procedurally defaulted if they could have been raised, but were not, prior to collateral attack." Govt. Resp. at 3 [Docket No. 99]. In short the court held that Lewis' *Brady* claim had been defaulted when it was not raised in the appeal of the denial of his state post-conviction petition. *Id.* at 1028. *Lewis* is decidedly unenlightening given the starkly different facts presented regarding Darryl Johnson's *Brady* claim.

Johnson's trial record was not developed for the purpose of litigating either his ineffectiveness claim or his *Brady* claim. The record on direct appeal was both incomplete and inadequate for the purpose of the appellate court determining whether and what evidence was suppressed by Vanyur and the BOP and its prejudicial effect. It has only been through the discovery **during this Sec. 2255 proceeding** of the names of additional inmates who were housed

---

[1] *McCleskey v. Zant*, 499 U.S. 467 (1996).

17

under highly restrictive conditions of confinement by the BOP at the time of Johnson's trial and the evidence supplied in Mr. Bezy's affidavits that Petitioner has been able to acquire the evidence to fully establish his *Brady* claim. It would be a strange result, indeed, if one were found to have procedurally defaulted a *Brady* claim prior to coming into possession of the information that establishes the *Brady* violation. There was no procedural default here, and the government's attempt to avoid the merits of Johnson's *Brady* claim should be rejected.

## V. Petitioner's *Johnson v. Mississippi* Claim

The government acknowledges, as it must, that the 8th Amendment prohibits "imposition of a death sentence based on constitutionally impermissible or inaccurate information." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988). Here, the government secured Johnson's death sentence in no small part through use of the misleading, inaccurate, and prejudicial testimony of Warden Vanyur. The government devotes little of its response to addressing the merits of this claim, merely stating in a single paragraph that the claim is procedurally defaulted and is only a reprisal of the "argument that Vanyur's testimony was materially false and inaccurate," claim rejected by the Seventh Circuit in Johnson's direct appeal. Govt. Resp. at 10-11 [Docket No. 99]. These arguments are without merit.

As set out above, Johnson's trial record was not developed for the purpose of litigating his ineffectiveness claim or his *Brady* claim. The same holds true for his *Johnson v. Mississippi* claim. As trial counsel was admittedly unprepared for Warden Vanyur's rebuttal testimony and likely unaware that it was inaccurate if not out and out false, the record before the appellate court was "incomplete" and "inadequate" to allow the appellate court to review the claim. It has only

been through the discovery of the actual practices of the BOP, the ever-growing number of names of additional inmates who were housed under highly restrictive conditions of confinement by the BOP at the time of Johnson's trial, and the evidence supplied in Mr. Bezy's affidavits that this issue has been able to be sufficiently factually developed.

Based upon the facts presently before the Court, there can be no doubt that Johnson's jury was misinformed by Vanyur of both the BOP's and the court's ability to impose individualized highly restrictive conditions of confinement for as long as the BOP deemed necessary in order to eliminate any risk of future danger to prison staff, other inmates, witnesses, witnesses' families, innocent bystanders, society as a whole, or anyone else mentioned by the government in its closing argument. Tr. 2593, 2594, 2598, 2647-48. This is the essence of a claim under *Johnson v. Mississippi*, and relief, therefore, is warranted.

## CONCLUSION

For all the reasons set forth above, as well as those contained in our prior pleadings with the Court, Petitioner Darryl Lamont Johnson respectfully requests that the Court grant Johnson's §2255 petition based on his *Brady v. Maryland* and *Johnson v. Mississippi* claims (as well as on the other grounds raised in his Petition), vacate his sentence, order a new sentencing hearing, and grant whatever other relief it deems just and proper.

Respectfully submitted,


/s/ Terence H. Campbell_____                    /s/ Lorinda M Youngcourt_____

Terence H. Campbell                                       Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.                       Youngcourt Law Office

19

33 North Dearborn Street, Suite 600                    P.O. Box 206
Chicago, Illinois 60602                                Huron, Indiana 47437-0206
(312) 263-0345                                         (866) 274-3218

*Counsel for Darryl Lamont Johnson*

### Certificate of Service

Terence H. Campbell, an attorney, hereby certifies that in accordance with Fed.R.Crim.P.

49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1. Darryl Johnson's Final Reply In Support of His *Brandy v. Maryland* and *Johnson v. Mississippi* Claims

was served pursuant to the District Court's ECF system as to ECF filers, including the United

States Attorney's Office.

/s/ Terence H. Campbell
Terence H. Campbell